UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
------------------------------------------------------------ x

ROY STEWART MOORE and KAYLA MOORE,    :
:
Plaintiffs,    :
:    Index No. 19 Civ. 4977 (ALC)
:
- against -    :    **ORAL ARGUMENT REQUESTED**
:
SACHA NOAM BARON COHEN, SHOWTIME    :
NETWORKS, INC., AND CBS CORPORATION,    :
:
Defendants.    :
------------------------------------------------------------ x


### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Elizabeth A. McNamara
Rachel F. Strom
Eric J. Feder
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York  10020
(212) 489-8230
(212) 489-8340
lizmcnamara@dwt.com
rachelstrom@dwt.com
ericfeder@dwt.com

Of Counsel:
Russell Smith, Esq.
Jeff Holmes, Esq.

SMITHDEHN LLP
2500 Broadway
Building F, Suite F-125
Santa Monica, California  90404
(310) 396-9045
rsmith@smithdehn.com
jholmes@smithdehn.com

*Attorneys for Defendants Sacha Noam Baron Cohen,
Showtime Networks Inc. and CBS Corporation*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND ............................................................................................3

    A.    The Parties ...........................................................................................3

    B.    *Who Is America?* ................................................................................4

    C.    Judge Moore's Agreement to Participate in *Who Is America?* ..............................5

    D.    The Episode of the Program Featuring Judge Moore ...............................................7

    E.    Transfer of this Action from the District of Columbia .............................................8

ARGUMENT .....................................................................................................................9

I.    PLAINTIFFS' CLAIMS ARE BARRED BY THE CONSENT AGREEMENT ..............9

    A.    New York Courts Consistently Enforce Waivers In Appearance Agreements ......9

    B.    Plaintiffs' Arguments to Avoid Enforcement of the Waiver Are Meritless ..........11

        1.    Plaintiffs Cannot Claim Fraudulent Inducement When the Agreement Disclaims Reliance on the Allegedly Fraudulent Representations ................................................................................. 11

        2.    The Consent Agreement's Waiver of Specific Claims Is Enforceable ........................................................................................ 14

        3.    A Handwritten Notation on a Different Clause of the Agreement Has No Effect on the Explicit Waiver of the Claims Asserted Here ........ 15

        4.    Defendants Can Enforce the Consent Agreement .................................... 16

II.    THE CLAIMS INDEPENDENTLY FAIL AS A MATTER OF LAW ...........................18

    A.    Judge Moore Cannot Base A Defamation Claim on Protected Satire ..................18

    B.    Plaintiffs' Emotional Distress Claim Is Barred .....................................................22

    C.    Plaintiffs Cannot Plead a Fraud Claim...................................................................24

CONCLUSION...................................................................................................................255

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*2 Broadway LLC v. Credit Suisse First Boston Mortg. Capital, LLC,*
    No. 00 Civ. 5773, 2001 WL 410074 (S.D.N.Y. Apr. 23, 2001) .......................................6, 16

*Bihag v. A&E Television Networks, LLC,*
    669 F. App'x 17 (2d Cir. 2016) ...............................................................................................10

*Biro v. Condé Nast,*
    807 F.3d 541 (2d Cir. 2015) .....................................................................................................22

*Biro v. Condé Nast,*
    883 F. Supp. 2d 441 (S.D.N.Y. 2012) ..........................................................................7, 19, 22

*Celle v. Filipino Reporter Enters. Inc.,*
    209 F.3d 163 (2d Cir. 2000) .....................................................................................................19

*Chaiken v. VV Publ'g Corp.,*
    No. 91 Civ. 2102, 1992 WL 168282 (S.D.N.Y. June 30, 1992) ...............................................24

*Chao v. Mt. Sinai Hosp.,*
    476 F. App'x 892 (2d Cir. 2012) .............................................................................................22

*Chevron Corp. v. Donziger,*
    No. 11 Civ. 0691, 2013 WL 3879702 (S.D.N.Y. July 29, 2013) .............................................25

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio,*
    364 F. Supp. 3d 253 (S.D.N.Y. 2019) .......................................................................................5

*Cohen v. Cowles Media Co.,*
    501 U.S. 663 (1991) .................................................................................................................25

*Dongguk Univ. v. Yale Univ.,*
    734 F.3d 113 (2d Cir. 2013) .....................................................................................................23

*Farah v. Esquire Magazine,*
    736 F.3d 528 (D.C. Cir. 2013) .....................................................................................4, 18, 21

*Flamm v. Am. Ass'n of Univ. Women,*
    201 F.3d 144 (2d Cir. 2000) .....................................................................................................19

*Garber v. Legg Mason, Inc.,*
    347 F. App'x 665 (2d Cir. 2009) ...............................................................................................4

*Goldberg v. Mallinckrodt, Inc.*,
  792 F.2d 305 (2d Cir. 1986)...................................................................................25

*Gonzalez v. Bratton*,
  48 F. App'x 363 (2d Cir. 2002) .............................................................................22

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988)........................................................................... *passim*

*Idema v. Wager*,
  120 F. Supp. 2d 361 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002).................22, 23

*Klein v. Frenkel*,
  No. 14-cv-2719, 2015 WL 13721693 (E.D.N.Y. Feb. 19, 2015) .............................................9

*La Luna Enters., Inc. v. CBS Corp.*,
  74 F. Supp. 2d 384 (S.D.N.Y. 1999)......................................................................25

*Lan Sang v. Ming Hai*,
  951 F. Supp. 2d 504 (S.D.N.Y. 2013).....................................................................22

*LaRoss Partners, LLC v. Contact 911 Inc.*,
  874 F. Supp. 2d 147 (E.D.N.Y. 2012) ...................................................................18

*LaSalle Bank NA v. Nomura Asset Capital Corp.*,
  424 F.3d 195 (2d Cir. 2005)................................................................................16

*Levin v. McPhee*,
  119 F.3d 189 (2d Cir. 1997)................................................................................19

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
  838 F.2d 1287 (D.C. Cir. 1988) .............................................................................22

*Mateo v. Carinha*,
  No. 14 CV 9020, 2019 WL 1409727 (S.D.N.Y. Mar. 28, 2019)...............................................17

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990)....................................................................................19, 20

*Moldea v. N.Y. Times Co.*,
  22 F.3d 310 (D.C. Cir. 1994) .............................................................................20

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
  102 F.3d 660 (2d Cir. 1996)................................................................................17

*Novak v. Tucows, Inc.*,
  No. 06 CV 1909, 2007 WL 922306 (E.D.N.Y. Mar. 26, 2007), *aff'd*, 330 F.
  App'x 204 (2d Cir. 2009)..................................................................................18

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
  53 F. Supp. 3d 705 (S.D.N.Y. 2014)...................................................................22

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)...........................................................................6

*Routh v. Univ. of Rochester*,
  981 F. Supp. 2d 184 (W.D.N.Y. 2013) .................................................................24

*Russul Corp. v. Zim Am. Integrated Shipping Servs. Co.*,
  No. 06 Civ. 0037, 2009 WL 3247141 (S.D.N.Y. Oct. 5, 2009) ...........................................16

*Semper v. N.Y. Methodist Hosp.*,
  786 F. Supp. 2d 566 (E.D.N.Y. 2011) .................................................................23

*Shapiro v. NFGTV, Inc.*,
  9152, 2018 WL 2127806 (S.D.N.Y. Feb. 9, 2018).................................................10, 12

*SongByrd, Inc. v. Estate of Grossman*,
  206 F.3d 172 (2d Cir. 2000)..........................................................................16

*Spithogianis v. Haj-Darwish*,
  No. 07 Civ. 4609, 2008 WL 82188 (S.D.N.Y. Jan. 7, 2008)..............................................24

*Sylvester v. City of N.Y.*,
  385 F. Supp. 2d 431 (S.D.N.Y. 2005)..................................................................24

*W. Tsusho Co. v. Prescott Bush & Co.*,
  No. 92 Civ. 3378, 1993 WL 228072 (S.D.N.Y. June 23, 1993)............................................25

**State Cases**

*Bement v. N.Y.P. Holdings, Inc.*,
  307 A.D.2d 86 (1st Dep't 2003) ......................................................................24

*Brian v. Richardson*,
  87 N.Y.2d 46 (1995) .................................................................................18

*Danann Realty Corp. v. Harris*,
  5 N.Y.2d 317 (1959) .................................................................................12

*Dillon v. City of N.Y.*,
  261 A.D.2d 34 (1st Dep't 1999) ......................................................................19

*Farmers Ins. Exch. v. Morris*,
  228 So. 3d 971 (Ala. 2016) (Moore, C.J., dissenting) ................................................14

*Finebaum v. Coulter*,
  854 So. 2d 1120 (Ala. 2003) ......................................................................21, 22

iv

*Frank v. NBC*,
  119 A.D.2d 252 (2d Dep't 1986) ............................................................................20

*Gelbman v. Valleycrest Prod., Ltd.*,
  189 Misc. 2d 403 (Sup. Ct. N.Y. Cty. 2001) .........................................................11

*Gross v. N.Y. Times Co.*,
  82 N.Y.2d 146 (1993) ............................................................................................19

*Howell v. N.Y. Post Co.*,
  81 N.Y.2d 115 (1993) .......................................................................................23, 24

*Klapper v. Graziano*,
  129 A.D.3d 674 (2d Dep't 2015), *leave to appeal denied*, 30 N.Y.3d 988
  (2017) .............................................................................................................10, 11, 17

*Nizewitz v. Viacom Int'l, Inc.*,
  No. 158209-14, 2015 WL 3401196 (Sup. Ct. N.Y. Cty. Mar. 4, 2015) ..................11

*P&B Capital Grp., LLC v. RAB Performance Recoveries, LLC*,
  128 A.D.3d 1534 (4th Dep't 2015) .........................................................................15

*Psenicska v. Twentieth Century Fox Film Corp.*,
  Nos. 07 Civ. 10972, *et al.*, 2008 WL 4185752 (S.D.N.Y. Sept. 3, 2008), *aff'd*,
  409 F. App'x 368 (2d Cir. 2009 ........................................................................ *passim*

*Shields v. Gross*,
  58 N.Y.2d 338 (1983) ..............................................................................................9

*Shoemaker v. Discovery Commc'ns, LLC*,
  57 Misc. 3d 1203(A), 66 N.Y.S.3d 655 (Sup. Ct. N.Y. Cty. 2017).................10, 11

*Weil v. Johnson*,
  No. 119431/02, 2002 WL 31972157 (Sup. Ct. N.Y. Cty. Sept. 27, 2002) ..............11

**Federal Statutes**

28 U.S.C. § 1404(a) .........................................................................................................8

**Other Authorities**

Connor Sheets, *Roy Moore's wife, Kayla Moore, loses bid for state Republican
  Executive Committee*, AL.com (June 5, 2018), http://s.al.com/y7j0TPi...................4

Jonathan Allen, *Alabama's women wrote the verdict on Roy Moore*, NBC News
  (Dec. 13, 2017), https://nbcnews.to/2nWTpf9..........................................................4

Stephanie McCrummen, et al., *Woman says Roy Moore initiated sexual encounter when she was 14, he was 32*, Wash. Post (Nov. 9, 2017), http://wapo.st/2zvHx84 ........................................................................................... 4

Stephanie McCrummen, *Woman shares new evidence of relationship with Roy Moore when she was 17*, Wash. Post (Dec. 4, 2017), http://wapo.st/2AoUTDq ...................... 4

Defendants Sacha Baron Cohen ("Cohen"), Showtime Networks Inc. ("SNI"), and CBS Corporation ("CBS") (collectively, "Defendants") submit this memorandum of law in support of their motion to dismiss the Complaint ("Compl.") in this case with prejudice.

## PRELIMINARY STATEMENT

In this lawsuit, a prominent public official—former Chief Justice of the Alabama Supreme Court and candidate for the U.S. Senate, Roy S. Moore ("Judge Moore")—sues the makers of the political comedy television series *Who Is America?* (the "Program") for featuring him in an interview segment with a fictional character played by political satirist Sacha Baron Cohen. That segment commented facetiously about the public controversy over widespread news reports that Judge Moore had engaged in inappropriate relationships with young women. It was just one segment among many throughout the Program's run in which Cohen, playing cartoonishly absurd characters, interacted with unsuspecting public figures in order to playfully—but pointedly—satirize American society and politics. In response, Judge Moore asserts a defamation claim, and, with his wife, Kayla Moore ("Ms. Moore"), claims of fraud and intentional infliction of emotional distress ("IIED"), all arising out of the "severe loss of reputation" Judge Moore allegedly suffered when the interview segment aired. Compl.¶¶ 32, 38.

This lawsuit conflicts directly with the long tradition of First Amendment protection for political parody and satire of public figures—especially where the satirical work "could not reasonably have been interpreted as stating actual facts about the public figure involved." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988). In *Falwell*, the Supreme Court held that Rev. Jerry Falwell could not recover emotional distress damages based on a mock magazine interview in which "Falwell" stated that his "first time" was "a drunken incestuous rendezvous with his mother in an outhouse." *Id.* at 48. The Court acknowledged the publication was "offensive to" Falwell, and would "doubtless [be] gross and repugnant in the eyes of most," but

held that the claim could not survive.  *Id.* at 50.  In so holding, the Court explained:

> The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large. … Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to vehement, caustic, and sometimes unpleasantly sharp attacks.  The candidate who vaunts his spotless record and sterling integrity cannot convincingly cry "Foul!" when an opponent or an industrious reporter attempts to demonstrate the contrary.

*Id.* at 51–52 (internal citations and quotation marks omitted).  The same principles apply here.

The comedy sketch featuring Judge Moore and starring Sacha Baron Cohen—the well-known actor and political satirist—could not possibly be understood by reasonable viewers as stating actual facts about Judge Moore.  Just like Rev. Falwell did, Plaintiffs ask this Court to "find that a State's interest in protecting public figures from emotional distress is sufficient to deny First Amendment protection to speech … even when that speech could not reasonably have been interpreted as stating actual facts about the public figure."  *Id.* at 50.  As the Supreme Court did, this Court should "decline to do [so]."  *Id.*

Plaintiffs' claims also fail for a more basic reason: as a condition to participating in the Program, Judge Moore signed a "Standard Consent Agreement" under which he expressly waived "any claims … related to the Program or its production" against "anyone associated with the Program."  *See* Declaration of Elizabeth A. McNamara ("Decl.")  Ex. 1 ("Consent Agreement" or "SCA") ¶ 4.  Among the specifically enumerated claims he waived are the exact three claims asserted here: "defamation," "intentional infliction of emotional distress," and "fraud."  *Id.*  And Plaintiffs cannot avoid enforcement of the Consent Agreement by arguing that it was "obtained through fraud" because they were misled about the purpose of the interview of Judge Moore (Compl. ¶ 16)—on the contrary, the Consent Agreement contains a clause expressly disclaiming any "rel[iance] upon any promises or statements made by anyone about

the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program."  SCA ¶ 5.

The Court need not search far for precedent to support enforcement of this clear waiver, as the Second Circuit already enforced a "Standard Consent Agreement" (with nearly identical waiver language) used in connection with a production by the same satirist (Defendant Cohen) under strikingly similar circumstances:  When individuals featured in Cohen's documentary-style comedy film *Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan* ("*Borat*") filed a series of lawsuits against Cohen and the film's producers, the cases were consolidated in this District.  Although the plaintiffs in those cases made fraud arguments similar to those asserted by Plaintiffs here, the court dismissed those cases pursuant to the "explicit waiver clause that on its face prevent[ed] Plaintiffs from bringing the … actions." *Psenicska v. Twentieth Century Fox Film Corp.*, Nos. 07 Civ. 10972, *et al*., 2008 WL 4185752, at *4 (S.D.N.Y. Sept. 3, 2008), *aff'd*, 409 F. App'x 368 (2d Cir. 2009).  The result here— involving the same performer and materially identical contractual terms—should be no different. Indeed, the plaintiffs in the *Borat* cases were a driving instructor, etiquette trainers, and dinner guests, *see id.*; Judge Moore *is the former Chief Justice of a state Supreme Court*.  He is well aware of the consequences of signing contracts, and should be held to his agreement.

## **FACTUAL BACKGROUND**

### A.    **The Parties**

In 2017, Plaintiff Judge Moore ran for the U.S. Senate for the State of Alabama in a special election to replace Senator Jeff Sessions, who had been appointed Attorney General. During the campaign, Judge Moore faced mounting and widely reported claims that he had inappropriate sexual encounters with young women—including one who was underage at the

3

time—in the 1970s, while he was in his 30s.[1]  On December 12, 2017, Judge Moore lost the

election to Democratic candidate Doug Jones, which many analysts attributed to the allegations

made against Judge Moore.[2]  After his election loss, Plaintiffs filed a libel suit against several of

the women who had accused Judge Moore of misconduct.[3]

Plaintiff Kayla Moore is Judge Moore's wife, and was herself recently an unsuccessful

candidate for political office, running for state Republican Executive Committee in June 2018.[4]

Defendant SNI, a wholly owned subsidiary of CBS, exhibited the Program through the

cable network it owns and operates, SHOWTIME.  *See* Compl. ¶¶ 6, 13.  The Program was

created, co-produced, and co-written by its star, the comedian and political satirist Defendant

Sacha Baron Cohen, who is best known for projects in which he "portray[s] disguised fictional

characters" who interact with "real" people, including the television series *Da Ali G Show*, and

the films *Borat* and *Brüno*.  *See id.* ¶ 10.

## B.    Who Is America?

The Program is a comedy series that employs fictional characters from across the

political spectrum (all played by Cohen) who conduct interviews with real individuals—both

---

[1] *See, e.g.*, Stephanie McCrummen, *et al.*, *Woman says Roy Moore initiated sexual encounter when she was 14, he was 32*, Wash. Post (Nov. 9, 2017), http://wapo.st/2zvHx84; Stephanie McCrummen, *Woman shares new evidence of relationship with Roy Moore when she was 17*, Wash. Post (Dec. 4, 2017), http://wapo.st/2AoUTDq.  The Court can take judicial notice of these widely reported, recent national news stories.  *See, e.g.*, *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (affirming judicial notice of "publicly available historical [news] articles" about political controversy); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (affirming judicial notice of "press articles" which were "offered only to show that information [at issue] was publicly available, not for the truth of the matters asserted there").

[2] *See, e.g.*, Alexander Burns & Jonathan Martin, *Once a Long Shot, Democrat Doug Jones Wins Alabama Senate Race*, N.Y. Times (Dec. 12, 2017), https://nyti.ms/2C8yEQz (describing Judge Moore as "scandal-scarred" "after a brutal campaign marked by accusations of sexual abuse and child molestation"); Jonathan Allen, *Alabama's women wrote the verdict on Roy Moore*, NBC News (Dec. 13, 2017), https://nbcnews.to/2nWTpf9.

[3] *See* Decl. Ex. 4 (Complaint in *Moore v. Hagedorn, et al.* (Ala. Cir. Ct. Etowah Cty.).

[4] *See* Connor Sheets, *Roy Moore's wife, Kayla Moore, loses bid for state Republican Executive Committee*, AL.com (June 5, 2018), http://s.al.com/y7j0TPi.

famous and unknown—to expose the disparate views in our country.  For example, Cohen portrays conservative conspiracy theorist and "citizen journalist" Billy Wayne Ruddick Jr., PhD, who skewers the left-leaning views of Presidential candidates Bernie Sanders and Jill Stein.  He also plays Gio Monaldo, an Italian fashion photographer who reveals the vanity in Hollywood through interviews with various celebrities.  And, as is relevant here, Cohen portrays "Captain Erran Morad," an Israeli "anti-terror" expert.  In the first two episodes of the Program, "Morad" interviews a number of political pundits and candidates who support his "Kinderguardians" plan to arm school children with guns, teaches a former Republican state representative how to detect terrorists by yelling epithets and wearing a burqa, and asks former Vice President Dick Cheney to sign his "waterboarding kit" (a towel and plastic milk jug) during a sit-down interview.[5]

### C.  Judge Moore's Agreement to Participate in *Who Is America?*

The third episode of the Program includes an interview of Judge Moore by the Erran Morad character.  Compl. ¶ 18.  The interview took place at a hotel in Washington, D.C. in February 2018.  *Id*. ¶ 15.  Prior to the taping, Judge Moore (with Ms. Moore present) signed a Standard Consent Agreement with "Yerushalayim TV (including its assigns, licensees, parents, subsidiaries, and affiliates)," which are collectively defined as the "Producer" in the agreement. *See* SCA at 1; Compl. ¶¶ 15, 24.  Judge Moore alleges he had been told that the production was part of a ceremony celebrating the 70th anniversary of the State of Israel, and he was going to "receive an award for his strong support of Israel" during the taping.  Compl. ¶ 15.

---

[5] *See* SHOWTIME, *Official Clip ft. Jason Spencer | Ep.2 | Who Is America? | SHOWTIME*, YouTube (July 23, 2018), https://youtu.be/4k4pMTsa1Kw; SHOWTIME, *Who Is America? (2018) | First Look | Sacha Baron Cohen SHOWTIME Series*, YouTube (July 15, 2018), https://youtu.be/QkXeMoBPSDk ("Kinderguardians" segment); Avi Selk, *Watch Dick Cheney enthusiastically sign a 'waterboard kit'*, Wash. Post (July 9, 2018), https://wapo.st/2zkM2Uw.  The court can take judicial notice of these publicly available videos.  *See, e.g.*, *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 263–64 (S.D.N.Y. 2019) (taking judicial notice of local television news interview available online).

Judge Moore (referred to in the Consent Agreement as "Participant") entered into the agreement "[i]n exchange for the Producer making a $200 donation to a charity chosen by the Participant and allowing an opportunity for the Participant to appear in a television series."  SCA at 1.[6]  In the Consent Agreement, Judge Moore agreed that he

> specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Program, which are related to the Program or its production, or this agreement, including, but not limited to, claims involving assertions of … (h) infliction of emotional distress (whether allegedly intentional or negligent), … (m) defamation (such as any allegedly false statements made in the Program), … [or] (p) fraud (such as any alleged deception about the Program or this consent agreement) ….

SCA ¶ 4.  The same paragraph contains waivers of numerous other tort and contract claims, including "false light," "breach of any alleged contract," and "prima facie tort."  *Id.*

The Consent Agreement further provides that

> the Participant acknowledges that in entering into [the Consent Agreement], the Participant is not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program.  Participant is signing this agreement with no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program.

*Id.* ¶ 5.  The Consent Agreement is signed by "Roy S. Moore," and dated 2/14/18.  *See id.*  At the top of the agreement, beneath the introductory paragraph referencing the donation to a charity of the Participant's choice, the text "Foundation For Moral Law" is written in ink.  *Id.*  In addition,

---

[6] On a motion to dismiss, "courts may consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference ... and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.'"  *Psenicska*, 2008 WL 4185752, at *4 (quoting *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000)).  Here, Plaintiffs' allegation that "the release that Judge Moore signed was obtained through fraud, and was therefore void and inoperative" is central to the Complaint; the SCA was relied upon by the D.C. district court in transferring the case to this Court, and may be considered on this motion.  *See* Compl. ¶ 24; *see also Psenicska*, 2008 WL 4185752, at *4 (considering similar agreements signed by plaintiffs on motions to dismiss in *Borat* cases); *2 Broadway LLC v. Credit Suisse First Boston Mortg. Capital, LLC*, No. 00 Civ. 5773, 2001 WL 410074, at *5 (S.D.N.Y. Apr. 23, 2001) (considering releases that were not attached to the complaint on a motion to dismiss because "the Complaint explicitly references them.").

in the paragraph listing each of the waived claims, the parenthetical language in clause (f)—
"intrusion or invasion of privacy (such as any allegedly sexually oriented or offensive behavior
or questioning)"—is struck-through, with the initials "RSM" handwritten alongside. *See id.*

### D.   The Episode of the Program Featuring Judge Moore

After signing the Consent Agreement, Judge Moore was interviewed for the Program.
The episode containing this interview was first exhibited on SHOWTIME on July 29, 2018.[7]

The interview with Judge Moore was the first segment in the 25-minute episode.  After
an introduction from "Morad," the segment shows a montage of news anchors discussing the
rising tide of accusations of sexual misconduct against Judge Moore, with a succession of news
anchors saying "Four women…," "A fifth woman…," "A total of nine women have now come
forward," with one clip showing onscreen text from a *Washington Post* article stating "Woman
says Roy Moore initiated sexual encounter when she was 14, he was 32."  The segment then cuts
to President Trump at a rally telling his audience "Get out and vote for Roy Moore.  Do it."

After first discussing with Judge Moore why the State of Alabama is so closely connected
to Israel (during which Judge Moore states that "Alabama has always been a state that valued
freedom, valued liberty"), Morad brings up the Israeli military's use of technology to fight
terrorist attacks.  He describes a device which he claims can detect the location of tunnels used to
infiltrate the country with "seismic waves."  He explains that the technology was also able to
"identify other abnormalities," including "sex offenders and particularly pedophiles," who
secrete a certain "enzyme" at "three times the level of non-perverts."  Morad then holds up the

---

[7] The full episode may be viewed on the DVD attached as Decl. Ex. 2.  It is well settled that, in defamation
claims, the material "containing the allegedly defamatory statements" are "deemed part of the pleading and
may be considered" on a motion to dismiss.  *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 455 (S.D.N.Y. 2012)
(collecting cases) (citation omitted).  Additionally, the segment featuring Judge Moore is available online at
https://youtu.be/3kaJaDx51iw.

"device"—a black plastic wand that looks like an ordinary metal detector that would be used for security checks at airports and courthouses.  Morad waves the wand in front of himself and Judge Moore, noting casually that "because neither of us are sex offenders, then it make absolutely nothing [*sic*]."  However, to Morad's apparent surprise, as he waves the wand in front of Judge Moore, it emits a beep.  Looking confused, Morad insists the device "must be faulty," smacks it against his hand, and asks if Judge Moore may have lent the jacket he was wearing to someone else.  Judge Moore states that he has "been married for 33— and never had an accusation of such things" (despite the widespread reports of precisely those accusations).  He then cuts off the interview and leaves, as Morad insists that the device is "not saying that you are a pedophile, of course not" and that he is "not saying you are a sex offender at all."

E.     **Transfer of this Action from the District of Columbia**

Notwithstanding the waiver of claims, and the forum selection clause in the Consent Agreement requiring all claims to be brought in New York, Plaintiffs filed this action in the U.S. District Court for the District of Columbia, seeking "damages in excess of $95,000,000 USD," in addition to costs and attorneys' fees.  Defendants moved to transfer to this Court under 28 U.S.C. § 1404(a), pursuant to the Consent Agreement's forum selection clause.  *See* ECF No. 6 (the "Transfer Motion").  Plaintiffs opposed enforcement of the clause on the basis that the entire Consent Agreement was void because it was induced by fraud.  *See* Opposition, ECF No. 15.

On April 29, 2019, the D.C. district court held a hearing, at the end of which the court issued an order granting the Transfer Motion.  *See* Decl. Ex. 3 ("Hearing Tr.") at 28:20-39:9. The court rejected Plaintiffs' arguments that Defendants could not enforce the Consent Agreement that was signed by Yerushalayim TV ("YTV"), holding that Defendants all fall within the Agreement's definition of "Producer" (as "affiliates" and "licensees"), and that Defendants could also enforce the agreement as third-party beneficiaries.  *Id.* at 33:4-34:6.

## ARGUMENT

Not only do Plaintiffs' claims fail as a matter of First Amendment law, but each of the claims they assert here is squarely waived by the Consent Agreement that Judge Moore signed.

## I.     PLAINTIFFS' CLAIMS ARE BARRED BY THE CONSENT AGREEMENT

Just like the unsuccessful plaintiffs in the *Borat* cases, Plaintiffs' claims here fail because of the "explicit waiver clause that on its face prevents Plaintiffs from bringing [this] … action[]." *Psenicska*, 2008 WL 4185752, at *4. As Judge Preska held there, to allow cases like this to go forward "would empower … Plaintiffs to avoid the clear wording of their own contracts in a manner [the court] must decline to condone under well-settled New York law." *Id.* at *6.[8]

### A.     New York Courts Consistently Enforce Waivers In Appearance Agreements

The dismissal of the "*Borat*" claims in *Psenicska* rests on decades of New York precedent enforcing entertainment agreements, like the one at issue here. In *Shields v. Gross*, the New York Court of Appeals held that these agreements —sometimes called "appearance releases"—must be strictly enforced. 58 N.Y.2d 338 (1983). In that case, model Brooke Shields sued over the publication of nude photos taken when she was ten years old. Shields argued that as an adult she should be allowed to disaffirm the waiver agreement her mother had signed on her behalf. The Court, however, held that the waiver was "valid and enforceable" and barred her action. *Id.* at 343-45. Thus, even in a case implicating the *welfare of children*—a population accorded far greater protections by the law than media-savvy adults, let alone former judges—

---

[8] As here, the agreements in *Psenicska* contained New York choice of law clauses, which the court held "govern[] construction of the Agreement." 2008 WL 4185752, at *4 n.12. The clause here states that any claim "in connection with the Program or its production" will be "governed by the substantive laws of the State of New York." SCA ¶ 6. "[C]ourts in this Circuit have enforced similar choice of law provisions even when a party challenges the contract as fraudulent or claims that fraudulent inducement exists." *Klein v. Frenkel*, No. 14-cv-2719, 2015 WL 13721693, at *9 (E.D.N.Y. Feb. 19, 2015) (collecting cases). Accordingly, New York law applies both to the enforcement of the Consent Agreement, and to the enumerated claims referred to in the waiver clause.

New York's highest court *still* held that an unambiguous waiver of claims must be enforced.

Since *Shields*, New York courts have strictly enforced waiver clauses in media and entertainment appearance agreements. As the Appellate Division explained, such agreements "are commonly used in the entertainment industry, are enforceable and should not lightly be set aside." *Klapper v. Graziano*, 129 A.D.3d 674, 675 (2d Dep't 2015), *leave to appeal denied*, 30 N.Y.3d 988 (2017). *See also Shoemaker v. Discovery Commc'ns, LLC*, 57 Misc. 3d 1203(A), at *3, 66 N.Y.S.3d 655 (Sup. Ct. N.Y. Cty. 2017) (plaintiffs "clearly waived their right to bring th[e] action and [we]re precluded from doing so" by terms of appearance releases, and noting that "courts have consistently upheld such releases and agreements in similar circumstances").

Courts in this Circuit are fully in accord. In *Shapiro v. NFGTV, Inc.*, the court enforced an agreement signed by a reality show participant containing waiver language similar to that in the Consent Agreement, holding that "[t]he 'clear, broad, and dispositive[ ]' language used in the release agreed to by Plaintiff bars Plaintiff from asserting any claims related to her participation in the Program, including those involving fraud." No. 16 Civ. 9152, 2018 WL 2127806, at *7 (S.D.N.Y. Feb. 9, 2018) (quoting *Bihag v. A&E Television Networks, LLC*, 669 F. App'x 17, 18 (2d Cir. 2016)). That decision relied in part on the Second Circuit's summary order in *Bihag v. A&E*, which involved a similar consent agreement signed by a participant on a different reality show. Again, the Second Circuit did not hesitate to affirm dismissal of the plaintiff's lawsuit in the face of a waiver of "any and all claims" that was "clear, broad, and dispositive." 669 F. App'x at 18. No different from here, the plaintiff was "bound by the agreements he voluntarily signed, which expressly bar the claims he … attempted to assert in th[e] case." *Id.*

In sum, time and time again, New York courts have rejected claims from dissatisfied

participants in film and television productions based on similar waiver agreements.[9]  In light of this consistent precedent—including the Second Circuit's enforcement of the very same waiver language from the same producers under similar circumstances, *see Psenicska*, 409 F. App'x 368—there is no doubt that the Consent Agreement bars Plaintiffs' claims.

### B.    Plaintiffs' Arguments to Avoid Enforcement of the Waiver Are Meritless

#### 1.    Plaintiffs Cannot Claim Fraudulent Inducement When the Agreement Disclaims Reliance on the Allegedly Fraudulent Representations

In an attempt to avoid enforcement of the Consent Agreement, Judge Moore argues that he was fraudulently induced into signing it.  *See* Compl. ¶ 24.  But the agreement he signed expressly *disclaims* reliance on the precise kinds of representations he claims to have relied on. The D.C. district court already rejected Plaintiffs' identical fraud-based arguments with respect to the forum selection clause, and they fare no better in this context.  Indeed, these precise arguments—with respect to a materially identical agreement—were also rejected in *Psenicska*, which was then affirmed by the Second Circuit.

As here, in *Psenicska*, Defendant Cohen interacted with various people in the guise of a fictional character—there, the bumbling Kazakh reporter, Borat.  2008 WL 4185752, at *1.  As here, the plaintiffs alleged they were told they were being taped for an innocuous sounding foreign television production—there, an "educational documentary made for Belarus television" by a company called "Springland Films."  *Id.* at *2.  As here, the plaintiffs were offended by the

---

[9] *See, e.g.*, *Shoemaker*, 57 Misc. 3d 1203(A), at *1 (enforcing waiver signed by married couple featured on "90 Day Fiancee"); *Nizewitz v. Viacom Int'l, Inc.*, No. 158209-14, 2015 WL 3401196 (Sup. Ct. N.Y. Cty. Mar. 4, 2015) (dismissing claim from participant in reality dating show "Dating Naked" over alleged failure to sufficiently blur out nudity on screen); *Klapper*, 129 A.D.3d 674 (dismissing claims for, among other things, defamation, brought by plastic surgeon who was featured on reality show "Mob Wives"); *Weil v. Johnson*, No. 119431/02, 2002 WL 31972157 (Sup. Ct. N.Y. Cty. Sept. 27, 2002) (denying motion to enjoin release of documentary in light of agreement signed by plaintiff); *Gelbman v. Valleycrest Prod., Ltd.*, 189 Misc. 2d 403 (Sup. Ct. N.Y. Cty. 2001) (dismissing claims from game show contestant who had signed appearance release).

behavior of Cohen's character, and were surprised to later learn that they were in fact filmed for a wide-release comedy, after which they filed suit.  And, as here, each of the plaintiffs had signed substantially the same "standard consent agreement," which contained an unambiguous waiver of all claims against "anyone associated with the Film," including any claims for "fraud (such as any alleged deception or surprise about the Film or this consent agreement)."  *Id.* at *3 & n.10.  *See* Decl. Exs. 5–7 (appearance releases enforced in *Borat* cases).

The plaintiffs in *Psenicska* argued that the waiver clauses should not be enforced because the producers' "representations about the nature of the film and the identities of [the producer], Cohen and Springland Films were false and were meant to induce him or her to appear in the film."  2008 WL 4185752, at *5 (citing the complaints).  Judge Preska rejected that argument, recognizing that the New York Court of Appeals has long "held that the defense of fraud in the inducement is foreclosed to a party who disclaims, in the contract itself, reliance on fraudulent statements allegedly made to induce him to enter into the contract."  *Id.* at *6 (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 323 (1959)).  Each plaintiff expressly "waived his or her reliance on 'any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.'"  *Id.* at *6 (quoting agreements).  In short, that express waiver precluded the fraudulent inducement arguments.

The Second Circuit affirmed, reasoning that "where a plaintiff 'has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded,' the disclaimer 'destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon those contrary oral representations.'"  409 F. App'x at 371 (quoting *Danann*, 5 N.Y.2d at 320–21).  *See also Shapiro*, 2018 WL 2127806, at *8 (rejecting fraudulent inducement argument when the

12

appearance agreement expressly released fraud claims).

This well settled law "destroys" Plaintiffs' allegations of fraudulent inducement here. Plaintiffs repeat the phrase "falsely and fraudulently" *ad infinitum* in their Complaint, but, at base, the alleged misrepresentations were that: (1) YTV, "which does not actually exist," "was the producer and broadcaster of the show that Judge Moore would appear on, instead of the actual network that the show … later appeared on[,] Showtime" (Compl. ¶ 15); (2) the production of the Program was connected to Judge Moore receiving an "award for his strong support of Israel," which he was to receive "during the interview" (*id.*); and (3) Cohen was "falsely and fraudulently portraying himself as someone else" (*id.* ¶ 19). Distilled down, just as in *Psenicska*, Plaintiffs claim they were misled about the "nature of the Program" and the "identity … of … persons involved in the Program." SCA ¶ 5.

But in entering into the Consent Agreement, Judge Moore specifically acknowledged that he was "not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program." *Id.* He also agreed that he had "no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program." *Id.* Those express disclaimers, standing alone, are sufficient to defeat his "fraudulent inducement" argument. Yet, Judge Moore also explicitly waived any "claims involving assertions of . . . fraud (such as any alleged deception about the Program or this consent agreement)." *Id.* ¶ 4(p). Just as in *Psenicska*, "***dismissal [i]s compelled*** by the short, clear, unambiguous disclaimer of reliance on any oral statements about the [Program] or the identities of the people making it." 409 F. App'x at 372 (emphasis added).

In addition, and while not necessary to defeat Plaintiffs' fraud claims, as an attorney and

former Chief Justice, Judge Moore was plainly aware of the consequences of signing a written contract.  In a dissenting opinion issued just three years ago, Judge Moore himself cited the principle that, where "the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms," they must be "legally bound" to the terms and "had no basis to rely on oral assurances" to the contrary.  *Farmers Ins. Exch. v. Morris*, 228 So. 3d 971, 991 (Ala. 2016) (Moore, C.J., dissenting) (citation omitted).  The contract Judge Moore signed expressly and unambiguously disclaims reliance on the very statements he claims fraudulently induced him to enter into the Consent Agreement.  Under New York and Second Circuit law, he cannot avoid enforcement of that Agreement's terms.

### 2.    The Consent Agreement's Waiver of Specific Claims Is Enforceable

Plaintiffs have also argued that the waiver in the Consent Agreement is a "general release" that under New York law cannot "bar claims for injuries unknown at the time the release was executed."  Decl. Ex. 8 ("Pl. Ltr.") at 2.  But the waiver language in the Consent Agreement is not a "general release" at all; it is an explicit agreement not to assert claims "related to the Program or its production, or [the SCA]."  SCA ¶ 4.  And Plaintiffs cannot credibly argue that Judge Moore—a former Chief Justice—"never contemplated" a waiver of the claims asserted here, Pl. Ltr. at 2, given that the Consent Agreement specifically lists ***all three of Plaintiffs' claims*** as examples of the claims being waived: "(h) infliction of emotional distress," "(m) defamation," and "(p) fraud."  SCA ¶ 4.  Defendants are not seeking in any way to stretch a "general release" to cover claims not reasonably contemplated by the parties—they are seeking enforcement of the plain language of an explicit waiver of the very claims Plaintiffs now assert.[10]

---

[10] In addition, the cases relied upon by Plaintiffs in their pre-motion letter concern broad release language in commercial contracts and settlement agreements.  *See* Pl. Ltr. at 2.  Those decisions are inapposite in the

###### 3.    A Handwritten Notation on a Different Clause of the Agreement Has No Effect on the Explicit Waiver of the Claims Asserted Here

Plaintiffs have also suggested that the waiver in the Consent Agreement is somehow modified or nullified by the fact that Judge Moore crossed out the parenthetical phrase "(such as any allegedly sexual-oriented or offensive behavior or questioning)" following clause 4(f), which waives claims for "intrusion or invasion of privacy."  Plaintiffs' theory appears to be that, because the Program addressed the allegations of sexual misconduct against Judge Moore, and Judge Moore refused to waive a *particular type* of invasion of privacy claim arising out of "sexual-oriented ... questioning," the entire Consent Agreement is void.  This argument—which Plaintiffs also raised at oral argument on the Transfer Motion—has no merit and was appropriately rejected by the D.C. district court.  *See* Hearing Tr. at 14:7-13.

One undeniable flaw in Plaintiffs' argument is that clause 4(f) of the Consent Agreement is not even relevant to Plaintiffs' claims, since there is no claim for invasion of privacy in this lawsuit.  It should be obvious that a handwritten deletion of language identifying one example of a possible invasion of privacy claim would have no effect on the independent waiver of entirely distinct causes of action for defamation, emotional distress or fraud.  And, indeed, it is black letter contract law that "the modification of a contract supplants only the affected provisions of the original agreement while leaving the balance of it intact."  *P&B Capital Grp., LLC v. RAB Performance Recoveries, LLC*, 128 A.D.3d 1534, 1536 (4th Dep't 2015) (citations, quotation marks, and brackets omitted).  In short, Judge Moore did not seek to modify his broad waiver of the very claims he has asserted here and therefore his waiver stands.

Moreover, even if the modification of a clause involving an unasserted invasion of

---

context of the appearance releases and Consent Agreements that New York courts have consistently upheld to bar claims arising out of participation in a film or TV production.  *See supra* Section I.A.

privacy claim were somehow relevant, that edit cannot reasonably be interpreted as a broad

agreement by the Defendants that the interview or Program "would not involve any allegation

[of] sexually oriented or offensive behavior or questioning," as Plaintiffs have argued.  Hearing

Tr. at 13:19-21.  *See LaSalle Bank NA v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d

Cir. 2005) ("In interpreting a contract under New York law, 'words and phrases ... should be

given their plain meaning.'") (citation omitted).  Indeed, Judge Moore was the Chief Justice of a

state Supreme Court—he is well versed in the law of contracts, and surely understands how to

draft contractual language to achieve a particular result.  If he wanted to create an agreement that

an interview would not involve any questions related to sexual issues—or, for that matter, an

agreement that did not waive claims for defamation, infliction of emotional distress and fraud

involving sexual questioning—he was fully capable of doing so.  If the non-lawyer plaintiffs in

*Psenicska* were held to the strict terms of their agreements, surely Judge Moore must be as well.

### 4.  Defendants Can Enforce the Consent Agreement

Plaintiffs have also sought to avoid enforcement of the Consent Agreement because the

Defendants are not signatories to the document.  But the D.C. district court correctly rejected that

argument in holding that the Defendants could enforce the Consent Agreement's forum selection

clause.  *See* Hearing Tr. at 32:12-34:12.  That is now the "law of the case."[11]

The D.C. court's reasoning as to the forum selection clause applies with equal force to

Defendants' right to enforce the Consent Agreement as a whole.  <u>First</u>, the Agreement is between

the "Participant" and the "Producer," and expressly defines "Producer" as "Yerushalayim TV"

---

[11] *See, e.g., SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 178 n.7 (2d Cir. 2000); *Russul Corp. v. Zim Am. Integrated Shipping Servs. Co.*, No. 06 Civ. 0037, 2009 WL 3247141, at *4 (S.D.N.Y. Oct. 5, 2009) ("By finding the forum selection clause in the Bill of Lading enforceable and then transferring this case to this district, [the prior judge] determined that the Bill of Lading controls this transaction…. Therefore, under the law of the case doctrine, the Bill of Lading … is applicable here as well.").

and its "assigns, licensees, parents, subsidiaries, and affiliates."  SCA at 1.  Plaintiff cannot

dispute that, as the ultimate sole owner of YTV, Cohen is a "parent" (or at least an "affiliate") of

YTV, nor can there be any dispute that, as the network (and its parent) that exhibited the

Program, SNI and CBS are "licensees" of YTV.  *See* Hearing Tr. at 33:4-34:6.  Thus, each of the

Defendants falls within the definition of "Producer" under the Agreement.

     <u>Second</u>, as the D.C. district court also correctly found, Defendants can also enforce the

Consent Agreement as intended third-party beneficiaries, since the agreement contains a waiver

of claims "related to the Program or its production" against not only the "Producer" but "any of

its assignees or *licensees* or *anyone associated with the Program*."  SCA ¶ 4 (emphasis added);

Hearing Tr. at 33:4-34:6.  It is well settled that a party that falls within the categories of releasees

in an agreement is a third-party beneficiary of that agreement, and may enforce the waiver.[12]

     In fact, a New York court rejected a similar argument that a non-signatory could not

enforce an appearance release in the *Klapper* case.  There, in connection with the reality show

"Mob Wives," the plaintiff argued that only the production company that signed the agreement—

not the other companies he sued—could enforce the release.  41 Misc. 3d 401, 408–09 (Sup. Ct.

Kings Cty. 2013), *aff'd*, 129 A.D.3d 674.  The court found this "technical challenge" to be

"without merit," holding that "[i]t is abundantly clear that the [named] defendants are closely

intertwined in the production of Mob Wives."  *Id.*  The court held the agreement "serve[d] to

insulate the named party … as well as the corporate affiliates and assigns who play a role in

---

[12] *See, e.g.*, *Mateo v. Carinha*, No. 14 CV 9020, 2019 WL 1409727, at *3 n.1 (S.D.N.Y. Mar. 28, 2019)
(defendant employee of city was a third-party beneficiary of agreement that "clearly contemplates a release of
[plaintiff's] claims against all officers, employees, agents, and representatives of the City").  The fact that the
Defendants are not explicitly named in the Consent Agreement is of no moment.  On the contrary, it is well
settled that "[a] party need not necessarily be specifically mentioned in a contract to be considered a third-party
beneficiary."  *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662–63 (2d Cir. 1996)
(collecting cases).

producing Mob Wives." *Id.* at 410.  Similarly here, Defendants fall squarely among the entities

against whom claims "related to the Program or its production" are waived.  Plaintiffs effectively

concede this point when they allege Defendants were "agents" in the production of the Program,

*see* Compl. ¶¶ 11, 15–16.  At bottom, Plaintiffs cannot credibly argue that the Defendants may

not enforce the waiver that is included for their direct benefit.  Plaintiff's claims are barred by the

Consent Agreement under well settled law, and the Complaint should be dismissed.[13]

## II.      THE CLAIMS INDEPENDENTLY FAIL AS A MATTER OF LAW

Even apart from the Consent Agreement, Plaintiffs' claims also fail on their merits.

### A.      Judge Moore Cannot Base A Defamation Claim on Protected Satire

Judge Moore's defamation claim fails because the Program cannot be construed as stating

any actual facts about him, and is instead "fully protected satire." *Farah*, 736 F.3d at 536.

As the New York Court of Appeals has summarized, "[s]ince falsity is a *sine qua non* of

a libel claim and since only assertions of fact are capable of being proven false, we have

consistently held that a libel action cannot be maintained unless it is premised on published

assertions of *fact*." *Brian v. Richardson*, 87 N.Y.2d 46, 50–51 (1995) (citations omitted).

Indeed, the Supreme Court has made clear that the First Amendment "provides protection for

statements that cannot reasonably be interpreted as stating actual facts about an individual."

---

[13] Dismissal of the claims waived by Judge Moore necessarily requires dismissal of the claims nominally asserted on behalf of Ms. Moore, since her claims are entirely derivative of Judge Moore's, and are based only on alleged harm to *his* reputation. *See infra* Section II.B-C.  *Cf. Novak v. Tucows, Inc.*, No. 06 CV 1909, 2007 WL 922306, at *13 (E.D.N.Y. Mar. 26, 2007) (holding that "[p]laintiffs cannot escape their contractual obligations simply by joining parties who did not sign the contract and then claiming that the forum selection clause does not apply"), *aff'd*, 330 F. App'x 204 (2d Cir. 2009).  In addition, Ms. Moore, as president of the Foundation for Moral Law, which received the donation, directly benefited from the agreement containing the waiver.  *Cf. LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 154–56 (E.D.N.Y. 2012) ("[T]he Second Circuit has held that a non-signatory is estopped from denying its obligation to arbitrate when it received a 'direct benefit' from a contract containing an arbitration clause.") (collecting cases).  Even if Ms. Moore's claims could survive the express waiver of the claims on which her claims are dependent, those claims fail on their merits.  *See infra* Section II.

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (citation, brackets, and quotation marks omitted). Thus, when assessing the viability of a libel claim, "the thrust of the dispositive inquiry under both New York and constitutional law is 'whether a reasonable [reader] could have concluded that [the publications were] conveying facts about the plaintiff.'" *Levin v. McPhee*, 119 F.3d 189, 196–97 (2d Cir. 1997) (quoting *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152–53 (1993)). *See also Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000).

Under this test, "[l]oose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable." *Dillon v. City of N.Y.*, 261 A.D.2d 34, 38 (1st Dep't 1999). The Supreme Court has explained that "[t]his provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20 (citation omitted). *See also Biro*, 883 F. Supp. 2d at 461 ("[T]he Supreme Court has afforded constitutional protection to the type of speech often characterized as rhetorical hyperbole, parody, loose, or figurative.").

To determine whether a statement conveyed actual facts about a plaintiff, courts "look to the immediate context and the broader social context of the statement," rather than "parsing out and evaluating the challenged statements in isolation." *Levin*, 119 F.3d at 196–97. "[T]he words must be construed in the context of the entire … publication as a whole, [and] tested against the understanding of the average reader," taking into account its "whole apparent scope and intent." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (citations omitted).

Here, no reasonable viewer could interpret the Program as actually stating that the plastic wand "device" waved by Cohen in front of Judge Moore actually discerned that he is a "pedophile and a sex offender," as Plaintiffs claim. Compl. ¶ 27. The "broader social context" here is a political comedy program featuring a famous satirist disguised as a series of overtly

fictional characters who engage in over-the-top behavior to provoke reactions from public

figures.  The "immediate context" is an interview with a "prominent conservative and a God

fearing person of faith," Compl. ¶ 32, who had recently had his political aspirations derailed

because of accusations of sexual misconduct.  In this context, the segment featuring Judge Moore

can only be interpreted as pointed political satire, which is fully protected by the First

Amendment.  *See Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313 n.2 (D.C. Cir. 1994)

("constitutional protection afforded to parody, satire, and other imaginative commentary").[14]

No viewer of the Program would take anything the comically militaristic "terrorism

expert" Erran Morad says at face value—whether he is proposing to arm kindergarteners or

claiming that he possesses a handheld tunnel-detection device that is also somehow able to detect

"sex offenders."  Indeed, the entire point of the joke (as made clear by the introductory montage

of news stories on Judge Moore's Senate run) was that the device was, of course, completely

fake, and was being used to subtly confront Judge Moore with the *already widely reported*

accusations against him, even as he insisted (falsely) that he "never had an accusation of such

things."  The absurdity of the segment's premise speaks for itself, even if it were not introduced

by Sacha Baron Cohen wearing thick makeup and speaking in an exaggerated Israeli accent.

While perhaps uncomfortable—akin to Vice President Cheney being asked to autograph

a "waterboard kit" in another segment—this is "fully protected satire" of a controversial political

figure, not actionable defamation.  As the Supreme Court has held, "[t]he appeal of the political

---

[14] Plaintiffs have cited *Frank v. NBC*, 119 A.D.2d 252, 257 (2d Dep't 1986), for the principle that "one's reputation can be as effectively and thoroughly destroyed with ridicule as by any false statement of fact."  *See* Pl. Ltr. at 1.  But that decision pre-dates both *Milkovich* and *Falwell*, which make clear that a claim based on mockery is not actionable unless the statement can be reasonably understood to convey "actual facts" about a plaintiff.  *See supra* at 18-19 and *infra* at 23.  And, in any event, the court in *Frank* held that libel claims based on a comedy sketch should have been dismissed where "no person of any sense could take [the sketch] seriously."  119 A.D.2d at 260.

cartoon or caricature is often based on exploitation of … politically embarrassing events—an exploitation often calculated to injure the feelings of the subject of the portrayal," but that this type of expression has "played a prominent role in public and political debate" and is protected by the First Amendment.  *Falwell*, 485 U.S. at 54.

Even in cases where the parodic character of a publication was far less apparent, courts have found it to be protected under the First Amendment.  For example, in *Farah*, the D.C. Circuit affirmed dismissal of a libel claim over a blog post announcing that two of the most prominent proponents of the "birther" conspiracy theory about President Obama were recalling their just-released book about the topic because President Obama had, three weeks earlier, released his long-form birth certificate.  736 F.3d at 530.  The court held that "reasonable readers of [the blog at issue] would recognize the prominent indicia of satire in the … article," including the setting (a blog that frequently posted comedic political articles), the "humorous [and] outlandish details" in the story, and other "[s]tylistic elements," that suggested a reader should not "take[] the story literally."  *Id.* at 538.  "Because the reasonable reader could not, in context, understand *Esquire*'s blog post to be conveying 'real news'—that is, actual facts about [the plaintiffs]—the blog post was not actionable defamation," and was instead protected "political speech aimed at critiquing [the plaintiffs'] public position" on the "birther" issue.  *Id.* at 539.

Consider also *Finebaum v. Coulter*, where one radio host sued another for libel after the defendant ranted how, during the plaintiff's interview with a football coach, "these two guys really slobbered over each other, I mean, I really thought they were going to start performing oral sex on one another, it was so sickening."  854 So. 2d 1120, 1123 (Ala. 2003).  The Alabama Supreme Court held that the claim should have been dismissed because, in the context of his sports talk radio program, the statement was not one that could "reasonably be interpreted as

stating actual facts" about the plaintiff, and was instead "only rhetorical hyperbole." *Id.* at 1129. Concurring in that decision was then-Chief Justice Roy Moore.[15]

### B.    Plaintiffs' Emotional Distress Claim Is Barred

Plaintiffs' claim for intentional infliction of emotional distress ("IIED") fares no better than the defamation claim.  IIED claims are "routinely dismissed where"—as here—"they 'fall well within the ambit of other traditional tort liability,'" such as defamation.  *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 530 n.10 (S.D.N.Y. 2013) (quoting *Gonzalez v. Bratton*, 48 F. App'x 363, 365 (2d Cir. 2002)).[16]  "[T]he Second Circuit [has] observed that 'New York law considers claims sounding in tort to be defamation claims ... where those causes of action seek damages only for injury to reputation, [or] *where the entire injury complained of by plaintiff flows from the effect on his reputation*.'"  *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 725–26 (S.D.N.Y. 2014) (quoting *Chao v. Mt. Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (adding emphasis)).  That is the case here.  Plaintiffs explicitly allege that their emotional distress flows <u>entirely</u> from the alleged injury to Judge Moore's reputation.[17]  Judge Moore's IIED claim is thus duplicative of his defamation claim.

---

[15] Even if the Program could somehow be reasonably interpreted to be stating that Judge Moore is a "sex offender" as an "actual fact" (and it cannot), Plaintiff, indisputably a public figure and public official, has not plausibly alleged that Defendants acted with actual malice—that is "with knowledge that the statements were false or with reckless disregard as to their falsity"—given the widespread reports in reputable media outlets of the allegations against Judge Moore.  *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (affirming dismissal of libel claim at pleading stage for failure to plausibly plead actual malice); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988) (holding that "good faith reliance on previously published reports in reputable sources … precludes a finding of actual malice as a matter of law").  The conclusory allegation that "Defendants acted with actual malice," Compl. ¶ 30, is insufficient to avoid dismissal under this standard.  *See Biro*, 807 F.3d at 546–47.

[16] *See also Idema v. Wager*, 120 F. Supp. 2d 361, 370 (S.D.N.Y. 2000) ("New York courts have consistently held that a plaintiff may not maintain a separate claim for intentional infliction of emotional distress grounded in the same facts as a claim for libel."), *aff'd*, 29 F. App'x 676 (2d Cir. 2002).

[17] *See* Compl. ¶¶ 37, 38 ("Plaintiffs have suffered extreme emotional distress *as a result of* Judge Moore being falsely portrayed, mocked and defamed as a sex offender and pedophile …"; "Judge Moore has been the subject of widespread ridicule and has suffered severe loss of reputation, *which has in turn also caused* him, Mrs. Moore, and his entire family severe emotional distress…") (emphasis added).

The IIED claim is also squarely barred by the Supreme Court's *Falwell* decision.  There, after trial, the jury dismissed plaintiff's libel claims because "the ad parody could not 'reasonably be understood as describing actual facts about [Falwell] or actual events in which [he] participated,'" but awarded damages for IIED.  485 U.S. at 49.  The Supreme Court reversed, refusing to endorse a rule that would subject "political cartoonists and satirists … to damages awards without any showing that their work falsely defamed its subject" because "the First Amendment prohibits such a result in the area of public debate about public figures."  *Id.* at 53.  Instead, the Court held, a public figure could not bring an IIED claim based on publication of speech—even where that speech was "patently offensive and … intended to inflict emotional injury"—unless he could "show[] in addition that the publication contains a false statement of fact which was made with 'actual malice.'"  *Id.* at 50, 56.  This rule precludes the IIED claim here.  *See Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 127–29 (2d Cir. 2013) (affirming ruling that "a public figure cannot circumvent the strict 'actual malice' standard imposed by the First Amendment by calling his claim for defamation by a different name") (citation omitted).

Nor have Plaintiffs even pleaded the actual elements of an IIED claim, which is not surprising, as courts have repeatedly held that this is "nearly impossible" to do in New York. *Idema*, 120 F. Supp. 2d at 370.  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community."  *Id.* (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122 (1993)).  Conversely, "[a]cts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [IIED] because the conduct alleged is not sufficiently outrageous."  *Semper v. N.Y. Methodist Hosp.*,

786 F. Supp. 2d 566, 587 (E.D.N.Y. 2011).  It is "long settled that publication of a single, purportedly false or defamatory [statement] regarding a person does not constitute extreme and outrageous conduct as a matter of law."  *Bement v. N.Y.P. Holdings, Inc.*, 307 A.D.2d 86, 92 (1st Dep't 2003); *see also Howell*, 81 N.Y.2d at 126 (holding that "newspaper's publication of a newsworthy photograph" of plaintiff at a private psychiatric facility could not support an IIED claim "even if defendants were aware that publication would cause plaintiff emotional distress").

Finally, "false accusations of criminal conduct"—even crimes of a sexual nature involving minors—"generally do not rise to the level of extreme and outrageous conduct that is necessary to support an IIED claim."  *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 214–15 (W.D.N.Y. 2013) (discussing case holding that "widely disseminat[ing] false statements about a college soccer coach, accusing him of having improper sexual relationships with students" was not sufficiently outrageous).  Plaintiffs have not—and cannot—plead an IIED claim here.[18]

## C.  Plaintiffs Cannot Plead a Fraud Claim

Separate from the waiver in the Consent Agreement, Plaintiffs' fraud claim fails because Plaintiffs' alleged "injury" caused by the fraud is, again, nothing more than the claimed harm to Judge Moore's reputation.[19]  It is well settled that "[f]raud damages are limited to 'the actual pecuniary loss suffered' as a direct result of the misrepresentation."  *Spithogianis v. Haj-Darwish*, No. 07 Civ. 4609, 2008 WL 82188, at *7 (S.D.N.Y. Jan. 7, 2008) (collecting cases).

---

[18] Ms. Moore separately fails to state an IIED claim because her alleged "distress" derives entirely from the alleged harm to her *husband's* reputation.  *See* Compl. ¶¶ 37-38.  Just as "[o]nly the party about whom the allegedly libelous statements were made has standing to sue" for defamation, a "family member not named in [an] allegedly defamatory [publication] has no claim for emotional distress."  *Chaiken v. VV Publ'g Corp.*, No. 91 Civ. 2102, 1992 WL 168282, at *2 (S.D.N.Y. June 30, 1992) (citation omitted).  *See also Sylvester v. City of N.Y.*, 385 F. Supp. 2d 431, 442 (S.D.N.Y. 2005) (noting lack of authority for IIED claim from "false statements … directed at the plaintiffs' family member, but not the plaintiffs").

[19] *See* Comp. ¶¶ 47-48 ("As a direct and proximate result of Defendant[s'] false and fraudulent representations, Judge Moore, Mrs. Moore, and his entire family have suffered extreme emotional distress *as a result of Judge Moore being falsely portrayed* as a sex offender and pedophile.") (emphasis added).

"[O]ut-of-pocket" losses do not include harm to reputation or even "lost time."  *W. Tsusho Co. v. Prescott Bush & Co.*, No. 92 Civ. 3378, 1993 WL 228072, at *3 (S.D.N.Y. June 23, 1993).[20]

Ultimately, Plaintiffs' effort to plead around a deficient defamation claim by alleging fraud is barred by the First Amendment.  In a case directly on point, a restaurant owner asserted defamation and fraud claims against a news broadcaster (in fact, CBS) because the reporters (for its evening news program) asked for permission to film in the plaintiff's restaurant for "background footage for a broadcast about tourism in Miami Beach," but then used the footage to illustrate a report on the resurgence of the Russian mafia.  *La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 387 (S.D.N.Y. 1999).  Although the court was admittedly "troubled by plaintiff's allegations of defendants' fraudulent behavior in obtaining permission to film [in the restaurant], plaintiff's claim for fraud nevertheless must fail because it impermissibly threatens 'to punish the expression of [even] truthful information or opinion.'"  *Id.* at 392 (citation omitted).  The court refused to let the plaintiff "use different tort claims 'to avoid the strict requirements for establishing a libel or defamation claim,' or to seek 'damages for injury to his reputation.'"  *Id.* (quoting *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991)).  The result should be the same here and, for that separate reason, Plaintiffs' fraud claim must be dismissed.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Complaint should be dismissed with prejudice.

Dated: September 12, 2019                     Respectfully Submitted,

                                                               /s/ *Elizabeth A. McNamara*
                                                               Elizabeth A. McNamara
                                                               Rachel F. Strom
                                                               Eric J. Feder

---

[20] *See also Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305 (2d Cir. 1986) (loss of time not compensable in fraud); *Chevron Corp. v. Donziger*, No. 11 Civ. 0691, 2013 WL 3879702, at *2 (S.D.N.Y. July 29, 2013) ("New York does not permit recovery on a fraud theory for reputational injury.").

DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York  10020
(212) 489-8230
(212) 489-8340 (fax)


Of Counsel:

Russell Smith, Esq.
Jeff Holmes, Esq.
SMITH DEHN LLP
2500 Broadway
Building F, Suite F-125
Santa Monica, California  90404
(310) 396-9045
rsmith@smithdehn.com
jholmes@smithdehn.com

*Attorneys for Defendants*