UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
------------------------------------------------------------ x

ROY STEWART MOORE and KAYLA MOORE,    :
                                                                          :
                        Plaintiffs,                              :    Index No. 19 Civ. 4977 (ALC)
                                                                          :
            - against -                                            :
                                                                          :
SACHA NOAM BARON COHEN, SHOWTIME    :
NETWORKS, INC., AND CBS CORPORATION,    :
                                                                          :
                        Defendants.                            :
------------------------------------------------------------ x

**DECLARATION OF ELIZABETH A. MCNAMARA
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

1.      I am a member of the law firm Davis Wright Tremaine LLP, attorneys for

defendants Sacha Baron Cohen, Showtime Networks Inc. and CBS Corporation (collectively, the

"Defendants") in the above-captioned case.  I make this declaration in support of Defendants'

motion to dismiss the Complaint in this case for the sole purpose of attaching true and correct

copies of documents that are incorporated by reference in, integral to, and/or replied upon by the

Complaint, and/or of which the Court can take judicial notice.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the Standard Consent

Agreement that Plaintiff Roy S. Moore signed on February 14, 2018 in connection with the

filming of a segment that was featured on the television program "Who Is America?".  This

document was previously filed in this case as Exhibit A to the Declaration of Todd S. Schulman

in support of the Defendants' Motion to Transfer the case to this Court (ECF No. 27-3)

3.      Attached hereto as **Exhibit 2** is a DVD containing a true and correct copy of

episode 103 of *Who Is America?*, which aired on the SHOWTIME network on July 29, 2018,

and contains the interview with Plaintiff Roy S. Moore at issue in this case.  A copy of this DVD

was previously filed in this case as Exhibit A to the Declaration of Brendan Countee in support of the Defendants' Motion to Transfer the case to this Court (ECF No. 27-4).

4.    Attached hereto as **<u>Exhibit 3</u>** is a true and correct copy of the transcript of the hearing on April 29, 2019, before Hon. Thomas F. Hogan in the U.S. District Court for the District of Columbia, on the Defendants' motion to transfer the case to this Court pursuant to 28 U.S.C. § 1404, during which Judge Hogan announced his decision granting the motion to transfer.

5.    Attached hereto as **<u>Exhibit 4</u>** is a true and correct copy of the complaint filed on April 30, 2018, by Roy Moore and Kayla Moore against Richard Hagedorn, Marjorie Leigh Corfman, Debbie Wesson Gibson, Beverly Young Nelson, Tina Turner Johnson, and Fictitious Defendants 1-19 in the Circuit Court of Alabama, Etowah County, Docket number 31-CV-2018-900346.00.

6.    Attached hereto as Exhibits 5–7 are the consent agreements signed by the plaintiffs in cases arising out of their participation in the production of the film *BORAT – Cultural Learnings of America for Make Benefit Glorious Nation of Kazhakstan* (which was produced by and starred Defendant Sacha Baron Cohen), which were consolidated in this District before Judge Preska and dismissed on September 3, 2008.  *See Psenicska v. Twentieth Century Fox Film Corp.*, Nos. 07 Civ. 10972, *et al.*, 2008 WL 4185752,  at *3 n.10 (S.D.N.Y. Sept. 3, 2008) (identifying the filings containing the copies of each agreement), *aff'd*, 409 F. App'x 368 (2d Cir. 2009).  In particular:

a.    Attached hereto as **<u>Exhibit 5</u>** is a true and correct copy of a Standard Consent Agreement signed by Michael Psenicska, plaintiff in *Psenicska v. Twentieth Century Fox Film Corp.*, No. 07 Civ. 10972 (S.D.N.Y.), filed as Exhibit A to

the Declaration of Joan Hansen in Support of Defendants' Motion to Dismiss the Complaint in that case (ECF No. 10-2).  Address and phone number information of the plaintiff has been redacted from this version of the exhibit.

b.   Attached hereto as **<u>Exhibit 6</u>** are true and correct copies of Standard Consent Agreements signed by Cindy Streit, Sarah Moseley, Ben K. McKinnon, Michael M. Jared, and Lynn S. Jared, plaintiffs in *Streit, et al. v. Twentieth Century Fox Film Corp.*, No. 08 Civ. 1571 (S.D.N.Y.), collectively filed as Exhibit D to the Declaration of Joan Hansen in Support of Defendants' Motion to Dismiss the First Amended Complaint in that case (ECF No. 10-5). Address and phone number information of the plaintiffs has been redacted from this version of the exhibit.

c.   Attached hereto as **<u>Exhibit 7</u>** is a true and correct copy of a Standard Consent Agreement signed by Kathie Martin, plaintiff in *Martin v. Larry Charles, et al.*, No. 08 Civ. 1828 (S.D.N.Y.), filed as Exhibit B to the Declaration of R. Metcalf in Support of Defendants' Motion to Dismiss the First Amended Complaint in that case (ECF No. 14-4).  Address and phone number information of the plaintiff has been redacted from this version of the exhibit.

7.   Attached hereto as **<u>Exhibit 8</u>** is a true and correct copy of a letter from Plaintiffs to the Court responding to Defendants' letter requesting a pre-motion conference on their motion to dismiss (ECF No. 37).  Plaintiffs' letter was submitted to the Court and served on Defendants on July 16, 2019, but was not filed on the Court's docket for this case.

I declare under the penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing is true and correct.

EXECUTED this  12th day of September 2019

*/s/Elizabeth A. McNamara*
Elizabeth A. McNamara

# **EXHIBIT 1**

STANDARD CONSENT AGREEMENT

This is an agreement between Yerushalayim TV(including its assigns, licensees, parents, subsidiaries, and affiliates) (collectively, the "Producer") and the undersigned participant (the "Participant").  In exchange for the Producer making a $ _200_ donation to a charity chosen by the Participant and allowing an opportunity for the Participant to appear in a television series, the Participant agrees as follows:   *Foundation For Moral Law*

1.   The Participant agrees to be filmed and/or audiotaped by the Producer for a reality-style television series (the "Program").  It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2.   The Participant agrees that any rights that the Participant may have in the Program or the Participant's contribution are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Program and any recorded material that includes the Participant, without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for that.  The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Program, but also in any advertising, marketing or publicity for the Program and in connection with any ancillary products associated with the Program.

3.   The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Program and the Participant's participation in it, and that the consent agreement, for this and other reasons, cannot be revoked.

4.   The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Program, which are related to the Program or its production, or this agreement, including, but not limited to, claims involving assertions of (a) failure to adequately compensate Participant, (b) failure to use the footage of Participant in the Program, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion or invasion of privacy (~~such as any allegedly sexual-oriented or offensive behavior or questioning~~) (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made in the Program), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Program or the Program in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Program or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

5.   This is the entire agreement between the Participant and the Producer or anyone else in relation to the Program, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program.  Participant is signing this agreement with no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program.

6.   Although the Participant agrees not to bring any claim in connection with the Program or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.  This paragraph is intended by the parties to stand on its own, and it is intended to be valid and enforceable, even if a court finds that other paragraphs are not valid or enforceable.

AGREED AND ACCEPTED:
SIGNED:

*Roy S. Moore*

PRINT: *Roy Moore*

Dated: *2/14/18*

Yerushalayim TV

By: _____

Print: _____

# <u>EXHIBIT 2</u>

# DVD FILED WITH CLERK OF COURT

# **<u>EXHIBIT 3</u>**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ROY STEWART MOORE, ET AL,          :
                                   :
                Plaintiffs,        :      Docket No. CA 18-2082
                                   :
            vs.                    :        Washington, D.C.
                                   :      Monday, April 29, 2019
SACHA NOAM BARON COHEN, ET AL      :          10:00 a.m
                                   :
                Defendants.        :
-----------------------------x



TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE THOMAS F. HOGAN
UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Plaintiffs:      LARRY KLAYMAN, Esquire
                         Klayman Law Group, P.A.
                         2020 Pennsylvania Ave., NW
                         Suite 800
                         Washington, DC  20006

For the Defendants:      ELIZABETH A. MCNAMARA, Esquire
                         Davis Wright Tremaine LLP
                         1251 Avenue of the Americas
                         21st Floor
                         New York, New York  10020-1104

                         ERIC J. FEDER, Esquire
                         LISA ZYCHERMAN, Esquire
                         Davis Wright Tremaine LLP
                         1919 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, DC  20006-3401

Court Reporter:          CRYSTAL M. PILGRIM, RPR
                         Official Court Reporter
                         United States District Court
                         District of Columbia
                         333 Constitution Avenue, NW
                         Washington, DC  20001

```
1                          P-R-O-C-E-E-D-I-N-G-S
```

2          THE DEPUTY CLERK:  Your Honor, this is civil action

3  18-2082, Roy Stewart Moore, et al versus Sacha Noam Baron

4  Cohen, et al.

5      Will counsel please approach the lectern and state your

6  appearances for the record and introduce any parties at your

7  table.

8          MR. KLAYMAN:  Good morning, Your Honor, Larry

9  Klayman.  I'm here on behalf of Chief Justice Roy Moore,

10  plaintiff, his wife Kayla Moore, plaintiff.

11      Sitting here is Melissa Issak.  She's local counsel from

12  Montgomery, Alabama I wanted to get your permission to sit with

13  us.

14          THE COURT:  Thank you.  Former Chief Judge Moore is

15  no longer Chief Judge.  He's now a civilian I take it.

16          MR. KLAYMAN:  Correct.

17          THE COURT:  All right, thank you.

18          MS. MCNAMARA:  Good morning, Your Honor, Elizabeth

19  McNamara with Davis Wright Tremaine on behalf of all of the

20  defendants.  I'm here with my colleagues Eric Feder and Lisa

21  Zycherman.

22          THE COURT:  All right, thank you.

23      We're here today for motions that have been filed by the

24  various defendants to transfer the case under 28 U.S.C. 1404

25  (A).  As well as a motion for plaintiff to file, a leave to

1  file a sur-reply to the opposition to the motion to transfer

2  which I think I've reviewed not necessarily to rule upon at

3  this time.

4      In any event, the issue really is the plaintiff in this

5  case, the former Chief Justice of the Supreme Court of Alabama

6  and his wife, a lawsuit filed against Baron Cohen, Showtime

7  Network and CBS here in the District of Columbia for defamation

8  on behalf of the Judge Moore, intentional infliction of

9  emotional distress on both the plaintiffs and fraud on behalf

10 of the plaintiffs arising out of his appearance on Who is

11 America, the program which is apparently a political comedic

12 television series featuring Mr. Cohen produced by Showtime and

13 CBS.

14     The issue really is there's a forum-selection clause in

15 the contract that requires, according to the movants, in the

16 event that in the choice of law in this forum selection in the

17 contract consent agreement 6, I believe, in any event agrees,

18 the participants agree not no bring any claim in connection

19 with the program production, but if they do bring one it must

20 be brought before and adjudicated by only a competent court

21 located in the State and County of New York and governed by the

22 substantive law of the State of New York.  And that paragraph

23 intended by the parties will stand on its own is intended to be

24 valid and enforceable even if a Court finds that the other

25 paragraphs are not valid and enforceable.

1        The defendants argued this case should be transferred

2   based upon the forum selection law contained in the agreement

3   and this is controlled more than by the federal procedure, but

4   by the Atlantic Construction Company case of the Supreme Court

5   in 2013.

6        So with that background, we'll start.  I'll start with the

7   movant very quickly with a couple of questions, then I'll turn

8   to Mr. Klayman.

9        MS. MCNAMARA:  Thank you, Your Honor.  Do you have

10  some specific questions or do you want me to address?

11       THE COURT:  I do have some questions you can start

12  and then I'll see where I think I want to have you explain a

13  couple of things.

14       MS. MCNAMARA:  Absolutely, Your Honor.  As you've I

15  think correctly laid out the issue here is really discreet and

16  we submit decided really by the Supreme Court decision in

17  Atlantic Marine in 2013 as you've already noted.

18       I mean, there's no dispute on this record that Judge Moore

19  executed the consent agreement and there's no dispute that the

20  consent agreement included a mandatory forum-selection clause

21  providing that any action has to be brought in New York under

22  New York law.  And as you've laid out, there's no dispute as to

23  the operative law.  The forum-selection clause would --

24       THE COURT:  What about his position that the whole

25  contract is void ab initio because of fraud?  It was induced

1  fraud to come to D.C. induced to enter into this interview

2  which was all a sham, he was not aware of and induced therefore

3  to make these statements were used to defame him and therefore,

4  he shouldn't be bound by the contract including the

5  forum-selection clause.

6       MS. MCNAMARA:  Yes, Your Honor, and that precise

7  issue has been raised and litigated in a number of cases

8  including what we consider to be a controlling case here, the

9  Northern District of Alabama case, but also a number of cases

10 here in this District as well as the Supreme Court which

11 addressed it all the way back in 1974.  And the established

12 principle from this entire line of cases is that if the

13 allegations of fraud go to the contract as a whole and there's

14 an argument as here, that the contract ab initio was somehow

15 fraudulently induced, that is not sufficient to preclude the

16 enforcement of the forum-selection clause.

17      The plaintiff must allege with plausible allegations that

18 he was fraudulently induced into the forum-selection clause.

19 Here the plaintiff makes no such allegation and nor could he we

20 submit.  The forum-selection clause is, as you've noted,

21 paragraph 6 in a one page agreement.  It's clearly there.  It

22 was not concealed which is one ground that courts have

23 indicated might be a basis for finding fraud, if the

24 forum-selection clause is concealed.  Here it plainly was not.

25 He read the contract.  He not only read the contract, he edited

1  the contract initially a change to the agreement.

2      Moreover, the other argument that sometimes is raised

3  where fraud as to the specific clause versus the entire

4  contract is if there was some differential in negotiating power

5  or an unsophisticated plaintiff.  Here we have far to the

6  contrary.  No one could argue that Judge Moore who not only is

7  an attorney and under the Cheney decision in this Court, just

8  being an attorney would be sufficient to override any plausible

9  argument that he wasn't sufficiently sophisticated to

10  understand the terms of the contract.  But here, he not only

11  was a former attorney, but he was the Chief Judge of Alabama

12  Supreme Court.  And no plausible argument we submit, Your

13  Honor, can be raised that he did not have the wherewithal to

14  understand the provision that's operative here and that

15  dictates the transfer of the case to New York.

16      As I've noted, we think the controlling case here really

17  is the Streit v. Twentieth Century Fox case out of Northern

18  District of Alabama where on remarkably identical facts dealing

19  with virtually --

20          THE COURT:  The same companies in general except

21  Twentieth Century?

22          MS. MCNAMARA:  Yes, it was Sacha Baron Cohen.  It was

23  his movie.  It was the same language in the agreement.  There

24  the Court addressed the precise issue being raised by the

25  plaintiffs here; i.e. that they contended that they were

1  fraudulently induced to enter the contract, but there was no

2  claim as there is none here that he was fraudulently induced

3  into signing the contract with a forum-selection clause.

4          THE COURT:  How do they litigate then their fraud

5  overall charge that they don't think they're bound by the

6  contract, they can't raise it here?

7          MS. MCNAMARA:  Yes, Your Honor.  It will be litigated

8  once it's transferred in New York.  I can foreshadow we will be

9  moving to dismiss under the consent agreement.  And at that

10  juncture it can appropriately be litigated.  If they believe

11  that those terms of the rest of the consent agreement are not

12  enforceable because of some fraud, then that is the forum in

13  which that argument has to be litigated and decided.  And

14  again, foreshadowing that's precluded by the Psenicska case out

15  of the Second Circuit.  But nonetheless, that is the proper

16  forum for him to raise the argument.

17          THE COURT:  The case arose here, right?  I mean, the

18  action that he's complaining of happened here in the District

19  of Columbia?

20          MS. MCNAMARA:  Yes, I don't think that there's any

21  dispute that we're alleging here that this seems to be a focus

22  of the plaintiffs that the District of Columbia would be a

23  proper venue.  In Atlantic Marine the operative Supreme Court

24  decision, thereto where the plaintiff had filed the action was

25  a proper venue under traditional venue analysis.

1          THE COURT:  Right.

2          MS. MCNAMARA:  But the Court still found that

3     transfer was warranted under the controlling terms of that

4     contract.  So the fact that this may be a proper venue is for

5     purposes of this transfer motion really irrelevant, Your Honor.

6          THE COURT:  All right, yes, Justice Alito in the

7     Atlantic Marine discussed reversing the lower court actually.

8          MS. MCNAMARA:  Exactly on that very point.  So I

9     think that obviously that's the controlling law here and that's

10    what further dictates the transfer of this motion to New York.

11         On the other argument that, that the plaintiffs try to put

12    forth in opposition to this motion, Your Honor, is that the

13    defendants are quote, "strangers" to the consent agreement.

14         THE COURT:  That goes to the supplemental motion to

15    file a sur-reply as well because the Salon article saying that

16    they're separate people and that --

17         MS. MCNAMARA:  Well, I understood the supplemental

18    sur-reply really to be putting forth further evidence of this

19    being an arguably a proper venue.  That there were statements

20    in that article that indicated that Sacha Baron Cohen had been

21    in D.C. and was operating in D.C. in connection with the

22    production of the film, at least part of it.  So I didn't see

23    that it went to his strangers to the consent agreement

24    argument, but maybe I was missing something, Your Honor.

25         THE COURT:  All right.

1          MS. MCNAMARA:  On that argument, we submit and I

2   think as we've indicated in our papers that it fails for two

3   independent reasons.  First, is that the defendants are in fact

4   covered by the agreement.  Under the agreement producers --

5          THE COURT:  He argued supplemental defendants are not

6   intended to be third party beneficiaries.

7          MS. MCNAMARA:  I see, I stand to be corrected, thank

8   you, Your Honor.

9          So here we submit that the argument that the YTV,

10  Yerushalayim TV was a signatory on the consent agreement is

11  unfounded for two reasons, Your Honor.  First is the fact that

12  terms, the expressed terms of the agreement producer is defined

13  and I quote from the agreement, "as YTV and its assignees,

14  licensees, parents, subsidiaries and affiliates."

15         As we've produced and submitted in this motion, it's

16  established that Mr. Cohen is in fact the parent and affiliate

17  of YTV.  He's the ultimate owner of the company and clearly he

18  was the creator of the show, and so clearly he is affiliated.

19         Then also Showtime and it's parent CBS were indisputably

20  the licensees of the program and acquired the rights and the

21  ability to air it on TV.

22         But even if the Court were to conclude that the express

23  terms of the contract did not, was not intended to and did not

24  reach these defendants, and we submit that it does, then we

25  still submit that the Court needs to or should conclude that

1    these defendants were sufficiently closely related to YTV and

2    they clearly were intended third party beneficiaries of the

3    agreement.  You get there again by looking at the express terms

4    of the agreement itself, Your Honor.

5         The agreement provides that Judge Moore had waived his

6    right to bring claims related to the program and its production

7    as against quote, "anyone associated with the program", end

8    quote.  And plainly Sacha Baron Cohen the program's creator as

9    well as Showtime and CBS who licensed and aired the program are

10   associated with the program.  They were indeed intended

11   beneficiaries.

12        Again, I think the case that's most on point there is a

13   New York case cited in our papers which is the Clapper case

14   that dealt with a very similar consent agreement where one

15   party had executed it and the plaintiff there like here tried

16   to argue that the affiliated companies were not captured and

17   did not get the benefit of the terms of the agreement.  And

18   there and we submit the same here the Court concluded that they

19   clearly were intended beneficiaries.  They clearly were

20   associated with the program, each of the defendants and were

21   entitled to get the benefit of the agreement.

22        THE COURT:  The New York case is the Maggie 21, which

23   New York case are you talking about?

24        MS. MCNAMARA:  The Klapper case versus Viacom.  It's

25   cited in our papers, Your Honor.  I can give you the cite.

1          THE COURT:  That's all right, I'll have it here.

2          MS. MCNAMARA:  It's 41, MS 3d and it's affirmed by

3    the second department in New York 129 A.D. 3d 674.  That case

4    did not involve a forum-selection clause, but it involved the

5    enforcement of a very similar consent agreement and it's terms

6    to the affiliated parties dealing with a television show just

7    like this one.

8          So Your Honor for that reason as well, we submit that that

9    second argument that's put forth by the plaintiffs also fails

10   and for all these undisputed facts and undisputed and

11   controlling law, we submit that this case should be transferred

12   to the Southern District of New York.  If the plaintiffs want

13   to raise their arguments about fraud ab initio, they are more

14   than entitled to raise those arguments in the Southern

15   District.  But this is not the right forum.

16         As Your Honor underscored at the outset, and I think

17   appropriately, even if this Court were to conclude that there

18   were issues about the viability of the agreement, other terms

19   of the agreement, by its expressed terms the forum-selection

20   clause stands alone even if the rest of the contract fails.

21   And so for all of these reasons, Your Honor, we ask that the

22   Court transfer the case to New York.

23         THE COURT:  All right, thank you, Ms. McNamara,

24   appreciate the argument.

25         MS. MCNAMARA:  Thank you.

1          THE COURT:  Mr. Klayman, I'll hear from you at this

2    time as to those issues I've raised both on the legal standard

3    under the Atlantic Marine case and the liability to

4    forum-selection clause and as to the beneficiaries under the

5    defendants, et cetera, not being signatories to the contract

6    whether they can enforce the forum-selection clause and whether

7    the whole thing is void or not in any event.

8          MS. MCNAMARA:  Thank you, Your Honor.  As Your Honor

9    knows and you're a very distinguished jurist, so I don't need

10   to flatter you, but you have won awards for your ability on the

11   bench and I appreciate that.  So I'm not going to get into the

12   fact that plaintiffs have a presumption of being able to choose

13   the forum.  We start with that, and that's a known concept.

14      Secondly, there was no meeting of the minds here.  And if

15   I may approach the bench.  I have a highlighted version of the

16   Standard Consent Agreement, if I may give you a copy of it.

17          THE COURT:  All right, you can do that.  The Clerk

18   can take that.

19      Let me just get back to your first statement, the

20   presumption.  You're right under the 404 Section generally,

21   but where there's forum-selection clause the Supreme Court said

22   and I'll quote, "should be given controlling weight in all but

23   the most exceptional cases and basically the non-movant bears

24   the burden of demonstrating that such extraordinary

25   circumstances exist and must show."  And another quote is,

1  "why the Court should not transfer the case of the forum to

2  which the parties agreed."

3      So if it's valid the plaintiff's choice of forum does not

4  bear weight.

5          MR. KLAYMAN:  I agree, Your Honor, I was getting to

6  that, but this is that exceptional or unusual case and that's

7  the point.

8          THE COURT:  All right, I have in front of me now as

9  part of the argument the one page contract signed by Roy S.

10 Moore and by the TV, YTV we'll call it.

11         MR. KLAYMAN:  Yes, it's exceptional and unusual for a

12 number of reasons.  First of all, there was no consideration

13 here with regard to Judge Moore.  The $200 for the standard

14 consent agreement is consideration was for the Foundation for

15 Moral Law, that's a corporation 501(c)(3).  There was no

16 consideration going to him.

17     Secondly, very importantly in terms of the fraud and the

18 inducement here.  Look at paragraph 4, Your Honor, the

19 highlighted portion.  Judge Moore crossed out and initialed

20 that this matter would not involve any allegation sexually

21 oriented or offensive behavior or questioning.  Specifically,

22 ruled out of this agreement signed by somebody who wanted to

23 obviously hide who he was, the signature for Yerushalayim TV.

24     I might add in that regard there's no showing here

25 definitively that Sacha Baron Cohen is the owner of

1    Yerushalayim TV.  The fact that there is an affidavit submitted

2    by someone who claims to be a producer, we haven't had a chance

3    to examine him.  Everything about this entire matter was on a

4    fraud, upon a fraud, upon a fraud.  Woody Allen would say a

5    travesty of a mockery of a travesty of a fraud in this

6    instance.  This is an exceptional case.

7              THE COURT:  Well, this is a motion status, this is

8    not the trial yet or is not discovery involving that, but in

9    any event on paragraph 4F raise intrusion or invasion of

10   privacy, that was not crossed out.  After that in parens such

11   as any allegedly sexual oriented or offensive behavior or

12   questioning close parens was crossed out and initialed by R.M.

13   Moore, signatore R.S. Moore.

14             MR. KLAYMAN:  That's right.  Here's the exceptional

15   nature, the unusual nature, the egregiousness of these frauds.

16   And not just one, but at least four separate frauds that were

17   committed upon Judge Moore.  Culminating in articles like this:

18   Roy Moore fails pedophile detector test from Sacha Baron Cohen.

19   What could be worse, Your Honor, what worse act could you

20   conceivably commit than to accuse a distinguished jurist in

21   particular of being a pedophile which he is not.

22             THE COURT:  But where do I get with this either the

23   Northern District of Alabama case Streit v. Twentieth Century

24   Fox which is almost identical to this case, essentially the

25   same contract at issue or other related cases from our court

1   saying that he would have to allege that he was fraudulently

2   induced or agreed to the forum-selection clause itself, not

3   just the contract as a whole?

4        MR. KLAYMAN:  I'm glad you asked the question.  I was

5   getting to that.  Your Honor, you're not bound by the Northern

6   District of Alabama.  That's a lower court decision.  It's not

7   binding law.  It's not a Circuit Court decision.  It's not a

8   Supreme Court decision.  And that Court didn't face the same

9   exceptional circumstances, unusual circumstances that we're

10  facing here.  That's one Judge in the Northern District of

11  Alabama.  I'm surprised that my esteemed counsel would cite it

12  when they're so anxious to get back to a court that they think

13  will be favorable to them.

14       THE COURT:  I notice in your pleadings you mention

15  that.  What evidence do I have of that that there would be a

16  left leaning judge favorable to the entertainment industry in

17  New York as opposed to Washington D.C.?

18       MR. KLAYMAN:  Actually, I never said left leaning,

19  Your Honor, in deference.  I may have said that somewhere else,

20  but I never said it in the pleadings.  The Southern District is

21  very favorably disposed towards the entertainment industry, so

22  is the Central District of California.  That's why they choose

23  this as the forum-selection clause. It's their home court.

24  It's where they want to be.

25       THE COURT:  You said on page 6 of your opposition,

1  "Indeed defendant's motion is purely tactical.  They clearly

2  perceived New York as a more favorable forum where they would

3  more likely find a favorable left leaning, pro-entertainment

4  industry judge to rule in their favor."

5           MR. KLAYMAN:  Okay, I guess I did say that.  Well,

6  that's what I believe.  I was trying to be tactful.  I don't

7  want to put you on the spot, you know.  Judge is suppose to

8  rule neutrally and that's your reputation.

9           THE COURT:  You said that, that's fine, that's all.

10          MR. KLAYMAN:  Here's the test, Your Honor.  Let me

11 just go through the frauds that were committed and why this is

12 exceptional.

13     First of all, Judge Moore was offered to go to Washington

14 D.C. at the Mandarin Hotel with his wife Kayla to get an award

15 from Israel.  He is a very religious devote person of faith,

16 and he supports Israel, he thought it was genuine.

17     He gets there and he's presented with this standard

18 consent agreement.  He crosses out, and then they made a point

19 in their pleadings that we didn't reference the actual portion

20 of the standard consent agreement that we considered to be

21 fraudulent.  Well, here it is.  I mean, it's right there.

22     He told them and he only agreed to be interviewed if he

23 wasn't going to be smeared on the basis of alleged sexual

24 offensive behavior.  They signed that.  They agreed to that.

25 That's another fraud.

1      Sacha Baron Cohen is in disguise.  In fact, he brags about

2    it, that's one of the pleadings that we submitted not just with

3    regard to Judge Moore, but with regard to Ben Carson where he

4    was ready to present a fraudulent ID to the Secret Service

5    which would have been a major crime, but he came up with

6    another fraud, dropped the ID on the floor and maybe the Secret

7    Service will believe that I am who I say I am.

8      Next he gets in front of the set, the TV set and they hold

9    up this so-called pedophile detecting device which starts

10   beeping which also is a fraud.

11     And then last but not least, after the whole thing is over

12   Ms. Isaac, local counsel for Mr., for Judge Moore, sends a

13   letter, and I have the return receipt, to David Nevins,

14   Showtime Networks and CBS Leslie Moonves. Moonves has had his

15   own issues obviously.  And says do not publish this, do not

16   broadcast it, it's defamation.  They went ahead and did it

17   anyway.  These people, the level of arrogance is such a level.

18          THE COURT:  They also did other political figures,

19   right?

20          MR. KLAYMAN:  They did, but they didn't accuse

21   anybody of being a pedophile.

22          THE COURT:  Such as Sanders was also included, was he

23   also included?

24          MR. KLAYMAN:  I don't specifically recollect him.

25   Vice President Cheney was, O.J. Simpson was.  There were

1   others, but no one was accused of the crime of morale turpitude

2   which is the most severe defamation per se.  You don't have to

3   prove damages.

4       But the point here is and let me get to your question

5   about the case law that was cited by counsel for the

6   defendants.  They themselves recognized that in exceptional and

7   unusual cases that the test is a three part test to vitiate any

8   kind of consent waiver to forum selection or any other aspect

9   of the contract which was never a part of the meeting of the

10  minds here.

11      Number one, fraud.

12      And the third factor, I'll skip the second because we

13  don't need to get into that, public policy.

14      There was fraud, there was egregious fraud, compounded

15  fraud and as a matter of public policy this Court cannot

16  condone defrauding any individual much more a former Justice of

17  the Alabama Supreme Court.

18      So the two tests that we meet for exceptional circumstance

19  here devoid this entire agreement have been met.

20          THE COURT:  Well, let me just talk about the

21  inducement of a fraud of the forum-selection clause itself.

22  You indicated there was one case in Alabama was the only one.

23      They've cited several other cases, some in D.C.  Cheney v.

24  IPD Analytics 583 F.Supp 2d at 117, Bank v. Laptop, et cetera,

25  206 F.Supp 3d Eastern District of New York at 780 which has a

1   collection of cases.  They also claim Supreme Court has written

2   on this in Scherk v. Alberto-Culver case 417 U.S. 506 at 519.

3        Is there other case law besides the one Alabama case that

4   supports you have to set aside this particular clause not just

5   the whole contract?

6        MR. KLAYMAN:  First of all, all of the cases go on a

7   case by case basis, that's crucial, Your Honor, it's the facts

8   of that case.  You know that, I know that, Judge knows that.

9   The facts of this case are particularly egregious given the

10  number of fraudulent acts, given the simple fact uncontroverted

11  that Judge Moore crossed out any aspect about sexual offensive

12  behavior.  Given what occurred with regard to the type of

13  defamation and intentional infliction of emotional distress.

14  People have been known to jump off buildings when they have

15  been accused of things like this being a pedophile unfairly.

16  This is the most severe form of defamation.

17       On top of it as Your Honor suggested or even alluded to

18  the defendants in this case aren't even the defendants that

19  could have been in the case if they had disclosed exactly who

20  was putting on this show.  There's another fraud.

21       Yerushalayim TV, Showtime and CBS.  There's no mention of

22  that.  If they were going to be above board and not defraud my

23  client, if there was a meeting of the minds, why wouldn't they

24  just simply tell them this is a Showtime series.  It's not a

25  Yerushalayim TV by someone who claims to be a former Mosad

1    agent.

2         THE COURT:  Would your argument be the same for every

3    single individual that Mr. Moore has gone after then basically?

4    Wouldn't they all have the same right to bring a defamation

5    clause, they tricked, there's a Georgia state legislator

6    according to the pleadings somebody talked about or you said

7    Mr. Chaney.  I don't know what he did there.  I assume it was

8    under an assumed name with assumed facts that he was

9    approaching these people.

10         MR. KLAYMAN:  The difference is is that those

11   individuals went along with the fraud.  At some point they

12   ratified it in effect.  Mr. Cheney was asked do you think I

13   should water board my wife to get the truth and he said yes.

14   Then they asked, Sacha Baron Cohen asked him to sign his water

15   boarding paddle best wishes which he did.

16         With regard to the Georgia state legislator, he went along

17   with that.  He actually contacted me and asked me to represent

18   him.  I said no, I'm not.  I don't think you have a case.

19   Judge Moore does have a case.  He didn't go along with it.  He

20   walked off the set.  But for the fact that he's a gentleman,

21   Sacha Baron Cohen probably wouldn't be walking around right

22   now.

23         So it's a completely different set of circumstance and the

24   level of the egregiousness is much greater than in any case and

25   the fraud is greater and the public policy is greater and

1   someone has to stand up and say no, this isn't right, Your

2   Honor.  I believe that you're the Judge to do that.

3        And it doesn't matter what some judge in the Northern

4   District of Alabama said or somebody in the Southern District

5   of New York in the lower court level.  The Supreme Court never

6   said this is a firm principal that applies to every case.  It

7   says there are exceptional cases where it does not apply.

8            THE COURT:  All right.

9            MR. KLAYMAN:  Now after this thing is over, let me

10  just say this as a personal comment.  It wasn't enough that

11  they destroyed my client's reputation.  Roy Moore fails a

12  pedophile detector test.  This is in Alabama, obviously a

13  political motivation here.

14       Then they nominated themselves for a Golden Globe if you

15  can believe that.  Let's destroy the man and give ourselves a

16  Golden Globe.  We brought suit before Your Honor.  Thank God at

17  that point they backed off and canceled the entire show which

18  have high ratings.

19       So you know they know that they've got liability here.

20  They don't want to incur more of it.  You, Your Honor, are the

21  one Judge that has an opportunity here to put a stop to this to

22  say enough is enough.  You can't go around destroying people

23  because you think it's funny.  And Sacha Baron Cohen, we know

24  who he is.  He's not somebody of high class or high moral value

25  here.  This Court is, the Judge is.  I stand behind him with my

1  reputation.  He's my friend.  He's my client and I look

2  forward, Your Honor, to your allowing this case to remain here

3  because this is the proper forum.  The witnesses are here.  The

4  people at the hotel, the film crew, the security crew.  They

5  all saw what happened.  And let them go in front a jury of

6  their peers here.  What's wrong with a D.C. jury?  Let them

7  decide.

8       Your Honor, I thank you for your time and any further

9  questions I'll be happy to answer.

10          THE COURT:  Thank you, Mr. Cohen -- sorry -- Klayman,

11  I appreciate your work on this.

12          MR. KLAYMAN:  One other thing.

13          THE COURT:  Yes.

14          MR. KLAYMAN:  If you would like to have Judge Moore

15  take the stand because they submitted an affidavit, he's

16  willing to do that to explain exactly what happened under oath.

17          THE COURT:  I don't think that will be necessary in

18  the context of the motion, but I appreciate his offer to do so.

19       Ms. McNamara, you want to answer that litany of any

20  concerns that he had crossed out the particular area that was

21  gone into by Mr. Cohen as not being available in the contract

22  and therefore that should vitiate the fraud that, as fraud it

23  should vitiate the selection of forum clause.

24          MS. MCNAMARA:  Yes, Your Honor.  That is no different

25  than the long line of cases that we put in our papers.

1          THE COURT:  Isn't that part of the contract that

2    knocks out the area that they would agree to discuss and then

3    it is discussed as affecting the forum?

4          MS. MCNAMARA:  Well first of all, Your Honor, let me

5    get that file.

6        I don't read it as knocking out that area.  It simply said

7    it includes a definition of invasion of privacy.  I don't read

8    this as any commitment nor could it reasonably I would argue be

9    understood to be a commitment that there would be no

10   discussion.

11       But even if you presume that is the case, Your Honor, it

12   still goes squarely to fraud in the ab initio of entering into

13   the agreement and that a term of the agreement that he contends

14   was violated.

15       What you heard today, you heard him in making the argument

16   that this is an exceptional ground.  He walked you through all

17   the alleged fraud that's committed.  What you did not hear is

18   any argument at all that there was any fraud in connection with

19   the forum-selection clause.  And that is what the law requires.

20   Not just in the Northern District of Illinois which in turn

21   cites the Supreme Court of Alabama cases to that effect.  But

22   in this District as well and we cited for example the Cheney v.

23   IPD case --

24          THE COURT:  Right.

25          MS. MCNAMARA:  -- which squarely holds exactly that

1   rule as does the Billard v. Angrick case out of this District.

2   Which again squarely holds that the alleged fraud has to go to

3   the forum-selection clause, not as to any other terms, not as

4   to commitments made or supposedly misrepresentations in the

5   entering into the agreement.

6       And that is what is lacking here.  The plaintiff has not

7   made any argument to that effect and for that reason alone the

8   clause stands and remember, the clause stands regardless.  If

9   the Court were to find and I don't think it's before the Court

10  now, so I would, I think should be an issue before the Seventh

11  District presumably, but if the Court were to find that the

12  rest of the contract is not enforceable by the terms of the

13  contract, the forum-selection clause still stands and would be

14  fully enforceable.

15          THE COURT:  All right.  Let me ask you a procedural

16  question which is a little bit different.

17          MS. MCNAMARA:  Sure.

18          THE COURT:  You're all arguing like this to be

19  transferred to the Southern District.  Can it be transferred to

20  the Southern District?  Are there other New York resident

21  defendants?

22          MS. MCNAMARA:  Yes, both Showtime and CBS have their

23  principal place of business in New York.

24          THE COURT:  Would it go to Southern District or would

25  there be diversity problems, a tort case?

1          MS. MCNAMARA:  No, I don't think there would be a

2     diversity problem.  I don't think so.  I mean, why if the

3     plaintiff would --

4          THE COURT:  Plaintiff's diverse.

5          MS. MCNAMARA:  Right.

6          THE COURT:  I don't know the other company, all are

7     in California?

8          MS. MCNAMARA:  Mr. Cheney is a California resident --

9     I mean, Mr. Cohen is a California resident and Showtime and CBS

10    their principle place of business are in New York.

11         THE COURT:  Nothing in Alabama?

12         MS. MCNAMARA:  No, there's no procedural problem.

13         THE COURT:  All right.

14         MR. KLAYMAN:  Your Honor, may I have one minute?

15         MS. MCNAMARA:  Your Honor, I would also note just

16    very quickly two small points.  Again, the plaintiff iterated,

17    argued again that the plaintiff had selected D.C. and so D.C.

18    should be his forum.  But the Supreme Court spoke squarely to

19    that point in Atlantic Marine when it says the plaintiff's

20    choice of forum merits no weight.  So that is simply not an

21    issue at all.

22         Then finally, Your Honor, the plaintiff also mentioned

23    that there was no consideration under the contract.  We would

24    argue clearly he selected the non-profit to give the money to.

25    That clearly was his choice, his consideration.

 1          But moreover, the fact remains that that argument was

 2   never raised in the papers and under the Singh case out of this

 3   District, it would have been waived.

 4               THE COURT:  All right, thank you.

 5               MS. MCNAMARA:  Thank you very much, Your Honor.

 6               THE COURT:  Certainly.

 7               MR. KLAYMAN:  May I have a minute?

 8               THE COURT:  Yes.

 9               MR. KLAYMAN:  I certainly thank you Your Honor.

10          The basic concept here is that this contract was entered

11   into by fraud.  It's voidable ad initio, the entire thing goes

12   out.

13               THE COURT:  I understand.

14               MR. KLAYMAN:  We cited the second restatement.  There

15   are D.C. cases which we cited, Your Honor, In Re:  Estate of

16   McKinney, 953 A 2d 336, 342 D.C. 2008 quoting Barrer,

17   B-A-R-R-E-R, versus Women's National Bank, 245 U.S. Appeals,

18   D.C. 349, 354 to 55 1985 wherein it was held, it is well

19   established that misrepresentation of material facts may be a

20   basis for the recision of a contract even where the

21   misrepresentations are made innocently without knowledge of

22   their falsity and without fraudulent intent.

23          So there's the exceptional case here, it was done

24   intentionally, willfully and maliciously, the fraud.  The

25   rationale supporting this rule which has its origins in equity

1  is that as between two innocent parties.  The party making the

2  representation should bear the loss.

3       The defendants, we don't even have the defendants here

4  because they were fraudulently concealed as well making this

5  even a more exceptional case.

6       Stated another way, the rule is based on the view that

7  quote, "no one has made a false statement ought to benefit at

8  the expense of another who has been prejudiced by relying on

9  that statement."  This rule may be employed actively as in a

10 suit at equity year (sic) law for recision and restitution or

11 possibly as a defense to a suit for breach of contract.

12      That's the essence.  There never was a contract here, it

13 is voidable.  That's why this is exceptional.  That's why this

14 is unusual.  That's why the fraud is massive.  That's why the

15 public policy weighs in favor of throwing out the entire

16 contract.  With the entire contract goes the choice of the

17 forum.  To reward them for committing five frauds on top of the

18 other and then bragging about it and then having themselves

19 nominated for Golden Globe giving interviews.  This is how I

20 tried to defraud the Secret Service, look at this.  That can't

21 be permitted in any court of law.

22      We know the age that we live in, Your Honor.  The age that

23 we live in is that no one believes either the entertainment

24 industry or the media anymore.  It's time that they clean their

25 act up.  The way that can be done because they won't do it

1  themselves is for this Court to start the process.

2          THE COURT:  All right.

3          MR. KLAYMAN:  I would like to add one more last

4  thing.  I'd like to give Your Honor a copy of this.  After this

5  whole concerted affair occurred, Ms. Isaac had delivered, I

6  have the return receipt for this as well.  A letter to both CBS

7  and Showtime and we said do not air this.  If you air it, you

8  will be sued for defamation.  They did it anyway because to

9  them money talks and nobody walks.  Doesn't matter who you

10 hurt.  This was very profitable at the expense of my client

11 whose reputation has been destroyed.  I know because I was with

12 him shortly after this in Birmingham and I could see the effect

13 on him and Kayla, his wife, who was also induced to go here.

14 This cannot be permitted, Your Honor, not in a civilized

15 society.  There's no reason why they can't come here and tell a

16 D.C. jury what their losing defenses may be.

17     Thank you.

18          THE COURT:  All right, thank you, Mr. Klayman.  I

19 appreciate the work again.

20     I'm going to issue a ruling at this time.  The case has

21 been pending before us.  It was filed in late 2018, but in any

22 event it's time to dissolve this matter one way or another and

23 move it to the next step for the parties to resolve this.

24     At the beginning I explained the background how this case

25 arose and the argument has further fleshed that out.  This will

1  be a bench opinion of the Court, will be the only opinion I'll

2  issue.

3      On the application defendants' that's plural, motion to

4  transfer the case under 28 U.S.C. 1404 and the case law that

5  applies following Atlantic Marine from the Supreme Court.  The

6  full case is Atlantic Marine Construction Company v. United

7  States District Court for the Western District of Texas,

8  decided 2013.  It's cited at 571 U.S. 49 and it's a unanimous

9  opinion by Justice Alito in reversing the lower court under the

10  forum-selection clause discussion and it's clear where they

11  held the present case both the District Court and the Court of

12  Appeals misunderstood the standard to be applied adjudicating a

13  Section 1404 motion in a case involving a forum-selection

14  clause are therefore reversed the judgment below.

15      They go through the series of case laws as they get to

16  that and they explain that a motion, this is a quote, "to

17  transfer under 1404 (a) calls on the district court to weigh in

18  the balance a number of case-specific factors and that the

19  presence of a forum-selection clause will be a significant

20  factor that figures in centrally the district court calculus

21  citing to an earlier case.

22      In any event, they eventually conclude that the

23  forum-selection clause does not render venue in a court wrong.

24  There is venue here or improper within the meaning of 1406 or

25  Rule 12(b)(3).  The clause may be enforced through a motion

1   transfer under 1404 (a).  Unlike Section 1406(a), the 1404(a)

2   does not condition transfer initial forum selection being

3   wrong.

4        They go on to explain that the 1404(a) is not a suitable

5   mechanism of enforcement forum-selection clause because they

6   agree with Atlantic Marine.  The Court of Appeals failed to

7   provide a sound answer to the problem of how you interpret a

8   forum-selection clause contract according to a non-federal

9   forum should be enforced or not, et cetera.

10       In this case, essentially what that says we have the

11  problem here is that the burden shifts differently with the

12  type of clause that we have here, forum-selection clause from

13  the normal considerations in the transfer on venue basis.

14       So that where the Supreme Court has held the calculus

15  changes when the parties' contract contains a valid

16  forum-selection clause.  In such a case we're advised I have to

17  ordinarily transfer the case to the forum specified in that

18  clause and should deny a transfer motion under Section 1404(a)

19  only under extraordinary circumstances unrelated to the

20  convenience of the parties.  It should be given controlling

21  weight in all but the most exceptional circumstances.  That's

22  another Supreme Court case, Ricoh at 487 U.S. 23 a 1988 case.

23       So now the way I have to look at this is that a non-movant

24  bears the burden of demonstrating that such extraordinary

25  circumstances exist.  So that Mr. Klayman and his client must

1  show the Court why I should not transfer the case to a forum

2  which the parties agree to.

3      So the forum-selection clause is valid.  The plaintiff's

4  choice of forum merits no weight and the Court should not

5  consider arguments about the parties' private interest.

6      The Supreme Court indicates that as I said clearly when

7  you review Atlantic Marine.  So I have to determine first if

8  the forum-selection clause is valid, enforceable and then if

9  so, I've got to determine whether the plaintiff has met the

10  burden of establishing their exceptional public interest

11  factors justify a denial of the transfer.

12      I'm going to conclude in this matter as to the purpose of

13  this motion only the clause is valid, enforceable and that the

14  plaintiff has not shown exceptional public interest factors

15  justify denying the transfer to the Southern District of New

16  York and will order such a transfer.

17      I'm going to make the following reasons and findings to

18  validate that decision.  First, as to the validity of the

19  forum-selection clause have been strongly attacked by the

20  non-movant in this case, the plaintiff, Judge Moore and his

21  wife, that it is brought fraud ab initio through the fraudulent

22  matters as discussed in the argument that obtained this TV show

23  that was shown to the detriment it's claimed of the plaintiff,

24  both plaintiffs.

25      So the forum- selection clause when you read it is number

1   6 totally different than the paragraph 4 that's been presented

2   to me where Mr. Moore changed the contract to his own review,

3   personal review of the contract, taking out behind invasion of

4   privacy such as any allegedly sexual oriented or offensive

5   behavior questioning.  Paragraph 6 is further down the bottom

6   of the page was not touched or marked or any question

7   apparently raised about it.

8        The plaintiffs think that the contract of being void ab

9   initio and therefore there's no basis to enforce it including

10  the forum-selection clause.

11       But as I said, the clause covers any claim in connection

12  with the Sacha Noam Baron production.  It is argued

13  additionally it can't be used against the non signatories to

14  the other defendants in this case to the contract because the

15  contract was between we'll call it YTV and Roy Moore, so that

16  would not be, these other people affected by have the right to

17  complain about the forum and could not move to transfer the

18  forum.

19       It seems to the Court that there are cases in this case in

20  this Court and other Courts that non signatories to the

21  agreement were bound by the forum-selection clause.  The claims

22  are closely related are that non-signatories whether you have

23  interest or derivative from related to the original case would

24  not be prejudiced by this.

25       So it seems to me that Mrs. Moore can't complain about the

1  transfer.  Additionally, the non-signatory defendants have two

2  reasons why they can rely upon the forum-selection clause as

3  well.

4      First, the agreement you read it talks about the producer

5  as, I'll try to pronounce it, Yerushalayim TV.  I'm calling it

6  YTV, that's the size, licensees, parents, subsidiaries and

7  affiliates, we have affidavits here that are un rebutted

8  despite the opposition claiming they shouldn't believe them.

9  And the article from a magazine as the opposition to believe in

10  these things.

11      Defendant submitted a declaration from the executive

12  producer of the program which states this YTV is only owned by

13  defendant Cohen.  It's only owned through the production

14  company which owns the program and licenses it that's a

15  licensee then to defendant Showtime and CBS.  So each of the

16  defendants and this included with the definition of producer in

17  the signatory consent agreement and there you may be

18  respectfully a parent or affiliate and licensee.  I think that

19  gives them the basis to move as well for the transfer under the

20  forum-selection clause.

21      The defendants argue alternatively they're intended to be

22  third party beneficiaries.  There are cases showing that it is

23  a recognized status and there have been cited by defendants

24  which we didn't discuss here, but there are cases establishing

25  that.  But I think the first principle that they're within the

1   line of licensees and affiliates is established by the evidence

2   and the affidavits before us.

3       So I think the defendants have the ability to enforce the

4   forum-selection clause.  The clause does apply to claims,

5   that's what it says, any claims have to be litigated in New

6   York brought by the plaintiffs, both plaintiffs in this case.

7       The plaintiffs' proposed sur-reply does not affect that

8   argument. They try to argue that the Shulman affidavit is

9   unsupported by real or actual evidence and they aren't intended

10  to be third party beneficiaries.  I don't see how that has any

11  bearing on a motion to transfer just challenging it by a news

12  article that somehow changes the contract.

13      So then I have to see whether or not the selection clause

14  is enforceable.  I think it is enforceable at this time because

15  of the following factors.  Despite the argument of the

16  plaintiff.  First of all, we look upon it if you look at the

17  law in D.C. that forum-selection clause is presumptively valid

18  and enforceable unless the party opposes the enforcement meets

19  a heavy burden showing their clause is a product of fraud or

20  that it's enforcement would contravene small, a strong public

21  policy of the forum in which suit is brought.  I believe that

22  was Judge Sullivan of our Court, D&S Consulting, 322nd F. Supp

23  at 49, 2018 case recently.  He's quoting from a D.C. Circuit

24  case of 2000, Marra, M-A-R-R-A, 216 F.3d at 124.

25      So unless it's tainted by fraud itself, talking about the

1    actual clause, not the entire contract or enforcement would

2    deprive his day in court.  It would not or their day in court

3    or any remedy or contravene a strong policy, public policy of

4    the forum state.

5        Again, going back I cited the Marra case, M-A-R-R-A, that

6    was originally tried 59 F. Supp 2d, 69 by Judge Urbina, but

7    then appealed to the cite I've already given.  So I don't see

8    any existence of those factors that would cause a difference

9    here.

10        Plaintiffs have argued forcibly that the entire agreement

11   was procured by fraud.  So they've argued using standard fraud

12   cases from D.C. and other places and restatement of contract

13   that the claim of fraud and the inducement is insufficient

14   whether or not it's insufficient to invalidate a

15   forum-selection clause.  But the case law is replete with

16   decisions that say it's the inclusion of the specific clause

17   forum-selection itself that must have been induced by fraud.

18   Not the entire contract even though it's part of the contract,

19   but more specifically there has to be claims of this particular

20   provision and we don't have that.  Nothing addresses in the

21   argument as to this particular provision as opposed to the

22   overall challenge on the contract.

23        You actually would have to have me find that fraud was so

24   overreaching in that it did affect the forum-selection clause

25   in order to invalidate it and I can't see that as the basis

1   that's before me in this argument.

2       They allege that Judge Moore was taken to D.C. to get this

3   award for his support of Israel, a totally fraudulent basis so

4   that he could be fraudulently portrayed as a pedophile on

5   national television.  And a television show was being produced

6   for YTV and not Cohen, Showtime and CBS basically that's a

7   fraud.  But that doesn't affect the forum-selection clause in

8   the agreement.

9       There's nothing that Judge Moore has alleged in any

10  affidavit otherwise that he was fraudulently induced to sign

11  the agreement as to the forum-selection clause itself.  There

12  was some claim that there's only one case in Alabama that says

13  that that was the Streit case Twentieth Century Fox which was

14  the same contract with some of the same defendants in this case

15  again about transferring it from Alabama to the Southern

16  District of New York and that that's an aberrant decision.

17  There's a series of D.C. cases we have which say actually the

18  same thing.  So that I don't think we can say that this is an

19  aberrant decision.

20      One for instance is the D&S Consulting referred to earlier

21  that is against the Kingdom of Saudi Arabia by Judge Sullivan.

22  One quote he has in there is forum-selection clauses are

23  presumably valid enforceable unless the party opposing

24  enforcement meets a heavy burden of proof, showing the clause,

25  the clause is the product of fraud or it's enforcement would

1   contravene a strong public policy in the forum which suit is

2   brought.

3        I'm not saying this Court endorses any kind of fraud, but

4   I don't see how the fact before me constitute that I can say

5   this particular forum-selection clause was fraudulent.

6        The general allegations about fraud and the inducement

7   that should set aside this contract is available to the

8   plaintiffs to litigate in the Southern District in New York.

9   There's nothing stopping them from raising that.  If they're

10  successful in that that's fine, but there's no reason it has to

11  be tried here that I could find.

12       Now the other part of it would be whether or not the

13  analysis I determined whether there's extraordinary

14  circumstance to justify the denial of the motion to transfer

15  the one that's the public interest.  We already discussed

16  whether or not it is against the public policy in D.C. beyond

17  the claim of fraud.  I don't see that.  So arguing about a

18  local D.C. jury, I don't see that there's any kind of a

19  relative suggestion to the Court that makes it better to try it

20  here than there.  In fact, if you look up the difference in

21  media time in filing civil cases and disposing of them.  In

22  last year the District of Columbia was six months and the

23  Southern District of New York was 6.4 months.  There's really

24  no difference in that factor.

25       The choice of law agreement in the contract talks about

1   the substantive law City of New York will agree which means it

2   probably should be tried in New York then because that's the

3   law that will apply unless the parties are successful, the

4   plaintiff is successful entirely in turning down the entire

5   contract because of fraud, but that is going to be for the

6   local court to try that and not me.

7        The localist deciding it here because of the alleged

8   tortious conduct occurred in D.C.  That's the only connection

9   with D.C.  No one resides here.  There's some argument maybe

10  the witnesses are here.  Well, the only witnesses are those who

11  were involved wherever the taping was done, where that was done

12  in the hotel room.  The witnesses say that they were in the

13  hotel from the hotel I mean that's pretty evident.

14       Judge Moore and his wife reside in Alabama.  Cohen resides

15  in California.  Showtime and CBS are apparently headquartered

16  in New York where their employees, some of the employees would

17  be.  I don't see how that changes the equation that I have to

18  use to determine whether it's appropriate here.

19       I don't see how the, even the supplemental material that

20  they wish to file about the Salon article that defendants they

21  argue are inextricably tied to TV and to Washington, D.C. with

22  this TV show.  I don't think there's any bearing whether or not

23  the forum-selection clause that Judge Moore had signed

24  originally has to be transferred or not.  Certainly venue would

25  be appropriate here.

1      I don't see an extraordinary circumstance that justify the

2  Court's refusing to enforce the forum-selection clause despite

3  the claim that the contract as an overall was fraudulently

4  induced.  It would have to be as to this clause individually.

5      So under the case law it's very, very clearly established.

6  I see no alternative except to transfer the case to the

7  Southern District of New York and grant the motion of all of

8  the defendants.  That'll be the order of the Court.  I'll

9  submit an order to that effect.

10      Thank you all for coming in.  I appreciate it.

11      Mr. Klayman, thank you for the argument.  I appreciate it.

12  That's the decision of the Court.

13      (Proceedings adjourned at 11:07 a.m.)

14                          -o0o-

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2      I certify that the foregoing is a true and correct

 3 transcript, to the best of my ability, of the above pages, of

 4 the stenographic notes provided to me by the United States

 5 District Court, of the proceedings taken on the date and time

 6 previously stated in the above matter.

 7      I further certify that I am neither counsel for, related

 8 to, nor employed by any of the parties to the action in which

 9 this hearing was taken, and further that I am not financially

10 nor otherwise interested in the outcome of the action.

11

12 /s/Crystal M. Pilgrim, RPR, FCRR    Date:  May 8, 2019

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# **<u>EXHIBIT 4</u>**

ELECTRONICALLY FILED
4/30/2018 3:48 PM
31-CV-2018-900346.00
CIRCUIT COURT OF
ETOWAH COUNTY, ALABAMA
CASSANDRA JOHNSON, CLERK

# IN THE CIRCUIT COURT OF
# ETOWAH COUNTY, ALABAMA

| | | |
|---|---|---|
| **ROY MOORE**, | ) | JURY TRIAL REQUESTED |
| **KAYLA MOORE**, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil No. _____ |
| | ) | |
| **RICHARD HAGEDORN**, | ) | |
| **MARJORIE LEIGH CORFMAN**, | ) | |
| **DEBBIE WESSON GIBSON**, | ) | |
| **BEVERLY YOUNG NELSON**, | ) | |
| **TINA TURNER JOHNSON**, | ) | |
| **FICTITIOUS DEFENDANTS 1-19,** | ) | |
| | | |
| Defendants. | | |

## **COMPLAINT**

Roy S. Moore and Kayla Moore, residents of Etowah County, Alabama, allege:

### **PARTIES & VENUE**

1.　Plaintiff, **Roy Moore**, is an individual over the age of nineteen (19) years and is a resident of Etowah County, Alabama.

2.　Plaintiff, **Kayla Moore**, is an individual over the age of nineteen (19) years and is a resident of Etowah County, Alabama.

3.　Defendant, **Richard Merlin Hagedorn** ("Hagedorn"), is an individual over the age of nineteen (19) years and is, upon information and belief, a resident of Etowah County, Alabama.

4.　Defendant, **Marjorie Leigh Corfman, aka Marjorie Leigh Polston Miles Corfman** ("Corfman"), is an individual over the age of nineteen (19) years and is, upon

information and belief, a resident of Etowah County, Alabama.

5.      Defendant, **Debbie Wesson Gibson** ("Gibson"), is an individual over the age of nineteen (19) years and, upon information and belief was a resident of Alabama and is currently a resident of Florida.

6.      Defendant, **Beverly Nelson, aka Beverly Young Harris Nelson** ("Nelson"), is an individual over the age of nineteen (19) years and is, upon information and belief, a resident of Anniston, Alabama.

7.      Defendant, **Tina Johnson, aka Tina Harvey Turner Lee Sitz Johnson** ("Johnson"), is an individual over the age of nineteen (19) years and is, upon information and belief, a resident of Etowah County, Alabama.

8.      Fictitious Defendants, described above as numbers one (1) through nineteen (19), are those persons or entities whose names will be substituted upon learning their true identities.

## FACTUAL BACKGROUND

9.      On April 26, 2017, Plaintiff Roy Moore ("Judge Moore), with his wife Kayla standing by his side, announced his candidacy for the Alabama U.S. Senate seat that had been vacated by the appointment of Jeff Sessions as United States Attorney General.

10.     Prior to that announcement, Judge Moore had twice been elected Chief Justice of the Alabama Supreme Court and had also served in elective office as a circuit judge in Etowah County.

11.     Judge Moore came in first in the August 15, 2017 Republican primary for U.S. Senate and also won the run-off election held on September 26, 2017. As the Republican nominee, he faced Democrat Doug Jones in the December 12, 2017 special election.

12.     Judge Moore has consistently espoused Biblical principles during his career in public life. No hint of scandal has ever attended any of his contests for public office from the

time he first ran for circuit judge in 1982 until his success in the two Senate primary elections in 2017, a period of 45 years. During that time, he ran for district attorney (1986), was appointed as a circuit judge (1992) and then elected to a full term (1994), was elected Chief Justice of the Alabama Supreme Court (2000), ran for governor twice (2006 and 2010), was re-elected as Chief Justice (2012), and won two primary elections for U.S. Senate (2017).

13.     During all his time in public life, beginning with his appointment as Deputy District Attorney for Etowah County in 1977, no suggestion of personal impropriety had ever been raised. Judge Moore has stood for public office eight times in Alabama. Yet 32 days before the December 12, 2017 special election, as he was on the verge of becoming the next U.S. Senator from Alabama, vile accusations of sexual impropriety suddenly appeared in the media.

14.     Although the liberal media, eager to bury Judge Moore's candidacy, have repeated over and over the mantra of "nine accusers," in fact only three women alleged improper conduct. Those three accusers, Defendants Leigh Corfman, Beverly Nelson, and Tina Johnson have all defamed Judge Moore by accusing him of immoral acts he never committed and adamantly denies.

15.     Corfman through an interview published in the Washington Post accused Judge Moore of sexual misconduct when she was 14 years old in 1979.

16.     Nelson on national television accused Judge Moore of attacking her in 1977 when she was 16 and throwing her out of a vehicle when she resisted.

17.     Mrs. Johnson accused Judge Moore of grabbing "her buttocks" as she was leaving his law office with her mother after an appointment in 1991.

18.     Those accusations involved events that supposedly occurred from 26 to 40

3

years ago. Yet they all coincidentally surfaced for the first time within a seven-day period, a mere 32 days before the December 12 general election. Corfman's accusation appeared in the Washington Post on Thursday, November 9; Nelson appeared on national television in a press conference with her attorney, Gloria Allred, on Monday, November 13; Johnson's story appeared in AL.com on Wednesday, November 15.

19.     On August 14, 2017, Gibson posted on social media that Hagedorn was "right to want outright denouncement from politicians and candidates for office. Silence, especially about Charlottesville, speaks volumes" in reference to Hagedorn's post on August 13, 2017. Hagedorn's post read as follows; "Dear local politicians and Senate candidates... it has come to some of us attention that you have been silent about yesterday's event."

20.     Gibson and Hagedorn in their posts revealed their true political agenda months before the Washington Post [hereinafter referred to as "WAPO"] allegations. In fact, on August 13, 2017, according to AL.com, Judge Moore released a statement to the press that read: "The violence and hatred behind the events in Charlottesville is unacceptable and must be stopped. These inexcusable acts will only cause more violence and division in our communities. Now is the time to turn to God and ask Him to change the hearts and heal our land. My prayers go out to those innocent victims involved."

21.     Gibson and Hagedorn revealed their true political agenda to ignore the truth in an effort to discredit "local politicians and Senate candidates."

22.     On September 20, 2017 Gibson posted a message of support for Doug Jones on her Facebook page which included an announcement that Vice President Joe Biden would visit Alabama to campaign for Jones. Wesson was a sign language interpreter for Hillary Clinton during her 2016 presidential campaign and had interpreted for Joe Biden in 2012. In early 2018 Gibson attempted to qualify as a Democrat to run for a seat in the Florida House

4

of Representatives.

23.     On or about October 12, 2017, Hagedorn met with an agent for the WAPO at the Big Chief Restaurant in Glencoe, Alabama and made statements which were false and defamatory, knowing that they would harm the character and reputation of Judge Moore.

24.     Hagedorn's brother, David Hagedorn, is a columnist for WAPO and resides in Washington, D.C., with his male partner. Supreme Court Justice Ruth Bader Ginsburg presided over the high-profile marriage of Hagedorn and his partner in Washington, D.C., while the case of *Obergefell v. Hodges* was pending before her Court. Richard Hagedorn attended the "wedding." Judge Moore had been critical of the same-sex marriage movement and its success in the federal courts prior to his candidacy for U.S. Senate. He had, in particular, criticized Justice Ginsburg for performing same-sex marriages while the legal validity of that practice was at issue in a case pending before her Court.

25.     Richard Hagedorn reposted on his Facebook page a message that "Roy Moore tells church congregation a conspiracy of 'lesbians, gays, bisexuals, socialists" are behind his multiple pedophilia accusations." Above that post, he added the headline: "This is why WE fight Roy Moore," revealing his true bias against Judge Moore and his true political motivation for participation in a conspiracy to defeat his candidacy.

26.     Further, Hagedorn did conspire and encourage others to make statements defaming Judge Moore's name and reputation.

27.     On or about October 13, 2017, Gibson posted a link on her Facebook page to a New York Magazine article entitled: "Democrats Have a Real Chance to Beat Roy Moore They Should Take It." At the time Gibson made this post, the allegations against Judge Moore had not been made public, and he was approximately 11 points ahead in the polls over his Democrat opponent, Doug Jones.

5

28.    In mid-October 2017, Corfman met with Eddie Sexton, an attorney with the firm of Gentle Turner Sexton & Harbison, LLC. Ed Gentle, founding member of the firm, has been the Treasurer of the Alabama Democratic Party since 2011 and wrote an article supporting Doug Jones candidacy for U.S. Senate on August 31, 2017.

29.    On November 9, 2017, the day the WAPO article was released, Attorney Sexton stated that Corfman told her story to the WAPO because "it was the right time to do it" and that Corfman had been discussing the matter with WAPO for several weeks.

30.    On November 29, 2017, twenty days later, Sharon Rondeau of the ThePostEmail.com reported that Sexton no longer represented Corfman. After calling and speaking with a receptionist from Gentle Turner Sexton & Harbison, LLC, Rondeau was informed that Sexton "is no longer representing [Corfman]." The receptionist stated, "I don't know who is representing her now, but it's no one in our firm." No reason was given for the loss of representation.

31.    The WAPO article entitled "Woman says Roy Moore initiated sexual encounter when he was 14, he was 32" was published On November 9, 2017. Corfman's account to the WAPO was false and malicious. She knowingly, wantonly and intentionally conveyed false information to WAPO in order to defame the character and reputation of Judge Moore, knowing and intending that her false and malicious statements would be republished across Alabama and the nation.

32.    Corfman's actions were rewarded financially and were attended with such notoriety as to encourage her conduct.

33.    Hagedorn not only conveyed false and malicious information to the WAPO but escorted its reporters for several days in Etowah County and attended meetings with other individuals, including Corfman and Wesson to further the false and malicious attacks on the

6

character and reputation of Judge Moore.

34.   On the evening of November 9, Hagedorn posted on this Facebook page a picture of his "friend of 40 years" Leigh Corfman, expressing his support and encouragement for her defamatory statements.

35.   Two days later, Hagedorn spoke with a reporter of BirminghamWatch.Org and said that he had "known Leigh Corfman for 25 years," and that he and Corfman talked about Judge Moore over the past "few years" but never in "great detail."

36.   In that article Hagedorn admitted to "drug offenses" and "prison" but failed to disclose that after serving prison sentences for trafficking and possession of cocaine, he was subsequently held in contempt of court by Judge Moore on May 18, 1994 for non-payment of past-due alimony and child support amounting with interest to $63,154.33. The following day, Judge Moore issued an income withholding for monthly payments of $600 against that arrearage.

37.   Most recently, Hagedorn plead nolo-contendere (no contest) to possession of marijuana in Okaloosa County, Florida.

38.   On November 13, 2017, only four days after the publication of the WAPO article and less than 30 days before the date of the special election for U.S. Senate, Beverly Nelson accused Judge Moore of assault and inappropriate advances of a sexual nature in December 1977 resulting in bruising to her neck and being abandoned in a parking lot outside her place of employment. Nelson further claimed that Judge Moore had flirted with her and signed her high-school yearbook. Nelson's attorney, Gloria Allred, called for a Senate Judiciary Committee investigation into the matter before the election but refused to release the yearbook for examination. Nelson later admitted adding "notes" to the yearbook which she had formerly attributed to Judge Moore.  Nelson further stated that Judge Moore

7

said to her: "You're just a child and I'm the District Attorney of Etowah County and if you tell anyone about this no one will believe you."

39.     In a televised news conference on November 13, 2017, Nelson further stated that she was attacked "as a child" and was frightened by Judge Moore's position and power. "I am coming forward to let Mr. Moore know that he no longer has any power over me and I no longer live in hear of him." Nelson failed to disclose that on June 21, 1991, Etowah County Circuit Judge Roy Moore presided over a divorce action between herself and her husband, Ervine Lee Harris, III. At the petition of both parties Judge Moore signed an order dismissing the divorce action. The signature on the order read "Roy Moore/DA." The initials "DA" stood for Delbra Adams, Judge Moore's judicial assistant. That same signature was later forged in Nelson's yearbook, including the inscription "/DA" which Nelson claimed represented his position as "district attorney," but actually represented the initials of his assistant, Delbra Adams. (See Plaintiffs exhibit 9.)

40.     On November 14, 2017, the day after Mrs. Nelson's telecast, Hagedorn posted a message of support for Mrs. Nelson on his Facebook page wishing her "Happy Birthday" and encouraging her to go "viral" with her story.

41.     Hagedorn's dislike and animosity toward Judge Moore are reflected in numerous posts on his social media pages and in his close relationships with Wesson, Corfman and Nelson. Those posts include libelous and damaging messages about the character and reputation of Judge Moore.

42.     On November 15, 2017, two days after Nelson's explosive allegations, and only six days after the WAPO story about Corfman, AL.com posted a story that Judge Moore, while in private practice had grabbed Tina Johnson's buttocks as she and her mother exited his law office in 1991. That statement was false and malicious and constitute slander

8

and libel. Johnson's story was repeated many times by state and national press outlets.

43.     Johnson has a motive to harm the character and reputation of Judge Moore because of a past case in which he represented her mother to change legal custody of her son from herself to her mother.

44.     Johnson's mother, Mary Katherine Cofield, signed an affidavit that is in the public record stating that Johnson had a violent nature and had been treated by a psychiatrist when she was approximately 15 years old.

45.     On November 21, 2017, Hagedorn posted to social media: "Women of Alabama protect yourselves and your daughters ... Vote Doug Jones ..."

46.     On December 4, 2017, a mere four days before Nelson was to confess that she had forged part of the yearbook inscription she had attributed to Judge Moore, Gibson shared with the WAPO a 1982 graduation card from Judge Moore that she had recently discovered in her attic. She claimed that the handwriting on the card was similar to that in Nelson's yearbook, thus seeking to corroborate Nelson's story.

47.     On December 26, 2017, two weeks after the special election, Hagedorn posted on his Facebook page a picture of himself at a restaurant in Delray Beach, Florida with his arm around Gibson. He added the mocking caption: "Happy New Year Roy!!"

48.     Each of the above-named defendants have committed libel and slander against Judge Moore by making statements which were false, malicious, and made with intentional or reckless disregard of the truth and with the intent that those statements be published to others including through state and national media. Those statements caused harm to the reputation and character of Judge Moore and also to his wife Kayla, lowered their standing in the community, and discouraged members of the community from associating with them. By making such statements to the public media, each of the defendants knew or should have

known that their comments would be widely disseminated, exposing Judge Moore and also

his wife Kayla, to disgrace, ridicule, odium and contempt resulting in general and special

damages. Judge Moore suffered economic harm both in the U.S. Senate campaign and in

time expended refuting the false allegations.

49.     Each of the above named individuals conspired and and associated with each

other in a common design and purpose for the political objective of defaming the character

and reputation of Roy and Kayla Moore in such manner as to cause them to experience

disgrace, shame and contempt.

50.     As a proximate cause of the intentional or reckless publication of defendants'

statements, Plaintiffs Roy and Kayla Moore were injured, harmed and damaged as follows:

(a)     Roy and Kayla Moore suffered damage to their reputations;
(b)     Judge Moore was unsuccessful in his bid for a U.S. Senate seat;
(c)     Roy and Kayla Moore suffered financial damage in the form of lost wages and
        opportunities;
(d)     Roy Moore's opportunity to run for political office was impaired;
(e)     Roy and Kayla Moore suffered loss of their ability to peaceably appear in
        public places without suffering unwarranted humiliation that was a direct
        result of defendants' defamatory attacks on their character.

## CAUSES OF ACTION

## COUNT ONE - NEGLIGENCE

51.     Plaintiffs re-allege all preceding paragraphs of the Complaint as if fully set forth

herein.

52.     At the aforesaid time and place, defendant(s) owed a duty to Plaintiffs to, *inter

alia*, refrain from and stop using defaming material that they reasonably or should have

reasonably know to be false.

53.     Defendants breached their duties to the Plaintiffs by negligently slandering and

allowing said statements to be published about the Plaintiffs, as aforesaid.

54.     As a proximate consequence of the negligence of the Defendants, Plaintiffs were injured and damaged as set forth above, herein.

## COUNT TWO - WANTONNESS

55.     Plaintiffs re-allege all preceding paragraphs of the Complaint as if fully set forth herein.

56.     At the aforesaid times and manners, Defendants wantonly and recklessly caused defamatory material to be published and disseminated throughout the State of Alabama and the nation using television, social media and other media outlets, as aforesaid.

57.     Defendants made the conscious decision to make defamatory statements that were both false and misleading about Judge Moore with total disregard for the truth and with malicious indifference to the innocence of others.

58.     As a proximate consequence of the wantonness and recklessness of the Defendants, Plaintiffs were injured and damaged as set forth above, herein.

## COUNT THREE – DEFAMATION

59.     Plaintiffs re-allege all preceding paragraphs of this Complaint as if fully set forth herein.

60.     At the time and place of the incidents made the basis of this suit, Defendants made statements that they knew to be false or in reckless disregard of the truth and that were defamatory of the Plaintiff. Defendants thereby caused damage to the Plaintiff's reputation and character. Their intentional, reckless, and/or wanton conduct was a proximate cause of the Plaintiff's injuries and damage described above, herein.

## COUNT FOUR – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

61.     Plaintiffs re-allege all preceding paragraphs of this Complaint as if fully set forth herein.

62.     At the aforesaid times and places, Defendants produced and disseminated defamatory material about Judge Moore with a complete disregard for truth and negligently, recklessly, intentionally and/or wantonly caused emotional distress to Roy Moore and Kayla Moore. Defendants are liable to the Plaintiffs in damages for those actions.

### COUNT FIVE – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

63.     Plaintiffs re-allege all preceding paragraphs of this Complaint as if fully set forth herein.

64.     At the aforesaid times and places, and for some time prior Defendants, with the intent to cause damage to the Plaintiffs, did intentionally utter, produce, and disseminate spoken and written communications to harm the reputation and character of Roy Moore.  The aforesaid outrageous and shocking acts were done with the intent of causing emotional distress and injury to Roy Moore and Kayla Moore and were a proximate cause of the Plaintiffs' injuries as described above, herein.

### COUNT SIX – OUTRAGE

65.     Plaintiffs re-allege all preceding paragraphs of this Complaint as if fully set forth herein.

66.     At the aforesaid times and places, Defendants—with the intent to cause severe damage to the Plaintiffs' reputation and standing in the community—intentionally or recklessly engaged in extreme and outrageous conduct that caused emotional distress so severe that no reasonable person could be expected to endure it.  Fully aware of the probable emotional impact their actions would have on the Plaintiffs, the Defendants nonetheless recklessly and willfully disregarded the consequences of their actions.

## COUNT SEVEN – CIVIL CONSPIRACY

67.     Plaintiffs re-allege all preceding paragraphs of this Complaint as if fully set forth herein.

68.     In addition to committing the underlying torts stated in the previous counts, Defendants agreed and worked together to achieve the common end of damaging the Plaintiffs' reputations in Alabama and nationwide and destroying Judge Moore's prospects for election to the U.S. Senate.

## REQUEST FOR RELIEF

1.      Plaintiffs demand judgment against Defendants for compensatory damages together with interest from the date of the injuries plus the costs of this action.

2.      Plaintiffs request judgment against Defendants for punitive damages in an amount that will adequately reflect the enormity of the Defendants' wrongful, outrageous acts and which will effectively deter other similar wrongful acts.

3.      Plaintiffs request further relief as allowed by law and as appropriate.

## PLAINTIFFS DEMAND A TRIAL BY JURY
## OF ANY ISSUE SO TRIABLE

Respectfully submitted,

s/Melissa L. Isaak_____
Melissa L. Isaak (ISA 007)
Attorney for Roy Moore
and Kayla Moore
The Isaak Law Firm
P.O. Box 4894
Montgomery, AL  36103
334-262-8200  tel
334-819-4072  fax

**<u>Complaint served by private process server</u>**

# **<u>EXHIBIT 5</u>**

## EXHIBIT A

**To the Declaration of Joan Hansen
in Support of Defendants' Motion To Dismiss the Complaint**



**One America Productions, Inc.**

Dear Film Participant,

Thanks very much for your interest in appearing in our Film. We're glad that you want to appear in the Film to share your views or insights with the public.  Attached is our standard legal consent agreement. You'll see it explains that in addition to the chance to appear in the Film, you will get an appearance fee of $500 in return for your letting us have unrestricted rights to use your image and voice in our Film. As the agreement makes clear, you will be waiving all claims in relation to the Film.

Please read, sign and return the agreement. Thanks again for your cooperation.

Yours sincerely,

8023 Beverly Boulevard • Suite 5-503 • Los Angeles, CA 90048-4523 • Ph 323.850.3120 • Fx 323.850.3112

STANDARD CONSENT AGREEMENT

This is an agreement between One America Productions, Inc. (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ 500 (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability to the Participant, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, that include assertions of (a) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (b) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (c) damages caused by acts of terrorism or war, (d) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (e) false light (such as any allegedly false or misleading portrayal of the Participant), (f) infliction of emotional distress (whether allegedly intentional or negligent), (g) trespass (to property or person), (h) breach of any alleged contract (whether the alleged contract is verbal or in writing), (i) allegedly deceptive business or trade practices, (j) copyright or trademark infringement, (k) defamation (such as any allegedly false statements made on the Film), (l) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (m) prima facie tort (such as alleged intentional harm to the Participant), (n) fraud (such as any alleged deception or surprise about the Film or this consent agreement), (o) breach of alleged moral rights, or (p) tortious or wrongful interference with any contracts or business of the Participant.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State of New York and County of New York, under the laws of the State of New York.

AGREED AND ACCEPTED:

Michael E. Psenicska

[please sign above line and print name below]

Dated: 06-13-05

[date to be filled in by Participant]

One America Productions, Inc.

By: _____

[please sign above line and print name below]

Name: Michael E. Psenicska

Address:
____  **REDACTED**

Phone Number:
_____  **REDACTED**

Social Security
Number: _____  **REDACTED**

# **<u>EXHIBIT 6</u>**

**<u>EXHIBIT D</u>**

**To the Declaration of Joan Hansen
in Support of Defendants' Motion To Dismiss the First Amended Complaint**

## STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ _100_ (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film, with the working title of "The New Americans" (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, which are related to the Film or its production, including, but not limited to, claims involving assertions of (a) failure to compensate Participant beyond the amount provided above, (b) failure to use the footage of Participant in the Film, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made on the Film), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Film or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.

AGREED AND ACCEPTED:

_Craig Street_

[please sign above line and print name below]

Dated: _10/24/05_
[date to be filled in by Participant]

Springland Films

By: _____

[please sign above line and print name below]

Name: _____

Address: _ **REDACTED**

Phone Number: ____ **REDACTED**

Social Security Number: _____

STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ _100_ (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film, with the working title of "The New Americans" (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, which are related to the Film or its production, including, but not limited to, claims involving assertions of (a) failure to compensate Participant beyond the amount provided above, (b) failure to use the footage of Participant in the Film, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made on the Film), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Film or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.

AGREED AND ACCEPTED:   _Sarah Mosley_

_Sarah Mosley_
X
[please sign above line and print name below]

Dated: _10-24-0C_
[date to be filled in by Participant]

Springland Films

By: _____

[please sign above line and print name below]

Name: _Sarah Mosdey_

Address: _ **REDACTED**

Phone Number: _ **REDACTED**

Social Security Number: _

STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ 100 (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film, with the working title of "The New Americans" (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, which are related to the Film or its production, including, but not limited to, claims involving assertions of (a) failure to compensate Participant beyond the amount provided above, (b) failure to use the footage of Participant in the Film, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made on the Film), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Film or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.

AGREED AND ACCEPTED:

*Ben K. McKinnon*
Ben K. McKinnon
[please sign above line and print name below]

Dated: 10/24/05
[date to be filled in by Participant]

Springland Films

By: *Todd Hill*

[please sign above line and print name below]

Name: _Ben K. McKennan_

Address: __     **REDACTED**

Phone Number: __     **REDACTED**

Social Security Number:_____

STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ *100* (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film, with the working title of "The New Americans" (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, which are related to the Film or its production, including, but not limited to, claims involving assertions of (a) failure to compensate Participant beyond the amount provided above, (b) failure to use the footage of Participant in the Film, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made on the Film), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Film or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.

AGREED AND ACCEPTED:

_____

[please sign above line and print name below]

Dated: _10/24/05_
[date to be filled in by Participant]

Springland Films

By: _____

[please sign above line and print name below]

Name: _____ MICHAEL M. JARED _____

Address: ____ **REDACTED**

Phone Number: _____ **REDACTED**

Social Security Number: _____

STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ _100_ (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

    1.  The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film, with the working title of "The New Americans" (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

    2.  The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

    3.  The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

    4.  The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, which are related to the Film or its production, including, but not limited to, claims involving assertions of (a) failure to compensate Participant beyond the amount provided above, (b) failure to use the footage of Participant in the Film, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made on the Film), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Film or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

    5.  This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

    6.  Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York.

AGREED AND ACCEPTED:

_[signature]_                                          Springland Films

[please sign above line and print name below]          By: _[signature]_

Dated: _10/24/05_
[date to be filled in by Participant]                  [please sign above line and print name below]

Name: _____ *Lynn S. Jared* _____

Address: _____            **REDACTED**

Phone Number: _____     **REDACTED**     _____

Social Security Number:_____

# **<u>EXHIBIT 7</u>**

## **EXHIBIT B**

**To the Declaration of Slade R. Metcalf
in Support of Defendants' Motion To Dismiss the First Amended Complaint**

## STANDARD CONSENT AGREEMENT

This is an agreement between Springland Films (the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer's obligation to pay a participation fee in the amount of $ _350_ (receipt of which is acknowledged by the Participant) and the opportunity for the Participant to appear in a motion picture, the Participant agrees as follows:

1. The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film (the "Film"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2. The Participant agrees that any rights that the Participant may have in the Film or the Participant's contribution to the Film are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Film and any recorded material that includes the Participant without restriction in any media throughout the universe in perpetuity and without liability to the Participant, and the Participant hereby grants any consents required for those purposes. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Film, but also in any advertising, marketing or publicity for the Film and in connection with any ancillary products associated with the Film.

3. The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Film and the Participant's participation in it, and that the consent agreement, for this and other reasons, shall be irrevocable.

4. The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Film, that include assertions of (a) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (b) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (c) damages caused by acts of terrorism or war, (d) intrusion (such as any allegedly offensive behavior or questioning or any invasion of privacy), (e) false light (such as any allegedly false or misleading portrayal of the Participant), (f) infliction of emotional distress (whether allegedly intentional or negligent), (g) trespass (to property or person), (h) breach of any alleged contract (whether the alleged contract is verbal or in writing), (i) allegedly deceptive business or trade practices, (j) copyright or trademark infringement, (k) defamation (such as any allegedly false statements made on the Film), (l) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Film or the Film in relation to the Participant), (m) prima facie tort (such as alleged intentional harm to the Participant), (n) fraud (such as any alleged deception or surprise about the Film or this consent agreement), (o) breach of alleged moral rights, or (p) tortious or wrongful interference with any contracts or business of the Participant, or any claim arising out of the Participant's viewing of any sexually-oriented materials or activities.

5. This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.

6. Although the Participant agrees not to bring any claim in connection with the Film or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought

before, and adjudicated by, only a competent court located in the State of New York and County of New York, under the laws of the State of New York.

AGREED AND ACCEPTED:

_Kathie B. Martin_

[please sign above line and print name below]

Springland Films

By: _Jeff_

[please sign above line and print name below]

Dated: _10-24-05_
[date to be filled in by Participant]

Description:   Shirt _Blue_   _Purple Suit_   Height_____   Age_____

Hair_____   Sex _F_

Other_____

Name: _Kathie B. Martin_

Address:                    **REDACTED**

Phone Number: _____   **REDACTED**

Social Security Number:_____

_ETIQUETTE COACH_

# **EXHIBIT 8**

# KLAYMAN LAW GROUP
## A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.                    2020 Pennsylvania Ave. N.W., #800                    Tel: 310-595-0800
                                       Washington, DC, 20006                               Fax: 202-379-9289

July 16, 2019

**Via Electronic Mail and Federal Express**

Hon. Andrew L. Carter, Jr.
U.S. District Court for the Southern District of New York
40 Foley Square
New York, NY 10007

**Re:**   *Moore, et al. v. Cohen, et al.*, 1:19-cv-4977-ALC

Dear Judge Carter:

Pursuant to Your Honor's Order of July 2, 2019 [Dkt. # 41], Plaintiffs hereby respectfully submit the following based on the compelling facts and laws of this case:

## Introduction

First, the alleged Standard Consent Agreement (the "Agreement") between Plaintiffs and "Yerushalayim TV" is void and unenforceable for several reasons. The Restatement (Second) and New York law prohibit such types of "agreements" because it is a longstanding principle of contract law that a misrepresentation of material facts may be a basis for the rescission of a contract and thus void. The Agreement is also based on several levels of fraud. Moreover, a release that employs general terms will not bar subsequent claims outside the parties' contemplation at the time the release was executed. As discussed below, the Agreement cannot stand.

Second, Plaintiffs state valid claims against Defendants as a matter of law. Even a comedian with the reputation of Sasha Baron Cohen does not enjoy a James Bond-like 007 license to slander and defame. "[T]he danger implicit in affording blanket protection to humor or comedy should be obvious, for surely one's reputation can be as effectively and thoroughly destroyed with ridicule as by any false statement of fact. 'The principle is clear that a person shall not be allowed to murder another person's reputation in jest.'" *Frank v. National Broadcasting Co.*, 119 A.D.2d 252, 257, (N.Y. App. Div. 1986) (citations omitted).

Whether couched as opinion, humor, or rhetorical hyperbole, which Defendants attempt, defamatory statements made by a comedian are actionable where a reasonable listener or viewer could conclude that he or she was asserting or implying false facts about a plaintiff. If the challenged statements and conduct are reasonably susceptible to such a defamatory interpretation, their true meaning is a question of fact for the jury to resolve at trial.

Defendants' televised statements and actions about Judge Moore are reasonably susceptible to a defamatory interpretation. Under New York law, these defamatory statements and actions are a recognized form of defamation for false statements relating to Judge Moore's conduct of his trade,

1

business or profession and also accuse him of one of the most heinous crimes. Accordingly, Plaintiffs have stated viable claims for defamation.[1]

**Argument**

### A.      The Consent Agreement is Invalid and of No Force and Effect.

The Agreement was procured through fraud after fraud and cannot stand on this basis alone. Here, however, because Plaintiffs intend to fully brief the fraud issue in their opposition to Defendants' motion to dismiss, Plaintiffs focus on another aspect of why the Agreement cannot stand. Simply put, New York law does not construe a general release to bar claims for injuries unknown at the time the release was executed, even when the release contains broad language. *E\*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273 (S.D.N.Y. 2006).

Under New York law, the dispositive factor in determining the scope of a release is the parties' intent. *E\*Trade Fin. Corp.*, 420 F. Supp. 2d at 284-85; *Neuman v. Harmon*, 965 F. Supp. 503, 509 (S.D.N.Y. 1997). "[A] release like any contract must be construed to give force and effect to the intention of the parties." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 404 (2d Cir. 2000) (applying New York law). A court must "**determine the intent of the parties by examining the entirety of the settlement, the parties' acts, and all other conduct and surrounding circumstances that bear on the issue.**" *Actrade Liquidation Trust v. Greenwich Ins. Co. (In re Actrade Fin. Techs. Ltd.)*, 424 B.R. 59, 73 (S.D.N.Y. 2009) (emphasis added).[2]

Here, notwithstanding that the Agreement was procured through fraud, there is no question that Plaintiffs never contemplated a waiver of all rights when executing the Agreement, particularly since Judge Moore *affirmatively crossed out and initialed* the language which referred to "sexual oriented or offensive behavior or questioning." A representative for "Yerushalayim TV" accepted Judge Moore's change to the agreement and then signed it. Clearly, there was no meeting of the minds here and the entire Agreement was based on a lie.

Moreover, Defendants' example of case authority does not apply. In *Psenicska v. Twentieth Century Fox Film Corp.*, No. 07-cv-10972, 2008 Dist. LEXIS 69214 (S.D.N.Y. Sept. 3, 2008), movie participant plaintiffs filed suit against film companies based on "oral misrepresentations" about the nature of the film. *Psenicska v. Twentieth Century Fox Film Corp.*, 409 F. App'x 368, 370 (2d Cir. 2009). But, Plaintiffs here do not argue that the Agreement cannot stand because of an outside, oral agreement between the parties. Rather, Plaintiffs argue that the Agreement cannot stand because Judge Moore never contemplated or intended to waive his rights, based on – and backed up by – his crossing out and initialing the very phrase in the Agreement which Defendants

---

[1] Plaintiffs have also stated and pled viable claims for intentional infliction of emotional distress and fraud, but this brief Letter to the Court focuses on defamation only.

[2] California even provides *an automatic preservation* of claims that a releasing party may not know exist at the time of executing a release. For over 100 years, since 1872, the California Civil Code provided: "[a] general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her would have materially affected his or her settlement with the debtor or released party." Cal. Civ. Code § 1542. **New York law has mirrored this Code**. *See Clinton Street Food Corp.*, 254 B.R. 523, 535 (S.D.N.Y. 2000); *Cahill v. Regan*, 5 N.Y.2d 292, 184 N.Y.S.2d 348, 157 N.E.2d 505 (1959).

think allows them carte blanche to defame him in the most malicious way.

**B.      Plaintiffs Sufficiently Pled Claims Against Defendants as a Matter of Law.**

Defendants argue that their maliciously false actions and statements concerning Judge Moore are not premised on a provably false statement of fact. Defs. Let. at p. 3. Defendants' argument not only goes too far but is incorrect, principally because it ignores the very definition of defamation and the limited role of the court in determining whether a publication is susceptible of a defamatory meaning. Defendants' misconduct clearly conveys the point that Judge Moore is a pedophile, and Defendants sanction this point. A court's role, however, is merely to say whether the publication and actions of Defendants could reasonably be construed as "tend[ing] to expose [Judge Moore] to hatred, contempt, or aversion, or to induce an evil or unsavory opinion of him . . ." *Tracy v. Newsday, Inc.*, 5 N.Y.2d 134, 135-36, 182 N.Y.2d 1, 3 (1959). Defendants also confuse the law. The issue is not whether a reasonable viewer would believe that a "sex offender detector" wand is real; indeed defamation law does not require that interpretation. Rather, the issue is whether a viewer could have perceived a defamatory meaning. The author of an alleged defamatory publication need not have asserted the fact directly; he or she still may be liable if he asserts it by implication. *See Lutz v. Watson*, 136 A.D.2d 888, 525 N.Y.S.2d 80 (4th Dept. 1998).

Here, accusing someone of being a pedophile is not a matter of "poking fun" but an act of defamation in the worst way. Defendants' lean on the fact that Defendant Cohen used a "wand" with Judge Moore, thereby arguing that there is no such thing as an "authentic" sex offender wand. Defs. Let. at p 3. But, the implication that every viewer gleans from that wand and Defendants' misconduct is that not only are Defendants accusing Judge Moore of being a pedophile but that *he actually is* a pedophile, as he set off the "wand," realistic or not. There is nothing "nonsensical[,]" "silly" or even remotely humorous about that, particularly since Defendants even concede that there had been "a montage of news reports of the allegations against Judge Moore." *Id.*

Defendants' accusations are grounded in assertions of fact about Plaintiffs' alleged activities and are not framed in hyperbole, but rather purport to reply on news reports that establish the existence of Plaintiffs' alleged misconduct. *See Kelly v. Schmidberger*, 806 F.2d 44, 48 (2d Cir. 1986) (finding statement that plaintiff priests placed church property "in their own names" to be factual and imputing corrupt and possibly criminal conduct); *Coliniatis v. Dimas*, 848 F. Supp. 462, 466, 467 (S.D.N.Y. 1994) (determining that letter making accusation on "information of substantial but not absolute reliability" that company executive was engaged in a kick-back scheme could be factually verified and did not contain loose, figurative, or hyperbolic language that would negate the impression that the writer was asserting a statement of fact). This type of defamation, which, among other things, accuses Judge Moore of the worst kind of crime, is actionable on its face.

Defendants' contrived "long line" of cases that they purport to rely on in support of their position are easily distinguishable. For example, the *one* case that they actually cite, *Hustler v. Magazine, Inc. v. Falwell*, 485 U.S. 46, 50, 51-52 (1988), is inapposite. In an effort to save space, Plaintiffs will distinguish the case in their opposition to Defendants' motion to dismiss. The bottom line is this: one cannot engage in rank fraud and then falsely brand any person a pedophile on national and international television and escape without legal consequences. Defendants profited handsomely from their illegal actions, even arrogantly, shamelessly and proudly submitting and then promoting their repugnant scheme to defame for Golden Globe and Emmy awards. Now, they must be held to account for the damage done to Plaintiffs.

Plaintiffs look forward to briefing these and related issues fully in their opposition to Defendants' impending motion to dismiss.

3

Sincerely,

Larry Klayman

cc: Defendants' counsel