**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROY STEWARY MOORE, et al<br><br>               Plaintiffs,<br>v.<br><br>SASHA NOAM BARON COHEN, et al<br><br>           Defendants. | **Index No. 19 Civ. 4977 (ALC)**<br><br>**ORAL ARGUMENT REQUESTED** |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

    Plaintiffs Roy Moore ("Judge Moore") and Kayla Moore ("Ms. Moore") (collectively "Plaintiffs") submit the following in opposition to Defendants Sasha Noam Baron Cohen ("Defendant Cohen"), Showtime Networks, Inc. ("Defendant Showtime") and CBS Corporation's ("Defendant CBS") (collectively "Defendants") Motion to Dismiss.

    Oral argument is respectfully requested.

**Dated**: October 28, 2019                      Respectfully Submitted,

                                             /s/ *Larry Klayman*
                                      Larry Klayman, Esq.
                                      KLAYMAN LAW GROUP P.A.
                                      2020 Pennsylvania Ave NW # 800
                                      Washington, D.C. 20006
                                      (561) 558-5536
                                      Email: leklayman@gmail.com

## <u>TABLE OF CONTENTS</u>

STATEMENT OF RELEVANT FACTS ........................................................................2

THE LAW ...................................................................................................................3

    The "Consent Agreement" is Void for Fraud under the Restatement ..................4

    The "Consent Agreement" is Void for Fraud under Contract Law ....................6

    Plaintiffs Reasonable Relied Upon Defendants' Fraudulent Oral Representations............7

    The "Consent Agreement" is an Improper General Release ...............................9

    Plaintiffs Properly Amended the Consent Agreement to Exclude the Conduct of Defendants ...................................................................................................12

    Since the Consent Agreement is Invalid and Unenforceable, Plaintiffs' Claims Must Proceed Since They Are Properly Pled................................................14

        Defamation......................................................................................14

        Intentional Infliction of Emotional Distress ..........................................15

        Fraud ..............................................................................................17

CONCLUSION...........................................................................................................17

# **TABLE OF AUTHORITIES**

## *Cases*

*Actrade Liquidation Trust v. Greenich Ins. Co. (In re Actrade Fin. Techs. Ltd.*), 424 B.R. 59 (S.D.N.Y. 2009) ......................................................................................................10, 11

*Crotona 1967 Corp. v. Vidu Bros. Corp.*, 925 F. Supp. 2d 298 (E.D.N.Y. 2013)........................13

*E\*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273 (S.D.N.Y. 2006)................10, 11

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) .............................................................16

*In re Windsor Plumbing Supply Co.*, 170 B.R. 503 (Bankr. E.D.N.Y. 1994) ...............................13

*Jack Kelly Partners LLC v. Zegelstein*, 140 A.D.3d 79, 85 (App. Div.) .........................................6

*Kratzenstein v. Western Assurance Co.,* 116 N.Y. 54 (N.Y. 1889).................................................13

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d. 299 (S.D.N.Y. 2004) ......................................................................................10

*Miller v. Celebration Mining Co.*, P.3d 1231 (Sup.Ct).................................................................5

*Missel v. Cty. of Monroe*, 2011 U.S. Dist. LEXIS 91700 (W.D.N.Y. Aug. 17, 2011)............15, 16

*Neuman v. Harmo*n, 965 F. Supp. 503 (S.D.N.Y. 1997) .............................................................11

*New Talli Enters. v. Van Gorden*, 2003 NY Slip Op 51066(U) (Civ. Ct.) ................................6, 7

*Nolan v. State of N.Y.*, 158 A.D.3d 186 (App. Div.)....................................................................17

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)........................................................................17

*Pinto v. Allstate Ins. Co.*, 221 F.3d 394 (2d Cir. 2000) ..............................................................11

*Rejent v. Liberation Publ'ns*, 197 A.D.2d 240 (App. Div. 1994*)* ....................................................17

*Salomone v. Macmillan Pub. Co.*, 411 N.Y.S.2d 105 (Sup. Ct. 1978).........................................14

*Shah v. Racetrac Petroleum Co.*, 338 F.3d 557 (6th Cir. 2003)................................................8, 9

## *Secondary Sources*

Restat 2d of Contracts, § 164 (2nd 1981) .............................................................................4, 5, 6

## **MEMORANDUM OF LAW**

Plaintiffs have been subjected to severe damage including but not limited to reputation as well as emotional distress after having been victims of Defendants' latest ploy for financial gain, notoriety, and ratings. Judge Moore was fraudulently tricked into appearing on a world-wide broadcast where he was falsely accused of being a child sex-offender. Comp. ¶ 21. However, Defendants believe that they are immune to consequences for their reprehensible conduct by virtue of a "Consent Agreement" that was obtained wholly through fraudulent measures, and is therefore unenforceable and voidable, as set forth in detail below. In any event, it is undisputable that:

> After the taping of Judge Moore's segment, when Plaintiffs discovered that they had been fraudulently induced to fly to Washington, D.C. and that Judge Moore's segment was to appear on Showtime and CBS, his Alabama counsel, Melissa Isaak, Esq. sent a preemptive notice to Defendants Showtime, CBS and thus Cohen warning them that Plaintiffs would resort to appropriate legal remedies if they chose to air the segment.

> In the preemptive notice, Defendants CBS, Showtime and thus Cohen were informed that the release that Judge Moore had signed was obtained through fraud, and was therefore void and inoperative. Comp. ¶ 23 – 24.

This would clearly vitiate the "Consent Agreement," even if it were at any point in time, valid and enforceable (it was not). However, apparently arrogantly believing that they are untouchable, Defendants still proceeded to broadcast Judge Moore's segment, driven solely by their thirst for ratings and profit. Based on the equities alone, Defendants' motion to dismiss must be denied, as they are truly the sole wrong-doers and tortfeasor here.

This is a truly extraordinary case, where Defendants have perpetrated fraud upon fraud in order to trick Judge Moore in to appearing on television, only to be falsely branded a pedophile in front of a worldwide audience. This, in and of itself, distinguishes the facts at issues from any previous cases involving Borat or other projects by Defendant Cohen. Furthermore, it is

1

indisputable that, even if the "Consent Agreement" was valid – it is not, as set forth below – Defendants clearly went outside of the scope of any agreement, since Plaintiffs expressly declined to waive "claims involving assertions of…any allegedly sexual oriented or offensive behavior or questioning." ECF No. 51, Ex. 1. This is evidenced by the fact that Plaintiffs crossed out the "waiver" provision regarding "sexual oriented or offensive behavior or questioning." Defendants signed the "Consent Agreement" after having assented to this modification, making this part of any agreement that was reached between the parties. Indeed, even the U.S. District Court for the District of Columbia, in ruling that the forum selection clause in the "Consent Agreement" was enforceable, paid particular attention to this fact and expressly questioned Defendants about it. Exhibit 1. Specifically, the Court asked:

> Isn't that part of the contract that knocks out the area that they would agree to discuss and then it is discussed as affecting the forum? Exhibit 1, 23:1-3.

Thus, in sum, Defendants have perpetrated fraud upon fraud in their greedy quest for notoriety, fame, and profit, at the expense of Plaintiffs, who are truly innocent bystanders who were caught in their web of fraud. It is inherently unjust to allow for Defendants to harm Plaintiffs and allow them to profit from telling repeated lies. As set forth below, the "Consent Agreement" which forms the backbone of their entire argument, is completely invalid, and even if it were enforceable, Defendants far exceeded the scope of any "agreement." Thus, Defendants' motion to dismiss must be denied so that this case can proceed forthwith expeditiously.

## I.      STATEMENT OF RELEVANT FACTS

Judge Moore was fraudulently induced by Defendants to appear on Defendant Cohen's show "Who is America?" In order to fraudulently induce Plaintiffs to travel to Washington, D.C., where filming was to and did take place on or about February 14, 2018, Defendant Cohen and his agents falsely and fraudulently represented to Plaintiffs that Yerushalayim TV – which does

not actually exist – was the producer and broadcaster of the show that Judge Moore would appear on, instead of the actual network that the show that later appeared on - Defendant Showtime. Comp. ¶ 15. In addition, Defendant Cohen and his agents falsely and fraudulently represented that Judge Moore and Mrs. Moore were both being invited to Washington, D.C., for Judge Moore to receive an award for his strong support of Israel in commemoration of its 70th anniversary as a nation state. Comp. ¶ 15. Once there, "Defendant Cohen's character falsely and fraudulently introduced a false and fraudulent 'device' supposedly invented by the Israeli Army to detect pedophiles. During the segment, Defendant Cohen's 'device' – as part of the false and fraudulent routine – purports to detect Judge Moore as a sex offender, thus defaming him." Comp. ¶ 21. Plaintiffs had no knowledge that Defendant Cohen was in any way associated with the production that they were signing up for, nor that Defendants CBS and Showtime were involved. Plaintiffs also had no knowledge that the purpose of the "Consent Agreement" was to feature and defame Judge Moore on "Who is America?" and not to receive an award for Judge Moore's strong support of Israel. Had Plaintiffs known of these facts, they would never have signed the "Consent Agreement" and travelled to Washington D.C. Comp. ¶¶ 16 - 17. Ultimately, despite the fact that Judge Moore's Alabama counsel sent a preemptive notice to Defendants Showtime, CBS and thus Cohen, warning them that Plaintiffs would be forced to resort to appropriate legal remedies if they chose to air the segment, as the release had been obtained through fraud and was void and inoperative, Comp. ¶¶ 23-24, Defendants still chose to air Judge Moore's segment worldwide, causing him severe harm.

## II.    THE LAW

Crucially, the U.S District Court for the District of Columbia, in ruling that the forum selection clause in the "Consent Agreement" was enforceable, made no finding as to any

argument regarding whether the "Consent Agreement" was otherwise fraudulently obtained. "The general allegations about fraud and the inducement that should set aside this contract is available to the plaintiffs to litigate in the Southern District in New York. There's nothing stopping them from raising that. If they're successful in that that's fine, but there's no reason it has to be tried here that I could find." Exhibit 1 at 37: 6-11. Thus, the arguments set forth below are for this Court to decide, *de novo*.

### A.    The "Consent Agreement" is Void for Fraud Under the Restatement

The Second Restatement of Contracts says "[i]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement 2d of Contracts, § 164 (2nd 1981) (the "Restatement"). The comments to the Restatement set forth four elements in this regard: (1) a misrepresentation that was (2) fraudulent or material that (3) induced the recipient to make the contract, and that the recipient was (4) justified in relying upon the misrepresentation.

Here, the facts squarely meet the elements set forth by the Restatement. There are three primary misrepresentations at issue. The first misrepresentation was that Judge Moore was being flown to Washington D.C. to receive an award for his support of Israel, when in actuality it was so that he could be falsely portrayed as a pedophile on national television. The second misrepresentation was that the television segment was being produced by Yerushalayim TV, and not Defendant Cohen, Showtime, and CBS.  The third major misrepresentation was that Defendants agreed to not discuss anything that was "sexual oriented or offensive behavior or questioning," and then subsequently did so anyways, thus perpetrating the third fraud. These misrepresentations were clearly and admittedly fraudulent and material, and they induced

Plaintiffs to sign the "Consent Agreement" as it was pled in the Complaint that Plaintiffs would never have agreed to sign the "Consent Agreement" or fly to Washington D.C. had they had knowledge of either of these facts. Comp. ¶¶ 16-17. Lastly, Plaintiffs were clearly justified in relying upon these misrepresentations, as they had no possible basis for knowing that they were false at the time the purported "Consent Agreement" was executed.

Furthermore, in analyzing the the Restatement, courts have found that in very similar circumstances – where the assent to the contract was obtained fraudulently – the deceived party had the right to void the contract. In *Miller v. Celebration Mining Co.*, P.3d 1231 (Sup.Ct.), the Supreme Court of Utah held that a contract between a mining company and a mine was voidable where mine had been administratively dissolved prior to the execution of the contract. The president of the mining company argued that he should have been able to enforce the contract individually, to no avail. In analyzing the facts under the Restatement, the Supreme Court of Utah held that "[t]he identity of the parties to a contract is, as a general rule, a material part of the contract." *Id*. at 1235. "<u>Allowing the party that misrepresented its identity to enforce the contract may compel the innocent party into a contract it might otherwise be unwilling to enter as identity is inextricably tied to one party's assessment of the other's capacity to perform on the contract</u>." *Id*. (emphasis added). Here, the "Consent Agreement" clearly misrepresented the identity of Defendants, which lured Plaintiffs into a contract that they would be otherwise unwilling to enter. Comp. ¶¶ 16-17. The Supreme Court of Utah further found that the Plaintiff had not presented any facts that undermined the conclusion that the identity of the contracting party induced the defendants to enter into the contract, nor that the plaintiffs were not justified in relying on the misrepresentation. The same holds true here.

Crucially, the Restatement does not state that where these elements are met, only the specific provisions touched by the fraud are voidable. Indeed, pursuant to the express language of the Restatement, when these elements are met, as they are here, the "[entire] contract" is voidable by the recipient. Here, the elements of the Restatement have clearly been met. Thus, to the extent that Defendants argue that Plaintiffs are precluded from bringing any claims under the "waiver" provision in the "Consent Agreement," it is also clear that such an argument must fail, since there is no "Consent Agreement" to even enforce in the first place.

**B.     The "Consent Agreement" is Void for Fraud Under Contract Law**

Under New York law, it is clear that a showing of fraud is sufficient to support the recession of a contract. "Further, fraud sufficient to support the rescission requires only a misrepresentation that induces a party to enter into a contract resulting in some detriment; proof of scienter is not necessary and even an innocent misrepresentation is sufficient for rescission." *Jack Kelly Partners LLC v. Zegelstein*, 2016 NY Slip Op 03820, ¶ 3, 140 A.D.3d 79, 85, 33 N.Y.S.3d 7, 10 (App. Div.).

Furthermore, New York courts have found rescission to be the proper remedy in the event of fraud even where the contract expressly released the wrongdoer of liability. In *New Talli Enters. v. Van Gorden*, 2003 NY Slip Op 51066(U) (Civ. Ct.), the Court rescinded a lease agreement between a tenant and a landlord where the lease violated the certificate of occupancy, or the permitted uses for the property. *Id*. at 5. Despite the fact that the landlord professed no knowledge of this violation, and the fact that the lease agreement expressly stated that the "landlord made no promises or representations with respect to the demised premises," *id*. at 5-6, the Court found that recession was proper.

6

Here, not only were the material misrepresentations set forth in the preceding section made with knowledge of their falsity, they were also clearly made with fraudulent intent. This is evident from the face of the "Consent Agreement" alone. It is clear that Defendants knew that they had to disguise their identity, otherwise Plaintiffs would never have agreed to appear on "Who is America?" It is also clear that Defendants knew that Judge Moore would never have agreed to appear on national television to be falsely portrayed as a pedophile, which is why they had to lie about the purpose of the "Consent Agreement" and say that Judge Moore was to receive an award for his strong support of Israel. Lastly, similar to how the *New Talli* court found that it was irrelevant that the lease at issue stated that the landlord made no promises or representations, it is equally irrelevant here that the "Consent Agreement" contains a waiver clause. Since the "Consent Agreement" itself was reached through fraudulent misrepresentation, the entire agreement can be rescinded and therefore voided by Plaintiffs. Thus, the specific provisions contained therein, including any waiver provisions, are of no force and effect. In any event, as set forth in detail below, Defendants <u>agreed</u> to not discuss anything that was "sexual oriented or offensive behavior or questioning," and then subsequently did so anyway, thereby violating and breaching the voidable "Consent Agreement" themselves.

### C.   Plaintiffs Reasonably Relied Upon Defendant's Fraudulent Oral Representations

One of Defendants' primary assertions is that Plaintiffs cannot assert that they relied on Defendants' undeniably false representations because the "Consent Agreement" contains a provision purportedly disclaiming these representations. However, Courts have held in similar circumstances that fraudulent statements inducing a party to enter into a contract can be considered even with the existence of such a contractual provision disclaiming them.

In *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557 (6th Cir. 2003), the Sixth Circuit had occasion to make a ruling on similar facts. In *Shah*, the Plaintiffs entered into a contract to lease a gas station and convenience store. *Id.* at 561. The lease agreement contained an express termination provision that clearly stated that either party could terminate the lease by simply giving the other party a 30-day notice of their intent to do so. *Id* at 562. The Plaintiffs were hesitant to enter into the lease agreement given the termination provision, but were assured by both the holders of the lease and the Defendants who owned the store, exterior improvements, and the real property that their policy was that they did not kick any dealer out so long as they performed satisfactorily. *Id.* at 563. Based on these oral assurances, the Plaintiffs entered into the lease. However, a little over a year later, Defendants unilaterally cancelled the lease agreement despite there being no indication that Plaintiffs were not performing satisfactorily. *Id.* at 565.

Crucially, the lease agreement in *Shah* contained two merger provisions. They read:

> This Contract, together with attached exhibits, and any other lease or contract executed the same date, constitutes the entire understanding between the parties and supersedes and cancels all previous contracts between the parties with respect to the facilities covered hereby.
>
> …
>
> This Contract supersedes and cancels all previous contracts or arrangements between the parties relating to the matters herein and no prior or subsequent stipulation, agreement or understanding, verbal or otherwise, of the parties or their agents relating to the matters herein shall be valid or enforceable unless embodied in the provisions of this Contract, or a separate instrument in writing. *Id.* at 563.

Despite the existence of these merger provisions - which clearly serve the same purpose as the Defendants here set forth their "disclaimer" provision - the Sixth Circuit still reversed summary judgment in favor of the Defendants with regard to Plaintiffs' claim for promissory fraud. In doing so, the Sixth Circuit rejected the Defendants' claims that it was *per se* unreasonable for Plaintiffs to rely on oral representations because of the existence of the merger clauses, which

closely mirrors the Defendants' arguments here. *Id*. at 568. One of the main factors that the Sixth Circuit emphasized was the number of misrepresentations made by Defendants, reasoning that "Defendant made *six* misrepresentations to Plaintiffs in response to Plaintiffs' obvious concerns." *Id*. at 568.

The facts here mirror *Shah* precisely. Like the Shah's, the Plaintiffs were fraudulently induced by Defendants to enter into the "Consent Agreement" with knowingly false oral representations. Plaintiffs would never have entered into the "Consent Agreement" but for these fraudulent representations. Comp. ¶¶ 16-17. The lease in *Shah* contained two merger provisions that clearly stated that "no prior or subsequent stipulation, agreement or understanding, verbal or otherwise, of the parties or their agents relating to the matters herein shall be valid or enforceable," which mimic the "disclaimer" provision asserted by Defendants here. In *Shah*, at least the Plaintiffs received what they contracted for – the gas station – albeit for only over a year. Here, Plaintiffs were completely blindsided, having been told that Judge Moore would be receiving an award for his support of Israel, while actually being made to endure claims of pedophilia on national television. Thus, even more so than in *Shah*, the Court here should and must permit Plaintiffs to assert the fraudulent representations of Defendants, despite the "disclaimer" provision in the "Consent Agreement."

**D.     The "Consent Agreement" is an Improper General Release**

The fundamental legal principle that a release does not extend to claims that a party does not know or suspect at the time of executing the release is deeply rooted in American law. Indeed, every jurisdiction includes some form of law refusing to bar claims for injuries undiscovered at the time the parties execute an agreement, including New York. For example, in

a landmark decision styled *E\*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273

(S.D.N.Y. 2006), the Court held unequivocally:

> A release that employs general terms will not bar claims outside the parties'
> contemplation at the time the release was executed. New York law does not
> construe a general release to bar claims for injuries unknown at the time the
> release was executed, even when the release contains broad language (internal
> citations omitted); Cal. Civ. Code § 1542 (West 2005) [] ("A general release does
> not extend to claims which the creditor does not know or suspect to exist in his or
> her favor at the time of executing the release, which if known by him or her must
> have materially affected his or her settlement with the debtor.").

*Id.* at 284 (emphasis added); *see also Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc*., 354

F. Supp. 2d 293, 299 (S.D.N.Y. 2004). "It is also a firm principle of New York law that it is less

likely that claims are covered by a general release if they are unknown at the time of the release."

*Actrade Liquidation Trust v. Greenich Ins. Co. (In re Actrade Fin. Techs. Ltd*.), 424 B.R. 59

(S.D.N.Y. 2009).

In *Actrade Liquidation Trust*, a debtor's successor-in-interest, i.e., a liquidation trust and

another debtor's trustee, sought a declaratory judgment that defendants were liable on bonds

aggregating $14 million that they issued in favor of debtor. *Actrade Liquidation Trust*, 424 B.R.

at 60-61. The court denied cross-motions for summary judgment on the defense of the release

and the parties proceeded to trial. At trial, the sole issue was the viability of the release defense.

There was "no question" that the release "cover[ed] all claims against the Sureties." *Id.* at 69.

(emphasis in original). The court held that the "general language would be conclusive but for the

principle of New York law that a release, general on its face, will be limited to those claims

within the contemplation of the parties at the time." *Id.*   "[T]he cases are many in which the

release has been avoided with respect to uncontemplated transactions despite the generality of

the language in the release form. *Id.*

Under New York law, the dispositive factor in determining the scope of a release is the parties' intent. *E\*Trade Fin. Corp.,* 420 F. Supp. 2d at 284-85; *Neuman v. Harmo*n, 965 F. Supp. 503, 509 (S.D.N.Y. 1997). "[A] release like any contract must be construed to give force and effect to the intention of the parties." *Pinto v. Allstate Ins. Co*., 221 F.3d 394, 404 (2d Cir. 2000) (applying New York law). A court or arbitrator must "determine the intent of the parties by examining the entirety of the settlement, the parties' acts, and all other conduct and surrounding circumstances that bear on the issue*." Actrade Liquidation Trust*, 424 B.R. at 73.

It is indisputable that the "Consent Agreement" constitutes a general release. Specifically, it states, the "[p]articipant…waives and agrees not to bring at any time in the future, <u>any claims against the producer</u>, or against any of its assignees or licensees or anyone associated with the Program, which are related to the Program or its production…." <u>Exhibit 2</u> (emphasis added). There can be nothing more "general" than a waiver of "any claims" against the producer. The mere fact that the "Consent Agreement" lists certain examples of claims, does not render it specific. Indeed, if Plaintiffs' brought a claim not listed in one the examples set forth by the Consent Agreement, it is an absolute certainty that Defendants would claim that it would still be barred under the language, "any claim."

Given that this is undeniably a general release, the Court must proceed to determine the intent of the parties. Here, it is clear that Plaintiffs never intended to even appear on "Who is America?" much less be falsely accused of pedophilia before a world-wide audience. Based on the record, its is abundantly clear that at the time that the "Consent Agreement" was executed, Plaintiffs believed that they were entering into an agreement for Judge Moore to receive an award for his strong support of Israel in commemoration of its 70th anniversary as a nation state. Comp. ¶ 15. Plaintiffs could not possibly have contemplated at the time that the "Consent

Agreement" was executed that he was releasing all claims for being falsely dubbed a pedophile before a worldwide audience, as there was no indication whatsoever that was the case. Thus, the "Consent Agreement" is clearly unenforceable on this basis as well.

**E.    Plaintiffs Properly Amended the Consent Agreement to Exclude the Conduct of Defendants**

Assuming *arguendo* that the purported "waiver" provision is valid – it is not, as set forth above – it is also clear that Plaintiffs expressly declined to waive "claims involving assertions of…any allegedly sexual oriented or offensive behavior or questioning." ECF No. 51, Ex. 1. This is evidenced by the fact that Plaintiffs crossed out the "waiver" provision regarding "sexual oriented or offensive behavior or questioning," and Defendants agreed to this modification. Thus, even if the remaining portions of the "waiver" provision were valid, it is clear that the parties agreed that any claims arising out of "sexual oriented or offensive behavior or questioning" would not be waived. Indeed, even the U.S. District Court for the District of Columbia, in ruling that the forum selection clause in the "Consent Agreement" was enforceable, paid particular attention to this fact and expressly questioned Defendants about it. Exhibit 1. Specifically, the Court asked:

> Isn't that part of the contract that knocks out the area that they would agree to discuss and then it is discussed as affecting the forum? Exhibit 1, 23:1-3.

It is indisputable that Defendants, through their phony and fraudulent claimed surrogates, signed the "Consent Agreement" after this modification had been made, thereby consenting to this modification. This is the law of the case.

> Under New York contract law, it is clear that handwritten amendments are valid.
>
> I note in this regard that there does not appear to be any prohibition under New York law on handwritten additions to contracts like guaranties; on the contrary, in some cases, **"handwritten entries on a printed document take precedence over those in typeface. This proposition is based on the belief that**

**a handwritten entry expresses the latest intent of the parties to the contract**." *Crotona 1967 Corp. v. Vidu Bros. Corp.*, 925 F. Supp. 2d 298, 314 (E.D.N.Y. 2013) (emphasis added).

"In addition, it is well established that handwritten entries on a printed document take precedence over those in typeface. This proposition is based upon the belief that a handwritten entry expresses the latest intention of the parties to the contract. *Kratzenstein v. Western Assurance Co.,* 116 N.Y. 54, 22 N.E. 221, 222 (N.Y. 1889). This is especially so when neither party to the contract contests the validity of the handwritten entries." *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 523 (Bankr. E.D.N.Y. 1994).

Defendants do not argue that the amendment to the "Consent Agreement" is not valid. Instead, the argue that the Court should take an extremely and ridiculously narrow interpretation of the amendment and find that it does not apply to Plaintiffs' claims. However, the plain language of the amendment shows why this view is incorrect and this argument disingenuous at best.. Defendants argue that the amendment only applies to "intrusion or invasion of privacy claims," apparently due to the fact that the amendment occurs immediately afterwards. However, the amendment clearly applies to "any allegedly sexual oriented or offensive behavior or questioning." (emphasis added). There is no limiting language that would support such a bizarre and narrow interpretation of the amendment. Furthermore, simply because the amendment contains the phrase "such as," does not limit it only to intrusion and invasion of privacy claims. Under the plain language rule, "such as" simply indicates that the proceeding language serves as an example. If the intent was truly to only limit the amendment to intrusion or invasion of privacy claims, then it should have said something like, "intrusion or invasion of privacy claims involving allegedly sexual oriented or offensive behavior or questioning." As currently constructed, however, the amendment cannot support such a narrow interpretation. Thus, given

13

the fact that its is clear that all of Plaintiff claims are entirely based on "sexual oriented…questioning," the amendment clearly makes any "waiver" completely unenforceable.

**F.    Since the Consent Agreement is Invalid and Unenforceable, Plaintiffs' Claims Must Proceed Since They Are Properly Pled**

**1.    Defamation**

Defendants' sole argument is that Plaintiffs cannot maintain a claim for defamation because his appearance on "Who is America?" is "fully protected satire." However, given the actual context of the segment, Defendants' conduct goes far beyond "satire," as it is clearly lobbing false, factual accusations of the most heinous and offensive nature at Judge Moore.

In *Salomone v. Macmillan Pub. Co.*, 411 N.Y.S.2d 105 (Sup. Ct. 1978), the Court decided a case with very similar facts. In a parody book, the manager of the Plaza Hotel in New York, Mr. Alphonse W. Salomone, was accused of being a child molester. "Immediately beneath that, in smaller letters, are the words "Mr. Salomone was a child molester!!" *Id*. at 107. The Court recognized that the parody, titled "Eloise Returns," was intended to be funny. *Id*. The Court also termed "Eloise Returns" an "obvious parody." *Id*. Despite this, the Court still found that whether the statement was defamatory was to be left to the discretion of the jury, and thus not properly decided on a motion to dismiss. "laymen serving on a jury, so the question of whether a particular statement is nonactionable humor or compensable libel should appropriately be left to the judgment of a jury[1]." *Id*. at 110. At least some of the reasoning of the Court was based on the truly reprehensible nature of the allegations – that the individual was a child molester:

---

[1] The Court's ruling was reversed on appeal, but the majority panel reversed it simply because the Plaintiff had not pled special damage. *Salomone v. MacMillan Pub. Co.*, 77 A.D.2d 501, 429 N.Y.S.2d 441 (App. Div. 1980). Defendants make no such argument here, nor could they, as Plaintiffs have clearly properly pled damages. Comp. ¶ 32. Indeed, only one judge, in a concurrence, found that the statement itself was not libelous because it was an obvious parody.

> Clearly the charge that someone is a "child molester" on its face imputes to an individual a crime involving moral turpitude -- the carnal abuse of children. It is a charge that, if true, causes revulsion -- for even in a society in which there has been a profound change in sexual mores, the use of children as sexual objects is considered a perversion of the lowest kind. There is nothing more likely than such a charge to create aversion and antipathy and destroy a reputation. It is reported that even in our prisons, with a population teeming with murderers, thieves, rapists and pimps, the child molester is on the lowest rung of the social ladder, and is regarded with scorn by his fellow criminals. *Id*. at 108.

These facts align squarely with the instant case, where Judge Moore was falsely accused of being a child molester and thus a pedophile. Comp. ¶ 21. In fact, the facts here are much worse, as "Who is America?" was broadcast around the world, severely amplifying the damages suffered by Plaintiffs. The mere fact that Defendant Cohen disguised himself and used a "wand" does not change the actual factual statement that was made – that Judge Moore was a child molester. Thus, at a minimum, whether these statements are factual and false must go to the jury to decide.

### 2.    Intentional Infliction of Emotional Distress

"To state a claim for intentional infliction of emotional distress, a plaintiff must allege that the defendant engaged in "(1) extreme and outrageous conduct; (2) [with] intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Missel v. Cty. of Monroe*, 2011 U.S. Dist. LEXIS 91700, at *19 (W.D.N.Y. Aug. 17, 2011). In *Missel*, the Court was faced with an analogous set of facts, and found that the plaintiff had properly stated a claim for intentional infliction of emotional distress.

In *Missel*, the plaintiff and defendant had a dispute, which led to the defendant falsely informing the plaintiff's employers that the plaintiff was a pedophile. *Id*. at 3. Since the plaintiff worked with children, he was terminated from employment. *Id*. The defendant also constantly stalked and harassed the plaintiff, including initiating a Sheriff's Department investigation into

plaintiff's alleged pedophilia, which produced no leads. *Id*. Under these facts, the court in *Missel* found that the plaintiff had properly stated a claim for intentional infliction of emotional distress. The Court found that "[plaintiff's] allegations taken as a whole, allege outrageous, atrocious conduct that is utterly intolerable in a civilized society." *Id*. at 20.

The facts here are similar, if not worse. Whereas *Missel* was falsely named a pedophile in his local community, which led to his loss of employment, Judge Moore was falsely called a pedophile on a world-wide platform. It thus makes total sense that where the court has found that even localized false accusations of pedophilia can support a claim for IIED, similar false accusations broadcasted worldwide are much worse.

Defendants assert that Plaintiffs' claim must fail because the injury claimed flows from the effect on his reputation. However, this is not true. The Complaint clearly sets pleads that Plaintiffs suffered severe emotional distress in <u>addition</u> to any reputational damages from the defamation:

> As a result of Defendants and their agents' extreme and outrageous conduct, Plaintiffs have suffered extreme emotional distress as a result of Judge Moore being falsely portrayed, mocked and defamed as a sex offender and pedophile in this district, on national television and worldwide. Comp. ¶ 37.

The emotional distress suffered by Plaintiff was amplified by Judge Moore's status as a "prominent conservative and a God fearing person of faith." Comp. ¶ 38.

Defendants also make the false assertion that Plaintiffs' claim must fail under *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) because a public figure bringing an IIED claim based on publication of speech must show a false statement of fact and actual malice. It is clear that whether Judge Moore is a child molester – he is not - is a question of fact that can easily be determined. Judge Moore, in his complaint, has clearly pled that these accusations are false statements of fact. As for malice, it is well-settled that the speaker need not know that the

statement being made is false, but simply with a "with reckless disregard of whether it was false or not" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964), particularly since was was broadcast amounts to defamation per se, where even damages are thus presumed. As set forth by New York courts, "[o]ne who publishes a slander that imputes serious sexual misconduct to another is subject to liability to the other without proof of special harm." *Rejent v. Liberation Publ'ns*, 197 A.D.2d 240, 245, 611 N.Y.S.2d 866, 869 (App. Div. 1994). *See also Nolan v. State of N.Y.*, 2018 NY Slip Op 00269, 158 A.D.3d 186, 69 N.Y.S.3d 277 (App. Div.).

Here, Defendants have absolutely no basis in fact to support their allegations that Judge Moore was a child molester, since none actually exists. They are simply intentionally perpetrating a lie in order to achieve ratings and profit. This is, at a minimum, a reckless disregard for the truth.

### 3.    Fraud

Defendants do not contend that their conduct was not fraudulent, nor could they. Their sole argument is that Plaintiffs can only recover the actual pecuniary loss suffered as a direct result of their fraud. The Complaint does plead this:

> Plaintiffs been the subject of widespread ridicule and Plaintiffs' entire family, including Mrs. Moore, have suffered loss of reputation, **financial loss**, and loss of time spent going to and being in Washington D.C. Comp. ¶ 48 (emphasis added).

Thus, given the fact that the fraudulent nature of their conduct has been conceded by Defendants, and that Plaintiffs have pled pecuniary loss, this cause of action must proceed to a simple determination of damages.

## III.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss and allow this matter to proceed forthwith the discovery phase.

17

PLAINTIFFS RESPECTFULLY REQUEST ORAL ARGUMENT.

Dated: October 28, 2019

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
D.C. Bar No. 334581
2020 Pennsylvania Ave NW #800
Washington, DC, 20006
Tel: (561)-558-5536
Email: leklayman@gmail.com

Attorney for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on October 28, 2019.

*/s/ Larry Klayman*
Larry Klayman, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ROY STEWART MOORE, ET AL,         :
                                  :
              Plaintiffs,         :      Docket No. CA 18-2082
                                  :
              vs.                 :         Washington, D.C.
                                  :      Monday, April 29, 2019
SACHA NOAM BARON COHEN, ET AL     :          10:00 a.m
                                  :
              Defendants.         :
------------------------------x



TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE THOMAS F. HOGAN
UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Plaintiffs:     LARRY KLAYMAN, Esquire
                        Klayman Law Group, P.A.
                        2020 Pennsylvania Ave., NW
                        Suite 800
                        Washington, DC  20006

For the Defendants:     ELIZABETH A. MCNAMARA, Esquire
                        Davis Wright Tremaine LLP
                        1251 Avenue of the Americas
                        21st Floor
                        New York, New York  10020-1104

                        ERIC J. FEDER, Esquire
                        LISA ZYCHERMAN, Esquire
                        Davis Wright Tremaine LLP
                        1919 Pennsylvania Avenue, NW
                        Suite 800
                        Washington, DC  20006-3401

Court Reporter:         CRYSTAL M. PILGRIM, RPR
                        Official Court Reporter
                        United States District Court
                        District of Columbia
                        333 Constitution Avenue, NW
                        Washington, DC  20001

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2              THE DEPUTY CLERK:  Your Honor, this is civil action

 3    18-2082, Roy Stewart Moore, et al versus Sacha Noam Baron

 4    Cohen, et al.

 5         Will counsel please approach the lectern and state your

 6    appearances for the record and introduce any parties at your

 7    table.

 8              MR. KLAYMAN:  Good morning, Your Honor, Larry

 9    Klayman.  I'm here on behalf of Chief Justice Roy Moore,

10    plaintiff, his wife Kayla Moore, plaintiff.

11         Sitting here is Melissa Issak.  She's local counsel from

12    Montgomery, Alabama I wanted to get your permission to sit with

13    us.

14              THE COURT:  Thank you.  Former Chief Judge Moore is

15    no longer Chief Judge.  He's now a civilian I take it.

16              MR. KLAYMAN:  Correct.

17              THE COURT:  All right, thank you.

18              MS. MCNAMARA:  Good morning, Your Honor, Elizabeth

19    McNamara with Davis Wright Tremaine on behalf of all of the

20    defendants.  I'm here with my colleagues Eric Feder and Lisa

21    Zycherman.

22              THE COURT:  All right, thank you.

23         We're here today for motions that have been filed by the

24    various defendants to transfer the case under 28 U.S.C. 1404

25    (A).  As well as a motion for plaintiff to file, a leave to
```

1  file a sur-reply to the opposition to the motion to transfer

2  which I think I've reviewed not necessarily to rule upon at

3  this time.

4      In any event, the issue really is the plaintiff in this

5  case, the former Chief Justice of the Supreme Court of Alabama

6  and his wife, a lawsuit filed against Baron Cohen, Showtime

7  Network and CBS here in the District of Columbia for defamation

8  on behalf of the Judge Moore, intentional infliction of

9  emotional distress on both the plaintiffs and fraud on behalf

10 of the plaintiffs arising out of his appearance on Who is

11 America, the program which is apparently a political comedic

12 television series featuring Mr. Cohen produced by Showtime and

13 CBS.

14      The issue really is there's a forum-selection clause in

15 the contract that requires, according to the movants, in the

16 event that in the choice of law in this forum selection in the

17 contract consent agreement 6, I believe, in any event agrees,

18 the participants agree not no bring any claim in connection

19 with the program production, but if they do bring one it must

20 be brought before and adjudicated by only a competent court

21 located in the State and County of New York and governed by the

22 substantive law of the State of New York.  And that paragraph

23 intended by the parties will stand on its own is intended to be

24 valid and enforceable even if a Court finds that the other

25 paragraphs are not valid and enforceable.

1      The defendants argued this case should be transferred

2  based upon the forum selection law contained in the agreement

3  and this is controlled more than by the federal procedure, but

4  by the Atlantic Construction Company case of the Supreme Court

5  in 2013.

6      So with that background, we'll start.  I'll start with the

7  movant very quickly with a couple of questions, then I'll turn

8  to Mr. Klayman.

9          MS. MCNAMARA:  Thank you, Your Honor.  Do you have

10  some specific questions or do you want me to address?

11          THE COURT:  I do have some questions you can start

12  and then I'll see where I think I want to have you explain a

13  couple of things.

14          MS. MCNAMARA:  Absolutely, Your Honor.  As you've I

15  think correctly laid out the issue here is really discreet and

16  we submit decided really by the Supreme Court decision in

17  Atlantic Marine in 2013 as you've already noted.

18      I mean, there's no dispute on this record that Judge Moore

19  executed the consent agreement and there's no dispute that the

20  consent agreement included a mandatory forum-selection clause

21  providing that any action has to be brought in New York under

22  New York law.  And as you've laid out, there's no dispute as to

23  the operative law.  The forum-selection clause would --

24          THE COURT:  What about his position that the whole

25  contract is void ab initio because of fraud?  It was induced

1    fraud to come to D.C. induced to enter into this interview

2    which was all a sham, he was not aware of and induced therefore

3    to make these statements were used to defame him and therefore,

4    he shouldn't be bound by the contract including the

5    forum-selection clause.

6         MS. MCNAMARA:  Yes, Your Honor, and that precise

7    issue has been raised and litigated in a number of cases

8    including what we consider to be a controlling case here, the

9    Northern District of Alabama case, but also a number of cases

10   here in this District as well as the Supreme Court which

11   addressed it all the way back in 1974.  And the established

12   principle from this entire line of cases is that if the

13   allegations of fraud go to the contract as a whole and there's

14   an argument as here, that the contract ab initio was somehow

15   fraudulently induced, that is not sufficient to preclude the

16   enforcement of the forum-selection clause.

17        The plaintiff must allege with plausible allegations that

18   he was fraudulently induced into the forum-selection clause.

19   Here the plaintiff makes no such allegation and nor could he we

20   submit.  The forum-selection clause is, as you've noted,

21   paragraph 6 in a one page agreement.  It's clearly there.  It

22   was not concealed which is one ground that courts have

23   indicated might be a basis for finding fraud, if the

24   forum-selection clause is concealed.  Here it plainly was not.

25   He read the contract.  He not only read the contract, he edited

1   the contract initially a change to the agreement.

2       Moreover, the other argument that sometimes is raised

3   where fraud as to the specific clause versus the entire

4   contract is if there was some differential in negotiating power

5   or an unsophisticated plaintiff.  Here we have far to the

6   contrary.  No one could argue that Judge Moore who not only is

7   an attorney and under the Cheney decision in this Court, just

8   being an attorney would be sufficient to override any plausible

9   argument that he wasn't sufficiently sophisticated to

10  understand the terms of the contract.  But here, he not only

11  was a former attorney, but he was the Chief Judge of Alabama

12  Supreme Court.  And no plausible argument we submit, Your

13  Honor, can be raised that he did not have the wherewithal to

14  understand the provision that's operative here and that

15  dictates the transfer of the case to New York.

16      As I've noted, we think the controlling case here really

17  is the Streit v. Twentieth Century Fox case out of Northern

18  District of Alabama where on remarkably identical facts dealing

19  with virtually --

20          THE COURT:  The same companies in general except

21  Twentieth Century?

22          MS. MCNAMARA:  Yes, it was Sacha Baron Cohen.  It was

23  his movie.  It was the same language in the agreement.  There

24  the Court addressed the precise issue being raised by the

25  plaintiffs here; i.e. that they contended that they were

1   fraudulently induced to enter the contract, but there was no

2   claim as there is none here that he was fraudulently induced

3   into signing the contract with a forum-selection clause.

4          THE COURT:  How do they litigate then their fraud

5   overall charge that they don't think they're bound by the

6   contract, they can't raise it here?

7          MS. MCNAMARA:  Yes, Your Honor.  It will be litigated

8   once it's transferred in New York.  I can foreshadow we will be

9   moving to dismiss under the consent agreement.  And at that

10  juncture it can appropriately be litigated.  If they believe

11  that those terms of the rest of the consent agreement are not

12  enforceable because of some fraud, then that is the forum in

13  which that argument has to be litigated and decided.  And

14  again, foreshadowing that's precluded by the Psenicska case out

15  of the Second Circuit.  But nonetheless, that is the proper

16  forum for him to raise the argument.

17         THE COURT:  The case arose here, right?  I mean, the

18  action that he's complaining of happened here in the District

19  of Columbia?

20         MS. MCNAMARA:  Yes, I don't think that there's any

21  dispute that we're alleging here that this seems to be a focus

22  of the plaintiffs that the District of Columbia would be a

23  proper venue.  In Atlantic Marine the operative Supreme Court

24  decision, thereto where the plaintiff had filed the action was

25  a proper venue under traditional venue analysis.

1          THE COURT:  Right.

2          MS. MCNAMARA:  But the Court still found that

3   transfer was warranted under the controlling terms of that

4   contract.  So the fact that this may be a proper venue is for

5   purposes of this transfer motion really irrelevant, Your Honor.

6          THE COURT:  All right, yes, Justice Alito in the

7   Atlantic Marine discussed reversing the lower court actually.

8          MS. MCNAMARA:  Exactly on that very point.  So I

9   think that obviously that's the controlling law here and that's

10  what further dictates the transfer of this motion to New York.

11         On the other argument that, that the plaintiffs try to put

12  forth in opposition to this motion, Your Honor, is that the

13  defendants are quote, "strangers" to the consent agreement.

14         THE COURT:  That goes to the supplemental motion to

15  file a sur-reply as well because the Salon article saying that

16  they're separate people and that --

17         MS. MCNAMARA:  Well, I understood the supplemental

18  sur-reply really to be putting forth further evidence of this

19  being an arguably a proper venue.  That there were statements

20  in that article that indicated that Sacha Baron Cohen had been

21  in D.C. and was operating in D.C. in connection with the

22  production of the film, at least part of it.  So I didn't see

23  that it went to his strangers to the consent agreement

24  argument, but maybe I was missing something, Your Honor.

25         THE COURT:  All right.

1          MS. MCNAMARA:  On that argument, we submit and I

2    think as we've indicated in our papers that it fails for two

3    independent reasons.  First, is that the defendants are in fact

4    covered by the agreement.  Under the agreement producers --

5          THE COURT:  He argued supplemental defendants are not

6    intended to be third party beneficiaries.

7          MS. MCNAMARA:  I see, I stand to be corrected, thank

8    you, Your Honor.

9          So here we submit that the argument that the YTV,

10   Yerushalayim TV was a signatory on the consent agreement is

11   unfounded for two reasons, Your Honor.  First is the fact that

12   terms, the expressed terms of the agreement producer is defined

13   and I quote from the agreement, "as YTV and its assignees,

14   licensees, parents, subsidiaries and affiliates."

15         As we've produced and submitted in this motion, it's

16   established that Mr. Cohen is in fact the parent and affiliate

17   of YTV.  He's the ultimate owner of the company and clearly he

18   was the creator of the show, and so clearly he is affiliated.

19         Then also Showtime and it's parent CBS were indisputably

20   the licensees of the program and acquired the rights and the

21   ability to air it on TV.

22         But even if the Court were to conclude that the express

23   terms of the contract did not, was not intended to and did not

24   reach these defendants, and we submit that it does, then we

25   still submit that the Court needs to or should conclude that

1  these defendants were sufficiently closely related to YTV and

2  they clearly were intended third party beneficiaries of the

3  agreement.  You get there again by looking at the express terms

4  of the agreement itself, Your Honor.

5      The agreement provides that Judge Moore had waived his

6  right to bring claims related to the program and its production

7  as against quote, "anyone associated with the program", end

8  quote.  And plainly Sacha Baron Cohen the program's creator as

9  well as Showtime and CBS who licensed and aired the program are

10 associated with the program.  They were indeed intended

11 beneficiaries.

12     Again, I think the case that's most on point there is a

13 New York case cited in our papers which is the Clapper case

14 that dealt with a very similar consent agreement where one

15 party had executed it and the plaintiff there like here tried

16 to argue that the affiliated companies were not captured and

17 did not get the benefit of the terms of the agreement.  And

18 there and we submit the same here the Court concluded that they

19 clearly were intended beneficiaries.  They clearly were

20 associated with the program, each of the defendants and were

21 entitled to get the benefit of the agreement.

22         THE COURT:  The New York case is the Maggie 21, which

23 New York case are you talking about?

24         MS. MCNAMARA:  The Klapper case versus Viacom.  It's

25 cited in our papers, Your Honor.  I can give you the cite.

1          THE COURT:  That's all right, I'll have it here.

2          MS. MCNAMARA:  It's 41, MS 3d and it's affirmed by

3   the second department in New York 129 A.D. 3d 674.  That case

4   did not involve a forum-selection clause, but it involved the

5   enforcement of a very similar consent agreement and it's terms

6   to the affiliated parties dealing with a television show just

7   like this one.

8       So Your Honor for that reason as well, we submit that that

9   second argument that's put forth by the plaintiffs also fails

10  and for all these undisputed facts and undisputed and

11  controlling law, we submit that this case should be transferred

12  to the Southern District of New York.  If the plaintiffs want

13  to raise their arguments about fraud ab initio, they are more

14  than entitled to raise those arguments in the Southern

15  District.  But this is not the right forum.

16      As Your Honor underscored at the outset, and I think

17  appropriately, even if this Court were to conclude that there

18  were issues about the viability of the agreement, other terms

19  of the agreement, by its expressed terms the forum-selection

20  clause stands alone even if the rest of the contract fails.

21  And so for all of these reasons, Your Honor, we ask that the

22  Court transfer the case to New York.

23          THE COURT:  All right, thank you, Ms. McNamara,

24  appreciate the argument.

25          MS. MCNAMARA:  Thank you.

1          THE COURT:  Mr. Klayman, I'll hear from you at this

2  time as to those issues I've raised both on the legal standard

3  under the Atlantic Marine case and the liability to

4  forum-selection clause and as to the beneficiaries under the

5  defendants, et cetera, not being signatories to the contract

6  whether they can enforce the forum-selection clause and whether

7  the whole thing is void or not in any event.

8          MS. MCNAMARA:  Thank you, Your Honor.  As Your Honor

9  knows and you're a very distinguished jurist, so I don't need

10  to flatter you, but you have won awards for your ability on the

11  bench and I appreciate that.  So I'm not going to get into the

12  fact that plaintiffs have a presumption of being able to choose

13  the forum.  We start with that, and that's a known concept.

14      Secondly, there was no meeting of the minds here.  And if

15  I may approach the bench.  I have a highlighted version of the

16  Standard Consent Agreement, if I may give you a copy of it.

17          THE COURT:  All right, you can do that.  The Clerk

18  can take that.

19      Let me just get back to your first statement, the

20  presumption.  You're right under the 404 Section generally,

21  but where there's forum-selection clause the Supreme Court said

22  and I'll quote, "should be given controlling weight in all but

23  the most exceptional cases and basically the non-movant bears

24  the burden of demonstrating that such extraordinary

25  circumstances exist and must show."  And another quote is,

1  "why the Court should not transfer the case of the forum to

2  which the parties agreed."

3      So if it's valid the plaintiff's choice of forum does not

4  bear weight.

5          MR. KLAYMAN:  I agree, Your Honor, I was getting to

6  that, but this is that exceptional or unusual case and that's

7  the point.

8          THE COURT:  All right, I have in front of me now as

9  part of the argument the one page contract signed by Roy S.

10 Moore and by the TV, YTV we'll call it.

11         MR. KLAYMAN:  Yes, it's exceptional and unusual for a

12 number of reasons.  First of all, there was no consideration

13 here with regard to Judge Moore.  The $200 for the standard

14 consent agreement is consideration was for the Foundation for

15 Moral Law, that's a corporation 501(c)(3).  There was no

16 consideration going to him.

17     Secondly, very importantly in terms of the fraud and the

18 inducement here.  Look at paragraph 4, Your Honor, the

19 highlighted portion.  Judge Moore crossed out and initialed

20 that this matter would not involve any allegation sexually

21 oriented or offensive behavior or questioning.  Specifically,

22 ruled out of this agreement signed by somebody who wanted to

23 obviously hide who he was, the signature for Yerushalayim TV.

24     I might add in that regard there's no showing here

25 definitively that Sacha Baron Cohen is the owner of

1   Yerushalayim TV.  The fact that there is an affidavit submitted
2   by someone who claims to be a producer, we haven't had a chance
3   to examine him.  Everything about this entire matter was on a
4   fraud, upon a fraud, upon a fraud.  Woody Allen would say a
5   travesty of a mockery of a travesty of a fraud in this
6   instance.  This is an exceptional case.
7           THE COURT:  Well, this is a motion status, this is
8   not the trial yet or is not discovery involving that, but in
9   any event on paragraph 4F raise intrusion or invasion of
10  privacy, that was not crossed out.  After that in parens such
11  as any allegedly sexual oriented or offensive behavior or
12  questioning close parens was crossed out and initialed by R.M.
13  Moore, signatore R.S. Moore.
14          MR. KLAYMAN:  That's right.  Here's the exceptional
15  nature, the unusual nature, the egregiousness of these frauds.
16  And not just one, but at least four separate frauds that were
17  committed upon Judge Moore.  Culminating in articles like this:
18  Roy Moore fails pedophile detector test from Sacha Baron Cohen.
19  What could be worse, Your Honor, what worse act could you
20  conceivably commit than to accuse a distinguished jurist in
21  particular of being a pedophile which he is not.
22          THE COURT:  But where do I get with this either the
23  Northern District of Alabama case Streit v. Twentieth Century
24  Fox which is almost identical to this case, essentially the
25  same contract at issue or other related cases from our court

1   saying that he would have to allege that he was fraudulently

2   induced or agreed to the forum-selection clause itself, not

3   just the contract as a whole?

4          MR. KLAYMAN:  I'm glad you asked the question.  I was

5   getting to that.  Your Honor, you're not bound by the Northern

6   District of Alabama.  That's a lower court decision.  It's not

7   binding law.  It's not a Circuit Court decision.  It's not a

8   Supreme Court decision.  And that Court didn't face the same

9   exceptional circumstances, unusual circumstances that we're

10  facing here.  That's one Judge in the Northern District of

11  Alabama.  I'm surprised that my esteemed counsel would cite it

12  when they're so anxious to get back to a court that they think

13  will be favorable to them.

14         THE COURT:  I notice in your pleadings you mention

15  that.  What evidence do I have of that that there would be a

16  left leaning judge favorable to the entertainment industry in

17  New York as opposed to Washington D.C.?

18         MR. KLAYMAN:  Actually, I never said left leaning,

19  Your Honor, in deference.  I may have said that somewhere else,

20  but I never said it in the pleadings.  The Southern District is

21  very favorably disposed towards the entertainment industry, so

22  is the Central District of California.  That's why they choose

23  this as the forum-selection clause. It's their home court.

24  It's where they want to be.

25         THE COURT:  You said on page 6 of your opposition,

1  "Indeed defendant's motion is purely tactical.  They clearly

2  perceived New York as a more favorable forum where they would

3  more likely find a favorable left leaning, pro-entertainment

4  industry judge to rule in their favor."

5          MR. KLAYMAN:  Okay, I guess I did say that.  Well,

6  that's what I believe.  I was trying to be tactful.  I don't

7  want to put you on the spot, you know.  Judge is suppose to

8  rule neutrally and that's your reputation.

9          THE COURT:  You said that, that's fine, that's all.

10          MR. KLAYMAN:  Here's the test, Your Honor.  Let me

11  just go through the frauds that were committed and why this is

12  exceptional.

13      First of all, Judge Moore was offered to go to Washington

14  D.C. at the Mandarin Hotel with his wife Kayla to get an award

15  from Israel.  He is a very religious devote person of faith,

16  and he supports Israel, he thought it was genuine.

17      He gets there and he's presented with this standard

18  consent agreement.  He crosses out, and then they made a point

19  in their pleadings that we didn't reference the actual portion

20  of the standard consent agreement that we considered to be

21  fraudulent.  Well, here it is.  I mean, it's right there.

22      He told them and he only agreed to be interviewed if he

23  wasn't going to be smeared on the basis of alleged sexual

24  offensive behavior.  They signed that.  They agreed to that.

25  That's another fraud.

1      Sacha Baron Cohen is in disguise.  In fact, he brags about

2  it, that's one of the pleadings that we submitted not just with

3  regard to Judge Moore, but with regard to Ben Carson where he

4  was ready to present a fraudulent ID to the Secret Service

5  which would have been a major crime, but he came up with

6  another fraud, dropped the ID on the floor and maybe the Secret

7  Service will believe that I am who I say I am.

8      Next he gets in front of the set, the TV set and they hold

9  up this so-called pedophile detecting device which starts

10 beeping which also is a fraud.

11     And then last but not least, after the whole thing is over

12 Ms. Isaac, local counsel for Mr., for Judge Moore, sends a

13 letter, and I have the return receipt, to David Nevins,

14 Showtime Networks and CBS Leslie Moonves.  Moonves has had his

15 own issues obviously.  And says do not publish this, do not

16 broadcast it, it's defamation.  They went ahead and did it

17 anyway.  These people, the level of arrogance is such a level.

18          THE COURT:  They also did other political figures,

19 right?

20          MR. KLAYMAN:  They did, but they didn't accuse

21 anybody of being a pedophile.

22          THE COURT:  Such as Sanders was also included, was he

23 also included?

24          MR. KLAYMAN:  I don't specifically recollect him.

25 Vice President Cheney was, O.J. Simpson was.  There were

1   others, but no one was accused of the crime of morale turpitude

2   which is the most severe defamation per se.  You don't have to

3   prove damages.

4       But the point here is and let me get to your question

5   about the case law that was cited by counsel for the

6   defendants.  They themselves recognized that in exceptional and

7   unusual cases that the test is a three part test to vitiate any

8   kind of consent waiver to forum selection or any other aspect

9   of the contract which was never a part of the meeting of the

10  minds here.

11      Number one, fraud.

12      And the third factor, I'll skip the second because we

13  don't need to get into that, public policy.

14      There was fraud, there was egregious fraud, compounded

15  fraud and as a matter of public policy this Court cannot

16  condone defrauding any individual much more a former Justice of

17  the Alabama Supreme Court.

18      So the two tests that we meet for exceptional circumstance

19  here devoid this entire agreement have been met.

20          THE COURT:  Well, let me just talk about the

21  inducement of a fraud of the forum-selection clause itself.

22  You indicated there was one case in Alabama was the only one.

23      They've cited several other cases, some in D.C.  Cheney v.

24  IPD Analytics 583 F.Supp 2d at 117, Bank v. Laptop, et cetera,

25  206 F.Supp 3d Eastern District of New York at 780 which has a

1    collection of cases.  They also claim Supreme Court has written

2    on this in Scherk v. Alberto-Culver case 417 U.S. 506 at 519.

3         Is there other case law besides the one Alabama case that

4    supports you have to set aside this particular clause not just

5    the whole contract?

6         MR. KLAYMAN:  First of all, all of the cases go on a

7    case by case basis, that's crucial, Your Honor, it's the facts

8    of that case.  You know that, I know that, Judge knows that.

9    The facts of this case are particularly egregious given the

10   number of fraudulent acts, given the simple fact uncontroverted

11   that Judge Moore crossed out any aspect about sexual offensive

12   behavior.  Given what occurred with regard to the type of

13   defamation and intentional infliction of emotional distress.

14   People have been known to jump off buildings when they have

15   been accused of things like this being a pedophile unfairly.

16   This is the most severe form of defamation.

17        On top of it as Your Honor suggested or even alluded to

18   the defendants in this case aren't even the defendants that

19   could have been in the case if they had disclosed exactly who

20   was putting on this show.  There's another fraud.

21        Yerushalayim TV, Showtime and CBS.  There's no mention of

22   that.  If they were going to be above board and not defraud my

23   client, if there was a meeting of the minds, why wouldn't they

24   just simply tell them this is a Showtime series.  It's not a

25   Yerushalayim TV by someone who claims to be a former Mosad

1    agent.

2           THE COURT:   Would your argument be the same for every

3    single individual that Mr. Moore has gone after then basically?

4    Wouldn't they all have the same right to bring a defamation

5    clause, they tricked, there's a Georgia state legislator

6    according to the pleadings somebody talked about or you said

7    Mr. Chaney.   I don't know what he did there.   I assume it was

8    under an assumed name with assumed facts that he was

9    approaching these people.

10          MR. KLAYMAN:   The difference is is that those

11   individuals went along with the fraud.   At some point they

12   ratified it in effect.   Mr. Cheney was asked do you think I

13   should water board my wife to get the truth and he said yes.

14   Then they asked, Sacha Baron Cohen asked him to sign his water

15   boarding paddle best wishes which he did.

16          With regard to the Georgia state legislator, he went along

17   with that.   He actually contacted me and asked me to represent

18   him.   I said no, I'm not.   I don't think you have a case.

19   Judge Moore does have a case.   He didn't go along with it.   He

20   walked off the set.   But for the fact that he's a gentleman,

21   Sacha Baron Cohen probably wouldn't be walking around right

22   now.

23          So it's a completely different set of circumstance and the

24   level of the egregiousness is much greater than in any case and

25   the fraud is greater and the public policy is greater and

1   someone has to stand up and say no, this isn't right, Your

2   Honor.  I believe that you're the Judge to do that.

3        And it doesn't matter what some judge in the Northern

4   District of Alabama said or somebody in the Southern District

5   of New York in the lower court level.  The Supreme Court never

6   said this is a firm principal that applies to every case.  It

7   says there are exceptional cases where it does not apply.

8             THE COURT:  All right.

9             MR. KLAYMAN:  Now after this thing is over, let me

10  just say this as a personal comment.  It wasn't enough that

11  they destroyed my client's reputation.  Roy Moore fails a

12  pedophile detector test.  This is in Alabama, obviously a

13  political motivation here.

14       Then they nominated themselves for a Golden Globe if you

15  can believe that.  Let's destroy the man and give ourselves a

16  Golden Globe.  We brought suit before Your Honor.  Thank God at

17  that point they backed off and canceled the entire show which

18  have high ratings.

19       So you know they know that they've got liability here.

20  They don't want to incur more of it.  You, Your Honor, are the

21  one Judge that has an opportunity here to put a stop to this to

22  say enough is enough.  You can't go around destroying people

23  because you think it's funny.  And Sacha Baron Cohen, we know

24  who he is.  He's not somebody of high class or high moral value

25  here.  This Court is, the Judge is.  I stand behind him with my

1 reputation.  He's my friend.  He's my client and I look

2 forward, Your Honor, to your allowing this case to remain here

3 because this is the proper forum.  The witnesses are here.  The

4 people at the hotel, the film crew, the security crew.  They

5 all saw what happened.  And let them go in front a jury of

6 their peers here.  What's wrong with a D.C. jury?  Let them

7 decide.

8     Your Honor, I thank you for your time and any further

9 questions I'll be happy to answer.

10          THE COURT:  Thank you, Mr. Cohen -- sorry -- Klayman,

11 I appreciate your work on this.

12          MR. KLAYMAN:  One other thing.

13          THE COURT:  Yes.

14          MR. KLAYMAN:  If you would like to have Judge Moore

15 take the stand because they submitted an affidavit, he's

16 willing to do that to explain exactly what happened under oath.

17          THE COURT:  I don't think that will be necessary in

18 the context of the motion, but I appreciate his offer to do so.

19     Ms. McNamara, you want to answer that litany of any

20 concerns that he had crossed out the particular area that was

21 gone into by Mr. Cohen as not being available in the contract

22 and therefore that should vitiate the fraud that, as fraud it

23 should vitiate the selection of forum clause.

24          MS. MCNAMARA:  Yes, Your Honor.  That is no different

25 than the long line of cases that we put in our papers.

1          THE COURT:  Isn't that part of the contract that

2    knocks out the area that they would agree to discuss and then

3    it is discussed as affecting the forum?

4          MS. MCNAMARA:  Well first of all, Your Honor, let me

5    get that file.

6       I don't read it as knocking out that area.  It simply said

7    it includes a definition of invasion of privacy.  I don't read

8    this as any commitment nor could it reasonably I would argue be

9    understood to be a commitment that there would be no

10   discussion.

11      But even if you presume that is the case, Your Honor, it

12   still goes squarely to fraud in the ab initio of entering into

13   the agreement and that a term of the agreement that he contends

14   was violated.

15      What you heard today, you heard him in making the argument

16   that this is an exceptional ground.  He walked you through all

17   the alleged fraud that's committed.  What you did not hear is

18   any argument at all that there was any fraud in connection with

19   the forum-selection clause.  And that is what the law requires.

20   Not just in the Northern District of Illinois which in turn

21   cites the Supreme Court of Alabama cases to that effect.  But

22   in this District as well and we cited for example the Cheney v.

23   IPD case --

24          THE COURT:  Right.

25          MS. MCNAMARA:  -- which squarely holds exactly that

1  rule as does the Billard v. Angrick case out of this District.

2  Which again squarely holds that the alleged fraud has to go to

3  the forum-selection clause, not as to any other terms, not as

4  to commitments made or supposedly misrepresentations in the

5  entering into the agreement.

6      And that is what is lacking here.  The plaintiff has not

7  made any argument to that effect and for that reason alone the

8  clause stands and remember, the clause stands regardless.  If

9  the Court were to find and I don't think it's before the Court

10  now, so I would, I think should be an issue before the Seventh

11  District presumably, but if the Court were to find that the

12  rest of the contract is not enforceable by the terms of the

13  contract, the forum-selection clause still stands and would be

14  fully enforceable.

15          THE COURT:  All right.  Let me ask you a procedural

16  question which is a little bit different.

17          MS. MCNAMARA:  Sure.

18          THE COURT:  You're all arguing like this to be

19  transferred to the Southern District.  Can it be transferred to

20  the Southern District?  Are there other New York resident

21  defendants?

22          MS. MCNAMARA:  Yes, both Showtime and CBS have their

23  principal place of business in New York.

24          THE COURT:  Would it go to Southern District or would

25  there be diversity problems, a tort case?

1          MS. MCNAMARA:  No, I don't think there would be a

2   diversity problem.  I don't think so.  I mean, why if the

3   plaintiff would --

4          THE COURT:  Plaintiff's diverse.

5          MS. MCNAMARA:  Right.

6          THE COURT:  I don't know the other company, all are

7   in California?

8          MS. MCNAMARA:  Mr. Cheney is a California resident --

9   I mean, Mr. Cohen is a California resident and Showtime and CBS

10  their principle place of business are in New York.

11         THE COURT:  Nothing in Alabama?

12         MS. MCNAMARA:  No, there's no procedural problem.

13         THE COURT:  All right.

14         MR. KLAYMAN:  Your Honor, may I have one minute?

15         MS. MCNAMARA:  Your Honor, I would also note just

16  very quickly two small points.  Again, the plaintiff iterated,

17  argued again that the plaintiff had selected D.C. and so D.C.

18  should be his forum.  But the Supreme Court spoke squarely to

19  that point in Atlantic Marine when it says the plaintiff's

20  choice of forum merits no weight.  So that is simply not an

21  issue at all.

22      Then finally, Your Honor, the plaintiff also mentioned

23  that there was no consideration under the contract.  We would

24  argue clearly he selected the non-profit to give the money to.

25  That clearly was his choice, his consideration.

1          But moreover, the fact remains that that argument was

2     never raised in the papers and under the Singh case out of this

3     District, it would have been waived.

4               THE COURT:  All right, thank you.

5               MS. MCNAMARA:  Thank you very much, Your Honor.

6               THE COURT:  Certainly.

7               MR. KLAYMAN:  May I have a minute?

8               THE COURT:  Yes.

9               MR. KLAYMAN:  I certainly thank you Your Honor.

10         The basic concept here is that this contract was entered

11    into by fraud.  It's voidable ad initio, the entire thing goes

12    out.

13              THE COURT:  I understand.

14              MR. KLAYMAN:  We cited the second restatement.  There

15    are D.C. cases which we cited, Your Honor, In Re:  Estate of

16    McKinney, 953 A 2d 336, 342 D.C. 2008 quoting Barrer,

17    B-A-R-R-E-R, versus Women's National Bank, 245 U.S. Appeals,

18    D.C. 349, 354 to 55 1985 wherein it was held, it is well

19    established that misrepresentation of material facts may be a

20    basis for the recision of a contract even where the

21    misrepresentations are made innocently without knowledge of

22    their falsity and without fraudulent intent.

23         So there's the exceptional case here, it was done

24    intentionally, willfully and maliciously, the fraud.  The

25    rationale supporting this rule which has its origins in equity

1   is that as between two innocent parties.  The party making the

2   representation should bear the loss.

3        The defendants, we don't even have the defendants here

4   because they were fraudulently concealed as well making this

5   even a more exceptional case.

6        Stated another way, the rule is based on the view that

7   quote, "no one has made a false statement ought to benefit at

8   the expense of another who has been prejudiced by relying on

9   that statement."  This rule may be employed actively as in a

10  suit at equity year (sic) law for recision and restitution or

11  possibly as a defense to a suit for breach of contract.

12       That's the essence.  There never was a contract here, it

13  is voidable.  That's why this is exceptional.  That's why this

14  is unusual.  That's why the fraud is massive.  That's why the

15  public policy weighs in favor of throwing out the entire

16  contract.  With the entire contract goes the choice of the

17  forum.  To reward them for committing five frauds on top of the

18  other and then bragging about it and then having themselves

19  nominated for Golden Globe giving interviews.  This is how I

20  tried to defraud the Secret Service, look at this.  That can't

21  be permitted in any court of law.

22       We know the age that we live in, Your Honor.  The age that

23  we live in is that no one believes either the entertainment

24  industry or the media anymore.  It's time that they clean their

25  act up.  The way that can be done because they won't do it

1    themselves is for this Court to start the process.

2            THE COURT:  All right.

3            MR. KLAYMAN:  I would like to add one more last

4    thing.  I'd like to give Your Honor a copy of this.  After this

5    whole concerted affair occurred, Ms. Isaac had delivered, I

6    have the return receipt for this as well.  A letter to both CBS

7    and Showtime and we said do not air this.  If you air it, you

8    will be sued for defamation.  They did it anyway because to

9    them money talks and nobody walks.  Doesn't matter who you

10   hurt.  This was very profitable at the expense of my client

11   whose reputation has been destroyed.  I know because I was with

12   him shortly after this in Birmingham and I could see the effect

13   on him and Kayla, his wife, who was also induced to go here.

14   This cannot be permitted, Your Honor, not in a civilized

15   society.  There's no reason why they can't come here and tell a

16   D.C. jury what their losing defenses may be.

17       Thank you.

18           THE COURT:  All right, thank you, Mr. Klayman.  I

19   appreciate the work again.

20       I'm going to issue a ruling at this time.  The case has

21   been pending before us.  It was filed in late 2018, but in any

22   event it's time to dissolve this matter one way or another and

23   move it to the next step for the parties to resolve this.

24       At the beginning I explained the background how this case

25   arose and the argument has further fleshed that out.  This will

1   be a bench opinion of the Court, will be the only opinion I'll

2   issue.

3       On the application defendants' that's plural, motion to

4   transfer the case under 28 U.S.C. 1404 and the case law that

5   applies following Atlantic Marine from the Supreme Court.  The

6   full case is Atlantic Marine Construction Company v. United

7   States District Court for the Western District of Texas,

8   decided 2013.  It's cited at 571 U.S. 49 and it's a unanimous

9   opinion by Justice Alito in reversing the lower court under the

10  forum-selection clause discussion and it's clear where they

11  held the present case both the District Court and the Court of

12  Appeals misunderstood the standard to be applied adjudicating a

13  Section 1404 motion in a case involving a forum-selection

14  clause are therefore reversed the judgment below.

15      They go through the series of case laws as they get to

16  that and they explain that a motion, this is a quote, "to

17  transfer under 1404 (a) calls on the district court to weigh in

18  the balance a number of case-specific factors and that the

19  presence of a forum-selection clause will be a significant

20  factor that figures in centrally the district court calculus

21  citing to an earlier case.

22      In any event, they eventually conclude that the

23  forum-selection clause does not render venue in a court wrong.

24  There is venue here or improper within the meaning of 1406 or

25  Rule 12(b)(3).  The clause may be enforced through a motion

1  transfer under 1404 (a).  Unlike Section 1406(a), the 1404(a)

2  does not condition transfer initial forum selection being

3  wrong.

4      They go on to explain that the 1404(a) is not a suitable

5  mechanism of enforcement forum-selection clause because they

6  agree with Atlantic Marine.  The Court of Appeals failed to

7  provide a sound answer to the problem of how you interpret a

8  forum-selection clause contract according to a non-federal

9  forum should be enforced or not, et cetera.

10      In this case, essentially what that says we have the

11  problem here is that the burden shifts differently with the

12  type of clause that we have here, forum-selection clause from

13  the normal considerations in the transfer on venue basis.

14      So that where the Supreme Court has held the calculus

15  changes when the parties' contract contains a valid

16  forum-selection clause.  In such a case we're advised I have to

17  ordinarily transfer the case to the forum specified in that

18  clause and should deny a transfer motion under Section 1404(a)

19  only under extraordinary circumstances unrelated to the

20  convenience of the parties.  It should be given controlling

21  weight in all but the most exceptional circumstances.  That's

22  another Supreme Court case, Ricoh at 487 U.S. 23 a 1988 case.

23      So now the way I have to look at this is that a non-movant

24  bears the burden of demonstrating that such extraordinary

25  circumstances exist.  So that Mr. Klayman and his client must

1    show the Court why I should not transfer the case to a forum

2    which the parties agree to.

3         So the forum-selection clause is valid.  The plaintiff's

4    choice of forum merits no weight and the Court should not

5    consider arguments about the parties' private interest.

6         The Supreme Court indicates that as I said clearly when

7    you review Atlantic Marine.  So I have to determine first if

8    the forum-selection clause is valid, enforceable and then if

9    so, I've got to determine whether the plaintiff has met the

10   burden of establishing their exceptional public interest

11   factors justify a denial of the transfer.

12        I'm going to conclude in this matter as to the purpose of

13   this motion only the clause is valid, enforceable and that the

14   plaintiff has not shown exceptional public interest factors

15   justify denying the transfer to the Southern District of New

16   York and will order such a transfer.

17        I'm going to make the following reasons and findings to

18   validate that decision.  First, as to the validity of the

19   forum-selection clause have been strongly attacked by the

20   non-movant in this case, the plaintiff, Judge Moore and his

21   wife, that it is brought fraud ab initio through the fraudulent

22   matters as discussed in the argument that obtained this TV show

23   that was shown to the detriment it's claimed of the plaintiff,

24   both plaintiffs.

25        So the forum- selection clause when you read it is number

1   6 totally different than the paragraph 4 that's been presented

2   to me where Mr. Moore changed the contract to his own review,

3   personal review of the contract, taking out behind invasion of

4   privacy such as any allegedly sexual oriented or offensive

5   behavior questioning.  Paragraph 6 is further down the bottom

6   of the page was not touched or marked or any question

7   apparently raised about it.

8        The plaintiffs think that the contract of being void ab

9   initio and therefore there's no basis to enforce it including

10  the forum-selection clause.

11       But as I said, the clause covers any claim in connection

12  with the Sacha Noam Baron production.  It is argued

13  additionally it can't be used against the non signatories to

14  the other defendants in this case to the contract because the

15  contract was between we'll call it YTV and Roy Moore, so that

16  would not be, these other people affected by have the right to

17  complain about the forum and could not move to transfer the

18  forum.

19       It seems to the Court that there are cases in this case in

20  this Court and other Courts that non signatories to the

21  agreement were bound by the forum-selection clause.  The claims

22  are closely related are that non-signatories whether you have

23  interest or derivative from related to the original case would

24  not be prejudiced by this.

25       So it seems to me that Mrs. Moore can't complain about the

1  transfer.  Additionally, the non-signatory defendants have two

2  reasons why they can rely upon the forum-selection clause as

3  well.

4      First, the agreement you read it talks about the producer

5  as, I'll try to pronounce it, Yerushalayim TV.  I'm calling it

6  YTV, that's the size, licensees, parents, subsidiaries and

7  affiliates, we have affidavits here that are un rebutted

8  despite the opposition claiming they shouldn't believe them.

9  And the article from a magazine as the opposition to believe in

10 these things.

11     Defendant submitted a declaration from the executive

12 producer of the program which states this YTV is only owned by

13 defendant Cohen.  It's only owned through the production

14 company which owns the program and licenses it that's a

15 licensee then to defendant Showtime and CBS.  So each of the

16 defendants and this included with the definition of producer in

17 the signatory consent agreement and there you may be

18 respectfully a parent or affiliate and licensee.  I think that

19 gives them the basis to move as well for the transfer under the

20 forum-selection clause.

21     The defendants argue alternatively they're intended to be

22 third party beneficiaries.  There are cases showing that it is

23 a recognized status and there have been cited by defendants

24 which we didn't discuss here, but there are cases establishing

25 that.  But I think the first principle that they're within the

1    line of licensees and affiliates is established by the evidence

2    and the affidavits before us.

3         So I think the defendants have the ability to enforce the

4    forum-selection clause.  The clause does apply to claims,

5    that's what it says, any claims have to be litigated in New

6    York brought by the plaintiffs, both plaintiffs in this case.

7         The plaintiffs' proposed sur-reply does not affect that

8    argument. They try to argue that the Shulman affidavit is

9    unsupported by real or actual evidence and they aren't intended

10    to be third party beneficiaries.  I don't see how that has any

11    bearing on a motion to transfer just challenging it by a news

12    article that somehow changes the contract.

13         So then I have to see whether or not the selection clause

14    is enforceable.  I think it is enforceable at this time because

15    of the following factors.  Despite the argument of the

16    plaintiff.  First of all, we look upon it if you look at the

17    law in D.C. that forum-selection clause is presumptively valid

18    and enforceable unless the party opposes the enforcement meets

19    a heavy burden showing their clause is a product of fraud or

20    that it's enforcement would contravene small, a strong public

21    policy of the forum in which suit is brought.  I believe that

22    was Judge Sullivan of our Court, D&S Consulting, 322nd F. Supp

23    at 49, 2018 case recently.  He's quoting from a D.C. Circuit

24    case of 2000, Marra, M-A-R-R-A, 216 F.3d at 124.

25         So unless it's tainted by fraud itself, talking about the

1   actual clause, not the entire contract or enforcement would

2   deprive his day in court.  It would not or their day in court

3   or any remedy or contravene a strong policy, public policy of

4   the forum state.

5        Again, going back I cited the Marra case, M-A-R-R-A, that

6   was originally tried 59 F. Supp 2d, 69 by Judge Urbina, but

7   then appealed to the cite I've already given.  So I don't see

8   any existence of those factors that would cause a difference

9   here.

10        Plaintiffs have argued forcibly that the entire agreement

11   was procured by fraud.  So they've argued using standard fraud

12   cases from D.C. and other places and restatement of contract

13   that the claim of fraud and the inducement is insufficient

14   whether or not it's insufficient to invalidate a

15   forum-selection clause.  But the case law is replete with

16   decisions that say it's the inclusion of the specific clause

17   forum-selection itself that must have been induced by fraud.

18   Not the entire contract even though it's part of the contract,

19   but more specifically there has to be claims of this particular

20   provision and we don't have that.  Nothing addresses in the

21   argument as to this particular provision as opposed to the

22   overall challenge on the contract.

23        You actually would have to have me find that fraud was so

24   overreaching in that it did affect the forum-selection clause

25   in order to invalidate it and I can't see that as the basis

1  that's before me in this argument.

2      They allege that Judge Moore was taken to D.C. to get this

3  award for his support of Israel, a totally fraudulent basis so

4  that he could be fraudulently portrayed as a pedophile on

5  national television.  And a television show was being produced

6  for YTV and not Cohen, Showtime and CBS basically that's a

7  fraud.  But that doesn't affect the forum-selection clause in

8  the agreement.

9      There's nothing that Judge Moore has alleged in any

10  affidavit otherwise that he was fraudulently induced to sign

11  the agreement as to the forum-selection clause itself.  There

12  was some claim that there's only one case in Alabama that says

13  that that was the Streit case Twentieth Century Fox which was

14  the same contract with some of the same defendants in this case

15  again about transferring it from Alabama to the Southern

16  District of New York and that that's an aberrant decision.

17  There's a series of D.C. cases we have which say actually the

18  same thing.  So that I don't think we can say that this is an

19  aberrant decision.

20      One for instance is the D&S Consulting referred to earlier

21  that is against the Kingdom of Saudi Arabia by Judge Sullivan.

22  One quote he has in there is forum-selection clauses are

23  presumably valid enforceable unless the party opposing

24  enforcement meets a heavy burden of proof, showing the clause,

25  the clause is the product of fraud or it's enforcement would

1   contravene a strong public policy in the forum which suit is

2   brought.

3        I'm not saying this Court endorses any kind of fraud, but

4   I don't see how the fact before me constitute that I can say

5   this particular forum-selection clause was fraudulent.

6        The general allegations about fraud and the inducement

7   that should set aside this contract is available to the

8   plaintiffs to litigate in the Southern District in New York.

9   There's nothing stopping them from raising that.  If they're

10  successful in that that's fine, but there's no reason it has to

11  be tried here that I could find.

12       Now the other part of it would be whether or not the

13  analysis I determined whether there's extraordinary

14  circumstance to justify the denial of the motion to transfer

15  the one that's the public interest.  We already discussed

16  whether or not it is against the public policy in D.C. beyond

17  the claim of fraud.  I don't see that.  So arguing about a

18  local D.C. jury, I don't see that there's any kind of a

19  relative suggestion to the Court that makes it better to try it

20  here than there.  In fact, if you look up the difference in

21  media time in filing civil cases and disposing of them.  In

22  last year the District of Columbia was six months and the

23  Southern District of New York was 6.4 months.  There's really

24  no difference in that factor.

25       The choice of law agreement in the contract talks about

1   the substantive law City of New York will agree which means it

2   probably should be tried in New York then because that's the

3   law that will apply unless the parties are successful, the

4   plaintiff is successful entirely in turning down the entire

5   contract because of fraud, but that is going to be for the

6   local court to try that and not me.

7        The localist deciding it here because of the alleged

8   tortious conduct occurred in D.C.  That's the only connection

9   with D.C.  No one resides here.  There's some argument maybe

10  the witnesses are here.  Well, the only witnesses are those who

11  were involved wherever the taping was done, where that was done

12  in the hotel room.  The witnesses say that they were in the

13  hotel from the hotel I mean that's pretty evident.

14       Judge Moore and his wife reside in Alabama.  Cohen resides

15  in California.  Showtime and CBS are apparently headquartered

16  in New York where their employees, some of the employees would

17  be.  I don't see how that changes the equation that I have to

18  use to determine whether it's appropriate here.

19       I don't see how the, even the supplemental material that

20  they wish to file about the Salon article that defendants they

21  argue are inextricably tied to TV and to Washington, D.C. with

22  this TV show.  I don't think there's any bearing whether or not

23  the forum-selection clause that Judge Moore had signed

24  originally has to be transferred or not.  Certainly venue would

25  be appropriate here.

1        I don't see an extraordinary circumstance that justify the

2   Court's refusing to enforce the forum-selection clause despite

3   the claim that the contract as an overall was fraudulently

4   induced.  It would have to be as to this clause individually.

5        So under the case law it's very, very clearly established.

6   I see no alternative except to transfer the case to the

7   Southern District of New York and grant the motion of all of

8   the defendants.  That'll be the order of the Court.  I'll

9   submit an order to that effect.

10       Thank you all for coming in.  I appreciate it.

11       Mr. Klayman, thank you for the argument.  I appreciate it.

12   That's the decision of the Court.

13       (Proceedings adjourned at 11:07 a.m.)

14                          -o0o-

15

16

17

18

19

20

21

22

23

24

25

```
1                        CERTIFICATE
2        I certify that the foregoing is a true and correct
3    transcript, to the best of my ability, of the above pages, of
4    the stenographic notes provided to me by the United States
5    District Court, of the proceedings taken on the date and time
6    previously stated in the above matter.
7        I further certify that I am neither counsel for, related
8    to, nor employed by any of the parties to the action in which
9    this hearing was taken, and further that I am not financially
10   nor otherwise interested in the outcome of the action.
11
12   /s/Crystal M. Pilgrim, RPR, FCRR      Date:  May 8, 2019
13
14
15
16
17
18
19
20
21
22
23
24
25
```

STANDARD CONSENT AGREEMENT

This is an agreement between Yerushalayim TV(including its assigns, licensees, parents, subsidiaries, and affiliates) (collectively, the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer making a $ _200_ donation to a charity chosen by the Participant and allowing an opportunity for the Participant to appear in a television series, the Participant agrees as follows: *Foundation For Moral Law*

    1.  The Participant agrees to be filmed and/or audiotaped by the Producer for a reality-style television series (the "Program"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

    2.  The Participant agrees that any rights that the Participant may have in the Program or the Participant's contribution are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Program and any recorded material that includes the Participant, without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for that. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Program, but also in any advertising, marketing or publicity for the Program and in connection with any ancillary products associated with the Program.

    3.  The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Program and the Participant's participation in it, and that the consent agreement, for this and other reasons, cannot be revoked.

    4.  The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Program, which are related to the Program or its production, or this agreement, including, but not limited to, claims involving assertions of (a) failure to adequately compensate Participant, (b) failure to use the footage of Participant in the Program, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion or invasion of privacy (such as any allegedly sexual-oriented or offensive behavior or questioning), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made in the Program), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Program in relation to the Program or the Program in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Program or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

    5.  This is the entire agreement between the Participant and the Producer or anyone else in relation to the Program, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program. Participant is signing this agreement with no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program.

    6.  Although the Participant agrees not to bring any claim in connection with the Program or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York. This paragraph is intended by the parties to stand on its own, and it is intended to be valid and enforceable, even if a court finds that other paragraphs are not valid or enforceable.

AGREED AND ACCEPTED:
SIGNED:

_Roy S. Moore_

PRINT: _Roy Moore_

Dated: _2/14/18_

Yerushalayim TV

By: _____

Print: _____