July 15, 2020

**Via CM/ECF and Electronic Mail**

Hon. Andrew L. Carter, Jr.
U.S. District Court for the Southern District of New York
40 Foley Square
New York, NY 10007

Re:     *Moore, et al v. Cohen, et al.*, **1:19-cv-4977-ALC – Joint Status Report**

Dear Judge Carter:

The parties in the above-referenced case provide the following Joint Status Report pursuant to the Court's order at the conference held on July 2, 2020. The parties have conferred and were not able to reach agreement on the scope and timing of discovery. Defendants respectfully request a telephone conference to discuss the parties' different proposals in greater detail.

      A.      **Plaintiffs' Proposal**

This Honorable Court's order of July 8, 2020, which clarifies misstatements in defense counsel's letter of July 2, 2020, provides:

This Honorable Court's Order of July 8, 2020, which clarifies misstatements in defense counsel's recent letter, which mischaracterized the Court's prior oral ruling. This Order provides:

> "This Court is in receipt of Defendants' letter and Plaintiffs' response.
>
> The motion to dismiss is denied in its entirety. Defendants may raise the issues addressed in their letter in a subsequent motion for summary judgment. If there is any discovery regarding Defendants' First Amendment argument, that discovery should take place at the same time as the discovery related to the Consent Agreement. Defendants' letter will not be struck from the record. (Signed by Judge Andrew L. Carter, Jr. on 7/8/2020."

In response, and during the parties consultation as ordered by the Court over the execution of this Order, Defendants' counsel predictably proposed discovery which will allow them to draft discovery responses for their clients, in particular Sasha Baron Cohen, a person whose modus operandi is false deception and trickery, to put it most diplomatically.

This proposal is unacceptable, as oral testimony (with prior relevant document production), with un-coached responses and where cross examination can also occur, is necessary to get honest spontaneous discovery which is not contrived and written by lawyers. This is in the interests of justice and fundamental fairness for all concerned.

In addition, as the Court ordered, discovery should not be bifurcated, as the issues at bar are overlapping and integrally related. In addition, as Plaintiffs are individuals with limited financial resources, and as Defendants are multi-trillion dollar companies, it makes sense and furthers fundamental fairness and equality to go forward with discovery on all pertinent issues as ordered, including the alleged defamation as the court ordered. Thus, discovery should respectively take place at the same time.  This will save and preserve valuable resources of both the parties and the Court and speed up the litigation.  Defendants' concept of "speeding up the litigation," is couched only to further their own interests with minimal disclosure of unverifiable information. This approach is rife with problems and is likely to lead to many discovery motions, which will elongate the litigation.

Accordingly, Plaintiffs' propose to adhere to this honorable Court's order of July 8, 2020, and not be constrained, as predictably Defendants' propose, by getting lawyer responses to legitimate discovery with regard to the parties. As Plaintiffs, Chief Justice Roy Moore and Mrs. Kayla Moore will participate in discovery without hiding behind the veil of their legal counsel neither should Defendants.  This case is a serious case, not entertainment,  and thus not part of Defendants' well known modus operandi of disguise and false if not fraudulent representations. *See* Plaintiffs' attachment.

### B. Defendants' Proposal

As Defendants understand the Court's decision on the motion to dismiss, the principal impediment to decision at the pleading stage was the Court's determination that evidence establishing the formal relationships among the named Defendants and the signatory to the Standard Consent Agreement (Yerushalayim TV) was outside the four corners of the Complaint.

At the conference held on July 2, 2020, the Court stated that the parties "should be able to move toward summary judgment fairly quickly," and that "the bulk of discovery will be related to this agreement and the corporate relationships …." Tr. at 4:10-13.  Defendants agree with this assessment.  With the production of a small number of additional documents, which have been officially filed with Secretaries of State, Defendants will eliminate any genuine issues of fact as to the relationships among any parties or relevant non-parties, and could move straight to summary judgment on the grounds asserted in their Rule 12 motion to dismiss.

Plaintiffs have asserted throughout this litigation that they need evidence going towards their arguments of fraudulent inducement.  But, based on the alleged misrepresentations detailed in the Complaint (*see* ECF No. 1 ¶¶ 15-21, 40-44), Defendants are assessing whether the parties could stipulate to certain facts concerning each Plaintiffs' alleged inducement to participate in the interview segment.  Plaintiffs do not explain why (apparently unlimited) discovery and depositions would be necessary to adduce facts that may well not be in dispute.

Underscoring Defendants' desire to move towards summary judgment as quickly as possible is the fact that this case concerns core, protected political satire of an indisputably controversial public figure.  "To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986); *New York Times Co. v. Sullivan*, 376 U.S.

July 15, 2020
Page 3

254 (1964)).  Likewise, "[t]he New York Court of Appeals has explained that there is 'particular value' in resolving defamation claims at the pleading stage"—or as early as possible—"so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms."  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) (quoting *Armstrong v. Simon & Schuster, Inc.,* 85 N.Y.2d 373, 379 (1995)).  *See generally Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53–54 (1988) (discussing importance of protecting political satire).

Accordingly, Defendants propose a bifurcated approach to discovery pursuant to which the parties would first engage in the limited discovery necessary to brief motions for summary judgment on the defenses asserted in Defendants' Motion to Dismiss, specifically, that Plaintiffs' claims are barred by the Standard Consent Agreement entered into between Judge Moore and Yerushalayim TV, and that, in any event, Plaintiffs' claims are barred by the First Amendment to the U.S. Constitution and Article I, Section 8 of the New York Constitution and/or fail to state a claim on the merits.  *See, e.g., Blair v. Inside Ed. Productions*, 7 F. Supp. 3d 348, 356 (S.D.N.Y. 2014) ("[T]he Court granted Inside Edition's motion to bifurcate discovery, to stay discovery unrelated to the truth or falsity of the broadcasts, and to entertain a motion for summary judgment on substantial truth.").

Defendants propose that this first phase of discovery be completed within sixty days, by September 14, 2020.

This initial phase of discovery would include:

- Production by Defendants of documents sufficient to establish the corporate structure and relationships among Defendants and Yerushalayim TV;

- Execution of declarations to authenticate those documents and attesting to those corporate relationships, to the extent the documents are not self-authenticating;

- Deposition by written questions of the declarants who executed any such declarations (to the extent necessary); and

- Stipulation as to any undisputed facts, including what representations were made to Plaintiffs by Defendants or any of their agents.

This phase of discovery would only entail limited discovery from Plaintiffs, if any.  What this phase of discovery would <u>not</u> include is the discovery from Plaintiffs to which Defendants would otherwise be entitled, including evidence going to the substantial truth of the allegedly defamatory statements and to Plaintiffs' reputations and damages, all of which would be quite extensive (and likely to lead to disputes between the parties that would require resolution by the Court).  *See generally Weber v. Multimedia Entm't, Inc.*, No. 97-cv-682, 1997 WL 729039, at *2-3 (S.D.N.Y. Nov. 24, 1997) (discussing broad scope of discovery related to reputation, including into sexual history of plaintiff, in libel case over statement calling plaintiff a "prostitute"); *Rivera v. NYP Holdings Inc.*, 63 A.D.3d 469, 881 N.Y.S.2d 60 (1st Dep't 2009) ("Defendants are entitled to the discovery they seek in their efforts both to establish their defense of truth to plaintiff's defamation claims, and to defend against plaintiffs' assertion of damage to his reputation.  Moreover, defendants are entitled to the opportunity to demonstrate the truth of

July 15, 2020
Page 4

the articles *as a whole*, warranting disclosure even as to assertions in those articles that are not directly challenged in plaintiff's complaint.") (internal citations omitted).

      After this preliminary phase of discovery is complete, the parties would have the opportunity to move (and/or cross-move) for summary judgment on the defenses asserted in Defendants' Motion to Dismiss. Motions for summary judgment would be due thirty days after the close of discovery, on October 14, 2020.

      In the event the Court denies the motion(s) for summary judgment, the parties would confer on a schedule for expeditiously completing any additional necessary discovery, including discovery that would go to the substantial truth of the statements at issue, the lack of actual malice, and discovery regarding the damages, if any, suffered by Plaintiffs.

      Defendants respectfully submit that their proposed approach is the most efficient—and, in light of the First Amendment interests at stake—most appropriate approach to resolving this case.

Respectfully Submitted,

Klayman Law Group, P.A.

/s/ Larry A. Klayman

*Attorneys for Plaintiffs*


Davis Wright Tremaine LLP

/s/Elizabeth A. McNamara

*Attorneys for Defendants*

**PLAINTIFF'S ATTACHMENT**



# Sacha Baron Cohen recounts narrow escape from Ben Carson's Secret Service

By Ian Mohr

May 24, 2019 | 3:59pm



Sacha Baron Cohen
Getty Images (Composite)

Sacha Baron Cohen was on the run from Secret Service agents when an interview with Ben Carson went hysterically awry.

Human chameleon Cohen managed to land an interview with the secretary of housing and urban development, he's revealed. Cohen was planning to conduct the chat as his wild character "OMGWhizzBoyOMG" — a Finnish YouTuber obsessed with unboxing Shopkins kids collectibles.

But the plan fell apart just before the interview began at the Washington, DC, Mandarin Oriental.

"We get there and there were Secret Service everywhere … it turns out that there's a conference there … and there were Secret Service throughout the building. So I was like, 'S–t! How do I get him?'" Cohen told a group of SAG members at a private talk, we hear. Sarah Silverman had urged Cohen to recall the wild Carson tale at the event.

Worried about being ID'd by the agents, Cohen recounted, "I spoke to my lawyer and I said, 'What happens if [Secret Service] wants to see my ID?' And he goes, 'Well, you have to show him your ID then, that's illegal not to show him.' "

Cohen additionally had a fake ID on him, but his lawyer cautioned that if he presented it, he could be arrested. "I go, 'OK what if I bend over and the fake ID falls on the floor? And they pick it up?'" Cohen asked the legal eagle. "And he goes, 'That might be OK.' " Entering the hotel, "the Secret Service are there I bend over … they pick it up, fine, I walk on," Cohen recalled.

But once he reached the interview room to meet Carson, the in-disguise star saw "a press officer of the White House there. And he sees all these Shopkins that I've got there. And he goes, 'What are those?' And I go [in character], 'Those are Shopkins!' He said, 'I know what they are — why are there Shopkins here?' "

When Cohen again answered in character as the punk-haired, bespectacled, Finnish toy obsessive, the White House staffer "literally gave one look to the Secret Service, and Ben Carson's leg is coming in and literally falls backwards."



With Carson abruptly pulled, "Then they looked — the rest of the Secret Service — like something is going on."

Cohen hurried to another room the show had booked — but, "I hide in this other room. Then I find out the Secret Service is coming to our room. I booked another room upstairs. I go to the other room."

That's when Cohen's security adviser informed the gadfly comic, he recalled, "The Secret Service know you're here, and that something's up, they don't know what it is, whether it's an attack or something's going on, and they're looking for you."

Cohen also learned that "some of the Secret Service were dressed as housekeepers and room service guys — we actually have behind-the-scene footage of Secret Service workers coming and listening through the door."

Luckily Cohen also planned "an escape route ... down around the back of the building through the garbage. And the security guard said ... 'They're by the garbage.' And I said, 'How do we get out of the building?' There's, like, 18 of these guys."



Ben Carson
LightRocket via Getty Images

According to Cohen, his guard told him, "'We're going to position a getaway car in front of the hotel ... You've got 25 feet from the elevator opening to the car.' And I go, 'What about the Secret Service guys?' And he goes, 'If they come towards you, I'm gonna take them down.' I go, 'What?!' He goes, 'Because that's what I have to do to get you into the car.' "

In the end, Cohen said, "I manage to get to the car, and we were followed by a police car for about five minutes and they didn't pull us over so I managed to get away with that."

Cohen was nominated for a Golden Globe for the series and is now being hotly tipped as a potential Emmy nominee.

Beltway insiders who did appear on the show included Dick Cheney, Howard Dean, Barney Frank, Corey Lewandowski, Trent Lott, Bernie Sanders and veteran newsman Ted Koppel.

Cohen has previously said he'd booked Carson for the ill-fated interview in a Q&A but has never revealed that he was afraid of being pursued by the Secret Service in the aftermath.

— ADVERTISEMENT —



Carson, meantime, was just in a bizarre exchange at a Capitol Hill hearing where he misheard a California congresswoman asking about "REOs" — a real estate term — as Oreos, as in the cookies.

FILED UNDER    DR. BEN CARSON,  POLITICS,  SACHA BARON COHEN,  SECRET SERVICE,  5/24/19