UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

--------------------------------------------------------- x

ROY STEWART MOORE and KAYLA MOORE,      :
                                                                          :
                              Plaintiffs,                           :        Index No. 19 Civ. 4977 (JPC)
                                                                          :
                                                                          :        **ORAL ARGUMENT REQUESTED**
                  - against -                                      :
                                                                          :
SACHA NOAM BARON COHEN, SHOWTIME          :
NETWORKS, INC., AND CBS CORPORATION,        :
                                                                          :
                              Defendants.                          :
--------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Elizabeth A. McNamara                              Of Counsel:
Rachel F. Strom                                         Russell Smith, Esq.
Eric J. Feder                                              Jeff Holmes, Esq.
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor       SMITHDEHN LLP
New York, New York  10020                        654 San Juan Avenue
(212) 489-8230                                          Venice Beach
(212) 489-8340                                          Los Angeles, California  90291
lizmcnamara@dwt.com                                (310) 396-9045
rachelstrom@dwt.com                                rsmith@smithdehn.com
ericfeder@dwt.com                                    jholmes@smithdehn.com

*Attorneys for Defendants Sacha Noam Baron Cohen,*
*Showtime Networks Inc. and CBS Corporation*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND .......................................................................................4

    A.    The Parties ..................................................................................4

    B.    Production Companies .................................................................4

    C.    Who Is America? ........................................................................5

    D.    The Episode of the Program Featuring Judge Moore ............6

    E.    The Standard Consent Agreement ...........................................8

    F.    Procedural History of this Action ............................................9

ARGUMENT .............................................................................................................10

I.     PLAINTIFFS' CLAIMS ARE BARRED BY THE SCA ...............................10

    A.    New York Courts Consistently Enforce Waivers In Appearance Agreements .....11

    B.    Plaintiffs' Arguments to Avoid Enforcement of the Waiver Are Meritless .........13

          1.    Plaintiffs Cannot Claim Fraudulent Inducement When the Agreement Disclaims Reliance on the Allegedly Fraudulent Representations .................... 13

          2.    Defendants Can Enforce the SCA.......................................... 16

          3.    The SCA's Waiver of Specific Claims Is Enforceable............................. 18

          4.    A Handwritten Deletion of Language Concerning a Possible Claim *Not* Asserted in this Action Has No Effect on the Explicit Waiver of the Claims Actually Asserted Here ...................... 19

          5.    Mrs. Moore's Derivative Claims Are Waived.......................... 22

II.    THE CLAIMS INDEPENDENTLY FAIL AS A MATTER OF First amendment LAW ...........................................................................23

    A.    Judge Moore Cannot Base a Defamation Claim on Satire Protected under the First Amendment..............................................23

    B.    Plaintiffs' Emotional Distress Claim Is Barred by the First Amendment ............28

i

C.     Plaintiffs' Fraud Claim Is Barred by the First Amendment....................................29

CONCLUSION..................................................................................................................................30

4828-1646-7927v.7 3940173-000105

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bihag v. A&E Television Networks, LLC*,
    669 F. App'x 17 (2d Cir. 2016) ........................................................................12

*Biro v. Condé Nast*,
    883 F. Supp. 2d 446 (S.D.N.Y. 2012).................................................................24

*Celle v. Filipino Reporter Enters. Inc.*,
    209 F.3d 163 (2d Cir. 2000)...............................................................................25

*Chaiken v. VV Publ'g Corp.*,
    No. 91 CIV. 2102, 1992 WL 168282 (S.D.N.Y. June 30, 1992)........................29

*Dongguk Univ. v. Yale Univ.*,
    734 F.3d 113 (2d Cir. 2013)...............................................................................29

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) .....................................................................23, 27

*Flamm v. Am. Ass'n of Univ. Women*,
    201 F.3d 144 (2d Cir. 2000)...............................................................................24

*HOP Energy, L.L.C. v. Local 553 Pension Fund*,
    678 F.3d 158 (2d Cir. 2012)...............................................................................13

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988)........................................................................1, 2, 26, 28, 29

*Idema v. Wager*,
    120 F. Supp. 2d 361 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002)........................28

*Kay-R Elec. Corp. v. Stone & Webster Constr. Co.*,
    23 F.3d 55 (2d Cir. 1994)...................................................................................21

*Kidder, Peabody & Co. v. Zinsmeyer Trustees Partnership*,
    41 F.3d 861 (2d Cir. 1994).................................................................................20

*Klein v. Frenkel*,
    No. 14-cv-2719, 2015 WL 13721693 (E.D.N.Y. Feb. 19, 2015) ........................11

*KTV Media Int'l, Inc. v. Galaxy Grp., LA LLC*,
    812 F. Supp. 2d 377 (S.D.N.Y. 2011)................................................................22

iii

*La Luna Enters., Inc. v. CBS Corp.*,
    74 F. Supp. 2d 384 (S.D.N.Y. 1999)......................................................................30

*Lan Sang v. Ming Hai*,
    951 F. Supp. 2d 504 (S.D.N.Y. 2013).....................................................................28

*Levin v. McPhee*,
    119 F.3d 189 (2d Cir. 1997).............................................................................23, 24

*Maddaloni Jeweles, Inc. v. Rolex Watch U.S.A., Inc.*,
    354 F. Supp. 2d 293 (S.D.N.Y. 2004)....................................................................18

*Mateo v. Carinha*,
    No. 14 CV 9020, 2019 WL 1409727 (S.D.N.Y. Mar. 28, 2019), *aff'd*, 799 F.
    App'x 51 (2d Cir. 2020)...........................................................................................17

*MGM Studios Inc. v. Canal+ Distrib. S.A.S.*,
    No. 07 Civ. 2918, 2010 WL 537583 (S.D.N.Y. Feb. 9, 2010) ...............................22

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990).............................................................................................23, 24

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994)..................................................................................26

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
    102 F.3d 660 (2d Cir. 1996).....................................................................................17

*Novak v. Tucows, Inc.*,
    No. 06-CV-1909, 2007 WL 922306 (E.D.N.Y. Mar. 26, 2007), *aff'd*, 330 F.
    App'x 204 (2d Cir. 2009).........................................................................................22

*Psenicska v. Twentieth Century Fox Film Corp.*,
    Nos. 07 Civ. 10972, *et al.*, 2008 WL 4185752 (S.D.N.Y. Sept. 3, 2008), *aff'd*,
    409 F. App'x 368 (2d Cir. 2009) ...............................................3, 10, 11, 12, 13, 14, 15, 16, 21

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014)........................................................................28

*RTC Mortg. Tr. 1995-S/N1 v. J.I. Sopher & Co.*,
    No. 96 Civ. 4992, 1998 WL 132815 (S.D.N.Y. Mar. 24, 1998) ............................21

*Shapiro v. NFGTV, Inc.*,
    No. 16 Civ. 9152, 2018 WL 2127806 (S.D.N.Y. Feb. 9, 2018) .......................12, 15

*Spithogianis v. Haj-Darwish*,
    No. 07 Civ. 4609, 2008 WL 82188 (S.D.N.Y. Jan. 7, 2008)...................................29

iv

*Sylvester v. City of N.Y.*,
    385 F. Supp. 2d 431 (S.D.N.Y. 2005)........................................................................29

*Torain v. Liu*,
    279 F. App'x 46 (2d Cir. 2008) ...............................................................................24

*Van Buskirk v. N.Y. Times Co.*,
    325 F.3d 87 (2d Cir. 2003)........................................................................................24

*W. Tsusho Co. v. Prescott Bush & Co.*,
    No. 92 Civ. 3378, 1993 WL 228072 (S.D.N.Y. June 23, 1993)................................29

*Webster v. N.Y. Life Ins.& Annuity Corp.*,
    386 F. Supp. 2d 438 (S.D.N.Y. 2005)......................................................................21

**State Cases**

*Aronson v. Wiersma*,
    65 N.Y.2d 592 (1985) ...............................................................................................24

*Balderman v. ABC*,
    292 A.D.2d 67 (4th Dep't 2002)...........................................................................29, 30

*Brian v. Richardson*,
    87 N.Y.2d 46 (1995) .................................................................................................23

*Buckley v. Nat'l Freight, Inc.*,
    90 N.Y.2d 210 (1997) ...............................................................................................22

*Centro Empresarial Cempresa S.A. v. Am. Movil S.A.B. de C.V.*,
    17 N.Y.3d 269 (2011) ...............................................................................................21

*Dillon v. City of N.Y.*,
    261 A.D.2d 34 (1st Dep't 1999) ...............................................................................24

*Doe v. Channel Four Television Corp.*,
    No. B217145, 2010 WL 1303493 (Cal. Ct. App. 2d Dist. Apr. 6, 2010) ................25

*Farmers Ins. Exch. v. Morris*,
    228 So. 3d 971 (Ala. 2016) (Moore, C.J., dissenting) ............................................16

*Finebaum v. Coulter*,
    854 So. 2d 1120 (Ala. 2003)......................................................................................27

*Frank v. NBC*,
    119 A.D.2d 252 (2d Dep't 1986) ..............................................................................26

v

*Gelbman v. Valleycrest Prod., Ltd.*,
　189 Misc. 2d 403 (Sup. Ct. N.Y. Cty. 2001) ........................................................12

*Gilbane Bldg. Co. v. St. Paul Fire & Marine Ins. Co.*,
　143 A.D.3d 146 (1st Dep't 2016), *aff'd*, 31 N.Y.3d 131 (2018) ............................13

*Gross v. N.Y. Times Co.*,
　82 N.Y.2d 146 (1993) ..........................................................................................24

*Klapper v. Graziano*,
　129 A.D.3d 674 (2d Dep't 2015) ..............................................................11, 12, 17

*Nizewitz v. Viacom Int'l, Inc.*,
　No. 158209-14, 2015 WL 3401196 (Sup. Ct. N.Y. Cty. Mar. 4, 2015) ..................12

*P&B Capital Grp., LLC v. RAB Performance Recoveries, LLC*,
　128 A.D.3d 1534 (4th Dep't 2015) .......................................................................20

*Shields v. Gross*,
　58 N.Y.2d 338 (1983) ...........................................................................................11

*Shoemaker v. Discovery Commc'ns, LLC*,
　57 Misc. 3d 1203(A), (Sup. Ct. N.Y. Cty. 2017) .............................................11, 12

*Weil v. Johnson*,
　No. 119431/02, 2002 WL 31972157 (Sup. Ct. N.Y. Cty. Sept. 27, 2002) .............12

## State Statutes

Wyo. Stat. Ann. § 17-16-1422 ...........................................................................................5

Defendants Sacha Baron Cohen ("Cohen"), Showtime Networks Inc. ("SNI"), and CBS Corporation n/k/a ViacomCBS Inc. ("ViacomCBS") (collectively, "Defendants") submit this memorandum of law in support of their motion for summary judgment.

## PRELIMINARY STATEMENT

In this lawsuit, a prominent public official—former Chief Justice of the Alabama Supreme Court and candidate for the U.S. Senate, Roy S. Moore ("Judge Moore")—sues the makers of the political comedy television series *Who Is America?* (the "Program") for featuring him in an interview segment with a fictional character played by famous satirist Sacha Baron Cohen that was filmed on February 14, 2018 and first aired in July 2018.  That segment commented facetiously on the public controversy over widespread news reports during Judge Moore's Senate run in 2017 that he had engaged in inappropriate relationships with young women when he was in his thirties.  It was just one segment among many throughout the Program's run in which Cohen, playing cartoonishly absurd characters, interacted with public figures in order to playfully—but pointedly—satirize American society and politics.  In response, Judge Moore filed a lawsuit asserting claims for defamation, and, with his wife, Kayla Moore ("Mrs. Moore," and collectively with Judge Moore, "Plaintiffs"), fraud and intentional infliction of emotional distress ("IIED"), all arising out of the "severe loss of reputation" Judge Moore allegedly suffered when the segment aired.  Compl. ¶¶ 32, 38.

This lawsuit conflicts directly with the long tradition of First Amendment protection for political parody and satire of public figures—especially where the satirical work "could not reasonably have been interpreted as stating actual facts about the public figure involved." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988).  In *Falwell*, the Supreme Court held that Rev. Jerry Falwell could not recover emotional distress damages based on a mock magazine

interview in which "Falwell" stated that his "first time" was "a drunken incestuous rendezvous with his mother in an outhouse."  *Id.* at 48.  The Court acknowledged the publication was "offensive to" Falwell, and would "doubtless [be] gross and repugnant in the eyes of most," but held that such caustic criticism of public officials was protected as part of the "robust political debate encouraged by the First Amendment."  *Id.* at 50-51.  The same principles apply here: just like Rev. Falwell, Plaintiffs ask this Court to "find that a State's interest in protecting public figures from emotional distress is sufficient to deny First Amendment protection to speech … even when that speech could not reasonably have been interpreted as stating actual facts about the public figure."  *Id.* at 50.  As the Supreme Court did, this Court should also "decline to do [so]."  *Id.*

Plaintiffs' claims also fail for a more basic reason: as a condition to participating in the Program, Judge Moore signed a "Standard Consent Agreement" ("SCA") with Yerushalayim Television, LLC ("YTV")—a production company owned by Cohen—under which Judge Moore expressly waived "any claims … related to the Program or its production" against "anyone associated with the Program."  Defendants' Local Rule 56.1 Statement of Undisputed Material Facts (cited herein as "56.1") ¶ 75.  Among the specifically enumerated claims he waived are the exact three claims asserted here: "defamation," "intentional infliction of emotional distress," and "fraud."  *Id.*  And Plaintiffs cannot avoid enforcement of the SCA by arguing that it was "obtained through fraud" because they were misled about the purpose of the interview of Judge Moore (Compl. ¶ 16) – on the contrary, the SCA contains a clause expressly disclaiming any "rel[iance] upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program."  56.1 ¶ 77.

4828-1646-7927v.7 3940173-000105

In short, the SCA disposes of Plaintiffs' claims in their entirety.  Judge Carter, before whom this case was originally proceeding, found he could not rule at the motion to dismiss stage on Defendants' ability to enforce the SCA, because documentation outside the four corners of the Complaint was needed to determine the relationship between Defendants and YTV.  ECF 88 ("July 2 Tr.") at 2:16-4:8.  On that basis alone, he denied Defendants' motion to dismiss.  *Id.* But Defendants have now produced documents showing each Defendant's exact relationship to YTV, which, together with unrebutted testimony, demonstrate beyond a doubt that Defendants can enforce the SCA against Plaintiffs.  As a result, this Court can reach only one result: the SCA bars Plaintiffs' claims against Defendants, and the Complaint should be dismissed.

The Court need not search far for precedent to support enforcement of this clear waiver, as the Second Circuit already enforced a "Standard Consent Agreement" (with nearly identical waiver language) used in connection with a production by the same satirist (Defendant Cohen) under strikingly similar circumstances:  When individuals featured in Cohen's documentary-style comedy film *Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan* ("*Borat*") filed a series of lawsuits against Cohen and the film's producers, the cases were consolidated in this District.  Although the plaintiffs in those cases made fraud arguments similar to those asserted by Plaintiffs here, the court dismissed those cases pursuant to the "explicit waiver clause that on its face prevent[ed] Plaintiffs from bringing the … actions." *Psenicska v. Twentieth Century Fox Film Corp.*, Nos. 07 Civ. 10972, *et al.*, 2008 WL 4185752, at *4 (S.D.N.Y. Sept. 3, 2008), *aff'd*, 409 F. App'x 368 (2d Cir. 2009).  The result here—involving the same performer and materially identical contractual terms—should be no different. Indeed, the plaintiffs in the *Borat* cases were a driving instructor, etiquette trainers, and a dinner

guest; Judge Moore *is the former Chief Justice of a state Supreme Court*.  He is well aware of the consequences of signing contracts, and should be held to his agreement.

## FACTUAL BACKGROUND

### A.    The Parties

In 2017, Plaintiff Judge Moore ran for the U.S. Senate for the State of Alabama in a special election to replace Senator Jeff Sessions.  56.1 ¶ 3.  During the campaign, Judge Moore faced mounting and widely reported claims that he had inappropriate sexual encounters with young women—including one who was underage at the time—in the 1970s, while he was in his 30s.  *See* 56.1 ¶ 4.  On December 12, 2017, Judge Moore lost the election to Democratic candidate Doug Jones.  56.1 ¶ 5.   Many analysts attributed Judge Moore's defeat to the allegations made against him.  56.1 ¶ 6.  After his election loss, Plaintiffs filed a libel suit against several of the women who had accused Judge Moore of misconduct.  56.1 ¶ 7.

Plaintiff Kayla Moore is Judge Moore's wife, and was herself recently an unsuccessful candidate for political office (state Republican Executive Committee in June 2018).  56.1 ¶¶ 8, 10.  Mrs. Moore is the President of the Foundation for Moral Law.  56.1 ¶ 9.

Defendant SNI, a wholly owned subsidiary of ViacomCBS, aired and distributed the Program through the cable network it owns and operates, SHOWTIME.  *See* 56.1 ¶¶ 12, 27.  The Program was created, co-produced, and co-written by its star, the comedian and political satirist Defendant Sacha Baron Cohen, who has created numerous projects in which he "portray[s] disguised fictional characters" who interact with "real" people, including the television series *Da Ali G Show*, and the films *Borat* and *Brüno*.  *See* 56.1 ¶¶ 11, 26.

### B.    Production Companies

Mr. Cohen is, and at all times relevant to this action has been, the ultimate sole owner of a number of production companies that were involved with the production of the Program.  56.1

4

¶¶ 13-24.  Relevant to this action, YTV was formed under Wyoming law on October 6, 2017.

56.1 ¶ 14.  Its sole member is Greenpark Television, LLC ("Greenpark"), a California limited

liability company ("LLC") formed in May 2017.  56.1 ¶¶ 15, 18.  YTV was an active corporation

under Wyoming law through October 2019.  56.1 ¶ 16.[1]  Greenpark's sole member is a

California LLC called La Quinta Entertainment, LLC ("La Quinta").  56.1 ¶¶ 19, 20.  La

Quinta's sole member is Please You Can Touch, LLC ("PYCT").  56.1 ¶¶ 21.  PYCT was

formed under California law on August 11, 2009.  56.1 ¶ 22.  PYCT's sole member is Mr.

Cohen.  56.1 ¶ 23.

PYCT and La Quinta jointly licensed the Program to SNI for airing and distribution

through SHOWTIME.  56.1 ¶¶ 28, 72.

### C.    Who Is America?

The Program is a comedy series that employs fictional characters from across the

political spectrum (all played by Cohen) who conduct interviews with a wide range of famous

and unknown individuals, from Bernie Sanders on the left to Dick Cheney on the right, to expose

and comment on various cultural and political views in our country.  The interview segment with

Judge Moore appeared in the third episode of the Program.  The first three episodes of the

Program – together with Cohen's long history of satirical commentary – provide the context in

which viewers would likely view the Program.

Episode 1 (which premiered on July 15, 2018), begins with an interview of Bernie

Sanders by fictional character "Billy Wayne Ruddick, Jr. Ph.D," a right-wing conspiracy theorist

---

[1] In December 2019, YTV was administratively dissolved by the state of Wyoming because the company did not file its annual report for 2019.  56.1 ¶ 17.  However, the company was in good standing during and through the production and airing of the Program.  Under Wyoming law, an administratively dissolved company may be reinstated at any time within two years of dissolution upon submission of an application and payment of a nominal fee.  *See* Wyo. Stat. Ann. § 17-16-1422.

and citizen journalist, who explains to Sanders that his solution to economic disparity in America is to have the entire population become part of the "1 percent." 56.1 ¶ 30.  The episode concludes with the fictional Israeli counter-terrorism expert and ex-Mossad agent, "Erran Morad," promoting a "Kinderguardians" program to train young children as young as three to use firearms as a defense against school shootings.  56.1 ¶¶ 31, 32.  The segment includes a mock educational video set against a colorful cartoon background, featuring gun rights activist Philip Van Cleave, who instructs the audience in the use of firearms using children's songs and guns accessorized with stuffed animals bearing names like "Puppy Pistol," "Gunny Rabbit" and "Uzicorn."  56.1 ¶ 33.  The video is followed by a series of testimonials from prominent political figures endorsing the comically absurd program, including former Congressman Joe Walsh, and Congressmen Dana Rohrbacher and Joe Wilson.  56.1 ¶ 34.

In Episode 2 of the Program (which premiered July 22, 2018), "Morad" teaches a Georgia state politician how to combat ISIS, instructing him to detect and repel terrorists by yelling epithets, wearing a burqa, and attempting to touch them with his bare buttocks.  56.1 ¶¶ 35, 36.  Later in the episode, Morad interviews former Vice President Dick Cheney, during which Morad makes a number of double entendres based on Vice President Cheney's first name. 56.1 ¶ 37.  After the conversation turns to the subject of waterboarding, Morad notes that he has waterboarded his own wife and asks Vice President Cheney to autograph Morad's "waterboarding kit," which he agrees to do and does.  56.1 ¶ 38.

### D.    The Episode of the Program Featuring Judge Moore

The third episode of the Program (which premiered on July 29, 2018) includes an interview of Judge Moore by the Erran Morad character.  56.1 ¶¶ 49, 50.  The interview took

place at a hotel in Washington, D.C. on February 14, 2018. 56.1 ¶ 51.[2]

The Judge Moore interview was the first segment in the 25-minute episode.  56.1¶.  After an introduction from "Morad," the segment shows a montage of actual news footage of news anchors discussing the rising tide of accusations of sexual misconduct against Judge Moore, with a succession of news anchors saying "Four women…," "A fifth woman…," "A total of nine women have now come forward," with one clip showing onscreen text from a *Washington Post* article stating "Woman says Roy Moore initiated sexual encounter when she was 14, he was 32." 56.1 ¶ 53.  The segment then cuts to a clip of then-President Trump at a rally telling his audience "Get out and vote for Roy Moore.  Do it."  56.1 ¶ 54.

After first discussing with Judge Moore why the State of Alabama is so closely connected to Israel (during which Judge Moore states that "Alabama has always been a state that valued freedom, valued liberty"), "Morad" brings up the Israeli military's use of technology to fight terrorist attacks.  56.1 ¶ 55.  He describes a device which he claims can detect the location of tunnels used to infiltrate the country with "seismic waves."  56.1 ¶ 56.  He explains that the technology was also able to "identify other abnormalities," including "sex offenders and particularly pedophiles," who secrete a certain "enzyme" at "three times the level of non-perverts."  56.1 ¶ 57.  Morad then holds up the "device" – a black plastic wand that looks like an ordinary metal detector that would be used for security checks at airports and courthouses.  56.1 ¶ 58.  Morad waves the wand in front of himself and Judge Moore, noting casually that "because neither of us are sex offenders, then it make absolutely nothing [*sic*]."  56.1 ¶ 59.  However, to Morad's apparent surprise, as he waves the wand in front of Judge Moore, it emits a beep.  56.1 ¶

---

[2] Plaintiffs' round trip airfare from Montgomery, Alabama, hotel accommodations at the Mandarin Oriental Hotel in Washington, D.C., and car service to and from the airport, hotel, and shooting site, were all paid for by La Quinta, one of the production companies for the Program.  56.1 ¶¶ 39-48.

4828-1646-7927v.7 3940173-000105

60.  Looking confused, Morad insists the device "must be faulty," smacks it against his hand, and asks if Judge Moore may have lent the jacket he was wearing to someone else.  56.1 ¶ 61.  Judge Moore states that he has "been married for 33 – and never had an accusation of such things" (despite the widespread reports of precisely those accusations).  56.1 ¶ 62.  He then cuts off the interview and leaves, as Morad insists that the device is "not saying that you are a pedophile, of course not" and that he is "not saying you are a sex offender at all."  56.1 ¶ 63.[3]

   E.     **The Standard Consent Agreement**

   Prior to the taping of his interview, Judge Moore (with Mrs. Moore present) signed the SCA with "Yerushalayim TV (including its assigns, licensees, parents, subsidiaries, and affiliates)," which are collectively defined as the "Producer" in the agreement.  *See* 56.1 ¶ 66. Judge Moore alleges he had been told that the production was part of a ceremony celebrating the 70th anniversary of the State of Israel, and he was going to "receive an award for his strong support of Israel" during the taping.  Compl. ¶ 15.

   Judge Moore (referred to in the SCA as "Participant") entered into the agreement "[i]n exchange for the Producer making a $200 donation to a charity chosen by the Participant and allowing an opportunity for the Participant to appear in a television series."  56.1 ¶ 70.[4]  In the SCA, Judge Moore agreed that he

   > specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Program, which are related to the Program or its production, or this agreement, including, but not limited to, claims involving

---

[3] The episode also includes segments where Cohen, playing an over the top caricature of an effete, politically correct academic, Dr. Nira Cain-N'Degeocello, facilitates a "debate" between a Republican state legislator and rapper named "Bone Crusher" and engages in a rap battle on the streets of Atlanta.  56.1 ¶ 64.  Later, "Erran Morad" teaches three would-be vigilantes how to lure and trap illegal immigrants by hosting a fake Quinceañera celebration, which involves one of the men dressing up as a teenage girl (complete with a ball gown and tiara), before the plan is foiled by the arrival of the police.  56.1 ¶ 65.

[4] On February 20, 2018, a representative of La Quinta made the donation of $200 to the Foundation for Moral Law. 56.1 ¶ 79.

4828-1646-7927v.7 3940173-000105

assertions of … (h) infliction of emotional distress (whether allegedly intentional or negligent), … (m) defamation (such as any allegedly false statements made in the Program), … [or] (p) fraud (such as any alleged deception about the Program or this consent agreement) ….

56.1 ¶ 75.  The same paragraph contains waivers of numerous other tort and contract claims, including "false light," "breach of any alleged contract," and "prima facie tort."  *Id.*

The SCA further provides that

the Participant acknowledges that in entering into [the SCA], the Participant is not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program.  Participant is signing this agreement with no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program.

56.1 ¶ 77.  The SCA is signed by "Roy S. Moore," and dated 2/14/18.  56.1 ¶¶ 67, 68.  At the top of the agreement, beneath the paragraph referencing the donation to a charity of the Participant's choice, the text "Foundation For Moral Law" is written in ink.  56.1 ¶ 74.  In addition, in the paragraph listing each of the waived claims, the parenthetical language in clause (f)—"intrusion or invasion of privacy (such as any allegedly sexually oriented or offensive behavior or questioning)"—is struck-through, with the initials "RSM" handwritten alongside.  56.1 ¶ 76.

As its title indicates, the terms of the SCA were all standard contractual terms, none of which were targeted at Plaintiffs.  Indeed, with the exception of the handwritten strikethrough and listing of the charitable donation, the SCA signed by Judge Moore is identical to the standard consent agreements entered into by Walsh, Rohrbacher, Wilson (from the "Kinderguardians" segment) and Cheney (from the waterboarding segment) with YTV.  56.1 ¶¶ 80, 81.

### F.      Procedural History of this Action

On September 12, 2019, Defendants moved to dismiss the Complaint on substantially the same legal grounds that underlie this Motion.  *See* ECF No. 50.  At a July 2, 2020 conference, Judge Carter stated that, while "it seems likely that defendants are at least associated with the

program," he could not "resolve the factual issue of defendants' relationships to Yerushalayim TV and thus the applicability and impact of the consent agreement on the Moores' claims."  July 2 Tr. at 3:19-4:6.  On that basis alone, Judge Carter denied defendants' motion to dismiss without reaching any First Amendment issues.  *Id.* at 4:7-8.  The parties then began discovery.

After producing the set of documents necessary to establish the relevant corporate relationships, Defendants submitted a pre-motion letter to the Court seeking leave to file an early motion for summary judgment on the grounds asserted in their motion to dismiss, but now with the necessary evidentiary record.  *See* ECF No. 90.  Defendants also requested that the Court stay discovery on additional issues outside the scope of this motion.  *Id.*  The Court granted this request, streamlining discovery to resolve the one issue that Judge Carter could not reach: the Defendants' ability to enforce the SCA.  ECF No. 96 ("Dec. 3 Tr.") 40:7-41:2.  In addition, the Court allowed Plaintiffs to take additional discovery addressed specifically to the issues for this Motion.  ECF No. 105 ("Dec. 18 Tr.") 33:23-36:3.  In connection with Defendants' Motion for Summary Judgment, Defendants produced documents to Plaintiffs relevant to the motion, and Plaintiffs took the depositions of Cohen, Todd Schulman, and Jenifer Wallis.  *See* McNamara Decl. ¶ 2.

## ARGUMENT

Each of Plaintiffs' claims—including their fraud claim—is barred by the express language of the SCA that Judge Moore entered into.  Further, Plaintiffs' defamation and emotional distress claims arise out of fully protected satirical commentary and fail as a matter of established First Amendment law.

## I.    PLAINTIFFS' CLAIMS ARE BARRED BY THE SCA

Just like the unsuccessful plaintiffs in the *Borat* cases, Plaintiffs' claims here fail because of the "explicit waiver clause that on its face prevents Plaintiffs from bringing [this] … action[]."

*Psenicska*, 2008 WL 4185752, at *4.  As Judge Preska held there, to allow cases like this to go forward "would empower … Plaintiffs to avoid the clear wording of their own contracts in a manner [the court] must decline to condone under well-settled New York law." *Id*. at *6.[5]

**A.    New York Courts Consistently Enforce Waivers In Appearance Agreements**

The dismissal of the "*Borat*" claims in *Psenicska* rests on decades of New York precedent enforcing entertainment agreements, like the one at issue here.  In *Shields v. Gross*, the New York Court of Appeals held that these agreements—sometimes called "appearance releases"—must be strictly enforced.  58 N.Y.2d 338 (1983).  In that case, model Brooke Shields sued over the publication of nude photos taken when she was ten years old.  Shields argued that as an adult she should be allowed to disaffirm the waiver agreement her mother had signed on her behalf.  The Court, however, held that the waiver was "valid and enforceable" and barred her action.  *Id.* at 343-45.  Thus, even in a case implicating the *welfare of children*—a population accorded far greater protections by the law than media-savvy adults, let alone former judges— New York's highest court *still* held that an unambiguous waiver of claims must be enforced.

Since *Shields*, New York courts have strictly enforced waiver clauses in media and entertainment appearance agreements.  As the Appellate Division explained, such agreements "are commonly used in the entertainment industry, are enforceable and should not lightly be set aside."  *Klapper v. Graziano*, 129 A.D.3d 674, 675 (2d Dep't 2015).  *See also Shoemaker v. Discovery Commc'ns, LLC*, 57 Misc. 3d 1203(A), at *3 (Sup. Ct. N.Y. Cty. 2017) (plaintiffs

---

[5] As here, the agreements in *Psenicska* contained New York choice of law clauses, which the court held "govern[] construction of the Agreement."  2008 WL 4185752, at *4 n.12.  The clause here states that any claim "in connection with the Program or its production" will be "governed by the substantive laws of the State of New York."  56.1 ¶ 78.  "[C]ourts in this Circuit have enforced similar choice of law provisions even when a party challenges the contract as fraudulent or claims that fraudulent inducement exists."  *Klein v. Frenkel*, No. 14-cv-2719, 2015 WL 13721693, at *9 (E.D.N.Y. Feb. 19, 2015) (collecting cases).  Accordingly, New York law applies both to the enforcement of the SCA, and to the enumerated claims referred to in the waiver clause.

"clearly waived their right to bring th[e] action and [we]re precluded from doing so" by terms of appearance releases, and noting that "courts have consistently upheld such releases and agreements in similar circumstances").

Courts in this Circuit are fully in accord.  In *Shapiro v. NFGTV, Inc.*, the court enforced an agreement signed by a reality show participant containing waiver language similar to that in the SCA, holding that "[t]he 'clear, broad, and dispositive[ ]' language used in the release agreed to by Plaintiff bars Plaintiff from asserting any claims related to her participation in the Program, including those involving fraud."  No. 16 Civ. 9152, 2018 WL 2127806, at *7 (S.D.N.Y. Feb. 9, 2018) (quoting *Bihag v. A&E Television Networks, LLC*, 669 F. App'x 17, 18 (2d Cir. 2016)). That decision relied in part on the Second Circuit's summary order in *Bihag v. A&E*, which involved a similar consent agreement signed by a participant on a different reality show.  Again, the Second Circuit did not hesitate to affirm dismissal of the plaintiff's lawsuit in the face of a waiver of "any and all claims" that was "clear, broad, and dispositive."  669 F. App'x at 18. Like Plaintiffs here, the plaintiff in *Bihag* was "bound by the agreements he voluntarily signed, which expressly bar the claims he … attempted to assert in th[e] case."  *Id.*

In sum, time and time again, New York courts have rejected claims from dissatisfied participants in film and television productions based on similar waiver agreements.[6]  In light of this consistent precedent—including the Second Circuit's enforcement of the very same waiver language from the same producers under similar circumstances, *see Psenicska*, 409 F. App'x

---

[6] *See, e.g.*, *Shoemaker*, 57 Misc. 3d 1203(A), at *1-3 (enforcing waiver signed by married couple featured on "90 Day Fiance"); *Nizewitz v. Viacom Int'l, Inc.*, No. 158209-14, 2015 WL 3401196 (Sup. Ct. N.Y. Cty. Mar. 4, 2015) (dismissing claim from participant in reality dating show "Dating Naked" over alleged failure to sufficiently blur out nudity on screen); *Klapper*, 129 A.D.3d 674 (dismissing claims for, among other things, defamation, brought by plastic surgeon who was featured on reality show "Mob Wives"); *Weil v. Johnson*, No. 119431/02, 2002 WL 31972157 (Sup. Ct. N.Y. Cty. Sept. 27, 2002) (denying motion to enjoin release of documentary in light of agreement signed by plaintiff); *Gelbman v. Valleycrest Prod., Ltd.*, 189 Misc. 2d 403 (Sup. Ct. N.Y. Cty. 2001) (dismissing claims from game show contestant who had signed appearance release).

368—there is no doubt that the SCA bars Plaintiffs' claims.

**B.     Plaintiffs' Arguments to Avoid Enforcement of the Waiver Are Meritless**

It is a "bedrock principle of contract interpretation that 'a written agreement that is complete, clear and unambiguous on its face ***must*** be enforced according to the plain meaning of its terms.'" *Gilbane Bldg. Co. v. St. Paul Fire & Marine Ins. Co.*, 143 A.D.3d 146, 156 (1st Dep't 2016) (citation omitted) (emphasis added), *aff'd*, 31 N.Y.3d 131 (2018); *see also HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir. 2012) ("Under New York law, a court must give full effect to unambiguous contract terms."). Here, the waiver clause of the SCA could not be clearer; Defendants seek only to enforce the "plain meaning of its terms."

Over the course of this litigation, Plaintiffs have raised a variety of arguments in an effort to avoid the straightforward provisions of the SCA. None of the arguments holds water.

**1.     Plaintiffs Cannot Claim Fraudulent Inducement When the Agreement Disclaims Reliance on the Allegedly Fraudulent Representations**

First, Judge Moore has argued that he was fraudulently induced into signing the SCA and its waiver of each claim asserted should not be enforced. *See* Compl. ¶ 24. But the agreement he signed expressly *disclaims* reliance on the precise kinds of representations he claims to have relied on. The D.C. district court already rejected Plaintiffs' similar fraud-based arguments with respect to the forum selection clause (D.D.C. Tr. 35:10-37:5), and they fare no better in this context. Further, virtually identical fraud arguments—with respect to a materially same agreement—were also rejected in *Psenicska*, which was then affirmed by the Second Circuit.

In *Psenicska*, as here, Defendant Cohen interacted with various people in the guise of a fictional character – there, the bumbling Kazakh reporter, Borat. 2008 WL 4185752, at *1. As here, the plaintiffs alleged they were told they were being taped for an innocuous sounding foreign television production – there, an "educational documentary made for Belarus television"

13

by a company called "Springland Films."  *Id.* at *2.  As here, the plaintiffs were offended by the behavior of Cohen's character, felt that the film portrayed them in a false and defamatory light, and were surprised to later learn that they were in fact filmed for a wide-release comedy, after which they filed suit.[7]  And, as here, each of the plaintiffs had signed substantially the same "standard consent agreement," which contained an unambiguous waiver of all claims against "anyone associated with the Film," including any claims for "fraud (such as any alleged deception or surprise about the Film or this consent agreement)."  *Id.* at *3 & n.10.[8]

The plaintiffs in *Psenicska* argued that the waiver clauses should not be enforced because the producers' "representations about the nature of the film and the identities of [the producer], Cohen and Springland Films were false and were meant to induce him or her to appear in the film."  2008 WL 4185752, at *5 (citing the complaints).[9]  Judge Preska rejected that argument, recognizing the New York Court of Appeals has long "held that the defense of fraud in the inducement is foreclosed to a party who disclaims, in the contract itself, reliance on fraudulent statements allegedly made to induce him to enter into the contract."  *Id.* at *6 (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 323 (1959)).  Each plaintiff expressly "waived his or her reliance on 'any promises or statements made by anyone about the nature of the Film or the identity of any other Participants or persons involved in the Film.'"  *Id.* (quoting agreements).  In short, that express waiver precluded the fraudulent inducement arguments.

The Second Circuit affirmed, reasoning that "where a plaintiff 'has in the plainest language announced and stipulated that it is not relying on any representations as to the very

---

[7] *See, e.g.*, 56.1 ¶ 83 (complaint in one of the consolidated *Borat* cases, alleging that the film "cast[] Plaintiffs as racially intolerant").

[8] *See* 56.1 ¶¶ 84-91 (appearance releases enforced in Borat cases).

[9] *See also* 56.1 ¶ 82 (complaint alleged that the *Borat* producers engaged in "fraud and deceit").

4828-1646-7927v.7 3940173-000105

matter as to which it now claims it was defrauded,' the disclaimer 'destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon those contrary oral representations.'"  409 F. App'x at 371 (quoting *Danann*, 5 N.Y.2d at 320–21).  *See also Shapiro*, 2018 WL 2127806, at \*8 (rejecting fraudulent inducement argument when the appearance agreement expressly released fraud claims).

This well settled law "destroys" Plaintiffs' allegations of fraudulent inducement here as well.  Plaintiffs repeat the phrase "falsely and fraudulently" *ad infinitum* in their Complaint, and have continued to do so throughout this case.  *See, e.g.,* Dec. 3 Tr. at 6:10-7:6, 36:21-37:6.  But, the Complaint sets forth the alleged misrepresentations that form the basis of Plaintiffs' fraud claim: (1) YTV, "which does not actually exist," "was the producer and broadcaster of the show that Judge Moore would appear on, instead of the actual network that the show … later appeared on[,] Showtime" (Compl. ¶ 15); (2) the production of the Program was connected to Judge Moore receiving an "award for his strong support of Israel," which he was to receive "during the interview" (*id.*); and (3) Cohen was "falsely and fraudulently portraying himself as someone else" (*id.* ¶ 19).  Distilled down, just as in *Psenicska*, Plaintiffs claim they were misled about the "nature of the Program" and the "identity … of … persons involved in the Program."  56.1 ¶ 77.

But, just like the plaintiffs in *Psenicska*, in entering into the SCA, Judge Moore specifically acknowledged that he was "not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program."  *Id.*  He also agreed that he had "no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program."  *Id.*  Those express disclaimers, standing alone, are sufficient to defeat his "fraudulent inducement" argument.  Yet, Judge Moore also explicitly waived any

15

"claims involving assertions of … fraud (such as any alleged deception about the Program or this consent agreement)."  56.1 ¶ 75.  Just as in *Psenicska*, "**dismissal [i]s compelled** by the short, clear, unambiguous disclaimer of reliance on any oral statements about the [Program] or the identities of the people making it."  409 F. App'x at 372 (emphasis added).

As an attorney and former Chief Justice, Judge Moore is hardly one to argue that he is not bound by the express language of his agreement when he was plainly aware of the consequences of signing a written contract.  In a dissenting opinion issued just four years ago, Judge Moore himself cited the principle that, where "the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms," they must be "legally bound" to the terms and "had no basis to rely on oral assurances" to the contrary.  *Farmers Ins. Exch. v. Morris*, 228 So. 3d 971, 991 (Ala. 2016) (Moore, C.J., dissenting) (citation omitted).  The contract Judge Moore signed just two years later expressly and unambiguously disclaims reliance on the very statements he claims fraudulently induced him to sign the SCA.  Under New York law and Second Circuit precedent, Plaintiffs cannot avoid enforcement of that agreement's terms.

### 2.      Defendants Can Enforce the SCA

Plaintiffs have also sought to avoid enforcement of the SCA because the Defendants are not signatories to the document.  This argument is unavailing.

First, the SCA is an agreement between the "Participant" (Judge Moore) and the "Producer," and expressly defines "Producer" as "Yerushalayim TV" and its "assigns, licensees, parents, subsidiaries, and affiliates."  56.1 ¶ 70.  Cohen, as the ultimate sole member of the LLCs

that own YTV, is indisputably a "parent" of YTV.  56.1 ¶ 24.[10]  And the Program was licensed to SNI (56.1 ¶ 28) by YTV's parent companies (La Quinta and PYCT), making SNI (and its parent ViacomCBS) "licensees" of YTV.  56.1 ¶ 72.  Thus, based on the undisputed record, each of the Defendants falls within the definition of "Producer" under the Agreement.[11]

Second, even if Defendants did not fall within the SCA's definition of "Producer," they could nevertheless enforce the SCA as intended third-party beneficiaries, since the agreement contains a waiver of claims "related to the Program or its production" against not only the "Producer" (as so defined) but "any of its assignees or licensees or *anyone associated with the Program*."  56.1 ¶ 75 (emphasis added).  There can be no doubt that the star and producer of the Program and the owners of the cable network that aired it are entities "associated with the Program," and therefore directly benefit from the waiver of claims.  And it is well settled that a party that falls within the categories of releasees in an agreement is a third-party beneficiary of that agreement, and may enforce the waiver of claims.[12]  In the *Klapper* case, for example, the plaintiff who signed a release in connection with his appearance on the reality show *Mob Wives* argued that only the production company that signed the agreement—not the other companies he sued—could enforce the release.  41 Misc. 3d 401, 408–09 (Sup. Ct. Kings Cty. 2013), *aff'd*, 129 A.D.3d 674 (2d Dep't 2015).  The court found this "technical challenge" to be "without merit,"

---

[10] As discussed *supra*, Cohen is the sole member of PYCT, which is the sole member of La Quinta, which is the sole member of Greenpark, which is the sole member of YTV.  *See supra* at 4-5; 56.1 ¶¶ 14-24.

[11] In granting the motion to transfer the case under the forum selection clause in the SCA, the district judge in the District of Columbia reached the same conclusion.  *See* D.D.C. Tr. at 33:4-34:6.

[12] *See, e.g.*, *Mateo v. Carinha*, No. 14 CV 9020, 2019 WL 1409727, at *3 n.1 (S.D.N.Y. Mar. 28, 2019) (defendant employee of city was a third-party beneficiary of agreement that "clearly contemplates a release of [plaintiff's] claims against all officers, employees, agents, and representatives of the City"), *aff'd*, 799 F. App'x 51 (2d Cir. 2020).  The fact that the Defendants are not explicitly named in the SCA is of no moment.  On the contrary, it is well settled that "[a] party need not necessarily be specifically mentioned in a contract to be considered a third-party beneficiary."  *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662–63 (2d Cir. 1996) (collecting cases).

4828-1646-7927v.7 3940173-000105

because "[i]t is abundantly clear that the [named] defendants are closely intertwined in the production of Mob Wives." *Id.* The same logic applies here, as Defendants fall squarely among the entities against whom claims "related to the Program or its production" are waived (in addition to falling within the definition of "Producer"). Plaintiffs effectively conceded this point when they alleged Defendants were "agents" in the production of the Program. *See* Compl. ¶¶ 11, 15–16. At bottom, Plaintiffs cannot credibly argue that the Defendants may not enforce the waiver that is included for their direct benefit.

### 3. The SCA's Waiver of Specific Claims Is Enforceable

Plaintiffs have also repeatedly insisted that the waiver in the SCA is a "general release" that, under New York law, cannot "bar claims outside the parties' contemplation at the time [of] the release." ECF No. 55 at 9-11 (citations omitted); ECF No. 68 at 1-2. But the waiver language in the SCA is far removed from a "general release"; it is an explicit agreement not to assert specifically identified claims "related to the Program or its production, or [the SCA]," and enumerates eighteen identified claims. 56.1 ¶ 75.[13] And Plaintiffs cannot credibly argue that *former Chief Justice* Moore did not "contemplate[]" a waiver of the claims asserted here, ECF No. 55 at 11, given that the SCA specifically lists ***all three of Plaintiffs' claims*** among the claims being waived: "(h) infliction of emotional distress," "(m) defamation," and "(p) fraud." 56.1 ¶ 75. Defendants are not seeking in any way to stretch a "general release" to cover claims not reasonably contemplated by the parties—they are seeking enforcement of the plain language of an explicit waiver of the very claims Plaintiffs now assert.[14]

---

[13] *Cf. Maddaloni Jeweles, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 298 (S.D.N.Y. 2004) (holding that a provision that the parties "hereby release all claims they might have against each other as of this date" was a general release).

[14] In addition, the cases relied upon by Plaintiffs concern broad release language in commercial contracts and settlement agreements. *See* ECF No. 55 at 9-11. Those decisions are inapposite in the context of the appearance

####        4.        A Handwritten Deletion of Language Concerning a Possible
                      Claim *Not* Asserted in this Action Has No Effect on the Explicit
                      Waiver of the Claims Actually Asserted Here

        Plaintiffs argue that because Judge Moore crossed out an explanatory parenthetical

phrase concerning waived claims for "intrusion and invasion of privacy" — "(such as any

allegedly sexual-oriented or offensive behavior or questioning)" —the independent and express

waiver of any libel, emotional distress and fraud claims has somehow been nullified.  Plaintiffs'

theory appears to be that by striking examples of what could constitute an intrusion or invasion

of privacy claim, the parties somehow reached an agreement that there would be no "sexual-

oriented" questioning which, because such questioning occurred, renders the entire SCA void.

*See*, *e.g.*, Dec. 3 Tr. at 13:22-14:5.[15]  This strained argument has no merit.

        Paragraph 4 of the SCA lists eighteen non-exclusive causes of action, in clauses

numbered (a) through (r), that Judge Moore waives against the Producer (and all those associated

with the Producer).  56.1 ¶ 75.  Among these is clause 4(f), "intrusion or invasion of privacy

(such as any allegedly sexual-oriented or offensive behavior or questioning)."  The *only* edit to

the SCA is that Judge Moore crossed out the phrase in parentheses.  56.1 ¶ 76.  In other words,

the crossed-out parenthetical merely provides examples of behavior that could constitute a single

cause of action, intrusion or invasion of privacy; it does not purport to define, clarify, or

otherwise modify any of the other causes of action waived, which include negligent or

intentional infliction of emotional distress, defamation, and fraud.

        Here, clause 4(f) of the SCA is irrelevant to Plaintiffs' claims, since there is no claim for

---

releases and consent agreements that New York courts have consistently upheld to bar claims arising out of
participation in a film or TV production.  *See supra* Section I.A.

[15] In trying to avoid enforcement of the forum selection clause, Plaintiff made the same argument; the D.C. district
court correctly rejected it.  D.D.C. Tr. at 14:7-13.

invasion of privacy in this lawsuit.  It should be obvious that a handwritten deletion of language identifying a possible example of an invasion of privacy claim would have no effect on the independent waiver of entirely distinct causes of action for defamation, emotional distress or fraud.  And, indeed, it is black letter contract law that "the modification of a contract supplants only the affected provisions of the original agreement while leaving the balance of it intact." *P&B Capital Grp., LLC v. RAB Performance Recoveries, LLC*, 128 A.D.3d 1534, 1536 (4th Dep't 2015) (citations, quotation marks, and brackets omitted).

The Second Circuit's decision in *Kidder, Peabody & Co. v. Zinsmeyer Trustees Partnership*, 41 F.3d 861 (2d Cir. 1994), is instructive.  There, the parties entered into a form agreement containing an arbitration clause as well as a separate clause binding the plaintiff brokerage firm to NASD rules, which provide that a customer can demand arbitration.  *Id.* at 863.  The parties had agreed to cross out the first arbitration clause, but "left intact" the NASD rules clause.  *Id.*  The court held the broker was still obligated to arbitrate, reasoning that the striking out of one paragraph related to arbitration would not nullify a separate provision that independently required arbitration.  *See id.*  In short, even if the strike-through modified the SCA at all, Judge Moore did not modify his broad waiver of the very claims he has asserted here and therefore the waiver stands.

Moreover, the striking of a clause involving an unasserted invasion of privacy claim, cannot reasonably be interpreted as creating a separate, affirmative agreement by the Defendants that "anything with regard to sexual orient[ed] or offensive behavior or questioning could not be the subject of that interview."  Dec. 3 Tr. at 13:23-14:2.  Not only is such an agreement nowhere to be found in the SCA (even as modified), Judge Moore also left intact the SCA's unequivocal statement that he had "no expectations or understandings concerning the conduct, *offensive or*

20

*otherwise*, of anyone involved in this Program."  56.1 ¶ 77 (emphasis added).  Judge Moore may well have subjectively wanted to enter into an agreement to keep those topics entirely off limits, but that is not at all reflected in the language of the SCA itself; a court may not interpret an unambiguous contract based on assumptions or desires in one party's mind.  *See, e.g.*, *Webster v. N.Y. Life Ins.& Annuity Corp.*, 386 F. Supp. 2d 438, 442 n.2 (S.D.N.Y. 2005) ("It is not the real intent but the intent expressed or apparent in the writing which is sought; it is the objective, not the subjective, intent that controls.") (quoting 11 Williston on Contracts §31:4).[16]  Even more troubling to Plaintiffs' unfounded argument is the common sense rule that deleted language cannot be used to render an otherwise clear contract ambiguous.  *See*, *e.g.*, *RTC Mortg. Tr. 1995-S/N1 v. J.I. Sopher & Co.*, No. 96 Civ. 4992, 1998 WL 132815, at *3 (S.D.N.Y. Mar. 24, 1998) ("The deleted words are not part of the agreement and cannot be relied on to create an ambiguity . . .  That the parties did not bother to retype the agreement does not change the fact that the deleted language is irrelevant, in view of the clear and unambiguous language that remains.").

Judge Moore was the Chief Justice of the highest court in the State of Alabama; he is well versed in the law of contracts, and surely understands how to draft contractual language to achieve a particular result.  If he wanted to create an agreement that an interview would not involve any questions related to sexual issues—or, for that matter, an agreement that did not waive claims for defamation, infliction of emotional distress and fraud involving sexual questioning—he was fully capable of doing so.  If the non-lawyer plaintiffs in *Psenicska* were held to the strict terms of their agreements, surely Judge Moore must be as well.

---

[16] *See also Kay-R Elec. Corp. v. Stone & Webster Constr. Co.*, 23 F.3d 55, 58–59 (2d Cir. 1994) (where "the language with respect to the parties' intent is clear and unambiguous, it will be given effect, *regardless of one party's claim that he intended something else*") (emphasis added); *Centro Empresarial Cempresa S.A. v. Am. Movil S.A.B. de C.V.*, 17 N.Y.3d 269, 277 (2011) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.") (citation omitted).

### 5.    Mrs. Moore's Derivative Claims Are Waived

Plaintiffs cannot get around the clear waiver in the SCA by tacking on Mrs. Moore as an additional plaintiff.  Indeed, it is well settled that "[p]laintiffs cannot escape their contractual obligations simply by joining parties who did not sign the contract and then claiming that the [provisions] do[] not apply."  *Novak v. Tucows, Inc.*, No. 06-CV-1909, 2007 WL 922306, at *13 (E.D.N.Y. Mar. 26, 2007) (citation omitted), *aff'd*, 330 F. App'x 204 (2d Cir. 2009). Accordingly, courts routinely enforce contractual provisions against parties that did not personally sign the contract when they are "'closely related' to one of the signatories such that 'enforcement . . . is foreseeable by virtue of the relationship between the signatory and the party sought to be bound."  *MGM Studios Inc. v. Canal+ Distrib. S.A.S.*, No. 07 Civ 2918, 2010 WL 537583, at *5 (S.D.N.Y. Feb. 9, 2010) (citation omitted) (enforcing forum selection clause).  In particular, courts have "repeatedly found non-signatories 'closely related' to signatories where their interests are completely derivative of and directly related to, if not predicated upon the signatory party's interests or conduct."  *KTV Media Int'l, Inc. v. Galaxy Grp., LA LLC*, 812 F. Supp. 2d 377, 386– 87 (S.D.N.Y. 2011) (citations and internal quotation marks omitted) (collecting cases); *see also Buckley v. Nat'l Freight, Inc.*, 90 N.Y.2d 210, 216–17 (1997) (wife's signing of settlement agreement releasing claims barred husband's claim for loss of consortium because claim was derivative of released claims).

Here, Mrs. Moore's claims are plainly "completely derivative of," "directly related to" and "predicated upon" Judge Moore's claims.  *Id.*[17]  In the Complaint, the damages claimed by

---

[17] Indeed, applying these principles in this very case, the District Court for the District of Columbia did not hesitate to enforce the forum selection clause in the SCA against both Judge Moore and Mrs. Moore on the grounds that Mrs. Moore's claims are "closely related" and "derivative from" Judge Moore's claims, so she therefore "can't complain about the transfer" to this Court.  D.D.C. Tr. at 32:8-33:1.

both Plaintiffs are framed in terms of reputational harm to Judge Moore.  *See* Compl. ¶¶ 37-38

(alleging that "Plaintiffs have suffered extreme emotional distress *as a result of Judge Moore*

*being falsely portrayed, mocked and defamed as a sex offender and pedophile*" and that "Judge

Moore has been the subject of widespread ridicule and has suffered *severe loss of reputation,*

*which has in turn also caused him, Mrs. Moore, and his entire family severe emotional distress*

…") (emphasis added); *id*. ¶ 47.  Accordingly, the waiver of those claims by Judge Moore also

serves as a waiver of Mrs. Moore's derivative claims.

## II.    THE CLAIMS INDEPENDENTLY FAIL AS A MATTER OF FIRST AMENDMENT LAW

Even apart from the SCA, Plaintiffs' claims also fail on their merits.

### A.    Judge Moore Cannot Base a Defamation Claim on Satire Protected under the First Amendment

Judge Moore's defamation claim fails because the Program cannot be construed as stating

any actual facts about him, and is instead "fully protected satire."  *Farah v. Esquire Magazine*,

736 F.3d 528, 536 (D.C. Cir. 2013).

As the New York Court of Appeals has summarized, "[s]ince falsity is a *sine qua non* of

a libel claim and since only assertions of fact are capable of being proven false, we have

consistently held that a libel action cannot be maintained unless it is premised on published

assertions of *fact*."  *Brian v. Richardson*, 87 N.Y.2d 46, 50–51 (1995) (citations omitted).

Indeed, the United States Supreme Court has made clear that the First Amendment "provides

protection for statements that cannot reasonably be interpreted as stating actual facts about an

individual."  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (citation, brackets, and

quotation marks omitted).  Thus, when assessing the viability of a libel claim, "the thrust of the

dispositive inquiry under both New York and U.S. constitutional law is 'whether a reasonable

[reader] could have concluded that [the publications were] conveying facts about the plaintiff.'"

4828-1646-7927v.7 3940173-000105

*Levin v. McPhee*, 119 F.3d 189, 196–97 (2d Cir. 1997) (quoting *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152–53 (1993)); *see also Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000).  "Whether particular words are defamatory presents a legal question to be resolved by the court in the first instance." *Aronson v. Wiersma*, 65 N.Y.2d 592, 593–94 (1985).[18]  Even where the words at issue could, in a different context, be considered defamatory, courts dismiss claims where "a reasonable listener could not have believed that the statements were intended to convey actual facts." *Torain v. Liu*, 279 F. App'x 46, 46–47 (2d Cir. 2008) (affirming dismissal of libel claim based on radio broadcast in which defendant called plaintiff a "sick racist pedophile," "loser pedophile" and "child predator").

Under this test, "[l]oose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable." *Dillon v. City of N.Y.*, 261 A.D.2d 34, 38 (1st Dep't 1999).  The Supreme Court has explained that "[t]his provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20 (citation omitted).  *See also Biro v. Condé Nast*, 883 F. Supp. 2d 446, 461 (S.D.N.Y. 2012) ("[T]he Supreme Court has afforded constitutional protection to the type of speech often characterized as rhetorical hyperbole, parody, loose, or figurative.") (citation omitted).

To determine whether a statement conveyed actual facts about a plaintiff, courts "look to the immediate context and the broader social context of the statement," rather than "parsing out and evaluating the challenged statements in isolation." *Levin*, 119 F.3d at 196–97.  "[T]he words

---

[18] *See also Gross*, 82 N.Y.2d at 152-53 ("The dispositive inquiry, under either Federal or New York law, is 'whether a reasonable [reader] could have concluded that [the articles were] conveying facts about the plaintiff,'" and that "inquiry … must be made by the court."); *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 90 (2d Cir. 2003) ("court must decide as a threshold issue" if a statement is "reasonably susceptible to the defamatory meaning imputed to it") (citation omitted).

must be construed in the context of the entire … publication as a whole, [and] tested against the understanding of the average reader," taking into account its "whole apparent scope and intent." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (citation omitted).

Here, the defamatory "statement" amounts to beeping from the "sex offender detector" wand when it was waved in front of Judge Moore.  But no reasonable viewer of the Program would assume that the wand was real and was actually detecting that Judge Moore is a "pedophile and a sex offender," as Plaintiffs claim.  Compl. ¶ 27.  Further, in the episode, after Judge Moore objected, "Morad" said that the device "must be faulty," asked if Judge Moore may have lent the jacket he was wearing to someone else, said that the device was "not saying that you are a pedophile, of course not" and that he was "not saying you are a sex offender at all." 56.1 ¶¶ 61, 63.  These are statements *contrary* to the alleged defamatory statements of fact.

The "broader social context" of the "statement" at issue is a political comedy program featuring a famous satirist portraying overtly fictional characters engage in over-the-top behavior to provoke reactions from public figures.  The parodic nature of the Program in general, and of the Erran Morad character in particular, is readily apparent, from the segment involving the cartoonishly absurd "Kinderguardians" program (56.1 ¶¶ 31-34), to his request that Dick Cheney autograph his "waterboard kit" (56.1 ¶¶ 37, 38) to his "sex offender detector" wand.  Indeed, in a prior case involving "Da Ali G Show" (another television show in which Defendant Cohen played fictional characters), the California Court of Appeal held that statements made in character were not actionable where "a reasonable viewer could not have understood the statements to convey a provably false assertion of fact, but instead merely as a joke or parody." *Doe v. Channel Four Television Corp.*, No. B217145, 2010 WL 1303493, at *5 (Cal. Ct. App. 2d Dist. Apr. 6, 2010).  As was observed in connection with defamation claims arising out of a

*Saturday Night Live* skit, "it is equally clear that not every humorous article, comedic routine or antic performance will subject its author or performer to liability for defamation.  As Judge Learned Hand once observed, '[i]t is indeed not true that all ridicule … or all disagreeable comment … is actionable; a man must not be too thin-skinned or a self-important prig.'"  *Frank v. NBC*, 119 A.D.2d 252, 257 (2d Dep't 1986) (quoting *Burton v. Crowell Publ'g Co.,* 82 F.2d 154, 155 (2d Cir. 1936)).

The "immediate context" is an interview with a "prominent conservative and a God fearing person of faith," Compl. ¶ 32, whose political aspirations had recently been derailed at least in part because of accusations of sexual misconduct.  In this context, the segment featuring Judge Moore can only be interpreted as pointed political satire, which is fully protected by the First Amendment.  *See Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313 n.2 (D.C. Cir. 1994) ("constitutional protection afforded to parody, satire, and other imaginative commentary").  Indeed, the entire point of the joke (as made clear by the introductory montage of news stories on Judge Moore's Senate run) was that the device was, of course, completely fake, and was being used to subtly confront Judge Moore with the *already widely reported* accusations against him, even as he insisted (falsely) that he "never had an accusation of such things."  The absurdity of the segment's premise speaks for itself, even if it were not introduced by Sacha Baron Cohen wearing thick makeup and speaking in an exaggerated Israeli accent.

While perhaps it made Plaintiffs uncomfortable, this is "fully protected satire" of a controversial political figure, not actionable defamation.  As the Supreme Court has held, "[t]he appeal of the political cartoon or caricature is often based on exploitation of … politically embarrassing events – an exploitation often calculated to injure the feelings of the subject of the portrayal," but that this type of expression has "played a prominent role in public and political

debate" and is protected by the First Amendment.  *Falwell*, 485 U.S. at 54.

Even in cases where the parodic character of a publication was far less apparent, courts have found it to be protected under the First Amendment.  For example, in *Farah*, the D.C. Circuit affirmed dismissal of a libel claim over a blog post announcing that two of the most prominent proponents of the "birther" conspiracy theory about President Obama were recalling their just-released book about the topic because the President, three weeks earlier, released his long-form birth certificate.  736 F.3d at 530.  The court held that "reasonable readers of [the blog at issue] would recognize the prominent indicia of satire in the … article," including the setting (a blog that frequently posted comedic political articles), the "humorous [and] outlandish details" in the story, and other "[s]tylistic elements," that suggested a reader should not "take[] the story literally."  *Id.* at 537-38.  "Because the reasonable reader could not, in context, understand *Esquire*'s blog post to be conveying 'real news'—that is, actual facts about [the plaintiffs]—the blog post was not actionable defamation," and was instead protected "political speech aimed at critiquing [the plaintiffs'] public position" on the "birther" issue.  *Id.* at 539.

Consider also *Finebaum v. Coulter*, where one radio host sued another for libel after the defendant ranted how, during the plaintiff's interview with a football coach, "these two guys really slobbered over each other, I mean, I really thought they were going to start performing oral sex on one another, it was so sickening."  854 So. 2d 1120, 1123 (Ala. 2003).  The Alabama Supreme Court held that the claim should have been dismissed because, in the context of his sports talk radio program, the statement was not one that could "reasonably be interpreted as stating actual facts" about the plaintiff, and was instead "only rhetorical hyperbole."  *Id.* at 1129 (citation, internal quotation marks and alterations omitted).  Concurring in that decision was then-Chief Justice Roy Moore.

### B.   Plaintiffs' Emotional Distress Claim Is Barred by the First Amendment

Plaintiffs' IIED claim fares no better than the defamation claim.  IIED claims are "routinely dismissed where"—as here—"they 'fall well within the ambit of other traditional tort liability,'" such as defamation.  *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 530 n.10 (S.D.N.Y. 2013) (citation omitted).[19]  "[T]he Second Circuit [has] observed that 'New York law considers claims sounding in tort to be defamation claims ... where those causes of action seek damages only for injury to reputation, [or] *where the entire injury complained of by plaintiff flows from the effect on his reputation*.'"  *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 725–26 (S.D.N.Y. 2014) (citation omitted).  That is the case here.  Plaintiffs explicitly allege that their emotional distress flows <u>entirely</u> from alleged injury to Judge Moore's reputation.[20]  Judge Moore's IIED claim is thus duplicative of his defamation claim.

The IIED claim is also squarely barred by the Supreme Court's *Falwell* decision.  There, after trial, the jury dismissed plaintiff's libel claims because "the ad parody could not 'reasonably be understood as describing actual facts about [Falwell] or actual events in which [he] participated,'" but awarded damages for IIED.  485 U.S. at 49.  The Supreme Court reversed, refusing to endorse a rule that would subject "political cartoonists and satirists … to damages awards without any showing that their work falsely defamed its subject" because "the First Amendment prohibits such a result in the area of public debate about public figures."  *Id.* at 53.  Instead, the Court held, a public figure could not bring an IIED claim based on publication

---

[19] *See also Idema v. Wager*, 120 F. Supp. 2d 361, 370 (S.D.N.Y. 2000) ("New York courts have consistently held that a plaintiff may not maintain a separate claim for intentional infliction of emotional distress grounded in the same facts as a claim for libel."), *aff'd*, 29 F. App'x 676 (2d Cir. 2002).

[20] *See* Compl. ¶¶ 37, 38 ("Plaintiffs have suffered extreme emotional distress *as a result of* Judge Moore being falsely portrayed, mocked and defamed as a sex offender and pedophile …"; "Judge Moore has been the subject of widespread ridicule and has suffered severe loss of reputation, *which has in turn also caused* him, Mrs. Moore, and his entire family severe emotional distress …") (emphasis added).

of speech—even where that speech was "patently offensive and … intended to inflict emotional injury"—unless he could "show[] in addition" that the publication met the requirements of a defamation claim (including "that the publication contains a false statement of fact which was made with 'actual malice'"). *Id.* at 50, 56. This rule precludes the IIED claim here. *See Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 127–29 (2d Cir. 2013) (affirming ruling that a plaintiff cannot "circumvent" the constitutional requirements for a libel cause of action "by calling his claim for defamation by a different name") (citation omitted).[21]

## C.    Plaintiffs' Fraud Claim Is Barred by the First Amendment

In the first instance, Plaintiffs' fraud claim fails not only because the fraud claim was waived in the SCA, but also because of the express disclaimer of reliance on the very statements that Plaintiffs claim underlie their fraud. *See supra* section I.B.1.

Plaintiffs' fraud claim also fails because, as with the IIED claim, Plaintiffs' alleged "injury" caused by the fraud is nothing more than the claimed harm to Judge Moore's reputation, and therefore falls with the defamation claim.[22] In *Balderman v. ABC*, the Appellate Division reversed the denial of a motion to dismiss a claim for "intentional tort" based on alleged "acts of deception to induce [the plaintiff to] participate in [a] hidden-camera interview," which was then

---

[21] Mrs. Moore separately fails to state an IIED claim because her alleged "distress" derives entirely from the alleged harm to her *husband's* reputation. *See* Compl. ¶¶ 37-38. Just as "[o]nly the party about whom the allegedly libelous statements were made has standing to sue" for defamation, a "family member not named in [an] allegedly defamatory [publication] has no claim for emotional distress." *Chaiken v. VV Publ'g Corp.*, No. 91 CIV. 2102, 1992 WL 168282, at *2 (S.D.N.Y. June 30, 1992) (citation omitted). *See also Sylvester v. City of N.Y.*, 385 F. Supp. 2d 431, 442 (S.D.N.Y. 2005) (noting lack of authority for IIED claim from "false statements … directed at the plaintiffs' family member, but not the plaintiffs").

[22] *See* Compl. ¶¶ 47-48 ("As a direct and proximate result of Defendant[s'] false and fraudulent representations, Judge Moore, Mrs. Moore, and his entire family have suffered extreme emotional distress *as a result of Judge Moore being falsely portrayed* as a sex offender and pedophile.") (emphasis added). By a similar token, Plaintiffs' fraud claim fails because "[f]raud damages are limited to 'the actual pecuniary loss suffered' as a direct result of the misrepresentation." *Spithogianis v. Haj-Darwish*, No. 07 Civ. 4609, 2008 WL 82188, at *7 (S.D.N.Y. Jan. 7, 2008) (citation omitted) (collecting cases). "[O]ut-of-pocket" losses do not include harm to reputation or even "lost time." *W. Tsusho Co. v. Prescott Bush & Co.*, No. 92 Civ. 3378, 1993 WL 228072, at *3 (S.D.N.Y. June 23, 1993). The only injury Plaintiffs allege is reputational harm to Judge Moore; they could not, in any event, show any out-of-pocket loss, given that all of their travel expenses were paid for by the production companies. *See supra* p. 7, fn. 2.

"edited … to portray him as deceptive, untruthful, unethical, incompetent and untrustworthy." 292 A.D.2d 67, 76 (4th Dep't 2002).  The court explained that "[r]egardless of the label plaintiff places upon it … this cause of action is indistinguishable from the defamation cause of action," because "[a]ny injury to plaintiff … is the result of the allegedly unfavorable portrayal of him in the broadcast, not of defendant's behind-the-scenes deception and editing."  *Id.*

Plaintiffs' effort to plead around a deficient defamation claim by alleging fraud is also barred by the First Amendment.  In a case directly on point, a restaurant owner asserted defamation and fraud claims against a news broadcaster because the reporters (for its evening news program) asked for permission to film in the plaintiff's restaurant for "background footage for a broadcast about tourism in Miami Beach," but then used the footage to illustrate a report on the resurgence of the Russian mafia.  *La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 387 (S.D.N.Y. 1999).  Although the court was admittedly "troubled by plaintiff's allegations of defendants' fraudulent behavior in obtaining permission to film [in the restaurant], plaintiff's claim for fraud nevertheless must fail because it impermissibly threatens 'to punish the expression of [even] truthful information or opinion.'"  *Id.* at 392 (citation omitted).  The court refused to let the plaintiff "use different tort claims 'to avoid the strict requirements for establishing a libel or defamation claim,' or to seek 'damages for injury to his reputation.'"  *Id.* (quoting *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991)).

The result should be the same here and, for that separate reason, Plaintiffs' fraud claim fails as a matter of law.

## CONCLUSION

For the reasons set forth above, this Court should grant summary judgment in favor of Defendants.

30

Dated: February 8, 2021                              Respectfully Submitted,

                                                     */s/Elizabeth A. McNamara*
                                                     Elizabeth A. McNamara
                                                     Rachel F. Strom
                                                     Eric J. Feder
                                                     DAVIS WRIGHT TREMAINE LLP
                                                     1251 Avenue of the Americas, 21st Floor
                                                     New York, New York  10020
                                                     (212) 489-8230
                                                     (212) 489-8340 (fax)


                                                     Of Counsel:

                                                     Russell Smith, Esq.
                                                     Jeff Holmes, Esq.
                                                     SMITH DEHN LLP
                                                     2500 Broadway
                                                     Building F, Suite F-125
                                                     Santa Monica, California  90404
                                                     (310) 396-9045
                                                     rsmith@smithdehn.com
                                                     jholmes@smithdehn.com

                                                     Attorneys for Defendants

4828-1646-7927v.7 3940173-000105