**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ROY STEWART MOORE, et al

                        Plaintiffs,

v.

SACHA NOAM BARON COHEN, et al

                    Defendants.

**Index No. 19 Civ. 4977**

**ORAL ARGUMENT REQUESTED**

<u>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY**</u>
<u>**JUDGMENT**</u>

      Plaintiffs Roy Moore ("Judge Moore") and Kayla Moore ("Ms. Moore") (collectively "Plaintiffs") submit the following in opposition to Defendants Sacha Noam Baron Cohen's ("Defendant Cohen"), Showtime Networks, Inc.'s ("Defendant Showtime") and CBS Corporation's ("Defendant CBS") (collectively "Defendants") Motion for Summary Judgment

      Oral argument is respectfully requested.

**Dated**: March 15, 2021                 Respectfully Submitted,

                                     /s/ *Larry Klayman*
                                    Larry Klayman, Esq.
                                    KLAYMAN LAW GROUP P.A.
                                    7050 W. Palmetto Park Rd
                                    Boca Raton, FL, 33433
                                    (561) 558-5536
                                    Email: leklayman@gmail.com

# **TABLE OF CONTENTS**

STATEMENT OF RELEVANT FACTS ....................................................................4

THE LAW ..............................................................................................................8

The "Consent Agreement" Is Void for Fraud Under the Restatement ...............8

The "Consent Agreement" Is Void for Fraud Under Contract Law ..................10

Plaintiffs Reasonably Relied Upon Defendants' Fraudulent Oral Representations ..........11

The "Consent Agreement" Is An Improper General Release ...........................13

Plaintiffs Properly Amended the Consent Agreement, and Defendants Agreed, to Exclude the Defamatory Conduct of Defendants ............................................15

The Ownership of YTV is Irrelevant ..............................................................18

The Facts Here and All of The Case Law Above Renders *Psenicska v. Twentieth Century Fox Film Corp.*, 2008 U.S. Dist. LEXIS 69214 (S.D.N.Y Sep. 3, 2008) and its U.S Court of Appeals for the Second Circuit Decision Inapplicable. Instead, This Legal Precedent Supports Plaintiffs ................................................................19

Since the Consent Agreement is Invalid and Unenforceable, Plaintiffs' Claims Must Proceed Since They Are Properly Pled ..............................................21

Defamation ................................................................................................21

Intentional Infliction of Emotional Distress .......................................23

Fraud ...........................................................................................................24

Mrs. Moore's Claims Are Not Barred by the "Consent Agreement" ...............25

CONCLUSION ....................................................................................................25

# **TABLE OF AUTHORITIES**

## Cases

*Actrade Liquidation Trust v. Greenich Ins. Co. (In re Actrade Fin. Techs. Ltd.)*, 424 B.R. 59 (S.D.N.Y. 2009)............................................................................................14

*Crotona 1967 Corp. v. Vidu Bros. Corp.*, 925 F. Supp. 2d 298 (E.D.N.Y. 2013)........................16

*E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273 (S.D.N.Y. 2006)................13, 14

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)................................................24

*In re Windsor Plumbing Supply Co.*, 170 B.R. 503 (Bankr. E.D.N.Y. 1994) ..............................16

*Jack Kelly Partners LLC v. Zegelstein*, 140 A.D.3d 79, 85 (App. Div.) ......................................10

*Kratzenstein v. Western Assurance Co.,* 116 N.Y. 54 (N.Y. 1889)................................................16

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d. 299 (S.D.N.Y. 2004)................................................................................13

*Miller v. Celebration Mining Co.*, P.3d 1231 (Sup.Ct)................................................................9

*Missel v. Cty. of Monroe*, 2011 U.S. Dist. LEXIS 91700 (W.D.N.Y. Aug. 17, 2011)................23

*Neuman v. Harmon*, 965 F. Supp. 503 (S.D.N.Y. 1997) ........................................................14

*New Talli Enters. v. Van Gorden*, 2003 NY Slip Op 51066(U) (Civ. Ct.) ............................10, 11

*Nolan v. State of N.Y.*, 158 A.D.3d 186 (App. Div.)........................................................24

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)........................................................24

*Psenicska v. Twentieth Century Fox Film Corp.*, 2008 U.S. Dist. LEXIS 69214 (S.D.N.Y. Sep. 3, 2008) ........................................................................................19, 20

*Psenicska v. Twentieth Century Fox Film Corp.*, 409 F. App'x 368 (2d Cir. 2009)....................21

*Pinto v. Allstate Ins. Co.*, 221 F.3d 394 (2d Cir. 2000) ........................................................14

*Rejent v. Liberation Publ'ns*, 197 A.D.2d 240 (App. Div. 1994) ................................................24

*Salomone v. Macmillan Pub. Co.*, 411 N.Y.S.2d 105 (Sup. Ct. 1978)....................................21, 22

*Shah v. Racetrac Petroleum Co.*, 338 F.3d 557 (6th Cir. 2003)........................................11, 12, 13

## Secondary Sources

Restat 2d of Contracts, § 164 (2nd 1981) ........................................................................8, 9, 10

## **MEMORANDUM OF LAW**

Plaintiffs have been subjected to malicious, disgusting, outrageously vile  defamation and intentional infliction of emotion distress with ensuing severe and on-going damage including but after having been made victims of Defendants' latest cheap, low class, fraudulent and illegal scheme  for profit, notoriety, and ratings. This is a case where Defendants have committed fraud upon fraud upon fraud, each one compounding the extremely damaging effects on Judge Moore and his wife Kayla Moore, and entire Moore family.

Defendants' center their arguments around the "Consent Agreement," which they falsely claim negate Plaintiffs' causes of action. However, the "Consent Agreement" is completely unenforceable under well-settled law, and even if were enforceable – which it is not – Judge Moore explicitly excluded from the "Consent Agreement," with the express written agreement of Defendants, matters involving the publication of…any allegedly sexual oriented or offensive behavior or questioning." Despite this, Defendants in their greed were undeterred in maliciously defaming Judge Moore based on "sexual oriented or offensive behavior or questioning." *See* Plaintiffs' Statement of Additional Undisputed Material Facts ¶1 ("Stmt.") Thus, the "Consent Agreement" offers Defendants no protection from their heinous tortious acts.

Judge Moore was fraudulently tricked into appearing on a world-wide broadcast where he was falsely accused of being a child sex-offender. Stmt. ¶2. Defendants assert, but in reality cannot logically believe, that they are immune to consequences for their reprehensible and illegal conduct by virtue of  the "Consent Agreement" that was obtained wholly through fraudulent measures, and is therefore unenforceable and voidable, as set forth in detail below. In any event, it is undisputable that:

> After the taping of Judge Moore's segment, when Plaintiffs discovered that they had been fraudulently induced to fly to Washington, D.C. and that Judge Moore's segment

was to appear on Showtime and CBS, his Alabama counsel, Melissa Isaak, Esq. sent a preemptive notice to Defendants Showtime, CBS and thus Cohen warning them that Plaintiffs would resort to appropriate legal remedies if they chose to air the segment. In the preemptive notice, Defendants CBS, Showtime and thus Cohen were informed that the release that Judge Moore had signed was obtained through fraud, and was therefore void and inoperative. Stmt. ¶3

This would clearly void the "Consent Agreement," even if it were at any point in time, valid and enforceable  -- which it is not. However, apparently  believing that they are untouchable given their huge wealth, prominent Hollywood influence and arrogant belief that regrettably has proven often to be true, that courts will protect them, Defendants still proceeded to broadcast Judge Moore's segment, driven solely by their thirst for ratings and profit. Based on the equities alone, Defendants' motion must be denied, as they are truly the sole wrong-doers and tortfeasors here.

In short, this is a truly extraordinary case, where Defendants have illegally perpetrated fraud upon fraud in order to trick Judge Moore in to appearing on television, only to be falsely smeared and defamed as a pedophile in front of a worldwide audience. This heinousness and extreme defamation, in and of itself, distinguishes the facts at issues from any previous cases involving *Borat* or other projects by Defendant Cohen, notwithstanding that a careful reading of the lower court and appellate rulings shows clearly that these cases do not apply to the uncontroverted facts of this case, and instead work as strong precedent in favor of Plaintiffs.

That legal precedent notwithstanding, to be smeared and branded as a pedophile is worse than even being called a murderer! No such slander ever occurred in Borat, notwithstanding other compelling reasons as set forth below shows.  The Defendants cannot and should not be permitted to falsely hide behind that case, which actually supports Plaintiffs' claims, to claim no liability for what they have done!

Again, as set forth above, it is indisputable that, even if the "Consent Agreement" was valid – it is not, as set forth below – Defendants clearly and knowingly went outside of the scope of any agreement and simply violated it, since Plaintiffs expressly declined (with Defendants' agreement) to waive "claims involving assertions of…any allegedly sexual oriented or offensive behavior or questioning." Stmt. ¶1. This is evidenced by the fact that Plaintiffs crossed out and removed the "waiver" provision regarding "sexual oriented or offensive behavior or questioning." Stmt. ¶1. Defendants signed the "Consent Agreement" after having agreed to this modification, making this the material part of the written agreement that was reached between the parties. Indeed, even the U.S. District Court for the District of Columbia, in ruling that the forum selection clause in the "Consent Agreement" was enforceable, paid particular attention to this fact and expressly questioned Defendants' counsel about it. Stmt. ¶4. Specifically, the Court asked:

> Isn't that part of the contract that knocks out the area that they would agree to discuss and then it is discussed as affecting the forum? Stmt. ¶4

After this case was transferred to this Court, right out of the box the Honorable Andrew L. Carter also focused and zeroed in on the same modification at the initial August 1, 2019 status conference in this matter:

> I'll hand this back to counsel. There is something in this agreement that was highlighted and crossed out. Was that something that was done prior to the signing of the agreement or was that something done by counsel afterwards? Stmt. ¶ 5.

Judge Carter then urged the parties to settle and actually met with their counsel individually in his chambers that day. But Defendants arrogantly refused to entertain such discussions, and reported this back to Judge Carter who later denied their motions to dismiss, establishing crucial and applicable law of the case, as was discussed by Plaintiffs' counsel before the Honorable John P. Cronan ("Judge Cronan"). *Transcript of December 18, 2020 Hearing*, 29:17-20.

3

Thus, in sum, Defendants have perpetrated fraud upon fraud in their greedy quest for notoriety, fame, and profit, at the expense of Plaintiffs, who are truly innocent bystanders who were caught in their web of fraud. It is inherently unjust to allow for Defendants to severely harm Plaintiffs and allow them to profit from broadcasting repeated defamatory lies. As set forth below, the "Consent Agreement" which forms the backbone of their entire argument, is completely invalid, and even if it were arguable enforceable – which it clearly is not - Defendants illegally far exceeded and violated the scope and primary materiality of the modification in any "agreement."   Moreover, even were there an ambiguity in Defendants alleged favor, this must be put before the jury to decide. It is not the province of the Court to do so based on well-established legal authority set forth in greater detail below.

## I.     STATEMENT OF RELEVANT FACTS

Judge Moore was fraudulently induced by Defendants to appear on Defendant Cohen's show "Who is America?" In order to fraudulently induce Plaintiffs to travel to Washington, D.C., where filming was to and did take place on or about February 14, 2018, Defendant Cohen and his agents falsely and fraudulently represented to Plaintiffs that Yerushalayim TV ("YTV") was the producer and broadcaster of the show that Judge Moore would appear on, instead of the actual network that the show that later appeared on - Defendant Showtime. Stmt. ¶6. In addition, Defendant Cohen and his agents falsely and fraudulently represented that Judge Moore and Mrs. Moore were both being invited to Washington, D.C., for Judge Moore to receive an award for his strong support of Israel in commemoration of its 70th anniversary as a nation state. Stmt. ¶7. Once there, "Defendant Cohen's character falsely and fraudulently introduced a false and fraudulent 'device' supposedly invented by the Israeli Army to detect pedophiles. During the

segment, Defendant Cohen's 'device' – as part of the false and fraudulent routine – purports to detect Judge Moore as a sex offender, thus defaming him." Stmt. ¶8.

Evidence obtained in discovery shows that Judge Moore was a primary target if not the principal "road kill" of Defendants, which goes towards their intent to defame and defraud him. In a February 13, 2018 email from Mr. Schulman, he writes, "[w]e should move Roy Moore up to 2:30… [Defendant Cohen] wants as much time with him as possible." Stmt. ¶12.

Defendants set up numerous fake shell corporations in order to try to insulate Defendant Cohen from liability for his tortious conduct. Stmt. ¶9. This was done by creating shell corporation after shell corporation for the sole purpose of defrauding Judge Moore and Defendant Cohen's other victims, as well as a sleazy attempt to insulate Cohen personally from liability. This is evidenced by the fact that once YTV was used to defraud Judge Moore, Defendants no longer even kept it as an active corporation. At deposition, YTV's corporate counsel, Ms. Wallis, admitted as much:

> Q. What were the circumstances upon which it ceased to exist?
>  A. Once the annual filings are no longer filed, it's administratively dissolved by the state of formation.
>  Q. You were instructed to make no further administrative filings on behalf of Yerushalayim TV?
> A. I believe that calls for attorney-client privileged communication.
> Q. Okay. So you made no further filings on behalf of Yerushalayim TV?
> A. Correct. Stmt. ¶ 13.

Defendant Schulman made the same admission:

> Q. Mr. Schulman, Yerushalayim TV was formed for the sole purpose of the show "Who Is America?", correct?
> A. Yes. Stmt. ¶ 14.

Defendant Cohen and his team are nothing more than a virtual fraudulent racketeering enterprise.

In this regard, Plaintiffs were only allowed extremely limited discovery by this Court as to the origins of these numerous shell companies – only one hour for the deposition of Defendant Cohen, the mastermind and chief fraudster of what otherwise arguably is a criminal enterprise.

Furthermore, during deposition, which was conducted remotely, Defendant Cohen appeared to be being fed answers, Stmt. ¶10, which shows that he had no personal understanding of the numerous corporations that were used to defame Judge Moore, evidencing the fact they were no more than tools of fraud, specifically established for the sole purpose of committing fraud. A review of the video of the Cohen deposition will not only show him looking down, probably to a cell phone or tablet, but also hesitating in his answers to simple questions. Plaintiffs respectfully request that the Court order an evidentiary hearing on this apparent obstruction of justice if not perjury, as it is entirely improper, unethical and potentially illegal conduct.[1] Once verified through Cohen's sworn and other witness testimony before this Court, Plaintiffs will respectfully request a criminal contempt trial to address this serious matter.[2]

As such, the "Consent Agreement" was obtained through multiple fraudulent means. Plaintiffs had no knowledge that Defendant Cohen was in any way associated with the production that they were signing up for, nor that Defendants CBS and Showtime were involved. Plaintiffs also had no knowledge that the purpose of the "Consent Agreement" was to feature and

---

[1] This is in addition to the fraud furthered by attorney Jennifer Wallis, who assisted Defendants in setting up YTV for the purpose of defrauding Judge Moore.

[2] The undersigned counsel had warned this Court that its protective order was overly broad, and it has been predictably abused by Defendants in bad faith. Defendants have designated the entire video as confidential because it was purportedly taken at Defendant Cohen's personal residence, but there is no way for anyone to determine where it was taken based simply off a deposition video, which just depicts Cohen and the non-descript walls around him. This shows Defendants' arrogant bad faith modus operandi. Defendants and their counsel have little to no respect for the law, much less the proper use of a draconian and grossly overly broad protective order, generally used in complex commercial litigation entered by this Court despite warnings that it would be abused.

defame Judge Moore on "Who is America?" and not to receive an award for Judge Moore's strong support of Israel.  Had Plaintiffs known of these facts, they would never have  travelled to Washington D.C. and signed the Consent Agreement. Stmt. ¶11.

Ultimately, despite the fact that Judge Moore's Alabama counsel sent a preemptive notice to Defendants Showtime, CBS and thus Cohen, warning them that Plaintiffs would be forced to resort to appropriate legal remedies if they chose to air the segment, as the release had been obtained through fraud and was void and inoperative, Stmt. ¶3, Defendants brazenly still chose to air Judge Moore's segment worldwide, causing him severe harm, his wife and his family.

Lastly, with regard to the waiver provision of the "Consent Agreement," Judge Moore specifically and expressly crossed out "claims involving assertions of…any allegedly sexual oriented or offensive behavior or questioning" from the waiver provision. Stmt. ¶1. This meant to Judge Moore that there would be no discussion of any "allegedly sexual oriented or offensive behavior or questioning" involved. Stmt. ¶1.  Defendants expressly agreed to this modification of the "Consent Agreement," yet unquestionably went ahead and falsely smeared and branded Judge Moore a pedophile on national television. Stmt. ¶8. Indeed, at deposition, Todd Schulman, producer for "*Who is America*" and Cohen's right hand man in nearly of his shady endeavors, admitted that he was aware that Judge Moore had precluded any "claims involving assertions of…any allegedly sexual oriented or offensive behavior or questioning," yet did nothing to stop it:

> Q.     So you saw it after the interview started, but before the end of the interview with Judge Moore?
> A.     Yes. Stmt. ¶15.

At a bare minimum, this modification creates an ambiguity in the Consent Agreement that renders summary judgment improper, as admitted by the Court at the December 18, 2020 hearing in this matter:

> Well, Mr. Klayman, if you prevail in the motion that the language is ambiguous, that means that the motions will not prevail on that point. As Ms. McNamara confirmed earlier, their argument is going to be that the unambiguous language of the SCA precludes the claims that were brought. If you're accurate that there's language that makes the agreement ambiguous, then that will be a very strong point for you to make when you oppose a motion for summary judgment. Stmt. ¶ 16.

Thus, Defendants' motion for summary judgment must be denied.

## II.   **THE LAW**

### A.   **The "Consent Agreement" is Void for Fraud Under the Restatement**

The Second Restatement of Contracts says "[i]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement 2d of Contracts, § 164 (2nd 1981). The comments set forth four elements in this regard: (1) a misrepresentation that was (2) fraudulent or material that (3) induced the recipient to make the contract, and that the recipient was (4) justified in relying upon the misrepresentation.

Here, the facts squarely meet the elements set forth by the Restatement. There are three primary misrepresentations at issue. The first misrepresentation was that Judge Moore was being flown to Washington D.C. to receive an award for his support of Israel, when in actuality it was so that he could be falsely portrayed as a pedophile on national television. The second misrepresentation was that the television segment was being produced by Yerushalayim TV, and not Defendant Cohen, Showtime, and CBS.   The third major misrepresentation was that Defendants expressly <u>agreed</u> in writing to not discuss anything that was "sexual oriented or offensive behavior or questioning," and then subsequently did so anyways, thus perpetrating the

third fraud. These misrepresentations were clearly and admittedly fraudulent and material, and they induced Plaintiffs to sign the "Consent Agreement" as it was pled in the Complaint that Plaintiffs would never have agreed to sign the "Consent Agreement" or fly to Washington D.C. had they had knowledge of either of these facts. Stmt. ¶11. Lastly, Plaintiffs were clearly justified in relying upon these misrepresentations, as they had no possible basis for knowing that they were false at the time the purported "Consent Agreement" was executed.

Furthermore, in analyzing the the Restatement, courts have found that in very similar circumstances – where the assent to the contract was obtained fraudulently – the deceived party had the right to void the contract. In *Miller v. Celebration Mining Co.*, P.3d 1231 (Sup.Ct.), the Supreme Court of Utah held that a contract between a mining company and a mine was voidable where mine had been administratively dissolved prior to the execution of the contract. The president of the mining company argued that he should have been able to enforce the contract individually, to no avail. In analyzing the facts under the Restatement, the Supreme Court of Utah held that "[t]he identity of the parties to a contract is, as a general rule, a material part of the contract." *Id*. at 1235. "Allowing the party that misrepresented its identity to enforce the contract may compel the innocent party into a contract it might otherwise be unwilling to enter as identity is inextricably tied to one party's assessment of the other's capacity to perform on the contract." *Id*. (emphasis added). Here, the "Consent Agreement" clearly misrepresented the identity of Defendants, which lured Plaintiffs into a contract that they would be otherwise unwilling to enter. Stmt. ¶11. The Supreme Court of Utah further found that the Plaintiff had not presented any facts that undermined the conclusion that the identity of the contracting party induced the defendants to enter into the contract, nor that the plaintiffs were not justified in relying on the misrepresentation. The same holds true here.

Crucially, the Restatement does not state that where these elements are met, only the specific provisions touched by the fraud are voidable. Indeed, pursuant to the express language of the Restatement, when these elements are met, as they are here, the "[entire] contract" is voidable by the recipient. Here, the elements of the Restatement have clearly been met. Thus, to the extent that Defendants argue that Plaintiffs are precluded from bringing any claims under the "waiver" provision in the "Consent Agreement," it is also clear that such an argument must fail, since there is no "Consent Agreement" to even enforce in the first place.

**B.     The "Consent Agreement" is Void for Fraud Under Contract Law**

Under New York law, it is clear that a showing of fraud is sufficient to support the recission of a contract. "Further, fraud sufficient to support the rescission requires only a misrepresentation that induces a party to enter into a contract resulting in some detriment; proof of scienter is not necessary and even an innocent misrepresentation is sufficient for rescission." *Jack Kelly Partners LLC v. Zegelstein*, 2016 NY Slip Op 03820, ¶ 3, 140 A.D.3d 79, 85, 33 N.Y.S.3d 7, 10 (App. Div.).

Furthermore, New York courts have found rescission to be the proper remedy in the event of fraud even where the contract expressly released the wrongdoer of liability. In *New Talli Enters. v. Van Gorden*, 2003 NY Slip Op 51066(U) (Civ. Ct.), the Court rescinded a lease agreement between a tenant and a landlord where the lease violated the certificate of occupancy, or the permitted uses for the property. *Id*. at 5. Despite the fact that the landlord professed no knowledge of this violation, and the fact that the lease agreement expressly stated that the "landlord made no promises or representations with respect to the demised premises," *id*. at 5-6, the Court found that recession was proper. Here, not only were the material misrepresentations set forth in the preceding section made with knowledge of their falsity, they were also clearly

made with fraudulent intent. This is evident from the face of the "Consent Agreement" alone. It is clear that Defendants knew that they had to disguise their identity, otherwise Plaintiffs would never have agreed to appear on "Who is America?" It is also clear that Defendants knew that Judge Moore would never have agreed to appear on national television to be falsely portrayed as a pedophile, which is why they had to lie about the purpose of the "Consent Agreement" and say that Judge Moore was to receive an award for his strong support of Israel. Lastly, similar to how the *New Talli* court found that it was irrelevant that the lease at issue stated that the landlord made no promises or representations, it is equally irrelevant here that the "Consent Agreement" contains a waiver clause. Since the "Consent Agreement" itself was reached through fraudulent misrepresentation, the entire agreement can be rescinded and therefore voided by Plaintiffs. Thus, the specific provisions contained therein, including any waiver provisions, are of no effect.

In any event, as set forth in detail below, Defendants expressly <u>agreed</u> in writing to not discuss anything that was "sexual oriented or offensive behavior or questioning," and then subsequently did so anyway, thereby violating and breaching the voidable "Consent Agreement."

### C.   Plaintiffs Reasonably Relied Upon Defendants' Fraudulent Oral Representations

Courts have held in similar circumstances that fraudulent statements inducing a party to enter into a contract can be considered even with the existence of such a contractual provision disclaiming them. In *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557 (6th Cir. 2003), the U.S. Court of Appeals for the Sixth Circuit had occasion to make a ruling on similar facts. In *Shah*, the Plaintiffs entered into a contract to lease a gas station and convenience store. *Id.* at 561. The lease agreement contained an express termination provision that clearly stated that either party could terminate the lease by simply giving the other party a 30-day notice of their intent to do so. *Id* at 562. The Plaintiffs were hesitant to enter into the lease agreement given the termination

provision, but were assured by both the holders of the lease and the Defendants who owned the store, exterior improvements, and the real property that their policy was that they did not kick any dealer out so long as they performed satisfactorily. *Id*. at 563. Based on these oral assurances, the Plaintiffs entered into the lease. However, a little over a year later, Defendants unilaterally cancelled the lease agreement despite there being no indication that Plaintiffs were not performing satisfactorily. *Id*. at 565.

Crucially, the lease agreement in *Shah* contained two merger provisions. They read:

> This Contract, together with attached exhibits, and any other lease or contract executed the same date, constitutes the entire understanding between the parties and supersedes and cancels all previous contracts between the parties with respect to the facilities covered hereby.
> This Contract supersedes and cancels all previous contracts or arrangements between the parties relating to the matters herein and no prior or subsequent stipulation, agreement or understanding, verbal or otherwise, of the parties or their agents relating to the matters herein shall be valid or enforceable unless embodied in the provisions of this Contract, or a separate instrument in writing. *Id*. at 563.

Despite the existence of these merger provisions - which clearly serve the same purpose as the Defendants here set forth their "disclaimer" provision - the Sixth Circuit still reversed summary judgment in favor of the Defendants on Plaintiffs' claim for promissory fraud. The Sixth Circuit rejected the Defendants' claims that it was *per se* unreasonable for Plaintiffs to rely on oral representations because of the existence of merger clauses, which closely mirrors Defendants' arguments here. *Id*. at 568. One of the main factors that the Sixth Circuit emphasized was the number of misrepresentations made by Defendants, reasoning that "Defendant made *six* misrepresentations to Plaintiffs in response to Plaintiffs' obvious concerns." *Id*. at 568.

The facts here mirror *Shah* precisely. Like the Shah's, the Plaintiffs were fraudulently induced by Defendants to enter into the "Consent Agreement" with knowingly false oral representations. Plaintiffs would never have entered into the "Consent Agreement" but for these

fraudulent representations. Stmt. ¶11. The lease in *Shah* contained two merger provisions that clearly stated that "no prior or subsequent stipulation, agreement or understanding, verbal or otherwise, of the parties or their agents relating to the matters herein shall be valid or enforceable," which mimic the "disclaimer" provision asserted by Defendants here. In *Shah*, at least the Plaintiffs received what they contracted for – the gas station – albeit for only over a year. Here, Plaintiffs were completely blindsided, having been told that Judge Moore would be receiving an award for his support of Israel, while actually being made to endure claims of pedophilia on national television. Thus, even more so than in *Shah*, the Court here should and must permit Plaintiffs to assert the fraudulent representations of Defendants, despite the "disclaimer" provision in the "Consent Agreement."

> **D.     The "Consent Agreement" Is An Improper General Release**

The fundamental legal principle that a release does not extend to claims that a party does not know or suspect at the time of executing the release is deeply rooted in American law. Indeed, every jurisdiction includes some form of law refusing to bar claims for injuries undiscovered at the time the parties execute an agreement, including New York. For example, in a landmark decision styled *E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273 (S.D.N.Y. 2006), the Court held unequivocally:

> A release that employs general terms will not bar claims outside the parties' contemplation at the time the release was executed. New York law does not construe a general release to bar claims for injuries unknown at the time the release was executed, even when the release contains broad language (internal citations omitted); Cal. Civ. Code § 1542 (West 2005) [] ("A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.").

*Id.* at 284 (emphasis added); *see also Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354

F. Supp. 2d 293, 299 (S.D.N.Y. 2004). "It is also a firm principle of New York law that it is less likely that claims are covered by a general release if they are unknown at the time of the release." *Actrade Liquidation Trust v. Greenich Ins. Co.* 424 B.R. 59 (S.D.N.Y. 2009).

In *Actrade Liquidation Trust*, a debtor's successor-in-interest, i.e., a liquidation trust and another debtor's trustee, sought a declaratory judgment that defendants were liable on bonds aggregating $14 million that they issued in favor of debtor. *Actrade Liquidation Trust*, 424 B.R. at 60-61. The court denied cross-motions for summary judgment on the defense of the release and the parties proceeded to trial. At trial, the sole issue was the viability of the release defense. There was "no question" that the release "cover[ed] all claims against the Sureties." *Id.* at 69. (emphasis in original). The court held that the "general language would be conclusive but for the principle of New York law that a release, general on its face, will be limited to those claims within the contemplation of the parties at the time." *Id.* "[T]he cases are many in which the release has been avoided with respect to uncontemplated transactions despite the generality of the language in the release form. *Id.*

Under New York law, the dispositive factor in determining the scope of a release is the parties' intent. *E*Trade Fin. Corp.,* 420 F. Supp. 2d at 284-85; *Neuman v. Harmo*n, 965 F. Supp. 503, 509 (S.D.N.Y. 1997). "[A] release like any contract must be construed to give force and effect to the intention of the parties." *Pinto v. Allstate Ins. Co*., 221 F.3d 394, 404 (2d Cir. 2000).

It is indisputable that the "Consent Agreement" constitutes a general release. Specifically, it states, the "[p]articipant…waives and agrees not to bring at any time in the future, <u>any claims against the producer</u>, or against any of its assignees or licensees or anyone associated with the Program, which are related to the Program or its production…." <u>Moore Dec. Ex. 1</u>. (emphasis added). There can be nothing more "general" than a waiver of "any claims" against the producer.

The mere fact that the "Consent Agreement" lists certain examples of claims, does not render it specific. Indeed, if Plaintiffs' brought a claim not listed in one the examples set forth by the Consent Agreement, it is an absolute certainty that Defendants would claim that it would still be barred under the language, "any claim."

Defendants argument that the "Consent Agreement" is not a general release simply because it lists infliction of emotional distress, defamation and fraud as examples of claims being waived is unpersuasive, where the "Consent Agreement" expressly states that Judge Moore could not bring" any claims against the producer…." Simply put, Defendants cannot have it both ways. They cannot rely on language that waives specific claims only when it suits them, and then ignore a waiver of "any claims against the producer" when it does not suit them.

Given that this is undeniably a general release, the Court must proceed to determine the intent of the parties. Here, it is clear that Plaintiffs never intended to even appear on "Who is America?" much less be falsely accused of pedophilia before a world-wide audience.

### E.    Plaintiffs Properly Amended the Consent Agreement to Exclude the Conduct of Defendants

Assuming only *arguendo* that the purported "waiver" provision is valid – it clearly is not, as set forth above – it is also clear that Plaintiffs expressly declined to waive "claims involving assertions of…any allegedly sexual oriented or offensive behavior or questioning." Stmt. ¶1 This is evidenced by the fact that Plaintiffs crossed out and struck the "waiver" provision regarding "sexual oriented or offensive behavior or questioning," and Defendants agreed to this modification in the Consent Agreement itself!

Here, even if the remaining portions of the "waiver" provision were valid, it is clear that the parties agreed that any claims arising out of "sexual oriented or offensive behavior or questioning" would not be waived. Indeed, even the U.S. District Court for the District of

Columbia, in ruling that the forum selection clause in the "Consent Agreement" was enforceable, paid particular attention to this fact and expressly questioned Defendants about it. Stmt. ¶4. Specifically, the Court asked:

> Isn't that part of the contract that knocks out the area that they would agree to discuss and then it is discussed as affecting the forum? Stmt. ¶4.

Not surprisingly, the Honorable Andrew L. Carter also focused and zeroed in on the same agreed glaring and obvious written modification at the initial August 1, 2019 status conference:

> I'll hand this back to counsel. There is something in this agreement that was highlighted and crossed out. Was that something that was done prior to the signing of the agreement or was that something done by counsel afterwards? Stmt. ¶ 5.

It is indisputable that Defendants, through their phony and fraudulent claimed surrogates, signed the "Consent Agreement" after this modification had been made, thereby consenting to this.

Under New York contract law, it is clear that handwritten amendments are valid.

> I note in this regard that there does not appear to be any prohibition under New York law on handwritten additions to contracts like guaranties; on the contrary, in some cases, **"handwritten entries on a printed document take precedence over those in typeface. This proposition is based on the belief that a handwritten entry expresses the latest intent of the parties to the contract**." *Crotona 1967 Corp. v. Vidu Bros. Corp.*, 925 F. Supp. 2d 298, 314 (E.D.N.Y. 2013) (emphasis added).

"In addition, it is well established that handwritten entries on a printed document take precedence over those in typeface. This proposition is based upon the belief that a handwritten entry expresses the latest intention of the parties to the contract. *Kratzenstein v. Western Assurance Co.,* 116 N.Y. 54, 22 N.E. 221, 222 (N.Y. 1889). This is especially so when neither party to the contract contests the validity of the handwritten entries." *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 523 (Bankr. E.D.N.Y. 1994).

Defendants do not argue that the amendment to the "Consent Agreement" is not valid. Instead, they frivolously argue that the Court should take an extremely and ridiculously narrow

interpretation of the amendment and find that it does not apply to Plaintiffs' claims. However, the plain language of the amendment shows why this view is incorrect and this argument completely inapplicable and frivolous. Defendants argue that the amendment only applies to "intrusion or invasion of privacy claims," apparently due to the fact that the amendment occurs immediately afterwards. However, the amendment clearly applies to "<u>any</u> allegedly sexual oriented or offensive behavior or questioning." There is no limiting language that would support such a bizarre and narrow interpretation of the amendment. Furthermore, simply because the amendment contains the phrase "such as," does not limit it only to intrusion and invasion of privacy claims. Under the plain language rule, "such as" simply indicates that the proceeding language serves as an example. If the intent was truly to only limit the amendment to intrusion or invasion of privacy claims, then it should have said something like, "intrusion or invasion of privacy claims involving allegedly sexual oriented or offensive behavior or questioning." As constructed, however, the amendment cannot support such a narrow, frivolous interpretation. Thus, given the fact that its is clear that all of Plaintiff claims are entirely based on "sexual oriented…questioning," the amendment clearly makes any "waiver" completely unenforceable.

Crucially, what this boils down to is that Defendants waived their right and expressly agreed not to put forth "<u>any</u> allegedly sexual oriented or offensive behavior or questioning." Stmt. ¶1. This is indisputable: (1) the "Consent Agreement" contains this modification, and (2) Defendants signed the "Consent Agreement," thereby agreeing to this modification.

This destroys Defendants' argument that Judge Moore "waived" any argument that he was fraudulently induced into signing the Consent Agreement. ECF No. 116 at 13 – 16; *supra* section II(A)-(B).  Indeed, if Defendants want to assert that Judge Moore must be held to the express terms of the "Consent Agreement," then they must also be held to the express terms of

the "Consent Agreement." They cannot have it both ways. They are not allowed to "cherry pick" provisions of the Consent Agreement that suit them while ignoring those that do not.

Thus, there are only two possible avenues that this Court can take. Either it can find that both sides waived certain provisions - Judge Moore's fraudulent inducement and Defendants "any allegedly sexual oriented or offensive behavior or questioning" – or it can find that no waiver occurred, in which case, it is indisputable that the entire "Consent Agreement" is invalid under fraudulent inducement. It is fundamentally inequitable to apply the concept of waiver to only one party, and an appealable error as well.

At a bare minimum, the fact that Judge Moore specifically declined the waiver as to "claims involving assertions of…any allegedly sexual oriented or offensive behavior or questioning" creates an ambiguity that renders this matter unsuitable for summary judgment. As set forth previously, the Court itself recognized this plain fact during the December 18, 2020 hearing in this matter. Stmt. ¶16. Thus, while Plaintiffs' assertion is that it is unambiguous that they declined to waive any "claims involving assertions of…any allegedly sexual oriented or offensive behavior or questioning"- which Defendants then went ahead and did in any event - they alternatively assert that *at a minimum*, this creates an ambiguity in the release that makes it improper for disposition on summary judgment.

## F.      The Issue of Ownership of YTV is Irrelevant

Ultimately, it is clear from the preceding that the "Consent Agreement" is unenforceable, as it was obtained through layers and layers of fraud, and in any event, Judge Moore expressly omitted from any waiver, "any allegedly sexual oriented or offensive behavior or questioning." Stmt. ¶1. It is indisputable that falsely portraying Judge Moore as a pedophile qualifies as

"sexual oriented." At a minimum, as previously recognized by this Court, this creates an ambiguity that renders summary judgment improper, meaning this case must proceed to trial.

Thus, it does not really matter whether or not Defendants can enforce the "Consent Agreement," as Defendant's motion fails before it even reaches this question.

Lastly, Plaintiffs were only given extremely limited discovery as to the corporate ownership of YTV, and to compound matters, Defendants engaged in obstructionist and potentially criminal behavior even in this limited scope, as it was apparent that Cohen was simply being fed answers during his deposition, taking advantage of the COVID-19 pandemic forcing remote video depositions. Stmt. ¶10. Again, Plaintiffs respectfully request that the Court allow for an evidentiary hearing into this misconduct after carefully reviewing the video of Defendant Cohen's deposition, which shows him looking down, probably to a cell phone or tablet, but also hesitating to answer to simple questions until he is fed the answers[3] Stmt. ¶10.

G.     **The Facts Here and All of The Case Law Above Renders *Psenicska v. Twentieth Century Fox Film Corp.*, 2008 U.S. Dist. LEXIS 69214 (S.D.N.Y. Sep. 3, 2008) and its U.S Court of Appeals for the Second Circuit Decision Inapplicable. Instead, This Legal Precedent Supports Plaintiffs.**

The Court previously stated that it found Judge Preska's decision in *Psenicska v. Twentieth Century Fox Film Corp.*, 2008 U.S. Dist. LEXIS 69214 (S.D.N.Y. Sep. 3, 2008) persuasive, observing "[b]ut the defendants do point to a decision in this Court that was affirmed by the Second Circuit from Judge Preska. That does seem, at first impression, to be -- present rather similar facts and issues that we are facing here. And were the Court to decide in the manner that Judge Preska decided, there is at least the possibility that this case could be disposed of…." *Transcript of December 3, 2020 Proceeding*, ECF No. 96 at 41:13-19. However, it would

---

[3] Defendant Cohen has gone so far as to try to defraud the Secret Service in an attempt to smear then HUD Secretary Ben Carson, which is a crime. Stmt. ¶17.

appear that the Court did not take the time to review this case thoroughly, as its facts and legal analysis are clearly distinguishable from the facts here, and in fact support Plaintiffs.

In *Psenicska*, the Court was faced with the question of whether "documentary-style film" was ambiguous, which it clearly was not. *Id*. at 15. This is in stark contrast to here, where there is it clear what Plaintiff Judge Moore and Defendants contracted for —it simply cannot be disputed that Judge Moore and Defendants agreed to modify the "Consent Agreement" to exclude any "allegedly sexual oriented or offensive behavior or questioning." However, even assuming that there is an ambiguity here, it would be characterized by a two clauses in a contract that conflict, not the meaning of an unambiguous term like "documentary-style film." As found by Judge Preksa in *Psenicska*:

> **Where there are alternative, reasonable interpretations of a contract term**
> **rendering it ambiguous, the issue should be submitted to the trier of fact and is not**
> **suitable for disposition on a motion to dismiss**. *See K. Bell & Assocs., Inc. v. Lloyd's*
> *Underwriters,* 97 F.3d 632, 637 (2d Cir. 1996). A court should not find contract
> language ambiguous, however, on the basis of the interpretation urged by one party
> where that interpretation would strain the contract language beyond its reasonable and
> ordinary meaning. *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d
> Cir. 1990); *see also E.Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension
> Plan,* 7 F.3d 1091, 1095 (2d Cir. 1993) (contracting parties may not create an
> ambiguity merely by urging conflicting interpretations of their agreement). *Id*. at 16-17.
> (emphasis added).

Here, there is no plausible basis for asserting that any ambiguity is a result of an interpretation that would strain the contract language beyond its reasonable and ordinary meaning. The "Consent Agreement" was simply modified with the consent of all parties. Judge Preska's reasoning supports Plaintiffs', not the Defendants'!

Further distinguishing the *Psenicska* line of cases is the fact that in *Psenicska*, Plaintiff Martin expressly agreed to waive any claims "arising out of the Participant's viewing of any sexually-oriented materials or activities." *Id*. at N.8. The exact opposite is true here, as Judge

Moore expressly <u>declined</u> to waive any sexual related questioning. Again, the facts in this case before this Court make the case a strong one for Plaintiffs, not Defendants.

Lastly, in affirming the *Psenicska* ruling, the U.S. Court of Appeals for the Second Circuit ("Second Circuit") found that the "peculiar knowledge" exception to waiver of fraudulent inducement was inapplicable for reasons that are entirely distinguishable from the facts here. "The "peculiar-knowledge" exception is meant to "address circumstances where a party would face high costs in determining the truth or falsity of an oral representation" and does not apply where a party "could have insisted that the written contract terms reflect any oral undertaking on a deal-breaking issue." *Psenicska v. Twentieth Century Fox Film Corp.*, 409 F. App'x 368, 371 (2d Cir. 2009). Here, Judge Moore <u>did</u> insist that the written contract terms reflected any oral undertaking by expressly declining to waive any sexual related questioning. This cannot be disputed. The rest of the Second Circuit opinion supports Plaintiffs, not Defendants! Plaintiffs respectfully ask this Court to review both the lower court and appellate opinions carefully.

## H.   Since the Consent Agreement is Invalid and Unenforceable, Plaintiffs' Claims Must Proceed to Trial

### 1.   Defamation

Defendants' sole argument is that Plaintiffs cannot maintain a claim for defamation because his appearance on "Who is America?" is "fully protected satire." However, given the actual context of the segment, Defendants' conduct goes far beyond "satire," as it is clearly lobbing false, factual accusations of the most heinous and offensive nature at Judge Moore.

In *Salomone v. Macmillan Pub. Co.*, 411 N.Y.S.2d 105 (Sup. Ct. 1978), the Court decided a case with very similar facts. In a parody book, the manager of the Plaza Hotel in New York, Mr. Alphonse W. Salomone, was accused of being a child molester. "Immediately beneath that, in smaller letters, are the words "Mr. Salomone was a child molester!!" *Id*. at 107. The

Court recognized that the parody, titled "Eloise Returns," was intended to be funny. *Id*. The Court also termed "Eloise Returns" an "obvious parody." *Id*. Despite this, the Court still found that whether the statement was defamatory was to be left to the discretion of the jury. "Laymen serving on a jury, so the question of whether a particular statement is nonactionable humor or compensable libel should appropriately be left to the judgment of a jury[4]." *Id*. at 110. At least some of the reasoning of the Court was based on the truly reprehensible nature of the allegations – that the individual was a child molester:

> Clearly the charge that someone is a "child molester" on its face imputes to an individual a crime involving moral turpitude -- the carnal abuse of children. It is a charge that, if true, causes revulsion -- for even in a society in which there has been a profound change in sexual mores, the use of children as sexual objects is considered a perversion of the lowest kind. There is nothing more likely than such a charge to create aversion and antipathy and destroy a reputation. It is reported that even in our prisons, with a population teeming with murderers, thieves, rapists and pimps, the child molester is on the lowest rung of the social ladder, and is regarded with scorn by his fellow criminals. *Id*. at 108.

These facts align squarely with the instant case, where Judge Moore was falsely accused of being a child molester and thus a pedophile. In fact, the facts here are much worse, as "Who is America?" was broadcast around the world, severely amplifying the damages suffered by Plaintiffs. Thus, whether these statements are factual must go to the jury to decide. Defendants, having perpetrated fraud upon fraud, signed a modification to the Consent Agreement, and having smeared and defamed Judge Moore cannot hide behind a phony veil of alleged satire.

## 2. Intentional Infliction of Emotional Distress

"To state a claim for intentional infliction of emotional distress, a plaintiff must allege that the defendant engaged in "(1) extreme and outrageous conduct; (2) [with] intent to cause, or

---

[4] The Court's ruling was reversed on appeal, but the majority panel reversed it simply because the Plaintiff had not pled special damage. *Salomone v. MacMillan Pub. Co.*, 77 A.D.2d 501, 429 N.Y.S.2d 441 (App. Div. 1980). Indeed, only one judge, in a concurrence, found that the statement itself was not libelous because it was an obvious parody.

reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Missel v. Cty. of Monroe*, 2011 U.S. Dist. LEXIS 91700, at *19 (W.D.N.Y. Aug. 17, 2011). In *Missel*, the Court was faced with an analogous set of facts, and found that the plaintiff had properly stated a claim for intentional infliction of emotional distress.

In *Missel*, the plaintiff and defendant had a dispute, which led to the defendant falsely informing the plaintiff's employers that the plaintiff was a pedophile. *Id*. at 3. Since the plaintiff worked with children, he was terminated from employment. *Id*. The defendant also constantly stalked and harassed the plaintiff, including initiating a Sheriff's Department investigation into plaintiff's alleged pedophilia, which produced no leads. *Id*. Under these facts, the court in *Missel* found that the plaintiff had properly stated a claim for intentional infliction of emotional distress. The Court found that "[plaintiff's] allegations taken as a whole, allege outrageous, atrocious conduct that is utterly intolerable in a civilized society." *Id*. at 20.

The facts here are similar, and indeed even not worse. Whereas *Missel* was falsely named a pedophile in his local community, which led to his loss of employment, Judge Moore was falsely called a pedophile on a world-wide platform. It thus makes total sense that where the court has found that even localized false accusations of pedophilia can support a claim for IIED, similar false accusations broadcasted worldwide are much worse.

Defendants assert that Plaintiffs' claim must fail because the injury claimed flows from the effect on his reputation. However, this is not true. Plaintiffs suffered severe emotional distress in <u>addition</u> to any reputational damages from the defamation:

> As a result of Defendants and their agents' extreme and outrageous conduct, Plaintiffs have suffered extreme emotional distress as a result of Judge Moore being falsely portrayed, mocked and defamed as a sex offender and pedophile in this district, on national television and worldwide. Stmt. ¶18.

The emotional distress suffered by Plaintiff was amplified by Judge Moore's status as a "prominent conservative and a God fearing person of faith."

Defendants also make the false assertion that Plaintiffs' claim must fail under *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) because a public figure bringing an IIED claim based on publication of speech must show a false statement of fact and actual malice. This case is distinguishable from *Hustler*, involved a mock interview with Rev. Falwell where he "stated" his "first time" was a "drunken incestuous rendezvous with his mother in an outhouse." Whereas this is clearly no more than a piece of comedic satire that everyone knows is false and only meant as a joke, simply branding Judge Moore as a pedophile is much different, as it calling someone a pedophile could ring true.

As for malice, it is well-settled that the speaker need not know that the statement being made is false, but simply with a "with reckless disregard of whether it was false or not" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964), particularly since was was broadcast amounts to defamation per se, where even damages are thus presumed. As set forth by New York courts, "[o]ne who publishes a slander that imputes serious sexual misconduct to another is subject to liability to the other without proof of special harm." *Rejent v. Liberation Publ'ns*, 197 A.D.2d 240, 245, 611 N.Y.S.2d 866, 869 (App. Div. 1994). *See also Nolan v. State of N.Y.*, 2018 NY Slip Op 00269, 158 A.D.3d 186, 69 N.Y.S.3d 277 (App. Div.).

Here, Defendants have absolutely no basis to support their allegations that Judge Moore was a child molester and pedophile, since none exists. They are simply intentionally perpetrating a lie in order to achieve ratings and profit. This is, at a minimum, a reckless disregard for the truth.

### 3.     Fraud

Defendants do not contend that their conduct was not fraudulent, nor could they. They simply callously tie their argument in with their defamation argument, stating that "Plaintiffs' alleged "injury" caused by the fraud is nothing more than the claimed harm to Judge Moore's reputation, and therefore falls with the defamation claim." ECF No. 116 at 36. However, as set forth above, none of the Defendants' arguments on Plaintiffs' claim for defamation are availing and therefore their motion must be denied with regard to fraud as well.

## I.      Mrs. Moore's Claims Are Not Barred by the "Consent Agreement"

First, and foremost, since the "Consent Agreement" is clearly unenforceable, Mrs. Moore's claims are not barred the "Consent Agreement." In fact, it is the opposite. The "Consent Agreement" provides buttresses and supports her claims. Secondly, Mrs. Moore's claims are not derivative of, related to, or predicated on Judge Moore's claims. The emotional distress suffered by Mrs. Moore is her own, and not predicted on Judge Moore's claims. Any spouse would suffer severe emotional distress as a result of their spouse being falsely branded a pedophile on television, viewed by people all around the world. This is separate and apart from Judge Moore's claims, which stem from the damage to his reputation and his own emotional distress.

## III.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court deny Defendants' motion for summary judgment and allow this case to finally proceed to fully discovery and trial. Finally, Plaintiffs were denied adequate discovery by this Court, in contravention of the earlier rulings of Judge Carter, which were law of the case, and thus the Rule 56.1 Statement submitted by Defendants is of no force or effect, as they are a mere recitation of alleged facts as their counsel sees them. It also is infused with wholly irrelevant material that does not apply to the tortious acts committed against Judge Moore and his wife of many years, Kayla.

PLAINTIFFS RESPECTFULLY REQUEST ORAL ARGUMENT.

Dated: March 15, 2021

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
7050 W. Palmetto Park Rd.
Boca Raton FL 33433
Tel: (561)-558-5536
Email: leklayman@gmail.com

Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on March 15, 2021

*/s/ Larry Klayman*
Larry Klayman, Esq.