IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROY STEWART MOORE, et al | |
| | **Index No. 19 Civ. 4977 (ALC)** |
| Plaintiffs, | |
| v. | |
| SACHA NOAM BARON COHEN, et al | |
| Defendants. | |

## <u>DECLARATION OF CHIEF JUSTICE ROY STEWART MOORE</u>

I, Roy Stewart Moore, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

1.      I explicitly excluded from the "Consent Agreement" claims involving assertions of…any allegedly sexual oriented or offensive behavior or questioning." <u>Exhibit 1</u>; Consent Agreement.

2.      I was fraudulently tricked into appearing on a world-wide broadcast where I was falsely accused of being a child sex-offender.

3.      After the taping of my segment, when I discovered that we had been fraudulently induced to fly to Washington, D.C. and that my segment was to appear on Showtime and CBS, my Alabama counsel, Melissa Isaak, Esq. sent a preemptive notice to Defendants Showtime, CBS and thus Cohen warning them that I would resort to appropriate legal remedies if they chose to air the segment. In the preemptive notice, Defendants CBS, Showtime and thus Cohen were informed that the release that I had signed was obtained through fraud, and was therefore void and inoperative. <u>Exhibit 2</u>.

4.      The U.S. District Court for the District of Columbia, in ruling that the forum selection clause in the "Consent Agreement" was enforceable, paid particular attention to modification of the "Consent Agreement" and expressly questioned Defendants about it. Specifically, the Court asked:

> Isn't that part of the contract that knocks out the area that they would agree to discuss and then it is discussed as affecting the forum? Exhibit 3.

5.      The Honorable Andrew L. Carter also focused and zeroed in on the same written and mutually agreed to modification at the August 1, 2019 initial status conference in this matter:

> I'll hand this back to counsel. There is something in this agreement that was highlighted and crossed out. Was that something that was done prior to the signing of the agreement or was that something done by counsel afterwards? Exhibit 4.

6.      I was fraudulently induced by Defendants to appear on Defendant Cohen's show "Who is America?" In order to fraudulently induce me to travel to Washington, D.C., where filming was to and did take place on or about February 14, 2018, Defendant Cohen and his agents falsely and fraudulently represented to me that Yerushalayim TV was the producer and broadcaster of the show that I would appear on, instead of the actual network that the show that later appeared on - Defendant Showtime.

7.      We were told that my wife and I were both being invited to Washington, D.C., for me to receive an award for his strong support of Israel in commemoration of its 70th anniversary as a nation state.

8.      Defendant Cohen's character falsely and fraudulently introduced a false and fraudulent 'device' supposedly invented by the Israeli Army to detect pedophiles. During the segment, Defendant Cohen's 'device' – as part of the false and fraudulent routine – purports to detect me as a sex offender, thus defaming me.

9.      Defendants set up numerous fake corporations in order to try to insulate Defendant Cohen from liability for his tortious conduct. This was done by creating shell corporation after shell corporation for the sole purpose of defrauding me and Defendant Cohen's other victims.

10.      During deposition, which was conducted remotely, Defendant Cohen appeared to be being fed answers by his counsel, which shows that he had no personal understanding of the numerous corporations that were used to defame me, evidencing the fact they were no more than tools of fraud, specifically established for the sole purpose of committing fraud. A review of the video of the Cohen deposition will not only show him looking down, probably to a cell phone or tablet, but also hesitating in his answers to simple questions.  I was present by Zoom and viewed the deposition along with Melissa Isaak, my Alabama counsel.

11.      I had no knowledge that Defendant Cohen was in any way associated with the production that I was signing up for, nor that Defendants CBS and Showtime were involved. I also had no knowledge that the purpose of the "Consent Agreement" was to feature and defame me on "Who is America?" and not to receive an award for my strong support of Israel.  Had I known of these facts, they would never have signed the "Consent Agreement" and travelled to Washington D.C.

12.      Evidence obtained in discovery shows that I was a primary target of Defendants, which goes towards their intent to defame and defraud him. In a February 13, 2018 email from Mr. Schulman to the "*Who is America*" crew, he writes, "[w]e should move Roy Moore up to 2:30… [Defendant Cohen] wants as much time with him as possible." Exhibit 7.

13.      At deposition, Jennifer Wallis admitted that once YTV was used to defraud me, Defendants no longer even kept it as an active corporation:

Q. What were the circumstances upon which it ceased to exist?
A. Once the annual filings are no longer filed, it's administratively dissolved by the state of formation.
Q. You were instructed to make no further administrative filings on behalf of Yerushalayim TV?
A. I believe that calls for attorney-client privileged communication.
Q. Okay. So you made no further filings on behalf of Yerushalayim TV?
A. Correct.

14.     Todd Schulman made the same admission:

Q. Mr. Schulman, Yerushalayim TV was formed for the sole purpose of the show "Who Is America?", correct?
A. Yes.

15.     Todd Schulman admitted that he was aware that Defendants had agreed in writing to preclude any "claims involving assertions of…any allegedly sexual oriented or offensive behavior or questioning," yet did nothing to stop it:

Q.      So you saw it after the interview started, but before the end of the interview with Judge Moore?
A.      Yes.

16.     At the December 18, 2020 hearing in this matter the Court stated:

Well, Mr. Klayman, if you prevail in the motion that the language is ambiguous, that means that the motions will not prevail on that point. As Ms. McNamara confirmed earlier, their argument is going to be that the unambiguous language of the SCA precludes the claims that were brought. If you're accurate that there's language that makes the agreement ambiguous, then that will be a very strong point for you to make when you oppose a motion for summary judgment. Exhibit 5.

17.     Defendant Cohen has gone so far as to try to defraud the Secret Service in an attempt to smear then HUD Secretary Ben Carson. This calculated attempt would have resulted in a crime. Exhibit 6.

18.     As a result of Defendants and their agents' extreme and outrageous conduct, my wife, and for that matter my entire family, and I have suffered extreme emotional distress as a

result of my being falsely portrayed, mocked and defamed as a sex offender and pedophile in this district, on national television and worldwide as well as damages to my reputation.

SWORN TO UNDER PENALTY OF PERJURY THIS 15th OF MARCH 2021

_/s/ Roy Stewart Moore_
Roy Stewart Moore

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on March 15. 2021.

_/s/ Larry Klayman_
Larry Klayman, Esq.

EXHIBIT 1

STANDARD CONSENT AGREEMENT

This is an agreement between Yerushalayim TV(including its assigns, licensees, parents, subsidiaries, and affiliates) (collectively, the "Producer") and the undersigned participant (the "Participant"). In exchange for the Producer making a $ 200 donation to a charity chosen by the Participant and allowing an opportunity for the Participant to appear in a television series, the Participant agrees as follows: *Foundation For Moral Law*

1.  The Participant agrees to be filmed and/or audiotaped by the Producer for a reality-style television series (the "Program"). It is understood that the Producer hopes to reach a young adult audience by using entertaining content and formats.

2.  The Participant agrees that any rights that the Participant may have in the Program or the Participant's contribution are hereby assigned to the Producer, and that the Producer shall be exclusively entitled to use, or to assign or license to others the right to use, the Program and any recorded material that includes the Participant, without restriction in any media throughout the universe in perpetuity and without liability on the part of the Producer, and the Participant hereby grants any consents required for that. The Participant also agrees to allow the Producer, and any of its assignees or licensees, to use the Participant's contribution, photograph, film footage, and biographical material in connection not only with the Program, but also in any advertising, marketing or publicity for the Program and in connection with any ancillary products associated with the Program.

3.  The Participant understands that the Producer and its assignees or licensees are relying upon this consent agreement in spending time, money and effort on the Program and the Participant's participation in it, and that the consent agreement, for this and other reasons, cannot be revoked.

4.  The Participant specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Program, which are related to the Program or its production, or this agreement, including, but not limited to, claims involving assertions of (a) failure to adequately compensate Participant, (b) failure to use the footage of Participant in the Program, (c) infringement of rights of publicity or misappropriation (such as any allegedly improper or unauthorized use of the Participant's name or likeness or image), (d) damages caused by "acts of God" (such as, but not limited to, injuries from natural disasters), (e) damages caused by acts of terrorism or war, (f) intrusion or invasion of privacy (~~such as any allegedly sexual-oriented or offensive behavior or questioning~~), (g) false light (such as any allegedly false or misleading portrayal of the Participant), (h) infliction of emotional distress (whether allegedly intentional or negligent), (i) trespass (to property or person), (j) breach of any alleged contract (whether the alleged contract is verbal or in writing), (k) allegedly deceptive business or trade practices, (l) copyright or trademark infringement, (m) defamation (such as any allegedly false statements made in the Program), (n) violations of Section 43(a) of the Lanham Act (such as allegedly false or misleading statements or suggestions about the Participant in relation to the Program or the Program in relation to the Participant), (o) prima facie tort (such as alleged intentional harm to the Participant), (p) fraud (such as any alleged deception about the Program or this consent agreement), (q) breach of alleged moral rights, or (r) tortious or wrongful interference with any contracts or business of the Participant.

5.  This is the entire agreement between the Participant and the Producer or anyone else in relation to the Program, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program. Participant is signing this agreement with no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program.

6.  Although the Participant agrees not to bring any claim in connection with the Program or its production, if any claim nevertheless is made, the Participant agrees that any such claim must be brought before, and adjudicated by, only a competent court located in the State and County of New York, and governed by the substantive laws of the State of New York. This paragraph is intended by the parties to stand on its own, and it is intended to be valid and enforceable, even if a court finds that other paragraphs are not valid or enforceable.

AGREED AND ACCEPTED:
SIGNED:

_Roy S. Moore_

PRINT: _Roy Moore_

Dated: _2/14/18_

Yerushalayim TV

By: _____

Print: _____

# EXHIBIT 2

Mr. David Nevins
President & CEO
Showtime Networks, Inc.
1633 Broadway
New York, NY 10019

Leslie Moonves, CEO
CBS Corporation
51 W. 52nd Street
New, NY 10019

**RE:** *Fraudulently obtained interview with Judge Roy Moore*

Dear Mr. Nevins:

PLEASE BE ADVISED that my client, Judge Roy Moore, was fraudulently induced to fly to Washington, DC in mid-February 2018 for an interview with so-called Yerushalayim TV. I understand that Showtime and CBS intend to air this interview.

During that interview, Judge Moore signed a release. However, "[a] release obtained by fraud is void." *Taylor v. Dorough*, 547 So. 2d 536, 540 (Ala. 1989).

If CBS/Showtime airs an episode based on the above-referenced fraudulently obtained interview that defames my client, resort to appropriate legal remedies will follow.

This letter is a preemptive notice under § 6-5-186, Ala. Code 1975.

Sincerely,

Melissa L. Isaak

**Label 1**

EE 136181280 US

UNITED STATES POSTAL SERVICE®  PRIORITY MAIL EXPRESS™

FROM:
Isaak Law Firm
1290 Shellfield Rd
Enterprise, AL 36330

PAYMENT BY ACCOUNT (if applicable)

DELIVERY OPTIONS (Customer Use Only)
☑ SIGNATURE REQUIRED
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)
☐ 10:30 AM Delivery Required (additional fee, where available)

TO: (PLEASE PRINT)
Mr. David Nevins
President & CEO
Showtime Networks, Inc
1633 Broadway
New York, NY 10019
ZIP+4: 10019

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

ORIGIN (POSTAL SERVICE USE ONLY)
☑ 1-Day  ☐ 2-Day  ☐ Military  ☐ DPO
PO ZIP Code: 36330
Scheduled Delivery Date: 07/27/18
Postage: $24.70
Date Accepted: 07/26/18
Scheduled Delivery Time: ☐10:30 AM ☐3:00 PM
Time Accepted: 2:10 PM
Weight: 2-1 ozs.
Total Postage & Fees: $27.45
Return Receipt Fee: $2.75

LABEL 11-B, OCTOBER 2016  PSN 7690-02-000-9996

---

**Label 2**

CUSTOMER USE ONLY
FROM: (PLEASE PRINT)  PHONE 334-770-4636
Isaak Law Firm
1290 Shellfield Rd
Enterprise, AL 36330

EE 136181276 US

UNITED STATES POSTAL SERVICE®  PRIORITY MAIL EXPRESS™

PAYMENT BY ACCOUNT (if applicable)

DELIVERY OPTIONS (Customer Use Only)
☑ SIGNATURE REQUIRED

TO: (PLEASE PRINT)
Leslie Moonves, CEO
CBS Corporation
51 W 52nd St
New York, NY 10019
ZIP+4: 10019

ORIGIN (POSTAL SERVICE USE ONLY)
☑ 1-Day
PO ZIP Code: 36330
Scheduled Delivery Date: 07/27/18
Postage: $24.70
Date Accepted: 07/26/18
Time Accepted: 2:07 PM
Weight: 2-1 ozs.
Total Postage & Fees: $27.45

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

LABEL 11-B, OCTOBER 2016  PSN 7690-02-000-9996

```
=========================================
              ENTERPRISE
            616 GLOVER AVE
              ENTERPRISE
                  AL
              36330-2008
              0127600330
07/26/2018    (800)275-8777   2:11 PM
=========================================
=========================================
Product              Sale        Final
Description          Qty         Price

PM Exp 1-Day          1         $24.70
Flat Rate Env
    (Domestic)
    (NEW YORK, NY  10019)
    (Flat Rate)
    (Signature Requested)
    (Scheduled Delivery Date)
    (Friday 07/27/2018 12:00 PM)
    (Money Back Guarantee)
    (USPS Tracking #)
    (EE136181276US)
PM Exp                1          $0.00
Insurance
    (Up to $100.00 included)
Return                1          $2.75
Receipt
    (@@USPS Return Receipt #)
    (9590940240038079567762)
PM Exp 1-Day          1         $24.70
Flat Rate Env
    (Domestic)
    (NEW YORK, NY  10019)
    (Flat Rate)
    (Signature Requested)
    (Scheduled Delivery Date)
    (Friday 07/27/2018 12:00 PM)
    (Money Back Guarantee)
    (USPS Tracking #)
    (EE136181280US)
PM Exp                1          $0.00
Insurance
    (Up to $100.00 included)
Return                1          $2.75
Receipt
    (@@USPS Return Receipt #)
    (9590940240038079567779)
_____
Total                          $54.90
_____
Cash                           $60.00
Change                         ($5.10)

Includes up to $100 insurance

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Save this receipt as evidence of
insurance. For information on filing
an insurance claim go to
https://www.usps.com/help/claims.htm.

            Preview your Mail
           Track your Packages
          Sign up for FREE @
         www.informeddelivery.com


All sales final on stamps and postage
Refunds for guaranteed services only
       Thank you for your business
```

EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ROY STEWART MOORE, ET AL,        :
                                 :
            Plaintiffs,          :      Docket No. CA 18-2082
                                 :
            vs.                  :         Washington, D.C.
                                 :      Monday, April 29, 2019
SACHA NOAM BARON COHEN, ET AL    :          10:00 a.m
                                 :
            Defendants.          :
------------------------------x



TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE THOMAS F. HOGAN
UNITED STATES DISTRICT SENIOR JUDGE


APPEARANCES:

For the Plaintiffs:     LARRY KLAYMAN, Esquire
                        Klayman Law Group, P.A.
                        2020 Pennsylvania Ave., NW
                        Suite 800
                        Washington, DC  20006

For the Defendants:     ELIZABETH A. MCNAMARA, Esquire
                        Davis Wright Tremaine LLP
                        1251 Avenue of the Americas
                        21st Floor
                        New York, New York  10020-1104

                        ERIC J. FEDER, Esquire
                        LISA ZYCHERMAN, Esquire
                        Davis Wright Tremaine LLP
                        1919 Pennsylvania Avenue, NW
                        Suite 800
                        Washington, DC  20006-3401

Court Reporter:         CRYSTAL M. PILGRIM, RPR
                        Official Court Reporter
                        United States District Court
                        District of Columbia
                        333 Constitution Avenue, NW
                        Washington, DC  20001

1           THE COURT:   Isn't that part of the contract that

2    knocks out the area that they would agree to discuss and then

3    it is discussed as affecting the forum?

4           MS. MCNAMARA:  Well first of all, Your Honor, let me

5    get that file.

6       I don't read it as knocking out that area.  It simply said

7    it includes a definition of invasion of privacy.  I don't read

8    this as any commitment nor could it reasonably I would argue be

9    understood to be a commitment that there would be no

10   discussion.

11      But even if you presume that is the case, Your Honor, it

12   still goes squarely to fraud in the ab initio of entering into

13   the agreement and that a term of the agreement that he contends

14   was violated.

15      What you heard today, you heard him in making the argument

16   that this is an exceptional ground.  He walked you through all

17   the alleged fraud that's committed.  What you did not hear is

18   any argument at all that there was any fraud in connection with

19   the forum-selection clause.  And that is what the law requires.

20   Not just in the Northern District of Illinois which in turn

21   cites the Supreme Court of Alabama cases to that effect.  But

22   in this District as well and we cited for example the Cheney v.

23   IPD case --

24           THE COURT:  Right.

25           MS. MCNAMARA:  -- which squarely holds exactly that

EXHIBIT 4

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ROY STEWART MOORE and KAYLA
   MOORE,
4
                Plaintiffs,
5
                v.                        19 CV 4977 (ALC)
6
   SACHA NOAM BARON COHEN, et
7  al.,

8                Defendants.
                                          Conference
9  ------------------------------x
                                          New York, N.Y.
10                                        August 1, 2019
                                          10:10 a.m.
11
   Before:
12
                    HON. ANDREW L. CARTER, JR.,
13
                                          District Judge
14

15                       APPEARANCES

16 KLAYMAN LAW GROUP, P.A.
        Attorneys for Plaintiffs
17 BY:  LARRY E. KLAYMAN

18 DAVIS WRIGHT TREMAINE LLP
        Attorneys for Defendants
19 BY:  ELIZABETH A. McNAMARA
        RACHEL STROM
20

21

22

23

24

25

1             (Case called)

2             MR. KLAYMAN:  Larry Klayman for Judge Roy Moore.  Good

3    to meet you, your Honor.

4             MS. McNAMARA:  Elizabeth McNamara for the defendants

5    Sasha Baron Cohen, Showtime Networks and CBS, and this is

6    Rachel Strom, my partner, who is with me.

7             THE COURT:  Good morning.

8             We are here for a premotion conference.  This is the

9    first time this matter has been on in front of me.

10            I have seen the parties' submissions.  It seems to me

11   that it makes sense to set a briefing schedule for the

12   plaintiffs' motion to stay, as well as the defendants' 12(b)(6)

13   motion.

14            Before we do that, I didn't see on the docket anywhere

15   a copy of this standard consent agreement.  Do counsel have

16   that with them today, by any chance?

17            MS. McNAMARA:  I do, your Honor.

18            THE COURT:  Can you hand that to my deputy.

19            MS. McNAMARA:  Absolutely.  Thankfully, I didn't write

20   on it.

21            MR. KLAYMAN:  May I have a copy of it?

22            MS. McNAMARA:  I only have one copy.  I'm sorry.

23            THE COURT:  Thanks.  Hold on a second.

24            I'll hand this back to counsel.  There is something in

25   this agreement that was highlighted and crossed out.  Was that

 1    something that was done prior to the signing of the agreement

 2    or was that something done by counsel afterwards?

 3            MS. McNAMARA:  Your Honor, the yellow highlighting, I

 4    believe, was by counsel.  But the handwritten cross-out and

 5    initial was done at the time of execution.

 6            Your Honor, may I interject just a brief

 7    administrative matter?

 8            THE COURT:  Sure.

 9            MS. McNAMARA:  This is our first appearance before

10    your Honor, as you've already noted.  The plaintiffs' counsel

11    is not a New York bar, member of the New York bar, and has not

12    submitted *pro hac* papers.  I just wanted to bring that to the

13    attention of the Court.

14            MR. KLAYMAN:  I wanted to address that, your Honor, if

15    I may.

16            THE COURT:  Sure.

17            MR. KLAYMAN:  I never appeared in front of you.  It's

18    a pleasure.

19            I have consulted with Judge Moore, and we have decided

20    not to pursue the mandamus in DC and to proceed in front of

21    your Honor.  I will be submitting the *pro hac vice* application

22    later today.  I've been a member in good standing of the

23    District of Columbia and Florida bars for 39 and 42 years

24    respectively.

25            There was one issue that came up 23 years ago with

EXHIBIT 5

1

KCIKMOOC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ROY STEWART MOORE, et al.,

 4                  Plaintiffs,

 5           v.                          19 CV 4977 (JPC)
                                         Telephone Conference
 6   SACHA NOAM BARON COHEN,
     et al.,
 7
                  Defendants.
 8
     ------------------------------x
 9                                       New York, N.Y.
                                         December 18, 2020
10                                       1:00 p.m.

11   Before:

12                      HON. JOHN P. CRONAN,

13                                        District Judge

14                          APPEARANCES

15   FREEDOM WATCH, INC.
          Attorneys for Plaintiffs
16   BY:   LARRY KLAYMAN

17   DAVIS WRIGHT TREMAINE LLP
          Attorneys for Defendants
18   BY:   ELIZABETH McNAMARA
          RACHEL FAN STERN STROM
19        ERIC FEDER

20

21

22

23

24

25
```

KCIKMOOC

1   that says they get to do whatever they want.

2          So, yes, Actrade is applicable.  And the other cases

3   that we cited are applicable as well.  They claim there's an

4   inherent contradiction there.  And that's, by the way, a matter

5   that should go to a jury, your Honor, that's not your province

6   to make a decision on that.

7          THE COURT:  Well, Mr. Klayman, if you prevail in the

8   motion that the language is ambiguous, that means that the

9   motions will not prevail on that point.  As Ms. McNamara

10  confirmed earlier, their argument is going to be that the

11  unambiguous language of the SCA precludes the claims that were

12  brought.  If you're accurate that there's language that makes

13  the agreement ambiguous, then that will be a very strong point

14  for you to make when you oppose a motion for summary judgment.

15         MR. KLAYMAN:  The fact is, your Honor, that the issue

16  of intent is relevant.  The issue of how this entire thing was

17  structured, working together, is relevant, and there's no

18  reason not to allow for the deposition of Sacha Baron Cohen

19  simply because he's a famous movie star.  I'm sorry, he doesn't

20  get special protection.

21         THE COURT:  Mr. Klayman, that is not the inquiry here,

22  whether or not he received protection because of his notoriety.

23  The question is whether or not a deposition of him would be

24  appropriate, and what I'm trying to understand is, to what

25  extent you've already pursued depositions of individuals who

# EXHIBIT 6



# Sacha Baron Cohen recounts narrow escape from Ben Carson's Secret Service

By Ian Mohr                                                      May 24, 2019 | 3:59pm



Sacha Baron Cohen
Getty Images (Composite)

Sacha Baron Cohen was on the run from Secret Service agents when an interview with Ben Carson went hysterically awry.

Human chameleon Cohen managed to land an interview with the secretary of housing and urban development, he's revealed. Cohen was planning to conduct the chat as his wild character "OMGWhizzBoyOMG" — a Finnish YouTuber obsessed with unboxing Shopkins kids collectibles.

But the plan fell apart just before the interview began at the Washington, DC, Mandarin Oriental.

"We get there and there were Secret Service everywhere ... it turns out that there's a conference there ... and there were Secret Service throughout the building. So I was like, 'S–t! How do I get him?'" Cohen told a group of SAG members at a private talk, we hear. Sarah Silverman had urged Cohen to recall the wild Carson tale at the event.

Worried about being ID'd by the agents, Cohen recounted, "I spoke to my lawyer and I said, 'What happens if [Secret Service] wants to see my ID?' And he goes, 'Well, you have to show him your ID then, that's illegal not to show him.' "

Cohen additionally had a fake ID on him, but his lawyer cautioned that if he presented it, he could be arrested. "I go, 'OK what if I bend over and the fake ID falls on the floor? And they pick it up?'" Cohen asked the legal eagle. "And he goes, 'That might be OK.' " Entering the hotel, "the Secret Service are there I bend over ... they pick it up, fine, I walk on," Cohen recalled.

But once he reached the interview room to meet Carson, the in-disguise star saw "a press officer of the White House there. And he sees all these Shopkins that I've got there. And he goes, 'What are those?' And I go [in character], 'Those are Shopkins!' He said, 'I know what they are — why are there Shopkins here?' "

When Cohen again answered in character as the punk-haired, bespectacled, Finnish toy obsessive, the White House staffer "literally gave one look to the Secret Service, and Ben Carson's leg is coming in and literally falls backwards."



With Carson abruptly pulled, "Then they looked — the rest of the Secret Service — like something is going on."

Cohen hurried to another room the show had booked — but, "I hide in this other room. Then I find out the Secret Service is coming to our room. I booked another room upstairs. I go to the other room."

Case 1:19-cv-04977-JPC Document 125 Filed 03/15/21 Page 25 of 28

That's when Cohen's security adviser informed the gadfly comic, he recalled, "The Secret Service know you're here, and that something's up, they don't know what it is, whether it's an attack or something's going on, and they're looking for you."

Cohen also learned that "some of the Secret Service were dressed as housekeepers and room service guys — we actually have behind-the-scene footage of Secret Service workers coming and listening through the door."

Luckily Cohen also planned "an escape route ... down around the back of the building through the garbage. And the security guard said ... 'They're by the garbage.' And I said, 'How do we get out of the building?' There's, like, 18 of these guys."



Ben Carson
LightRocket via Getty Images

According to Cohen, his guard told him, "'We're going to position a getaway car in front of the hotel ... You've got 25 feet from the elevator opening to the car.' And I go, 'What about the Secret Service guys?' And he goes, 'If they come towards you, I'm gonna take them down.' I go, 'What?!' He goes, 'Because that's what I have to do to get you into the car.' "

In the end, Cohen said, "I manage to get to the car, and we were followed by a police car for about five minutes and they didn't pull us over so I managed to get away with that."

Cohen was nominated for a Golden Globe for the series and is now being hotly tipped as a potential Emmy nominee.

Beltway insiders who did appear on the show included Dick Cheney, Howard Dean, Barney Frank, Corey Lewandowski, Trent Lott, Bernie Sanders and veteran newsman Ted Koppel.

Cohen has previously said he'd booked Carson for the ill-fated interview in a Q&A but has never revealed that he was afraid of being pursued by the Secret Service in the aftermath.

— ADVERTISEMENT —



Carson, meantime, was just in a bizarre exchange at a Capitol Hill hearing where he misheard a California congresswoman asking about "REOs" — a real estate term — as Oreos, as in the cookies.

FILED UNDER    **DR. BEN CARSON**, **POLITICS**, **SACHA BARON COHEN**, **SECRET SERVICE**, **5/24/19**

EXHIBIT 7

Message

| | |
|---|---|
| **From:** | Todd Schulman [todd@fourbytwofilms.com] |
| **on behalf of** | Todd Schulman <todd@fourbytwofilms.com> [todd@fourbytwofilms.com] |
| **Sent:** | 2/13/2018 1:23:52 PM |
| **To:** | Melanie Elin [bukowskibabe@gmail.com] |
| **CC:** | Cassandra Laymon [film.cassie@gmail.com]; Ashley Underwood [Cauwood@gmail.com]; Daniel Nuzzi [daniel.j.nuzzi@gmail.com]; Julia Pyzik [julia.pyzik@gmail.com]; Nick Hatton [nick@fourbytwofilms.com]; alexis sampietro [atsampietro@gmail.com] |
| **Subject:** | Re: 2/14 Day 34 Prelim call sheet |

We should move Roy Moore up to 2:30… SBC wants as much time with him as possible.

Thanks,
Todd

On Feb 13, 2018, at 4:22 PM, Melanie <bukowskibabe@gmail.com> wrote:

And what about Roy Moore? He is scheduled for a pick up at 315PM. Did that change and he can stay longer?

On Tue, Feb 13, 2018 at 1:21 PM, Cassandra <film.cassie@gmail.com> wrote:
As lunch is too often delayed, I feel better w/ an 11:30 planned so if Brooks leaves quick we can be certain to feed crew before the other madness. If lunch is late (like today) it will be a bigger than usual issue. It makes my anxiety level go down to regular.

On Tue, Feb 13, 2018 at 4:16 PM Melanie <bukowskibabe@gmail.com> wrote:
Rep Mo Brooks is a hard out at 12PM. Will the shoot be done with him at 1130AM?

Roy Moore has a car pick-up at 315PM as per Alexis. Did his out time change?

On Tue, Feb 13, 2018 at 1:14 PM, Cassandra Laymon <film.cassie@gmail.com> wrote:
Notes.
Let's give Erran 5:15.
Lunch from 11:30-12
Roy Moore from 2:30-4:30
The rest looks ok for now.

Cassandra Laymon
Film.cassie@gmail.com
██████████████

> On Feb 13, 2018, at 3:00 PM, Melanie <bukowskibabe@gmail.com> wrote:
>
> Hello,
>
> Here is the preliminary call sheet for tomorrow, 2/14, complete with tentative shoot schedule with main union and splinter unit.
>
> Please let me know if I am missing anything or if there are any changes which need to be made.
>
> Thank you,

>
> Melanie
> <LQE D34 CS_02_14_18 PRELIM.pdf>

""
Cassandra Laymon Film.cassie@gmail.com ████████ (from the MePhone)

DEF0000068