**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ROY STEWART MOORE, et al

                             Plaintiffs,

v.

SACHA NOAM BARON COHEN, et al

                          Defendants.

**Index No. 19 Civ. 4977**

---

## <u>COUNSEL FOR CHIEF JUSTICE ROY MOORE AND KAYLA MOORE'S RESPONSE TO THE COURT'S MINUTE ORDER OF MAY 6, 2021</u>

**I.     INTRODUCTION**

Larry Klayman, Esq., ("Mr. Klayman") *pro hac vice* counsel for Chief Justice Roy Moore and his wife Kayla Moore, hereby responds to the Court's minute order of May 6, 2021, which, in addition to other matters discussed therein, orders, *inter alia*, that "Plaintiffs' counsel shall file a letter by May 19, 2021, showing cause why the Court should not refer him to the Grievance Committee based on his failure to notify the Court of Disciplinary sanctions imposed on him in *In re Klayman*, 228 A. 3d. 713 (D.C. 2020) and *In re Klayman*, 991 F. 3d 1389 (D.C. Cir. 2021).

The Court's order also sets a date, May 10, 2021, for Plaintiffs to file a reply to their "motion to recuse or disqualify the undersigned," meaning the Honorable John P. Cronan, which as set forth in a sworn affidavit prepared and signed by Plaintiff Chief Justice Roy Moore, attested to extra-judicial bias and favoritism in favor of Defendants Sacha Noam Baron Cohen, Showtime, Inc., and CBS Corporation, Dkt. No. 136. Plaintiffs complied with this deadline by filing their reply on that date. Dkt. No. 141. The Court's order also states that it will review the

video deposition of Defendant Sacha Noam Baron Cohen to determine whether it is subject to being designated as confidential under a protective order entered by the Court over the strong objection of Plaintiffs, who argued that the protective order was overly broad and subject to bad faith abuse by Defendants. The Court's order, however, does not set forth, as requested by Plaintiffs, that Judge Cronan will review the video deposition of Defendant Cohen to ascertain what Plaintiffs have alleged were answers to Mr. Klayman's questions being literally fed to Cohen, and thus potentially constituting obstruction of justice.  Previously, as set forth to this Court in prior correspondence, Plaintiffs tried to resolve this matter by asking that Defendant Cohen submit a sworn affidavit if Defendants claim that he was not being fed answers, but counsel for the Defendants refused.

Mr. Klayman hereby responds to the show cause order with regard to the disciplinary proceeding set forth in the Court's order, and hereby renews his request that it review the video deposition of Defendant Cohen to ascertain that he likely was being fed answers at this deposition and thus an evidentiary hearing is now necessary to put him and others under oath to determine definitively if this occurred, and then to take appropriate remedial action. This proceeding, if it is ordered, should be before another jurist of the U.S. District Court for the Southern District of New York, in light of Plaintiffs motion to recuse and/or be disqualified under 28 U.S.C. § 144 et. seq.

## II.   FACTUAL AND LEGAL DISCUSSION

Rule 1.5 (h) of the Local Civil Rules provides:

(h) Duty of Attorney to Report Discipline. (1) In all cases in which any federal, state or territorial court, agency or tribunal has entered an order disbarring or censuring **an attorney admitted to the bar of this Court**, or suspending the attorney from practice, whether or not on consent, the attorney shall deliver a copy of said order to the Clerk of this Court within fourteen days after the entry of the order. (2) In all cases in which any member of the bar of this Court has

resigned from the bar of any federal, state or territorial court, agency or tribunal while an investigation into allegations of misconduct against the attorney was pending, the attorney shall report such resignation to the Clerk of this Court within fourteen days after the submission of the resignation. (3) In all cases in which this Court has entered an order disbarring or censuring an Page - 1 8 - attorney, or suspending the attorney from practice, whether or not on consent, the attorney shall deliver a copy of said order within fourteen days after the entry of the order to the clerk of each federal, state or territorial court, agency and tribunal in which such attorney has been admitted to practice. (4) Any failure of an attorney to comply with the requirements of this Local Civil Rule 1.5(h) shall constitute a basis for discipline of said attorney pursuant to Local Civil Rule 1.5(c). (emphasis added).

**A.  Mr. Klayman Is Not a Member of the Bar of this Court**

Plaintiff's counsel is appearing *pro hac vice* for this case only, and thus in a limited capacity, on behalf of Chief Justice Roy Moore and his wife Kayla Moore and is not "admitted to the bar of this Court." Thus, the reporting requirement of Rule 1.5 (h) does not apply. However, Plaintiffs' counsel believed in good faith that Senior Staff Attorney Lawrence Bloom and the District of Columbia Disciplinary Counsel had informed the Southern District of New York of the three-month suspension in any event.  This notwithstanding, a well-respected professional ethics expert, Professor Ronald Rotunda, had testified before the Hearing Committee of the District of Columbia Board of Responsibility that discipline concerning Mr. Klayman was not warranted, as Mr. Klayman had committed no ethics violation. *See* Exhibit 1 – *Pro Bono Ethics Opinion of Professor Rotunda with Curriculum Vitae*. Indeed, Mr. Bloom has sent letters to all jurisdictions where Mr. Klayman is a member of the court and where he has legal proceedings pending for clients, which put these courts on notice. *See* Exhibit 2; *Letter from Mr. Bloom to Clerk of the Northern District of Texas filed by the Clerk as Public Correspondence*. Thus Mr. Klayman believed in good faith that the Southern District had been advised of the three-month suspension, even though under Rule 1.5 (h) he was not formally required to report it as he is not

member of the bar of this Court, as he is in the U.S. District Court for the Northern District of Texas. *Id.*

### B. Mr. Klayman Is a Member in Good Standing of The Florida Bar

Mr. Klayman has not been suspended by The Florida Bar, where he is also licensed, and has always since December 7, 1977, nearly 45 years ago, continuously been a member in good standing. *See* Exhibit 3 – *Certificate of Good Standing*. Thus, regardless of the District of Columbia Board of Professional Responsibilities three-month suspension, which has been served, Mr. Klayman had and continues to have an independent basis for his entry *pro hac vice* in this case.

### C. Defendants and Their Counsel's Attempts to Have Mr. Klayman Disciplined Before this Court Arose After Plaintiffs Chief Justice Roy Moore and his Wife Kayla, through Mr. Klayman, Alleged that Defendant Cohen Was Being Fed Answers to Questions Mr. Klayman Posed at Deposition.

Defendants' counsel knew of the three month suspension by the District of Columbia Board of Professional Responsibility, particularly since the sanction was published. This matter is thus being used in retaliation for Plaintiffs' having raised Defendant Cohen's likely having been fed answers at this deposition on January 13, 2021, and Plaintiffs' objection to the video of this deposition being improperly placed under seal as confidential in an obvious abuse of process concerning the protective order. Moreover, this disciplinary action was raised by Defendants' counsel, Davis Wright, at the very first status conference before the Honorable Andrew Carter in a tactical attempt, as occurred here, to work prejudice to the Moores and to deprive Plaintiffs of counsel by not having Judge Carter grant Mr. Klayman's *pro hac vice* entry, which he later did. Mr. Klayman also disclosed it to this Court in his original *pro hac vice* application. *See* Exhibit 4: *Transcript (highlighted) of Status Conference Before Judge Carter*. Moreover, the tactical "attack" on Mr. Klayman by Defendants' counsel to prejudice his clients at the initial status

conference before Judge Carter was later, as they had wanted, reported in the leftist pro-Cohen media shortly after the status conference, so this matter has been known and publically available throughout.

## III.   CONCLUSION

In sum, Mr. Klayman was not required under Rule 1.59 (h) to report the sanction to the Southern District as he is not "admitted to  the bar of this Court," and he had and continues to have an independent basis for his appearance *pro hac vice* as a member of The Florida Bar and in good faith believed that Mr. Bloom of the District of Columbia Bar Disciplinary Counsel Office had notified the Southern District of the three month suspension in any event, as he had with all other jurisdictions where Mr. Klayman has client matters pending. Moreover, the disciplinary proceeding was mentioned by counsel by Defendants to Judge Carter at the initial status conference and confirmed by Mr. Klayman, as well as disclosed in his *pro hac vice* application to this Court.

Finally, Mr. Klayman respectfully renews his request for this Court to review the video deposition of Defendant Cohen to confirm that he was likely being fed answers, and to refer this matter to another judge, presumably Judge Carter, who Plaintiffs have respectfully requested be reassigned to this case, to set an evidentiary hearing where testimony can be taken under oath concerning this potential obstruction of justice contrary to the administration of justice.

**Dated**: May 19, 2021                                        Respectfully Submitted,


 /s/ *Larry Klayman*
Larry Klayman, Esq.
KLAYMAN LAW GROUP P.A.
7050 W. Palmetto Park
Boca Raton FL 33433
(561) 558-5536
Email: leklayman@gmail.com

*Counsel for Plaintiffs*

Melissa Isaak, Esq.
2815-B Zelda Road
Montgomery, AL 36106
(334) 262-8200
Email: Melissa@protectingmen.com

*Of Counsel (Pro Hac Vice to be Filed)*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on May 19, 2021.

<i>/s/ Larry Klayman</i>
Larry Klayman, Esq.

# EXHIBIT 1



CHAPMAN UNIVERSITY | FOWLER SCHOOL OF LAW

ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dee Henley Chair and*
*Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/

2 June 2014

Board on Professional Responsibility
430 E Street, NW
Suite 138
Washington, DC 20001

RE: *In the matter of* Larry Klayman, Esq.  (Bar Docket No. 2008-D048)

My name is Ronald D. Rotunda.  I am the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University, The Dale E. Fowler School of Law, located in Orange, California, where I teach Professional Responsibility and Constitutional Law. I am a magna cum laude graduate of Harvard Law School, where I served as a member of the Harvard Law Review.  I later clerked for Judge Walter R. Mansfield of the United States Court of Appeals for the Second Circuit.

During the course of my legal career, I have practiced law in Washington, D.C., and served as assistant majority counsel for the Senate Watergate Committee. I am the co-author of Problems and Materials on Professional Responsibility (Foundation Press, Westbury, N.Y., 12th ed. 2014), the most widely used legal ethics course book in the United States.  It has been the most widely used since I coauthored the first edition in 1976.  In addition, I have authored or coauthored several other books on legal ethics, including Rotunda & Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility (ABA/Thompson, 11th ed. 2013).

In addition to these books, I have written numerous articles on legal ethics, as well as several books and articles on Constitutional Law, as indicated in the attached resume.  State and federal courts at every level have cited my treatises and articles over 1000 times.  From 1980 to 1987, I was a member of the Multistate Professional Examination Committee of the National Conference of Bar Examiners.

I have reviewed the facts of the above referenced bar complaint against Larry Klayman. It is my expert opinion that in the present situation Mr. Klayman has not committed any offense that merits discipline.  In fact, he, to the best of his ability, simply pursued an obligation that he knew that he owed to Sandra Cobas, Peter Paul, and Louise Benson.

Mr. Klayman, whose organization, Judicial Watch, was once engaged as attorneys for Paul (it never was engaged for Benson or Cobas), reasonably believed he had an ethical obligation to represent them**,** and chose to uphold his duty to these clients. District of Columbia Rule of Professional Conduct 1.3 states that, "(a) A lawyer shall represent a client zealously and diligently within the bounds of the law." Further, Rule 1.3(a) (comment 1) provides guidance on this issue and the duties of an attorney. "This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."

Recall *Maples v. Thomas*, 132 S.Ct. 912 (2012). In that case, two lawyers working in the firm of Sullivan & Cromwell entered an appearance for a client. These two associates worked pro bono and sought state habeas corpus for a defendant sentenced to death. A local Alabama lawyer moved their admission pro hac vice. Later, the two associates left the firm and their "new employment disabled them from representing" the defendant (one became a prosecutor and one moved abroad). Neither associate sought the trial court's leave to withdraw (which Alabama law required), nor found anyone else to assume the representation. Moreover, no other Sullivan & Cromwell lawyer entered an appearance, moved to substitute counsel, or otherwise notified the court of a need to change the defendant's representation. When Mr. Klayman left Judicial Watch, no other lawyer for Judicial Watch stepped up to the plate, because in fact Judicial Watch had taken actions adverse and harmful to Paul, Benson and Cobas. No lawyer stepped up to the plate in *Maples v. Thomas*.

The issue before the U.S. Supreme Court was whether the defendant showed sufficient "cause" to excuse his procedural default. Justice Ginsburg, for the Court, acknowledged that the usual rule is that even a negligent lawyer-agent binds the defendant. Here, however, the lawyers "abandoned" the client without notice and took actions which in fact harmed them thus severing the lawyer-client relationship and ending the agency relationship. This made the failure to appeal an "extraordinary circumstance" beyond the client's control and excused the procedural default. In the view of Mr. Klayman, he could not abandon the clients.

In applying these principles, it is reasonable and understandable that Mr. Klayman believed that had an ethical obligation, in accordance with perhaps the most important principle of this profession, to zealously and diligently represent his clients. More importantly, comment 7 observes that **"[n]eglect of client matters is a serious violation of the obligation of diligence."** Note that there is no credible claim that he used any confidence of Judicial Watch against Judicial Watch.

One should also consider Mr. Klayman's actions in light of the doctrine of necessity. We know that judges can decide cases even if they are otherwise disqualified if there is no other judge available to decide the case. For example, the Court of Claims applied the "rule of necessity" and held that, under that rule, its judges could hear the case involving their own salaries. Otherwise, no judge would be available to decide some important legal questions. The court then turned to the judges' substantive claim and denied it. *Atkins v. United States*, 556 F.2d 1028 (Ct.Cl.1977) (per curiam), cert. denied, 434 U.S. 1009 (1978). See also, *United States v. Will*, 449 U.S. 200 (1980). The *Will* Court explained: "The Rule of Necessity had its genesis at

least five-and-a-half centuries ago. Its earliest recorded invocation was in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he was a party when there was no provision for appointment of another judge."

Faced with the dilemma of either representing Cobra, Paul, and Benson, or allowing them to lose their legal rights, Mr. Klayman sided with the rights of the clients, in accordance with Rule 1.3, and thus, justifiably, chose to represent them. Judicial Watch attempted, and succeeded, at disqualifying Mr. Klayman from the lawsuits because it knew no one else would be able to represent Cobas, Paul, and Benson, and that Judicial Watch would escape liability for the wrongs that they had caused. The trial judge did disqualify Mr. Klayman in representing Paul in a new case after Paul's previous lawyers withdrew representation because he could not pay them, but note that the trial judge did *not* refer this case to the disciplinary authorities for further discipline. It appears reasonable to believe that the trial judge imposed all the discipline (in the form of a disqualification) that he believed should be imposed. The situation involving these particular clients provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account. Given this unprecedented situation, Mr. Klayman, out of necessity, attempted to correct the wrongs caused by Judicial Watch, so that he would not violate D.C. RPC Rule 1.3. Further establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul, and Benson.

There has been an unusual delay in instituting these proceedings against Mr. Klayman. If this were civil litigation, Bar Counsel's Petition would obviously not pass muster under the District of Columbia statute of limitations. The general statute of limitations for most civil causes of actions in the District of Columbia is three (3) years. D.C. Code § 12-301 *et seq*. "The purpose of statutes of limitation is 'to bring repose and to bar efforts to enforce stale claims as to which evidence might be lost or destroyed.'" *Medhin v. Hailu*, 26 A.3d 307, 313 n.7 (D.C. 2011) citing *Hobson v. District of Columbia*, 686 A.2d 194, 198 (D.C. 1996). "By precluding stale claims, statutes of limitations not only protect against 'major evidentiary problems which can seriously undermine the courts' ability to determine the facts,' but also protect[] a potential defendant's 'interest in security . . . and in planning for the future without the uncertainty inherent in potential liability,' and 'increase the likelihood that courts will resolve factual issues fairly and accurately.'" *Id*. Granted, the D.C. Rules of Professional Conduct do not expressly create a statute of limitations, the indisputable fact remains however that these proceedings — if they should have been brought at all — should have been brought years ago.

That brings up the problem of laches. The doctrine of laches bars untimely claims not otherwise barred by the statute of limitations. As held by the District of Columbia Court of Appeals, laches is the principle that "equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant. It was developed to promote diligence and accordingly to prevent the enforcement of stale claims." *Beins v. District of Columbia Bd. of Zoning Adjustment*, 572 A.2d 122, 126 (D.C. 1990). Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *Jeanblanc v. Oliver Carr Co.,* 1995 U.S. App. LEXIS 19995, *9 (D.C. Cir. June 21, 1995). Among the inequities that the doctrine of laches protects against is the loss of or difficulty in resurrecting pertinent evidence. *Id*.

3

Note that Mr. Klayman left Judicial Watch on September 19, 2003. He filed his appearance on behalf of Ms. Cobas on August 7, 2006 — long after he left Judicial Watch. There is no claim that he violated any confidences of Judicial Watch or that he earlier represented Judicial Watch against Ms. Cobas. This Bar Complaint was filed on May 1, 2014. The delay in filing the complaint was nearly 8 years.

The conduct alleged by Bar Counsel occurred between seven and eight years ago. Given the substantial delay in bringing the present Petition before the Board, Mr. Klayman's ability to defend this case has been detrimentally prejudiced, particularly as recollection and memory fade over the course of approximately seven to eight years and witnesses and the individuals involved may be unavailable in support of Mr. Klayman's defense. In Paul's case, for instance, he is in federal prison in Texas. Ms. Cobas has health problems and Ms. Benson is now an 83-year-old woman. The Bar should not use this unique factual situation to discipline Mr. Klayman given the equitable doctrine of laches. Such discipline, if the courts uphold it, can ruin his career.

This Petition also raises issues regarding the application of Mr. Klayman's Fifth Amendment due process rights. Lawyers in attorney discipline cases are entitled to procedural due process. In *Ruffalo*, the respondent appealed his disbarment after records of his employments were brought up into his disciplinary proceedings at a late stage in the proceedings without giving him the opportunity to respond. In reversing, the U.S. Supreme Court held that the attorney's lack of notice that his full employment record would be used in the proceedings caused a violation of procedural due process that "would never pass muster in any normal civil or criminal litigation." *In the Matter of John Ruffalo, Jr.,* 390 U.S. 544, 550 (1968).

In *Kelson*, the Supreme Court of California similarly held that it was a violation of procedural due process for the State Bar of California to amend its charges on the basis of Mr. Kelson's testimony without having given Mr. Kelson notice of the charge and an opportunity to respond. *Kelson v. State Bar,* 17 Cal. 3d. 1, 6 (Cal. 1976). *Kelson* is directly on point. Judicial Watch submitted boxes full of voluminous documents to the Bar Counsel's office in secret, none of which were ever served to Mr. Klayman until the Petition was filed and then served. It appears that Judicial Watch and Mr. Klayman have had a parting of the ways that has not been amicable. One can understand why, even after all these years, a former employer who is very upset might wish to use the discipline process to punish a former employee, but that does not mean that the discipline authorities should aid and abet (even unintentionally) what appears to be a vendetta by one private group against its former lawyer. Discipline, after all, exists to protect future clients and the public; it does not exist for one party to wreak punishment against another.

Further, these alleged ethical violations have already been dealt with by the Honorable Royce C. Lamberth in his Memorandum Opinion and Order in *Paul v. Judicial Watch, et al.*, No. 1:07-CV-00279 (D.D.C. filed Feb. 5, 2007). In his Memorandum Opinion, Judge Lamberth specifically addressed the issue of D.C. Bar Rule 1.9 in regard to disqualifying Mr. Klayman from continuing to represent Paul in the lawsuit. Judge Lamberth, in his ruling, found that "A survey of relevant case law in this and other circuits reveals some ambiguity with respect to the standard for disqualification in the face of a violation of Rule 1.9 (or its equivalent)." *Id.* at 6. Indeed, given the circumstances, and the harm that would be caused to Paul, it was ambiguous whether Rule 1.9 required Mr. Klayman's disqualification. Judge Lamberth took "note of Paul's

argument that he will suffer prejudice if Mr. Klayman is disqualified." *Id.* at 14. Judge Lamberth emphasized that "[t]he essence of the hardship that Paul asserts will result from disqualification of Mr. Klayman is an inability to obtain alternate counsel for lack of financial resources" and ultimately apologetically found that "[t]he Court is not unsympathetic to this concern." *Id* at 14.

Immediately following Judge Lamberth's order, Mr. Klayman ceased all legal representation of Mr. Paul. No harm was caused by the limited and short-term representation that Mr. Klayman had provided. In fact, the harm was only done when Judicial Watch ceased representation of Paul, who as a result has been convicted of the alleged crimes and has since been incarcerated. Judge Lamberth did not sanction Mr. Klayman, or even report his actions to the Bar Counsel or the Board. Judge Lamberth recognized that the D.C. RPC was not clear when disqualification was necessary under Rule 1.9 and thus took no further action.

Given the delay in instituting these proceedings, it appears that Judicial Watch has targeted Mr. Klayman for selective prosecution. Seldom in the history of the District of Columbia Bar has someone been the subject of such an investigation for such a technical violation. To prevail on a defense of selective prosecution, one must simply prove that he was singled out for prosecution among others similarly situated and that the decision to prosecute was improperly motivated. *See, e.g. United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982). Here, Mr. Klayman is being investigated, and even charged, with an alleged ethical violation that otherwise would have been resolved as a result of Judge's Lamberth's decision to disqualify Mr. Klayman from the case.

For the foregoing reasons, it is my expert opinion that this bar complaint should not be pursued. Mr. Klayman, faced with what Judge Lamberth concluded was an "ambiguous" rule, understood that Mr. Klayman did not take on a case for personal profit but simply to protect the rights of those who could otherwise not pursue justice in the court system. Further justifying dismissal of this bar complaint is the unreasonably delay by the Office of Bar Counsel in bringing these allegations against Mr. Klayman. Mr. Klayman's defense of these alleged ethical violations has been severely prejudiced by the length of time that has passed since the events leading up to the bar complaint took place.

In sum, Mr. Klayman should not be disciplined. He did what he believed he had an ethical obligation to do by protecting his clients, at his expense.

Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past,* HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers,* 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment,* 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act,* THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?,* WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions:  An Historical Review of the Supreme Court Nominations Process*, 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act*: *Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press,* in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)*
[The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP:
EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and
English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 ILLINOIS BAR
JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 MARQUETTE
UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col.  4 [reprinted in,
BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col.  4-6].

*When Duty Calls, Courts Can Be Flexible,* WASHINGTON POST, January 29, 1997, at p. A21, col.
2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It,
Inc.*, 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS'
LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No.
11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 NOTRE DAME LAW
REVIEW 655 (1997).

*Judges as Ambulance Chasers*, 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 LEGAL OPINION LETTER
1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing
Lawyers*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION
NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 LEGAL TIMES (OF
WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones*, CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21,
1997).

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act*, 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1  (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union*, 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues*, 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts*, 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom*, 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments*, 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice*, in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores*, 32 INDIANA LAW REVIEW 163 (1998).

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers*, 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics*, 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich*, CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?*, WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking:  A Brief Case Study*, 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display: Making Room for Religion in Public Forums*, LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts*, WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate*, 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws*, LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers*, THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence*, LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment*, 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention*, CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics*, in NATIONAL REVIEW ON LINE, Nov. 15, 2000,  http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000,  http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine,* 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution,* CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City,* NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?,* 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions*: *Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money*: *IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

Ronald D. Rotunda

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYm
QxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21
LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The
Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April
2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.,* 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203
(2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE
FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223
(2007).

*Rudy      Thinks      FAST*,      THE      AMERICAN      SPECTATOR,      January      25,      2008,
http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR
ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-
STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George
Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES
DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES
(Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15, 2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30, 2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510 (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co*., 60 SYRACUSE LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010, http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MD QwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010, http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2, http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21, http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010, http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-law/?singlepage=true

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010,      http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran*?, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL NEWS, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment*?, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 MCGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution,* NATIONAL REVIEW ONLINE, March 24, 2011,   http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparenţa Judiciară, Etica Judiciară şi o Soluţie Judiciară,* REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier*?, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same*: *Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training,* 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare,* WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

*Lessons of Watergate*, 54 ORANGE COUNTY LAWYER 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, NATIONAL LAW JOURNAL, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, THE JERUSALEM POST, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, NEW YORK POST, June 1, 2012.

*ObamaCare Legal Battles Not Over*, ORANGE COUNTY REGISTER, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, WASHINGTON TIMES, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* ORANGE COUNTY REGISTER, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, WASHINGTON TIMES, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in MODEL, RESOURCE, OR OUTLIER? WHAT EFFECT HAS THE U.S. CONSTITUTION HAD ON THE RECENTLY ADOPTED CONSTITUTIONS OF OTHER NATIONS?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

'*What* did he know, and when did he know it?', WASHINGTON TIMES, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over*: *This Time Around, Take a Closer Look at America's Bill of Rights*, WALL STREET JOURNAL, JULY 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, WASHINGTON POST, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, WALL STREET JOURNAL, JULY 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata*, 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later*: *Roe v. Wade*, CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil*, THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt,* DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial*, WALL STREET JOURNAL, May 2, 2014, at p. A13.

## Other Activities:

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.
CHAIR, Subcommittee on Model Rules Review (1992-1997).  [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA.  I traveled to Cambodia and worked with officials of UNTAC (the United Nations Transitional Authority in Cambodia) and Cambodian political leaders, who were

charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

> Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary. The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

> Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic. I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.) This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

Ronald D. Rotunda

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, *Distinguished International Research Fellow* at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, *Associate Editor* of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).

EXHIBIT 2



# OFFICE OF DISCIPLINARY COUNSEL

Hamilton P. Fox, III
*Disciplinary Counsel*

Julia L. Porter
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Myles V. Lynk
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik deBoer
Jerri U. Dunston
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Joseph C. Perry
William R. Ross
Clinton R. Shaw, Jr.
H. Clay Smith, III
Caroll Donayre Somoza
Traci M. Tait

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela Walker

*Manager, Forensic Investigations*
Charles M. Anderson

*Investigative Attorney*
Azadeh Matinpour

*Intake Investigator*
Melissa Rolffot

June 26, 2020

United States District Court
 for the Northern District of Texas
1100 Commerce Street, Room 1452
Dallas, TX  75242

> Re: *In re Larry Klayman*
> DCCA No. 18-BG-0100
> Disciplinary Docket No. 2008-D048
> <u>NOTICE OF SUSPENSION</u>

To Whom It May Concern:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named attorney. Our records reflect that Respondent is also licensed to practice law in the United States District Court for the Northern District of Texas.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501. *Please note, we can only accept expedited deliveries via USPS express mail.*

Sincerely,

/s/ Lawrence K. Bloom
Senior Staff Attorney

LKB/his

Enclosure:  DCCA Court Order for *In re Larry Klayman*
Disciplinary Docket No. 2008-D048

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-BG-0100

IN RE LARRY KLAYMAN

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 334581)

On Report and Recommendation of the
Board on Professional Responsibility
(BDN-48-08)

(Argued September 17, 2019                    Decided June 11, 2020)

*Stephen A. Bogorad*, with whom *John Thorpe Richards, Jr.*, was on the brief, for respondent.

*H. Clay Smith, III*, Assistant Disciplinary Counsel, with whom *Elizabeth A. Herman*, Deputy Disciplinary Counsel, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before FISHER, THOMPSON, and BECKWITH, *Associate Judges*.

PER CURIAM:   The Board on Professional Responsibility (the "Board") has recommended that this court suspend respondent Larry Klayman from the practice of law for ninety days based on his representation of three clients in violation of Rule 1.9 (conflict-of-interest) of the District of Columbia Rules of Professional Conduct (or its Florida equivalent).   In this matter, the Office of Disciplinary Counsel

("Disciplinary Counsel") takes exception to the Board's report and recommendation on three grounds.  First, Disciplinary Counsel challenges the Board's rejection of the finding by Hearing Committee Number Nine (the "Hearing Committee") that Mr. Klayman violated District of Columbia Rule of Professional Conduct 8.4(d). Second, Disciplinary Counsel takes exception to the Board's rejection of the Hearing Committee's finding that Mr. Klayman gave false testimony and made false representations to the Hearing Committee.  Finally, Disciplinary Counsel takes exception to the Board's recommendation that we impose a ninety-day suspension without a requirement that Mr. Klayman prove his fitness before being reinstated. For the reasons that follow, we accept the Board's recommendations.

## I.

The Board adopted most of the factual findings of the Hearing Committee, including as to the following, a summary regarding the three matters that underlie this disciplinary matter.  Mr. Klayman founded Judicial Watch and served as its in-house general counsel from its inception in 1994 until 2003.  During Mr. Klayman's tenure at Judicial Watch, Sandra Cobas served as the director of Judicial Watch's Miami Regional Office.  She complained to Judicial Watch about her employment

Case 1:19-cv-04977-JPC   Document 145   Filed 05/19/21   Page 35 of 57
Case 3:20-mc-00043-B   Document 7   Filed 07/01/20   Page 4 of 14   PageID 126

3

conditions, alleging that she was subject to a hostile work environment during several weeks in 2003. As general counsel, Mr. Klayman provided legal advice to Judicial Watch concerning Cobas's claims. After both Mr. Klayman and Ms. Cobas had ended their employment with Judicial Watch, Ms. Cobas filed a complaint against Judicial Watch in a Florida state court, making the same hostile-work-environment allegations. The Florida trial court granted a motion to dismiss the case (calling the complaint "'silly and vindictive'"). Thereafter, without seeking consent from Judicial Watch, Mr. Klayman entered an appearance on Ms. Cobas's behalf and filed a motion requesting that the trial court vacate its order of dismissal. When the motion was denied, Mr. Klayman filed a notice of appeal on Ms. Cobas's behalf and, later, a brief in a Florida appellate court, but the appellate court affirmed the dismissal.

In 2002, while still employed by Judicial Watch, Mr. Klayman solicited a donation from Louise Benson as part of a campaign to raise funds to purchase a building for the organization. Klayman was acting as both chairman and general counsel of Judicial Watch when he solicited this donation from Benson. Ms. Benson committed to donate $50,000 to the building fund, and thereafter paid $15,000 towards that pledge. Judicial Watch did not purchase a building. In 2006, after Mr. Klayman had left Judicial Watch, he and Ms. Benson filed a lawsuit against Judicial

Watch in federal court, where they were represented by attorney Daniel Dugan. Ultimately, the federal district court dismissed Ms. Benson's claims (but not Mr. Klayman's claims) on jurisdictional grounds. Shortly thereafter, Ms. Benson sued Judicial Watch in the Superior Court of the District of Columbia, alleging *inter alia* unjust enrichment and seeking a return of her donation. Initially, she was represented in that suit by Mr. Dugan. Eventually, and without seeking consent from Judicial Watch, Mr. Klayman entered an appearance in the case as co-counsel for Ms. Benson. Judicial Watch requested that Klayman withdraw, stating that he organized the fundraising effort that was at the center of Ms. Benson's complaint while he was Judicial Watch's attorney, and noting that Ms. Benson had identified him as a fact witness. When Mr. Klayman did not withdraw, Judicial Watch moved to disqualify him. The motion for disqualification was never decided, as the parties stipulated to the dismissal of the case.

In 2001, while Mr. Klayman was still employed by Judicial Watch, Judicial Watch and Peter Paul entered into a representation agreement, and a modification thereto, under which Judicial Watch agreed to evaluate legal issues emanating from Mr. Paul's fundraising activities during the election campaign for the New York State Senate in 2000 and to represent him in connection with an investigation into alleged criminal securities law violations and possible civil litigation stemming from

those fundraising activities.   Mr. Klayman drafted, edited, and approved the representation agreement and modification and authorized the signing of both documents as Judicial Watch's chairman and general counsel.  Judicial Watch later represented Mr. Paul in a civil lawsuit brought in California state court.  Following Mr. Klayman's departure from Judicial Watch, Judicial Watch withdrew from the representation.   Thereafter, Mr. Paul sued Judicial Watch in the United States District Court for the District of Columbia alleging, among other theories, that Judicial Watch breached its representation agreement with him.   While Mr. Paul initially was represented by Mr. Dugan, Mr. Klayman entered an appearance in the case without seeking Judicial Watch's consent.  Judicial Watch moved to disqualify Mr. Klayman.  The district court (the Honorable Royce Lamberth) granted the motion to disqualify, finding that Mr. Klayman's representation of Mr. Paul violated Rule 1.9.  The court found that Mr. Klayman was representing the plaintiff "in a matter directly arising from an agreement he signed in his capacity as [g]eneral [c]ounsel for the current defendant" and that Mr. Klayman's representation of Mr. Paul was "the very type of 'changing of sides in the matter' forbidden by Rule 1.9."

The Hearing Committee found that Mr. Klayman violated Rule 1.9 (or its Florida equivalent) in all three matters and violated Rule 8.4(d) in the Paul matter. It also found that Mr. Klayman gave false testimony before the Hearing Committee

and that his disciplinary history in Florida in connection with an unrelated matter was another aggravating factor.  On the basis of all the foregoing, the Hearing Committee recommended that Mr. Klayman be suspended for ninety days, with reinstatement contingent upon a showing of his fitness to practice law.  The Board, by contrast, recommended that Klayman be suspended for ninety days with no fitness requirement.  The Board disagreed with the Hearing Committee's finding that Disciplinary Counsel proved a violation of Rule 8.4(d) and with its finding that Mr. Klayman provided false testimony.

Before this court, neither Mr. Klayman nor Disciplinary Counsel takes issue with the finding that Mr. Klayman violated Rule 1.9 or its Florida equivalent in the matters described above, and we therefore need not address that finding.  Rather, as the Board did, we adopt the vast majority of the Hearing Committee's thorough analysis.  However, as noted above, Disciplinary Counsel takes exception to the Board's findings regarding Rule 8.4(d) and false testimony, and to the Board's recommended sanction insofar as it omits a fitness requirement.  We discuss these matters below.

**II.**

Disciplinary Counsel has the burden of proving a violation of the Rules of Professional Conduct by clear and convincing evidence. *In re Speights*, 173 A.3d 96, 99 n.3 (D.C. 2017). "When reviewing a recommended disciplinary sanction against an attorney, this court must accept the Board's findings of fact if they are supported by substantial evidence." *In re Sneed*, 673 A.2d 591, 593 (D.C. 1996). The Board "has the power to make its own factual findings" but "must accept the Hearing Committee's evidentiary findings, including credibility findings, if they are supported by substantial evidence in the record." *In re Bradley*, 70 A.3d 1189, 1193 (D.C. 2013) (internal quotation marks and emphasis omitted). "Substantial evidence means enough evidence for a reasonable mind to find sufficient to support the conclusion reached." *In re Thompson*, 583 A.2d 1006, 1008 (D.C. 1990). "[T]he Board and this court owe no deference to the Hearing Committee's determination of 'ultimate facts,' which are really conclusions of law and thus are reviewed *de novo*." *Bradley*, 70 A.3d at 1194. "Whether [a] respondent gave sanctionable false testimony before the Hearing Committee is a question of ultimate legal fact that the Board and this court review *de novo*." *Id.* "[T]his court usually adopts the Board's recommended sanction 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted[.]'" *Sneed*, 673 A.2d at 593.

**III**.


Rule 8.4(d) establishes that it is professional misconduct for a lawyer to
"[e]ngage in conduct that seriously interferes with the administration of justice[.]"
*Id.*  For conduct to violate Rule 8.4(d), the conduct must be improper, "bear directly
upon the judicial process," and "taint the judicial process in more than a *de minimis*
way."  *In re Carter*, 11 A.3d 1219, 1224 (D.C. 2011) (internal quotation marks
omitted).


Disciplinary Counsel asserts that the "Board erred by overturning the Hearing
Committee's conclusion that Mr. Klayman violated Rule 8.4(d) when he appeared
on behalf of [Mr.] Paul with a 'clear conflict of interest' and litigated against
disqualification for the second time."  The Board cited a number of reasons for
rejecting the Hearing Committee's conclusion, including its longstanding "concern[]
about the scope of Rule 8.4(d) in litigation-related disciplinary matters" and its view
that any Rule 8.4(d) violation would be "derivative of the conflict[-]of[-]interest
finding."  But the Board primarily followed this court's lead in considering the views
of the judge who presided over the litigation in which the disqualification motion
was filed.  *See In re White*, 11 A.3d 1226, 1232 (D.C. 2011).  The Board found it
"extra significan[t]" that Judge Lamberth, though he granted the motion to disqualify

Case 1:19-cv-04977-JPC   Document 145   Filed 05/19/21   Page 41 of 57
Case 3:20-mc-00043-B   Document 7   Filed 07/01/20   Page 10 of 14   PageID 132

9

Mr. Klayman, found "'a legitimate debate about [Mr. Klayman's] conduct'" and further found that Mr. Paul was a needy client who could not otherwise have afforded legal services.   In light of the "extraordinary situation" of Judge Lamberth's "supportive testimony" to the Hearing Committee, the Board was unable to conclude that Mr. Klayman's "behavior sufficiently tainted the judicial process to a degree adequate to sustain the Rule 8.4(d) charge."[1]  We accept the Board's reasoning and agree that no Rule 8.4(d) violation was proven by clear and convincing evidence.


## IV.


Before the Hearing Committee, Mr. Klayman testified, "I believed that Mr. Dug[]an had given the advice of counsel that I could do this [i.e., represent Ms. Benson], otherwise he [Dugan] wouldn't have prepared the pleading" opposing the motion to disqualify Mr. Klayman based on Rule 1.9."  The Hearing Committee found that this testimony was false, as was Mr. Klayman's testimony that Mr. Dugan "was the one who prepared the response to that disqualification motion."

---

[1]  The Board noted that in *White*, by contrast, Judge Lamberth concluded that White's conduct had tainted the proceedings; specifically, "[t]he entire litigation was disrupted and delayed while the [d]istrict [c]ourt dealt with the motion to disqualify[,]" and the court had to strike an entire deposition because of White's presence. *Id.* at 1232.

Disciplinary Counsel contends that this court should defer to the Hearing Committee's false-testimony findings as supported by substantial record evidence.

The Board found that Disciplinary Counsel failed to prove by clear and convincing evidence that Mr. Klayman gave false testimony.  The Board observed that the Hearing Committee had relied almost entirely on Mr. Dugan's testimony that he did not endorse Mr. Klayman's appearance in the Benson matter.  The Board reasoned, however, that the forcefulness of Mr. Dugan's testimony was undercut by his repeated inability to recall the substance of key conversations that took place between him and Mr. Klayman eight years earlier.  In addition, the Board cited prior, "apparently inconsistent" statements that Mr. Dugan had made about the matter (e.g., Mr. Dugan's apparent statement to Judicial Watch's counsel, referred to in Judicial Watch's memorandum in support of its motion to disqualify, that there was "no ethical issue arising from" Mr. Klayman's representation of Ms. Benson).

The Board's description of Mr. Dugan's "diminished recollection" of  his discussions with Mr. Klayman about the latter's entry of his appearance in the Benson matter, and about Judicial Watch's demand that Mr. Klayman withdraw from the representation, is supported by the record.  Further, while the Hearing Committee reasoned that Mr. Klayman "cannot have inferred" that Mr. Dugan

Case 1:19-cv-04977-JPC   Document 145   Filed 05/19/21   Page 43 of 57
Case 3:20-mc-00043-B   Document 7   Filed 07/01/20   Page 12 of 14   PageID 134

11

blessed his entry of appearance in the Benson matter from Mr. Dugan's filing of the opposition to the motion to disqualify since Mr. Dugan "did not write the opposition[,]" Mr. Dugan acknowledged that his associate may have edited the draft opposition before it was filed, acknowledged that he (Dugan) did *sign* the opposition, and testified that he would not have done so if he had thought that it was frivolous or thought it violated any ethics or pleadings rules.   Additionally, Mr. Klayman's testimony was to the effect that the circumstances caused him to *believe* that Mr. Dugan had given the advice of counsel.  We agree with the Board that there was not proof by clear and convincing evidence that Mr. Klayman testified dishonestly as to his belief and recollection.  Accordingly, we accept the Board's conclusion rejecting the finding that Mr. Klayman testified falsely.

## V.

In explaining its sanction recommendation, the Hearing Committee found that Mr. Klayman's misconduct was aggravated by his prior discipline in Florida and his denial of responsibility as to the underlying conduct.  He received a public reprimand in that jurisdiction after he failed to timely pay the full amount ($5,000) he had agreed to repay to a former client after mediation to resolve a fee dispute.  The Board gave this matter little weight because of Mr. Klayman's explanation that a serious

car accident had rendered him unable to work at full capacity and caused him "significant financial difficulties" that affected his ability to pay.  We accept that evaluation.

We also accept the Board's conclusion that Disciplinary Counsel did not show that a fitness requirement is warranted in this case.  To be sure, Disciplinary Counsel proved that Mr. Klayman flagrantly violated Rule 1.9 on three occasions.  His misconduct was not isolated, and, it appears, he acted vindictively and "motivated by animus toward Judicial Watch" (with which he had developed an acrimonious relationship).  We agree with the Board and the Hearing Committee that his misconduct was intentional rather than inadvertent or innocent.  We also readily agree with the Board that his misconduct — involving a "switch[ing of] sides" that strikes at the integrity of the legal profession — deserves the serious sanction of a ninety-day suspension.  Nevertheless, we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically.  *In re Adams*, 191 A.3d 1114, 1120 (D.C. 2018).  Accordingly, we decline to impose a fitness requirement.  We do, however, concur with Disciplinary Counsel's original recommendation that Mr. Klayman be ordered to complete a continuing legal education ("CLE") course on conflicts of interest.

Wherefore, effective thirty days after entry of this order, Mr. Klayman is suspended from the practice of law.   The period of suspension is ninety days, commencing after he has filed the affidavit required by D.C. Bar R. XI, § 14(g). Before reinstatement, he must also complete a CLE course on conflicts of interest.[2]

*So ordered.*

---

[2]  The pending motion by his counsel to withdraw is hereby granted.

EXHIBIT 3



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**Joshua E. Doyle**
**Executive Director**

**850/561-5600**
**www.FLORIDABAR.org**

State of Florida    )

County of Leon    )
            In Re:  0246220
                     Larry Elliot Klayman
                     Klayman Law Group, PA
                     2020 Pennsylvania Ave NW # 345
                     Washington, DC 20006-1811

I CERTIFY THE FOLLOWING:

I am the custodian of membership records of The Florida Bar.

Membership records of The Florida Bar indicate that The Florida Bar member listed above was admitted to practice law in the state of Florida on **December 7, 1977**.

The Florida Bar member above is an active member in good standing of The Florida Bar who is eligible to practice law in the state of Florida.

Dated this <u>18th</u> day of **May**, **2021**.

Cynthia B. Jackson, CFO
Administration Division
The Florida Bar

PG:R10
CTM-135138

# EXHIBIT 4

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    ROY STEWART MOORE and KAYLA
      MOORE,
 4
                      Plaintiffs,
 5
                 v.                        19 CV 4977 (ALC)
 6
      SACHA NOAM BARON COHEN, et
 7    al.,

 8                    Defendants.
                                           Conference
 9    ------------------------------x
                                           New York, N.Y.
10                                         August 1, 2019
                                           10:10 a.m.
11
      Before:
12
                        HON. ANDREW L. CARTER, JR.,
13
                                                District Judge
14

15                            APPEARANCES

16    KLAYMAN LAW GROUP, P.A.
            Attorneys for Plaintiffs
17    BY:  LARRY E. KLAYMAN

18    DAVIS WRIGHT TREMAINE LLP
            Attorneys for Defendants
19    BY:  ELIZABETH A. McNAMARA
            RACHEL STROM
20

21

22

23

24

25
```

1        (Case called)

2        MR. KLAYMAN:  Larry Klayman for Judge Roy Moore.  Good

3   to meet you, your Honor.

4        MS. McNAMARA:  Elizabeth McNamara for the defendants

5   Sasha Baron Cohen, Showtime Networks and CBS, and this is

6   Rachel Strom, my partner, who is with me.

7        THE COURT:  Good morning.

8        We are here for a premotion conference.  This is the

9   first time this matter has been on in front of me.

10        I have seen the parties' submissions.  It seems to me

11   that it makes sense to set a briefing schedule for the

12   plaintiffs' motion to stay, as well as the defendants' 12(b)(6)

13   motion.

14        Before we do that, I didn't see on the docket anywhere

15   a copy of this standard consent agreement.  Do counsel have

16   that with them today, by any chance?

17        MS. McNAMARA:  I do, your Honor.

18        THE COURT:  Can you hand that to my deputy.

19        MS. McNAMARA:  Absolutely.  Thankfully, I didn't write

20   on it.

21        MR. KLAYMAN:  May I have a copy of it?

22        MS. McNAMARA:  I only have one copy.  I'm sorry.

23        THE COURT:  Thanks.  Hold on a second.

24        I'll hand this back to counsel.  There is something in

25   this agreement that was highlighted and crossed out.  Was that

1   something that was done prior to the signing of the agreement

2   or was that something done by counsel afterwards?

3           MS. McNAMARA:  Your Honor, the yellow highlighting, I

4   believe, was by counsel.  But the handwritten cross-out and

5   initial was done at the time of execution.

6           Your Honor, may I interject just a brief

7   administrative matter?

8           THE COURT:  Sure.

9           MS. McNAMARA:  This is our first appearance before

10  your Honor, as you've already noted.  The plaintiffs' counsel

11  is not a New York bar, member of the New York bar, and has not

12  submitted *pro hac* papers.  I just wanted to bring that to the

13  attention of the Court.

14          MR. KLAYMAN:  I wanted to address that, your Honor, if

15  I may.

16          THE COURT:  Sure.

17          MR. KLAYMAN:  I never appeared in front of you.  It's

18  a pleasure.

19          I have consulted with Judge Moore, and we have decided

20  not to pursue the mandamus in DC and to proceed in front of

21  your Honor.  I will be submitting the *pro hac vice* application

22  later today.  I've been a member in good standing of the

23  District of Columbia and Florida bars for 39 and 42 years

24  respectively.

25          There was one issue that came up 23 years ago with

1   Judge Chin, 23 years, where I had an issue with him, and he

2   required that I provide to the Court, if I ever sought *pro hac*

3   *vice* entry again, a copy of his order where he said I would no

4   longer be able to come into his courtroom *pro hac vice*.  I

5   wanted to just advise you of that and use this as an

6   opportunity.

7        Ms. Strom and Ms. McNamara, on behalf of their client,

8   have consented to my *pro hac vice* entry, but I wanted to raise

9   that because Judge Chin had ordered that I advise the Court in

10  the future if I sought *pro hac vice* entry with you.

11       Obviously, we had hoped to proceed in DC.  We are

12  certainly confident of success, your Honor, in front of you.

13  The fact that we sought DC has no reflection on the integrity

14  or ability of this Court to adjudicate this issue.  And we have

15  submitted a letter pointing out how New York law actually is on

16  point with our client's case.

17       THE COURT:  Anything from defense's counsel on this?

18       MS. McNAMARA:  No, your Honor.  It is correct that we

19  consented to his *pro hac* application, provided that Mr. Klayman

20  complied with the local rules and the applicable orders under

21  *pro hac* which would necessitate him to, in addition to

22  providing your Honor with Judge Chin's decision, to apprise the

23  Court of pending disciplinary action against him in DC.

24       MR. KLAYMAN:  We will submit that in our application,

25  your Honor.

     1          There is no final decision.  Those matters are on

     2   appeal.  This is regrettable because if that's the case, it

     3   looks to me like she is consenting but yet saying something

     4   that would prejudice my application.  That was unnecessary

     5   because I said I would submit it and I said I would set forth

     6   what's required to be set forth.

     7          If that's the case, yes, I would like to seek a stay

     8   on the mandamus, if this is the way it's going to proceed.  I

     9   thought we were going to move forward amicably to get a just

    10   resolution of these matters on the merits rather than to have

    11   counsel in any kind of issue with each other.  I'm trying to be

    12   diplomatic.

    13          THE COURT:  Let's have plaintiffs' counsel file your

    14   *pro hac vice* application.  Can you get that submitted within a

    15   week from today?

    16          MR. KLAYMAN:  I can, your Honor.

    17          THE COURT:  Let's have that filed by August 8.  Let's

    18   deal with that issue sort of first.

    19          Let me find out, although I think I know the answer to

    20   this question, have there been any sort of settlement

    21   discussions at all between the parties?

    22          MR. KLAYMAN:  We are always open to settlement.  I

    23   would hope that there would be.  There not have been any

    24   settlement discussions.

    25          THE COURT:  Is there a reason for that?  Is it just

1  that the parties haven't gotten around to that?  There is no

2  interest in that?

3  MR. KLAYMAN:  I have an interest in that.  We would

4  like to settle the matter.

5  Your Honor, I'm sure, has read the various documents

6  that have been submitted to you.  Judge Moore has been, as we

7  allege, see severely defamed, called a pedophile.  That's very

8  serious.  And, yes, we would like to settle it.  New York law

9  is clear, as your Honor can read from our letter in what we set

10  forth, that you can't release someone from an act which has yet

11  to occur.

12  And we had several layers of fraud here.  Yerushalayim

13  TV is not Showtime, obviously.  Judge Moore thought he was

14  going to get an award from the State of Israel.  Turns out that

15  what he was getting was being branded a pedophile on national

16  and international television.  Even comedians are not immune

17  from that kind of behavior.

18  We would like to settle this thing.  We don't have an

19  ax to grind.  We just want to be made whole again, our client.

20  I'm welcome to that and so is Judge Moore.

21  THE COURT:  I take it from what you've said that you

22  have not made a demand of the defendant?

23  MR. KLAYMAN:  I have not.

24  THE COURT:  Anything from defense counsel on this?

25  MS. McNAMARA:  Thank you very much, your Honor.

1        We, of course, would listen to any demand made by the

2   plaintiff.  We would not foreclose that in any way.  However,

3   we do feel strongly, and there is strong principles at stake

4   here in this litigation, and those are the underpinnings to our

5   motion to dismiss that we would intend to file in the action.

6        Not only is it our position that it's strictly barred

7   by the consent agreement, which your Honor just looked at, but

8   it's squarely on point with the *Borat* decision that Judge

9   Preska dismissed with the exact same release, the exact same

10  waiver agreement, and the similar allegations of alleged fraud

11  that was affirmed by the Second Circuit, and it's squarely on

12  point.

13       So we don't think that this is a complicated issue,

14  and it's an issue of some importance for my clients.  This is

15  Mr. Cohen's business in many regards, and it's one that's

16  important to him, and we believe, even on the merits, that

17  there simply is not a claim.

18       MR. KLAYMAN:  Your Honor, the facts of this case are

19  different, and you pointed it out yourself, in effect, when you

20  asked Ms. McNamara to give you a copy of the release.  Judge

21  Moore crossed out anything dealing with sexual oriented or

22  offensive behavior.

23       What's important is that the defendants signed this

24  document.  This was a fraud.  They knew that they were going to

25  go on and brand him as a pedophile, and they signed it knowing

1     that that was out of the release; consequently, a major fraud.

2             Plus, Yerushalayim TV is not Showtime, is not CBS.

3             On top of that, there is a pattern and practice here

4     with regard to this particular show, Who Is America, where they

5     did the same thing with other people but not to this degree.

6             This case hinges on the merits.  It doesn't have

7     anything to do with *Borat*.  It has to do with Sasha Baron Cohen

8     and what he did Who is America.

9             THE COURT:  Let's do this.  We have a date for

10    plaintiffs' counsel to file the *pro hac vice* application.

11    Let's get a date for a joint status report from the parties.

12            I encourage the parties to engage in some settlement

13    discussions.  And in that status report you can let me know if

14    the case has settled, if the parties would like some help

15    settling the case.  And, if not, we don't need to have another

16    premotion conference.  The parties can submit a proposed

17    briefing schedule for the motion to dismiss and/or the motion

18    for a stay, if that's still going to be pursued, and I'll sign

19    off on that.

20            Let's do this, if both sides are willing to do this.

21    Let's have a brief discussion in the robing room off the record

22    about potential settlement, if everyone is OK with that.

23            Does that work for plaintiffs' counsel?

24            MR. KLAYMAN:  It does, your Honor.

25            THE COURT:  Does that work for defense counsel?

1          MS. McNAMARA:  Yes, your Honor, of course.

2          THE COURT:  Let's go do that quickly in the robing

3     room.

4          (In the robing room; discussion off the record)

5          THE COURT:  We had an off-the-record discussion about

6     settlement.  I would encourage the parties to continue to

7     pursue settlement discussions.

8          We have dates.  Again, the *pro hac vice* application

9     will be filed by August 8 and a joint status report on August

10    22.  In that status report let me know, again, if the parties

11    have settled or if the parties want me to refer this to a

12    magistrate judge for settlement or to the Court's annexed

13    mediation program.  If not, just give me a proposed briefing

14    schedule on the motion to stay and the motion to dismiss under

15    12(b)(6).

16         Anything else from plaintiffs' counsel today?

17         MR. KLAYMAN:  No, your Honor.  Thank you.

18         THE COURT:  Anything else from defense counsel?

19         MS. McNAMARA:  No, your Honor.  Thank you very much.

20         THE COURT:  We are adjourned.  Thank you.

21         (Adjourned)

22

23

24

25