# Braun v. Flynt

United States Court of Appeals for the Fifth Circuit

March 9, 1984

No. 82-1235

**Reporter**

726 F.2d 245 *; 1984 U.S. App. LEXIS 24650 **; 15 Fed. R. Evid. Serv. (Callaghan) 276; 10 Media L. Rep. 1497

Ed BRAUN, et al., Plaintiffs-Appellees, v. Larry C. Flynt, Defendant, Chic Magazine, Inc., Defendant-Appellant

**Subsequent History: [**1]**  As Amended; Petition For Rehearing En Banc Denied May 14, 1984.

**Prior History:** Appeal from the United States District Court for the Western District of Texas.

**Disposition:**  Vacated and remanded.

**Counsel:** Jack N. Price, Austin, Texas, for Appellant.

Byrd, Davis & Eisenberg, Austin, Texas, Don L. Davis, Austin, Texas, for Appellee.

**Judges:** Politz and Jolly, Circuit Judges, and Hunter, * District Judge.  Politz, Circuit Judge, specially concurring.

**Opinion by:** JOLLY

## Opinion

 **[*247]**  E. GRADY JOLLY, Circuit Judge:

This action arising in diversity involves suit by Jeannie Braun, a resident of Texas, against Larry C. Flynt, an Ohio resident, and Chic Magazine, Inc., an Ohio corporation, growing out of the alleged unauthorized, libelous publication in the December 1977 issue of *Chic* of Mrs. Braun's picture. On special interrogatories the jury found for Mrs. Braun as to defamation and invasion of privacy and returned actual and punitive damages on both grounds.  We reverse and remand.

I.

The dominant theme of *Chic* magazine is "female

---

* District Judge of the Western District of Louisiana, sitting by designation.

nudity." According to *Chic's* editor, the magazine depicts "unchastity **[**2]** in women." The associate editor admitted that the caricatures found in the magazine are "indecent." The particular issue of the magazine with which the case is involved contained numerous explicit photographs of female genitalia.  Suffice it to say that *Chic* is a glossy, oversized, hard-core men's magazine.

One of the opening sections of the magazine, entitled "Chic Thrills," contains brief stories about current "events." In the issue of the magazine in question, twenty-one vignettes were included in "Chic Thrills." Most of these either concerned sex overtly or were accompanied by a photograph or cartoon of an overtly sexual nature.

This is the context in which Mrs. Braun's picture was published.  Mrs. Braun was employed by Aquarena Springs amusement park in San Marcos, Texas.  Part of Mrs. Braun's job included working in a novelty act with "Ralph, the Diving Pig." In the act, Mrs. Braun, treading water in a pool, would hold out a bottle of milk with a nipple on it.  Ralph would dive into the pool and feed from the bottle.

Pictures and postcards were made of Ralph and Mrs. Braun's act, showing Ralph, in good form, legs fully extended, tail curled, diving toward Mrs. Braun, **[**3]** who is shown in profile holding the bottle.

Mrs. Braun had signed a release authorizing Aquarena Spring's use of the picture. The release provided that
> I [Jeannie Braun] in consideration of the fact that I am employed and paid by Aquarena, Inc., agree as part of my employment that all photos taken of me can be used by Aquarena Springs and their advertising and publicity agents.  It is to be understood that all photographs are to be in good taste and without embarrassment to me and my family.

In May 1977 an editor of the "Chic Thrills" section, Henry Nuwer, went to the amusement park and saw Ralph and Mrs. Braun.  He saw the postcard and

thought that it should be included in "Chic Thrills." In keeping with *Chic's* strict policy of obtaining the consent of persons whose pictures appear in "Chic Thrills," Mr. Nuwer called Ms. Jennifer Benton, Aquarena's public relations director, and requested transparencies or negatives of Ralph. Ms. Benton, who was not familiar with *Chic*, inquired about the nature of the magazine. Mr. Nuwer testified at trial that he told Ms. Benton that *Chic* was a men's magazine containing men's fashion, travel and humor. According [**4] to Mr. Nuwer, "the idea of nudity never came up." According to Ms. Benton, Mr. Nuwer never mentioned that it was a men's magazine but told her that the magazine was a "fashion magazine" with travel articles in it and that it had "the same clientele that would read a *Redbook* [*248] or *McCall's*."[1] Ms. Benton thereafter sent some negatives to Mr. Nuwer and the picture was run, with caption, in the December 1977 issue of *Chic*.[2]

On the same page on which Mrs. Braun's picture appeared were stores about "10 Things That P . . . Off Women" with an accompanying cartoon of a woman whose large breasts [**5] are partially exposed; a story entitled "Mammaries Are Made of This" about men whose breasts have been enlarged by exposure to a synthetic hormone, with an accompanying cartoon showing a man with large breasts; and a story entitled "Chinese Organ Grinder" about the use of sexual organs from deer, dogs and seals as a Chinese elixir. On the facing page is a picture showing a nude female model demonstrating navel jewelry and an article on "Lust Rock Rules" about a "throbbing paean" to sex written by "the Roman Polanski of rock." The cover of the issue shows a young woman sitting in a chair with her shirt open so as partially to reveal her breasts, one hand to her mouth and other hand in her tightly-fitting, unzipped pants.

Mrs. Braun learned of her inclusion in *Chic* on November 23, 1977, when she stopped at a drive-in grocery store in Maxwell, Texas, which lies between San Marcos and her home town of Lockhart, Texas. She walked into the store and a stranger walked up to her and said, "Hey, I know you," explaining that he recognized her from her picture in *Chic*. Mrs. Braun stated that

> . . . He went and got the magazine. And I stood there because I was really really [**6] terrified. I thought something is going to happen, my picture is not in this magazine. My legs were like jelly, I couldn't untrack. I was petrified. And he was thumbing through these pictures. I was raised in a private Catholic school and I had never seen anything like this. And I was terrified, I didn't know what he had in mind. I thought something horrible was going to happen to me. He flipped through that book and my picture was in that book. I didn't believe it. I stood there like a dummy.

Mrs. Braun testified that she "was very upset" and "felt like crawling in a hole and never coming out." She stated that she did not want to return to work, and that she suffered "embarrassment and humiliation."[3]

II.

Three weeks after she discovered her picture in *Chic*, Mrs. Braun filed this lawsuit against Larry Flynt, [**7] the publisher, and *Chic*, alleging invasion of privacy, slander and libel. The Brauns sought $100,000 actual and $1,000,000 punitive damages.

Trial was held April 19-20, 1982,[4] [**8] before a six-person jury. The jury returned damages for defamation of $5,000 actual and $25,000 punitive and damages for invasion of privacy of $15,000 actual and $50,000 punitive for a total of $95,000. In answering twelve special interrogatories,[5] the jury found, based on a preponderance of the evidence, that "a false impression as to Mrs. [*249] Braun's reputation, integrity or virtue" had been created and that *Chic* knew or should have

---

[1] The same clientele indeed; in the sense that both sets of readers were featherless bipeds.

[2] The caption read: "SWINE DIVE -- A pig that swims? Why not? This plucky porker performs every day at Aquarena Springs Amusement Park in bustling San Marcos, Texas. Aquarena staff members say the pig was incredibly easy to train. They told him to learn quick, or grow up to be a juicy ham sandwich."

[3] *Chic* presented evidence to the jury showing that Mrs. Braun participated as a "barrel racer" at a local rodeo on the same night that she discovered her picture in *Chic*.

[4] The case was tried twice. At the conclusion of the evidence in the first jury trial in February 1982, the court dismissed Larry Flynt upon his motion for a new trial. When the jury was unable to arrive at a verdict, the court declared a mistrial.

Mrs. Braun's husband, Ed Braun, in whose name the case was brought, did not seek damages and none were awarded him. Texas does not recognize a relational right to privacy or to recover for defamation. *Moore v. Charles B. Pierce Film Enterprises*, 589 S.W.2d 489, 491 (Tex.Civ.App.1979).

[5] *See* Appendix with special interrogatories.

known that such a false impression was created; that *Chic* had acted willfully and with reckless disregard for Mrs. Braun's reputation by publishing her picture; that *Chic* had "published Mrs. Braun's picture in a manner highly offensive to a reasonable person" and that *Chic* had not received valid consent from Aquarena Springs to publish the picture.

*Chic* filed timely notice of appeal under 28 U.S.C. § 1291.

III.

We turn initially to the determination of whether *Chic's* publication of Mrs. Braun's picture with piglet merits protection under the rigorous first amendment standard applied to publications regarding public figures. If such protection were due, as *Chic* strenuously claims, the verdict below would have to be reversed.

The protection due publishers by the first amendment against claims of libel has progressed from the first "modern" case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), through *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), and subsequent cases. It is clear that publications alleged to constitute invasions of privacy merit the same constitutional protections as do publications alleged to be defamatory. *Campbell v. Seabury Press*, 614 F.2d 395, 397 (5th Cir.1980); *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S. Ct. 465, 42 L. Ed. 2d 419 (1974). **[\*\*9]** We hold that *Chic's* publication of Mrs. Braun's picture is not entitled to constitutional protection under those standards.

*New York Times v. Sullivan* established that where public officials seek damages for libel there must be a showing of publication with " 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80, 84 S. Ct. at 726. In sum, a showing of mere negligence in publishing an untruthful and defamatory article would no longer suffice to support damages in libel actions brought by a public official.

In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967), the Supreme Court extended *New York Times v. Sullivan's* "actual malice" standard to defamation cases brought by public figures. Various definitions of what constitutes a public figure were offered. Public figures include those who have assumed an "influential role in ordering society" or one who has "relinquished . . . [his or her] interest in the protection of [his or her] own good name. . . ." Also, public figures include those who are "intimately involved **[\*\*10]** in the resolution of important public questions, or, by reason of their fame, shape events in areas of concern to society at large." 388 U.S. at 164, 87 S. Ct. at 1996 (1967) (Warren, C.J., concurring in result). In *Gertz*, which laid to rest consideration of the newsworthiness of the publication in determining the standard of liability, [6] the Court set forth the following rubric:

> That designation [as public official/public figure] may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular **[\*250]** public controversy and thereby becomes a public figure for a limited range of issues.

418 U.S. at 351, 94 S. Ct. at 3012-13.

**[\*\*11]** Under these various definitions, Mrs. Braun clearly was not a public figure. It is true that she voluntarily undertook a public job; however, the mere fact that she had limited public exposure does not suffice to expose her to the increased burdens and lessened protections of those who fall within the *Gertz* standard. She was involved in no public controversy and had no hand in determining the outcome of any important public issues. She certainly cannot be said to have relinquished interest in protecting her name and reputation by force of her limited role as an entertainer. "A private individual is not automatically transformed into a public figure just by becoming involved in or

---

[6] This alternative consideration had been forwarded by the Court primarily in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971), in Justice Brennan's plurality opinion, which held that the *New York Times v. Sullivan* "actual malice" standard should extend to cases involving private persons if the publication involved matters of general or public interest. "If a matter is a subject of public or general interest, it cannot become less so merely because a private individual is involved, or because in some sense the individual did not voluntarily choose to become involved." 403 U.S. at 43, 91 S. Ct. at 1819. *Gertz* rejected *Rosenbloom's* basis, finding that the "self-help" available to public persons to combat false publication was not available to private persons and that the public figure has, in most instances, willingly invited "attention and comment" whereas the private person has not. 418 U.S. at 344-45, 94 S. Ct. at 3009.

associated with a matter that attracts public attention." *Wolston v. Reader's Digest Assn, Inc.*, 443 U.S. 157, 167, 99 S. Ct. 2701, 2707, 61 L. Ed. 2d 450 (1979).

We therefore conclude that Mrs. Braun is a private individual and that *Chic* is not entitled to the protection of the first amendment applicable to public figures as such standard was enunciated by *New York Times v. Sullivan* and its progeny.

IV.

In determining the standard to be applied here, we start with **[\*\*12]** the premise that *Gertz* leaves to the states the task of defining a standard of liability for the defamation of a private individual. The states are not free, however, to impose liability without fault, nor are they free to award compensation greater than the actual injury suffered by a plaintiff. 418 U.S. at 348-49, 94 S. Ct. at 3011-12.

Because the prospect of punitive damage awards might tend to inhibit the exercise of legitimate first amendment rights, the Court in *Gertz* held that the states could not allow such awards in the absence of recklessness or actual knowledge of falsity. The states' interest in protecting private individuals from defamation was held not to extend to "securing for plaintiffs . . . gratuitous awards of money damages far in excess of any actual injury." *Id.* at 349, 94 S. Ct. at 3012. *Gertz* allows only those remedies which go "no farther than is necessary to protect the legitimate interest involved." *Id.*

In this case, we are faced with a single wrongful publication which has given rise to two separate causes of action under Texas law. Moreover, the plaintiff was allowed to recover damages under both theories **[\*\*13]** even though the two actions contain identical elements of damages. It has become obvious, with the expansion of privacy law, that a "false light" invasion of privacy action will often arise from the same circumstances which yield a cause of action for defamation. Federal courts have frequently noted the similarities between the two causes of action and have often carried over elements of state defamation law into their consideration of false-light invasion actions. *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir.1983); *Fogel v. Forbes, Inc.*, 500 F. Supp. 1081, 1088 (E.D.Pa.1980); *Cibenko v. Worth Publishers, Inc.*, 510 F. Supp. 761, 766 (D.N.J.1981).

The policy which motivates the holding of *Gertz* requires that there be only a single recovery where the same items of damages are alleged under both defamation and invasion of privacy theories. We must, therefore, look to the jury awards in this case to determine if Mrs. Braun has been doubly compensated for her injuries. Although we recognize that the principal element of injury in a defamation action is impairment of reputation, while an invasion of privacy claim is founded **[\*\*14]** on mental anguish, under Texas law, Mrs. Braun was entitled to recover actual damages for mental anguish under both causes of action. *Wood v. Hustler Magazine, Inc.*, No. H-81-186, F. Supp. (S.D.Tex. Mar. 1, 1983); *First State Bank v. Ake*, 606 S.W.2d 696, 705 (Tex.Civ.App.1980). She was also entitled to recover actual damages for the impugnment of her reputation under either theory. *See Time, Inc. v. Hill*, 385 U.S. 374, 386 n. 9, 87 S. Ct. 534, 541 n. 9, 17 L. Ed. 2d 456 (1967). **[\*251]** The elements of damages allowed under the two actions are overlapping. [7]

**[\*\*15]** Having examined the jury instructions and the special verdict in this case, we find that the elements constituting the basis of damages of each of the two causes of action were not sufficiently distinguished from one another to assure that there was no double compensation. Indeed, from the evidence offered on the damage issue, it is, as a practical matter, impossible to distinguish between damages Mrs. Braun suffered from defamation and from invasion of privacy. Very little evidence was offered to show that Mrs. Braun's reputation in her community actually was harmed by the publication, nor was there evidence of tangible economic damage to Mrs. Braun. The evidence supporting the award of damages in this case deals almost exclusively with Mrs. Braun's personal pain and suffering over the appearance of her photograph in *Chic*. Thus it would appear that the jury, in making the

---

[7] The jury in this case was instructed as follows with respect to damages:

> In order to recover damages to compensate for the defamation, Mrs. Braun must show that she has suffered or will suffer an impairment of her reputation or standing in her community, personal humiliation or mental anguish and suffering as a direct result of the publication of her picture in *Chic*.
>
> . . . .
>
> If you find that Mrs. Braun's privacy was wrongfully invaded, then you may consider an award of compensatory damages. Do not consider the elements of the cause of action for defamation in awarding damages for invasion of privacy. In awarding compensatory damages, you may consider Mrs. Braun's personal humiliation, mental anguish and suffering.

award based on Mrs. Braun's defamation cause of action, was primarily compensating her for the embarrassment and humiliation she suffered, the same harms for which the jury was instructed to compensate her under the invasion of privacy cause of action. The $5,000 award for defamation was made in response [**16] to an interrogatory regarding damage to reputation; however, the jury was instructed that it could consider Mrs. Braun's personal humiliation, mental anguish and suffering making both the defamation and invasion of privacy awards. Because of the manner in which the jury was instructed, it is impossible for us to determine to what exact extent the compensatory damage awards are overlapping. In view of the jury instructions, however, and the evidence presented, we are convinced that there is a substantial likelihood that the defamation award, at least in part, was intended to compensate Mrs. Braun for harms also compensated for by the invasion award.

With respect to punitive damages awarded for loss of reputation, we are persuaded beyond any doubt that they duplicate those awarded for invasion of privacy. The conduct upon which each award was based is the same: *Chic's* misrepresentations to the personnel of Aquarena Springs and its reckless disregard for the false impression its publication created of Mrs. Braun. *See infra* IV.B. Additionally, public policy reasons which support the award of punitive damages in libel actions do not justify punitive damages under both causes [**17] of action; that is, punitive damages seek to punish and to prevent future occurrences of a type of conduct, and here, punitive damages on one cause of action clearly fulfills that purpose. Indeed, it is doubtful whether we could ever uphold an award of punitive damages for both invasion of privacy and defamation based on the same reckless conduct.

Given our determination that there can be only a single recovery for any item of damages in a case such as this one, we are compelled to remand the case for a new trial on damages. To do so is the only way to guarantee that Mrs. Braun is compensated to the fullest extent allowed by law. On the evidence presented in the record before us, however, it appears that Mrs. Braun, on retrial, would be able to prove only nominal damages for loss of reputation independent of that for which she has been compensated for invasion of privacy. If so, retrial would be futile. This decision, however, is not one which we are free to make for the plaintiff; but the plaintiff has the alternative of accepting [*252] the compensatory damage award with respect to one of her causes of action. We can uphold one of the awards without running afoul of the [**18] rights of *Chic* against a double recovery. This is true because the jury was appropriately instructed with respect to the actual elements of damages allowable separately under each cause of action; it is merely the confluence of the two which infects the verdict and award in this case. We would, therefore, be able to uphold an entry of judgment on one of the compensatory awards and the correlative punitive damages if the jury's verdict is otherwise supportable in law and fact. Because the facts of this case and the nature of the damages suffered -- primarily, personal humiliation, embarrassment, pain and suffering -- fit more precisely the "false light" invasion of privacy theory than they do the defamation theory, we review the invasion of privacy award. [8] If Mrs. Braun elects to waive her right to retrial, no further appeal by *Chic* will be necessary. We accordingly do not reach the various challenges which *Chic* raises to the defamation award. *See, e.g., National Bank of Commerce v. Shaklee Corp.*, 503 F. Supp. 533 (W.D.Tex.1980); *Synercom Technology, Inc. v. University Computing Co.*, 474 F. Supp. 37 (W.D.Tex.1979).

[**19] V.

The question to which we now turn is whether the evidence supports the jury verdict finding *Chic* liable to Mrs. Braun for invasion of privacy under Texas law. In our analysis, because of the paucity of Texas cases concerning false-light invasion of privacy and because of the similarity of the two causes of action, we will, as have other jurisdictions, rely to some extent on Texas defamation cases.

A.

There are four separate and distinct causes of action under Texas law which spring from the individual's right of privacy. *Justice v. Belo Broadcasting Corp.*, 472 F. Supp. 145 (N.D.Tex.1979). *See Billings v. Atkinson*, 489 S.W.2d 858 (Tex.1973); *Gill v. Snow*, 644 S.W.2d 222 (Tex.App.1982). The branch of privacy law under which Mrs. Braun recovered involves the right of an individual to be free from publicity which places her in a false light in the public eye. The *Restatement (Second) of Torts* §

---

[8] Our conclusion in this regard is amply buttressed by the jury verdict which focused primarily on damages for invasion of privacy. Of course, if Mrs. Braun does waive her right to retrial, she has the right to insist that she should receive the maximum compensation permitted by our holding.

652(e) (1977) provides that:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if [**20]
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

The special verdict indicates that the jury found both that *Chic* published Mrs. Braun's picture in a manner highly offensive to a reasonable person, that *Chic* acted in wilful or reckless disregard of Mrs. Braun's right to be free from unwarranted publicity, and that *Chic's* publication created a false impression of Mrs. Braun. *See* Appendix. Having examined the record, we hold that a reasonable jury could conclude that Mrs. Braun's right to privacy under Texas law had been violated.

B.

Although we find no Texas cases directly on point, our examination of Texas defamation law and the law of privacy in other states which have adopted the Second Restatement formulation, as Texas has, [9] convinces us that *Chic* is liable to Mrs. Braun for its publication of her picture.

 [**21]

 [*253]  Although under Texas law the court must make a threshold determination whether the complained-of publication is capable of conveying defamatory or false meaning, *Golden Bear Distribution Sys. v. Chase Revel, Inc.*, 708 F.2d 944 (5th Cir.1983), whether the publication does actually place the subject in a false light and whether that false light would be highly offensive to a reasonable person are questions of fact. *Rinsley v. Brandt*, 700 F.2d at 1307; *Martin v. Municipal Publications*, 510 F. Supp. 255 (E.D.Pa.1981); *Raymer v. Doubleday & Co.*, 615 F.2d 241, 246 (5th Cir.) *cert. denied*, 449 U.S. 838, 101 S. Ct. 115, 66 L. Ed. 2d 45 (1980) (libel action; applying Texas law). The Texas Supreme Court set forth the standard in *Cotulla v. Kerr*, 74 Tex. 89, 11 S.W. 1058 (Tex.1889):

> In the absence of doubt or ambiguity growing out of the language used in the publication, we understand it to be the duty of the court to determine and instruct the jury whether or not it is libelous; but, where there is uncertainty or doubt, it is the duty of the court to give the jury [**22] a definition of what is a libel, and leave it for the jury to say whether the offense has been proved.

*Id.* at 1059.

Although *Chic* urges the contrary position, we hold that the evidence in this case supports the conclusion that the publication of Mrs. Braun's picture in the "Chic Thrills" section of the magazine was fully capable of conveying a false impression of Mrs. Braun. Similarly we are unpersuaded by *Chic's* argument that no reasonable person would find the publication of Mrs. Braun's picture in that context to be both false and highly offensive. Having examined the evidence presented, we hold that a reasonable person could have arrived at the same conclusion as did the jurors in this case. In reaching our conclusion, we have remained ever mindful that we sit as a court reviewing the verdict of Mrs. Braun's peers; we do not, cannot, and should not sit as jurors whose job it is ultimately to determine whether the publication was false and offensive.

C.

*Chic* urges that its publication of Mrs. Braun's picture was substantially true and that Mrs. Braun failed to establish falsity, a necessary element of the false-light invasion of privacy action. [**23] *Chic* argues that the picture and caption should have been considered by the jury separately and apart from the other portions of the magazine in determining whether they created a false impression of Mrs. Braun. This argument was raised before the district court in *Chic's* motion in limine to exclude from the jury the "unrelated contents" of the magazine. The court denied the motion and held that the entire magazine could be considered by the jury. Thus, in determining whether Mrs. Braun was presented in a false light, we must decide whether the picture of her should have been considered in isolation or in the context of the entire magazine.

In *Golden Bear Distribution Sys. v. Chase Revel, Inc., supra*, the plaintiff Golden Bear Distributing Systems of Texas brought suit for defamation against the defendant's magazine, *Entrepreneur*, arising from an article which, by confusing Golden Bear of Texas with Golden Bear of California, created the *impression* that Golden Bear of Texas had engaged in various

---

[9] *Justice v. Belo Broadcasting Corp.*, 472 F. Supp. at 146-47.

fraudulent investment practices. The article had, in fact, stated that only Golden Bear of California had defrauded investors, but in the *context* **[\*\*24]** of the article the accusation spilled over onto Golden Bear of Texas.

The defendant in *Golden Bear* first argued, as here, that only the portion of the article dealing with Golden Bear of Texas was relevant and secondly, that because those sections relating to Golden Bear of Texas were true, the article could not be considered defamatory.

This court rejected both arguments. First, we held that the *entire* article must be submitted to the jury and that the sections pertaining to Golden Bear of Texas must be considered in context. "The allegedly defamatory publication must be construed as a whole. If a defamatory **[\*254]** meaning *may* exist, . . . the court must allow the jury to determine whether an ordinary reader would perceive the statement as defamatory. *See Raymer v. Doubleday & Co.*, 615 F.2d 241, 246 (5th Cir.) *cert. denied*, 449 U.S. 838, 101 S. Ct. 115, 66 L. Ed. 2d 45 (1980) (applying Texas law)." 708 F.2d at 948. [10]

**[\*\*25]** Second, in considering whether the truth of the limited sections of the article pertaining to Golden Bear of Texas was an absolute defense to liability, this court said that "although the individual statements printed in the article, if read out of context, were true, the jury found that their *overall effect* was defamatory." 708 F.2d at 949. (Emphasis added.)

The pertinent facts and circumstances alleged here are that Mrs. Braun's picture was placed without her consent in a magazine devoted exclusively to sexual exploitation and to disparagement of women. Mrs. Braun contends, and the jury implicitly found, that the ordinary reader automatically will form an unfavorable opinion about the character of a woman whose picture appears in *Chic* magazine. [11] It was appropriate, therefore, to introduce the entire magazine so that the jury could, in effect, be placed in the position of the ordinary reader. Additionally, as we have learned from *Golden Bear*, the truth of the pictures depends upon the overall impression created by them in the context in which they were published.

**[\*\*26]** According to *Chic's* argument, context has no bearing on whether Mrs. Braun was libeled; we should cut out Mrs. Braun's picture and look solely at it to determine whether she had been defamed or cast in false light. Common sense dictates that the context and manner in which a statement or picture appears determines to a large extent the effect which it will have on the person reading or seeing it.

Texas law supports a realistic view which not only allows but requires presentation of proof which comports with the world outside the courtroom. That is where and how the alleged defamation occurred. If the construction which the ordinary reader would give to Mrs. Braun's picture depended solely on her picture, then the proof should have been limited solely to her picture. That is not the case, however. We cannot therefore find that the court erred in admitting the entire magazine into evidence. [12]

**[\*\*27]** D.

---

[10] *See also H.O. Merren & Co. v. A.H. Belo Corp.*, 228 F. Supp. 515, 518 (N.D.Tex.1964), *aff'd*, 346 F.2d 568 (5th Cir.1965); *Taylor v. Houston Chronicle Publishing Co.*, 473 S.W.2d 550, 554 (Tex.Civ.App.1971); *Hedgpeth v. Garman*, 136 S.W.2d 641, 642 (Tex.Civ.App.1939), *rev'd on other grounds*, 138 Tex. 73, 157 S.W.2d 139 (1941) (alleged defamatory publication "must be considered as a whole and in light of all pertinent facts and circumstances alleged in connection therewith"); *Times Publishing Co. v. Ray*, 1 S.W.2d 471, 473 (Tex.Civ.App.1927), *aff'd*, 12 S.W.2d 165 (Tex.1929) (alleged libels must be considered with "reference to their settings").

[11] *Chic* argues that no ordinary reader would assume Mrs. Braun to be unchaste or promiscuous on the basis of its publication of her picture. Even if this were true, the jury might have found that the publication implied Mrs. Braun's approval of the opinions expressed in *Chic* or that it implied Mrs. Braun had consented to having her picture in *Chic*. Either of these findings would support the jury verdict that the publication placed Mrs. Braun in a false light highly offensive to a reasonable person.

[12] A related issue pertaining to exclusion of the other portions of the magazine involves exclusion under Fed.R.Evid. 403, which allows the court in its discretion to bar relevant evidence whose "probative value is substantially outweighed by the danger of unfair prejudice. . . ." It is true that *Chic qua Chic* was not on trial. It is also true that the evidentiary impact of the other portions of the magazine was significant, but we cannot say that it was *unfairly* prejudicial so as to outweigh its probative value. Here, as in *Golden Bear*, the context was everything. The court instructed the jury that it was not to be "governed by bias, prejudice, sympathy, or public opinion. . . ." We do not find that the court erred in refusing to exclude the magazine under Rule 403.

*Chic* urges that under Texas's law of defamation, consent by an individual to publication of his or her picture for commercial purposes is a defense to libel. *Kimbrough v. Coca-Cola, Inc.*, 521 S.W.2d 719, 721 **[*255]** (Tex.Civ.App.1975). As stated in PROSSER, LAW OF TORTS § 18 at 101 (4th ed. 1971), consent viewed more acutely is not a defense per se but "goes to negative the existence of any tort in the first instance." As Prosser goes on to note, however: "If the plaintiff manifests consent to the defendant's act under a mistake as to its nature or character, the consent will still be effective, unless the defendant is aware of the mistake and takes advantage of it, as where he has misrepresented the matter to the plaintiff." *Id.* at 105.

The jury expressly found that Mr. Nuwer misrepresented the true nature of the magazine to Ms. Benton and that consent was not obtained. [13] **[**28]** While there was some dispute as to the exact nature of Mr. Nuwer's representation, sufficient evidence was presented at trial to support the jury's finding. [14]

*Chic* cites Virginia, [15] Oregon [16] and New York [17] cases for the proposition that, because the jury found that consent was deceitfully induced, rather than exceeded, Mrs. Braun's action lies not in defamation or libel, but must be brought against Aquarena Springs for breach of the consent given by Mrs. Braun to it.

No Texas case **[**29]** is cited on this point, nor have we found authority for this proposition. The gist of the argument, as we (we think) understand it, is that Mrs. Braun gave her release to Aquarena, qualified by the proviso that any pictures (and, implicitly, the use of any pictures) not be embarrassing to her or her family. Aquarena, by allowing itself to be misled by *Chic*, violated the terms of that release and is therefore liable to Mrs. Braun. Any cause of action against *Chic* should have been brought by Aquarena.

We decline to accept this tortuous, casuistic argument. The question here is not one of agency or privity or of other relationships among the parties. The question is whether *Chic* had consent to publish. Aquarena, acting in good faith and on the basis of the information the jury determined had been given to it by *Chic*, gave fraudulently induced consent, which is the legal equivalent of no consent. *See DeVall v. Strunk*, 96 S.W.2d 245, 246 (Tex.Civ.App.1936). All of *Chic's* tap dancing aside, *Chic* published the picture with no consent; Mrs Braun was placed in a false light, and *Chic* cannot now hide behind Aquarena's skirts.

VI.

**[**30]** *Chic* contests, in addition to its liability under Texas law, the reasonableness of the amount of the jury award against it and the propriety of awarding punitive damages under the circumstances of this case.

A.

*Chic* argues that Mrs. Braun presented such meager evidence of actual damages she suffered as a result of *Chic's* invasion of her privacy that the monetary award of $15,000 should not stand. Based on the evidence contained in the record, however, we cannot find that the jury's verdict on the invasion of privacy claim was unjustifiable. Mrs. Braun testified to embarrassment and humiliation and presented evidence that her work had suffered as a result of the publication of her picture. Her employer noted that there was "a difference in her emotional stability." Mrs. Braun was, and is, a respectable woman **[*256]** with a respectable, if unusual, job. Through deception, *Chic* obtained her picture and placed it in a magazine of nationwide circulation devoted to the publication of lewd pictures of women and to sexual exploitation. Her picture appeared in a section of the magazine containing vulgar cartoons and jokes. Her testimony makes it amply clear that **[**31]** Mrs. Braun in fact suffered a great deal of personal humiliation, extreme embarrassment, and shock as a result of the publication.

*Gertz* requires that "all awards must be supported by competent evidence concerning the injury."

Actual injury is not limited to out-of-pocket loss.

---

[13] *See* Appendix, special interrogatory number 9. *See also Wood v. Hustler Magazine, Inc., supra*, at - for a discussion of the elaborate, though there insufficient, measures by which *Hustler*, a companion Larry Flynt publication to *Chic*, obtains consent.

[14] The court instructed the jury that if it believed that Mr. Nuwer informed Ms. Benton that *Chic* was a men's magazine, then it had to find that Aquarena had a duty to obtain Mrs. Braun's specific consent to publication of the picture. Apparently the jury did not believe Mr. Nuwer.

[15] *Falwell v. Penthouse International, Ltd.*, 521 F. Supp. 1204 (W.D.Va.1981).

[16] *Castagna v. Western Graphics Corp.*, 38 Or. App. 403, 590 P.2d 291 (1979).

[17] *McAdam v. The Ridge Press, Inc.*, 57 A.D.2d 763, 394 N.Y.S.2d 202 (N.Y.App.Div.1977).

Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. . . . There need be no evidence which assigns an actual dollar value to the injury.

418 U.S. at 350, 94 S. Ct. at 3012.

Texas courts have consistently held that "the amount of damages in a defamation suit is left largely to the discretion of the jury. . . . Such damages are purely personal and cannot be measured by any fixed rule or standard." *First State Bank v. Ake*, 606 S.W.2d at 702. "The award of damages is within the province of the jury and should not be disturbed unless there is clear showing of excessiveness or impropriety on the part of the jury." *Reicheneder v. Skaggs Drug Center*, 421 F.2d 307, 313 (5th Cir.1970). Applying **[\*\*32]** this same standard to the invasion claim as we believe Texas courts would do, no showing of excessiveness or impropriety has been made here, and we will not disturb the jury's verdict.

B.

We next turn to the punitive damages awarded by the jury for invasion of privacy. Questions have been raised about the propriety of punitive damages in libel actions in the wake of *Gertz*. These questions have their origin in the somewhat ambiguous statement found in *Gertz* that "states may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." 418 U.S. at 349, 94 S. Ct. at 3011. These words would seem to indicate that at least as far as the Supreme Court was then concerned, the appropriateness of punitive damages was an open question. A reading of the entirety of the opinion, however, convinces us that *Gertz* allows punitive damages to be awarded in libel actions where the publisher acts recklessly or with malice. In addition to the above "double negative," the Court does go on to say that "it is necessary to restrict defamation plaintiffs *who do not prove knowledge* **[\*\*33]** *of falsity or reckless disregard for the truth* to compensation for actual injury." *Id.* (emphasis added). Further, *Gertz* notes that

> punitive damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions. They are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence . . . . the private defamation plaintiff who establishes liability under a less demanding standard than that stated by *New York Times* may recover only such damages as are sufficient to compensate him for actual injury.

418 U.S. at 350, 94 S. Ct. at 3012.

Unless we assume that the Court was not aware of the clear implications of what it was saying, we must assume that it intended that punitive damages are proper in libel actions upon a showing of recklessness or malice.

In *Golden Bear*, we stated that "*Gertz* . . . held that the states must require a showing of 'actual malice,' defined as ill will or reckless disregard of the falsity of the statement made, before a court may award punitive damages to private defamation **[\*\*34]** plaintiffs. . . ." 708 F.2d at 947.

Texas has interpreted *Gertz* accordingly. In *A.H. Belo Corp. v. Rayzor*, 644 S.W.2d 71, 85 (Tex.App.1982), the court stated that

> **[\*257]** if Rayzor, for purposes of this case, were a private person and not, as we have held, a public figure, . . . he would be limited to compensation for actual injury. Neither would a private individual seeking libel damages be entitled to exemplary damages, unless he proved malice. *See Gertz v. Welch*. . . .

Whether a publisher acted with malice is a jury question. *Fitzjarrald v. Panhandle Publishing Co.*, 149 Tex. 87, 228 S.W.2d 499, 505 (1950). The jury here found that *Chic* had acted in reckless disregard for Mrs. Braun's reputation in publishing her picture and returned $50,000 in punitive damages on the invasion of privacy count. Texas courts have held that, for the purpose of awarding punitive damages, malice may be inferred from the conduct of the wrongdoer as well as proved by direct evidence. *Chandler State Bank v. Dorsey*, 618 S.W.2d 113 (Tex.Civ.App.1981); *Gardner v. Kerly*, 613 S.W.2d 795 (Tex.Civ.App. 14th Dist.1981). **[\*\*35]** *See also National Bank of Commerce v. Shaklee*, 503 F. Supp. at 548-49. The testimony of members of the editorial staff of *Chic*, especially Mr. Nuwer, offers direct evidence that they acted with entire disregard for the falsity of their portrayal of Mrs. Braun. Mr. Nuwer testified that he knew that Aquarena Springs was "a family tourist attraction" and that there was "nothing obscene or lewd or indecent about the place." Yet when

asked to describe the predominant theme of *Chic* magazine, he replied, "Sexuality," and he agreed that some people could find the photographs of women contained in the magazine to be indecent. The jury was entitled to infer from these comments that Mr. Nuwer was actually aware that placing Mrs. Braun's picture in the context of *Chic* magazine would create a false impression of her.

In addition to this evidence, the jury's conclusion that *Chic* acted with malice toward Mrs. Braun is strongly supported by the evidence that *Chic* employees misrepresented the nature of the magazine to Aquarena Springs personnel in order to obtain transparencies of the picture for publication. The fact that the misrepresentations occurred **[\*\*36]** on at least two separate occasions and were made by two different *Chic* employees entitled the jury to conclude that the misrepresentations were not inadvertent or immaterial, as *Chic* argued. The jury was fully justified in concluding that the editorial staff was aware that Aquarena Springs would not have cooperated in or consented to the appearance of the picture in *Chic* if it had known the true nature of that publication. There was ample evidence that the editorial staff consciously deceived Aquarena Springs personnel for the purpose of obtaining the picture.

We recognize that because of *Gertz* and the nature of the false light invasion of privacy action, some distinctions can be drawn between an award of punitive damages in this case and the award of such damages in cases that do not implicate the first amendment. However, having decided that an award of punitive damages is appropriate in this case, we believe that the five factors set forth in *Maxey v. Freightliner Corp.*, 665 F.2d 1367 (5th Cir.1982) (en banc), are appropriate criteria by which to judge the amount of the award. [18] With respect to the quantum of punitive damages, we note that **[\*\*37]** awards of three times actual damages generally have not been considered excessive in this circuit. *Miley v. Oppenheimer & Co.*, 637 F.2d 318 (5th Cir.1981). The award in this case is only slightly more than three times the amount of punitive damages. [19]

Moreover, the conduct of *Chic* in obtaining the cooperation of the personnel of Aquarena Springs is precisely **[\*258]** the type of conduct for which awards of punitive damages are most appropriate; that is, there is a strong public interest in discouraging the repetition of such conduct. After reviewing the evidence in this case in the light of the five factors set out in *Maxey*, we are convinced that the award of punitive damages is reasonable.

**[\*\*38]** VII.

We note that *Chic* has raised a number of other claims of error committed below. While we do not address each in turn, we do note that many overlap with the issues which have been addressed specifically. We find no merit in any of the remaining contentions. [20]

In summary, we hold that there can be no duplicative awards of damages arising from a single publication merely because that publication yields causes of action under state law for both defamation and invasion of privacy. Because of the court's instructions and the nature of the evidence presented in this particular case, we cannot say that the damage awards are not duplicative. In particular, we are not convinced that the jury's award for loss of reputation **[\*\*39]** is supported by any facts independent of those which establish damages for invasion of privacy, that is, embarrassment and humiliation as a result of the publication; furthermore, we are convinced that the punitive damages award for loss of reputation cannot stand, as it lacks any basis of support independent of the punitive award for invasion of privacy. In order to ensure a proper verdict we are compelled to vacate and remand for retrial with respect to the entire damages issue. However, as we have indicated, we believe that such a retrial would be fruitless. If Mrs. Braun waives her right to retrial on this narrow issue, the district court is instructed to enter judgment for Mrs. Braun on the jury verdict as it relates to actual and punitive damages for invasion of privacy.

---

[18] The five factors are: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability involved, (4) the situation and sensibilities of the parties, and (5) the extent to which defendant's conduct offends a public sense of justice and propriety. 665 F.2d at 1377.

[19] In *Golden Bear*, punitive damages of $20,000 were upheld where actual damages were $30,000. 708 F.2d at 947.

However, in that case the conduct of the defendant publisher did not approach the level of recklessness and active deception as has been attributed to *Chic* here.

[20] "Nothing . . . in the First or Fourteenth Amendments requires that in a libel action an appellate court treat in detail by written opinion all contentions of the parties. . . ." *Time, Inc. v. Firestone*, 424 U.S. 448, 463, 96 S. Ct. 958, 969, 47 L. Ed. 2d 154 (1976).

VACATED and REMANDED.

APPENDIX TO OPINION

RECORD ON APPEAL -- VOLUME I

No. 82-1235 -- Braun v. Flynt

PAGE 000020-000023

1. Do you find that *Chic* defamed Mrs. Braun?

    Answer yes or no: yes

2. Do you find that the picture published by *Chic* left a false impression as to Mrs. Braun's reputation, integrity or virtue?

    Answer yes or no: yes

    If you answered **[**40]** No. 1 and No. 2 "yes," answer No. 3.

3. Do you find that *Chic* knew or should have known that the impression left was false?

    Answer yes or no: yes

4. What sum of money, if paid now in cash, will fairly and reasonably compensate Mrs. Braun for the damage to her reputation?

    Answer in dollars and cents or none: $5,000.00
    If you answered No. 3 "yes", answer No. 5.

5. Do you find that *Chic* acted in willful or reckless disregard of Mrs. Braun's reputation by publishing her picture?

    Answer yes or no: yes

6. What sum of money, if paid now in cash, should be awarded against *Chic* as exemplary or punitive damages for injuring Mrs. Braun's reputation?

    Answer in dollars and cents or none: $25,000.00

7. Do you find that *Chic's* publication of Mrs. Braun's picture created a false impression of her or was an unauthorized appropriation of her picture, reputation or accomplishments?

    Answer yes or no: yes

8. Do you find that *Chic* published Mrs. Braun's picture in a manner highly offensive to a reasonable person?

    Answer yes or no: yes **[**41]**

 **[*259]** 9. Do you find that *Chic* received a valid consent from Aquarena Springs to publish Mrs. Braun's picture? In answering this question, consider whether Mr. Nuwer misrepresented the nature of the magazine.

    Answer yes or no: no

10. What sum of money, if paid now in cash, will fairly and reasonably compensate Mrs. Braun for the invasion of her privacy?

    Answer in dollars and cents or none: $15,000.00

11. Do you find that *Chic* acted in willful or reckless disregard of Mrs. Braun's right to be free from unwarranted publicity?

    Answer yes or no: yes

12. What sum of money, if paid now in cash, should be awarded against *Chic* as exemplary or punitive damages for invading Mrs. Braun's privacy?

    Answer in dollars and cents or none: $50,000.00

**Concur by:** POLITZ

## Concur

POLITZ, Circuit Judge, specially concurring:

I concur in the result insofar as it relates to the invasion of privacy claim, but would reach and specifically address defamation and reverse as to that issue. The truth of the matter published is a defense to a defamation action. *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S. Ct. 958, 47 L. Ed. 2d 154 (1976); **[**42]** *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 498-499, 95 S. Ct. 1029, 1047-1048, 43 L. Ed. 2d 328 (1975) (Powell, J., concurring). It is conceded that the report regarding Ralph the diving pig and Mrs. Braun was factually accurate and that neither the picture nor the caption was distorted or offensive. That factual accuracy and non-distortion forecloses consideration of the issue of damages based on alleged defamation.

**End of Document**