## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ROY STEWART MOORE, et al

                Plaintiffs,

v.

SACHA NOAM BARON COHEN, et al

               Defendants.

**Index No. 19 Civ. 4977**

## NOTICE OF APPEAL

Plaintiffs Roy Stewart Moore and Kayla Moore hereby appeal to the U.S. Court of Appeals for the Second Circuit the District Court's  July 13, 2021 Order and Memorandum Opinion granting Defendants' Motion for Summary Judgment and all other orders and rulings adverse to Plaintiffs in this matter.

**Dated**: July 13, 2021                     Respectfully Submitted,

                              /s/ *Larry Klayman*
                             Larry Klayman, Esq.
                             KLAYMAN LAW GROUP P.A.
                             2020 Pennsylvania Ave NW # 800
                             Washington, D.C. 20006
                             (561) 558-5536
                             Email: leklayman@gmail.com

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on July 13, 2021.

*/s/ Larry Klayman*
Larry Klayman, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                    :

ROY STEWART MOORE and KAYLA MOORE,    :
                    :

            Plaintiffs,    :
                    :          19 Civ. 4977 (JPC)
       -v-             :
                    :      OPINION AND ORDER
SACHA NOAM BARON COHEN et al.,     :
                    :
           Defendants.    :
                    :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Roy Stewart Moore, the former Chief Justice of the Alabama Supreme Court, was

tricked into participating in an interview with Defendant Sacha Noam Baron Cohen on February

14, 2018.  Expecting to receive an award in Washington, D.C. for his support of Israel, Judge

Moore alleges that he was instead met with extreme and outrageous questioning from Cohen.  The

interview later aired on television as part of a comedy series that was broadcast by Defendants

Showtime Networks, Inc. ("Showtime") and CBS Corporation ("CBS").  Judge Moore and his

wife, Kayla Moore, allege intentional infliction of emotional distress and fraud, and Judge Moore

alone additionally pleads a claim of defamation.

      Defendants have moved for summary judgment, arguing that Plaintiffs' claims are barred

by both a waiver clause in the agreement that Judge Moore signed prior to the interview and also

by the First Amendment of the U.S. Constitution.  The Court agrees that Judge Moore's claims are

barred by the unambiguous contractual language, which precludes the very causes of action he

now brings.  Although Kayla Moore was not a signatory to that contract, her claims are barred by

the First Amendment.  Accordingly, Defendants' motion is granted in its entirety.

# I.  Background

## A.  Factual Background[1]

Judge Moore ran as a candidate for the U.S. Senate in 2017.  Pls. Counter-Rule 56.1 Stmt. ¶¶ 1, 3.  During the campaign, several published articles accused Judge Moore of inappropriate sexual encounters with young females, including one who was underage at the time, Defs. Rule 56.1 Stmt. ¶ 4, accusations that Plaintiffs strongly dispute and maintain were uncorroborated by any reputable source, Pls. Counter-Rule 56.1 Stmt. ¶ 4.  Judge Moore lost the election on December 12, 2017.  Pls. Counter-Rule 56.1 Stmt. ¶ 5.  Not long after, Judge Moore and his wife, Kayla Moore, were invited to Washington, D.C., purportedly for Judge Moore to receive an award for his support of Israel.  Defs. Counter-Rule 56.1 Stmt. ¶ 7.

Plaintiffs flew from Alabama to Washington, D.C. on February 13, 2018, and were transported by a car service to their hotel.  Pls. Counter-Rule 56.1 Stmt. ¶¶ 39, 41.  The interview took place the next day, on February 14, 2018, at a different hotel.  *Id.* ¶¶ 45, 51.  Before the

---

[1] The following facts are primarily taken from the parties' filings pursuant to Local Civil Rule 56.1.  On February 8, 2021, Defendants filed their statement of undisputed facts pursuant to Local Civil Rule 56.1, Dkt. 117 ("Defs. Rule 56.1 Stmt."), and on March 15, 2021, Plaintiffs filed their Rule 56.1 statement, which responded to Defendants' proffered undisputed facts and contained Plaintiffs' own statement of undisputed facts, Dkt. 126 at 1-25 ("Pls. Counter-Rule 56.1 Stmt."); Dkt. 126 at 25-29 ("Pls. Rule 56.1 Stmt.").  On April 15, 2021, Defendants filed a response to Plaintiffs' Rule 56.1 Statement.  Dkt. 129 ("Defs. Counter-Rule 56.1 Stmt.").

In responding to the undisputed facts proffered in Defendants' Rule 56.1 statement, Plaintiffs repeatedly deny facts without citation to admissible evidence to controvert as required by Local Civil Rule 56.1(d).  For instance, Plaintiffs deny Defendants' relatively innocuous factual proffer of Cohen's career as "a comedian and political satirist," Defs. Rule 56.1 Stmt. ¶ 11, by unhelpfully stating only that "Cohen is simply a fraudster," Pls. Counter-Rule 56.1 Stmt. ¶ 11, even though their Complaint alleges Cohen to be "an actor, comedian, screenwriter, and producer," Dkt. 1 ("Compl.") ¶ 10.  Courts routinely deem admitted those facts "not contradicted by citations to admissible evidence."  *Russel v. Aid to Developmentally Disabled, Inc.*, 416 F. Supp. 3d 225, 227 n.3 (E.D.N.Y. 2017), *aff'd*, 753 F. App'x 9 (2d Cir. 2018).  The Court therefore disregards Plaintiffs' denials that lack citation to evidence, *see Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003); *Lozada v. Cty. of Nassau*, No. 16 Civ. 6302 (JS), 2021 WL 1209740, at *6 n.6 (E.D.N.Y. Mar. 31, 2021), and has conducted its own independent review of the record supplied in connection with Defendants' motion to ensure that any facts relied upon in this Opinion and Order have adequate support.

interview, Judge Moore, in his wife's presence, signed an agreement titled the "Standard Consent Agreement," Dkt. 113-5 ("SCA"), with an entity called Yerushalayim TV ("YTV"). Pls. Counter-Rule 56.1 Stmt. ¶¶ 67-69. This agreement purports to waive numerous potential claims related to the interview, and, as discussed in greater detail below, includes a handwritten modification purportedly made by Judge Moore. *Id.* ¶ 76.

The interview was conducted by Cohen, who was dressed up and acting in the role of an Israeli "Anti-Terrorism Expert" named "Gen. Erran Morad." Defs. Rule 56.1 Stmt. ¶¶ 31, 52; Dkt. 112-2 ("Episode 3 Video"); Pls. Counter-Rule 56.1 Stmt. ¶ 50. At the time, Plaintiffs did not know that Defendants were involved in the interview, including that Cohen was actually the interviewer. Defs. Counter-Rule 56.1 Stmt. ¶ 11. Cohen first asked Judge Moore about Alabama's "strong connection with Israel," before proceeding to describe technology used by the Israeli military to combat terrorism. Defs. Rule 56.1 Stmt. ¶ 55; Episode 3 Video. Cohen discussed one specific device which he claimed the Israeli army employs to uncover tunnels used by terrorists to launch attacks. Defs. Rule 56.1 Stmt. ¶ 56; Episode 3 Video. Cohen explained that the device also can detect certain enzymes that are secreted only by "sex offenders and particularly pedophiles." Defs. Rule 56.1 Stmt. ¶ 57; Episode 3 Video. Retrieving this device, a black wand-like object, Cohen commented that "because neither of us are sex offenders, then it make absolutely nothing [sic]." Defs. Rule 56.1 Stmt. ¶¶ 58-59; Episode 3 Video. But when Cohen moved the wand closer to Judge Moore, the gadget seemed to emit a beeping noise. Defs. Rule 56.1 Stmt. ¶ 60; Episode 3 Video. Cohen then hit the device against his hand, stating that the device "must be faulty," before asking Judge Moore if he might have lent his jacket to someone else. Defs. Rule 56.1 Stmt. ¶ 61; Episode 3 Video. After declaring that he has been "married for 33 [years] – and never had an accusation of such things," Judge Moore left the hotel room, ending the interview. Defs. Rule 56.1 Stmt. ¶¶ 62-63; Episode 3 Video. As Judge Moore exited the room, Cohen maintained, "I am not

saying you are a sex offender at all."  Defs. Rule 56.1 Stmt. ¶ 63; Episode 3 Video.

This segment was aired as part of Episode 3 of *Who Is America?*, a comedy series in which Cohen plays fictional characters "from across the political spectrum" while conducting interviews with various individuals (the "Program").  Defs. Rule 56.1 Stmt. ¶¶ 25, 52; Pls. Counter-Rule 56.1 Stmt. ¶ 50.  The series touched on various political issues in America, with Cohen interviewing various former and current politicians, lobbyists, and rights activists.  Defs. Rule 56.1 Stmt. ¶¶ 30-38.  The first episode featured a discussion with a U.S. Senator, during which a disguised Cohen offered his economic proposal of "hav[ing] 100% of the people" put "in the one percent" to address economic disparity and showed the Senator a document purportedly created by the "International Institute of Truth and Knowledge" as support for his proposal.  *Id.* ¶ 30; Dkt. 112-2 ("Episode 1 Video").  That same episode also featured Cohen, in his "Erran Morad" character, promoting to several lobbyists and politicians his idea for "Kinderguardians", a program that would entail arming children as young as three years old with firearms to defend against school shootings.  Defs. Rule 56.1 Stmt. ¶¶ 31-34; Episode 1 Video.  On another episode of *Who Is America?*, Cohen, again as "Erran Morad", interviewed a former Vice President of the United States.  Defs. Rule 56.1 Stmt. ¶¶ 37-38; Dkt. 112-2 ("Episode 2 Video").  After discussions of prior international conflicts and enhanced interrogation, Cohen produced his "waterboarding kit" and asked the former Vice President to sign it.  Defs. Rule 56.1 Stmt. ¶ 38; Episode 2 Video.

Cohen created, co-produced, and co-wrote the Program, while Showtime aired and distributed it.  Pls. Counter-Rule 56.1 Stmt. ¶ 26; Defs. Rule 56.1 Stmt. ¶¶ 26-27.  CBS is the parent company of Showtime.  Defs. Rule 56.1 Stmt. ¶ 73.

## B.  Procedural Background

This case was filed on September 5, 2018, in the United States District Court for the District of Columbia.  Plaintiffs allege that Judge Moore was fraudulently induced by "Defendant Cohen

and his agents[,] including Defendants Showtime and CBS," into agreeing to be interviewed. Compl. ¶¶ 11, 15.  The Complaint asserts Plaintiffs would never have come to Washington, D.C., nor would Judge Moore have appeared in the Program, had they known the truth about the nature of the Program and the identity of its producers and broadcasters.  *Id.* ¶¶ 15-16.  Both Plaintiffs plead claims of intentional infliction of emotional distress and fraud.  *Id.* ¶¶ 33-48.  Judge Moore also brings a defamation claim, asserting that Cohen "falsely painted, portrayed, mocked, and with malice defamed" him "as a sex offender."  *Id.* ¶ 18; *see id.* ¶¶ 26-32.

On April 29, 2021, the Honorable Thomas F. Hogan of the United States District Court for the District of Columbia transferred venue to this District pursuant to 28 U.S.C. § 1404(a) based on the SCA's forum-selection clause.  *See* Dkt. 34, Dkt. 52-3; SCA ¶ 6.  Upon transfer, the case was assigned to the Honorable Andrew L. Carter, Jr.

Defendants filed a motion to dismiss on September 12, 2019, arguing in part that the SCA bars Plaintiffs' claims.  *See* Dkt. 50, Dkt. 51 at 9-16.  Judge Carter denied the motion at a court conference on July 2, 2020, explaining that, at the motion to dismiss stage, he could not consider Defendants' extrinsic evidence of their relationship to the SCA's signatory, YTV.  Dkt. 88 at 2-4. At another conference later that month, Judge Carter ordered discovery to commence.  Dkt. 86 at 8-10.

The case was reassigned to the undersigned on September 29, 2020.  Defendants requested a pre-motion conference on November 13, 2020, explaining that they had produced all discovery relating to their corporate relationship with YTV and intended to move for summary judgment and to seek a stay of discovery pending disposition of that motion.  Dkt. 90.  On December 3, 2020, the Court stayed most discovery, but allowed limited discovery on the issues raised in the instant motion for summary judgment: whether either the SCA or the First Amendment precludes

Plaintiffs' claims.  Dkt. 96 ("12/3/2020 Tr.") at 40.[2]

Defendants filed their motion for summary judgment and supporting documents on February 8, 2021.  Dkts. 111, 112, 113, 114, 115, 116 ("Motion"), 117.  Plaintiffs opposed the motion on March 15, 2021.  Dkts. 124 ("Opposition"), 125, 126.  Defendants filed their reply on April 5, 2021.  Dkts. 127 ("Reply"), 128, 129.

## II.  Applicable Legal Standards

### A.  Rule 56 of the Federal Rules of Civil Procedure

Under Federal Rule of Civil Procedure 56, a movant seeking summary judgment must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A moving party may show that there is no genuine issue of material fact "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim."  *Id.* at 114 (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

In considering whether Defendants have met this burden, the Court "construe[s] the evidence adduced . . . in the light most favorable to plaintiff's case."  *Holcomb v. Iona College*,

---

[2] Plaintiffs' counsel has repeatedly asserted that the Court's decision to stay discovery pending disposition of this motion somehow contravened earlier rulings of Judge Carter, which counsel has characterized as "law of the case."  *See* 12/3/2020 Tr. at 5, 7, 25; Dkt. 105 at 30; Opposition at 25.  "[T]he law of the case doctrine," however, "does not abrogate this Court's discretion over case management and its ability to modify prior scheduling orders."  *City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345 (AJN) (KHP), 2019 WL 11662228, at *1 (S.D.N.Y. Oct. 24, 2019).  Further, in denying Defendants' motion to dismiss because of Defendants' reliance on extrinsic evidence, Judge Carter made clear that Defendants may "raise the issues addressed" in that motion "in a subsequent motion for summary judgment."  Dkt. 75.

521 F.3d 130, 132 (2d Cir. 2008).  If a motion for summary judgment is "properly supported by documents or other evidentiary materials," the nonmoving party "may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise . . . must set forth 'specific facts' demonstrating that there is a 'genuine issue for trial.'"  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed R. Civ. P. 56(e) (amended in 2010)); *see also Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## B.  The Canon of Constitutional Avoidance

Defendants present two independent arguments for dismissal:  Plaintiffs' claims are barred by the waiver language in the SCA and the claims fail under the First Amendment.  It is well settled that "federal courts should, where possible, avoid reaching constitutional questions." *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149-50 (2d Cir. 2001), *certified question accepted*, 96 N.Y.2d 931 (2001), *and certified question answered*, 98 N.Y.2d 198 (2002).  Therefore, a court must strive to resolve the issues before it on the basis of state law, which may "render decisions on federal constitutional questions unnecessary."  *Id.* (citing *Bell v. Maryland*, 378 U.S. 226 (1964)); *see also Caviezel v. Great Neck Pub. Sch.*, 739 F. Supp. 2d 273, 282 (E.D.N.Y. 2010) ("[F]ederal courts endeavor to avoid deciding constitutional questions whenever a case or controversy may be decided on other grounds"), *aff'd*, 500 F. App'x 16 (2d Cir. 2012).

The Court therefore first applies New York contract law to attempt to resolve Defendants' motion based on the waiver provisions of the SCA, and only turns to Defendants' First Amendment arguments if necessary.  As discussed below, the Court treats each Plaintiff's causes of action separately because only Judge Moore signed the SCA.  While Judge Moore's claims can be resolved by application of state law to the SCA, Kayla Moore's claims require this Court to consider constitutional issues.

## III.  Judge Moore's Claims

### A.  Relevant Principles of Contract Interpretation Under New York Law

Under New York law,[3] "a valid release constitutes a complete bar to an action on a claim which is the subject of the release."  *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (quoting *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011)).  "If 'the language of a release is clear and unambiguous, the signing of a release is a "jural act" binding on the parties.'"  *Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 276 (quoting *Booth v. 3669 Delaware*, 92 N.Y.2d 934, 935 (1998)).  Once a defendant meets "the initial burden of establishing that it has been released from any claims, a signed release 'shifts the burden of going forward . . . to the [plaintiff] to show that there has been fraud, duress or some other fact which will be sufficient to void the release.'"  *Id.* (alterations in original) (quoting *Fleming v. Ponziani*, 24 N.Y.2d 105, 111 (1969)).

"[T]he question of whether a written contract is ambiguous is a question of law for the court."  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009).  In resolving this issue, the Court must first "determine[] from the face of the agreement, without reference to extrinsic evidence," whether the contract is ambiguous.  *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (quoting *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)).  A contract is ambiguous when "the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the

---

[3] The forum-selection provision of the SCA, which Judge Hogan applied to transfer the case to this District, states that the substantive laws of New York apply to any claims "in connection with the Program or its production."  SCA ¶ 6.  The claims at issue are covered by this language, and both parties apply New York law in their briefs.  The Court therefore applies New York law.  *See, e.g.*, *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000) ("The parties' briefs assume that New York law controls this dispute, and such implied consent . . . is sufficient to establish choice of law." (alteration in original) (internal quotation marks and citation omitted)).

context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.'" *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).  This Court must "give effect to the *expressed* intentions of the parties; [t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* at 467 (alteration in original) (internal quotation marks and citations omitted).  Further, "[a] court should not find contract language ambiguous . . . on the basis of the interpretation urged by one party where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." *Psenicska v. Twentieth Century Fox Film Corp.*, No. 07 Civ. 10972 (LAP), 2008 WL 4185752, at *4 (S.D.N.Y. Sept. 3, 2008), *aff'd*, 409 F. App'x 368 (2d Cir. 2009).  "[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *L. Debenture Tr. Co. of N.Y.*, 595 F.3d at 468 (alteration in original) (quoting *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569-70 (2002)).

### B.  Defendants May Enforce the Standard Consent Agreement

The preamble to the SCA provides that the agreement is between "Yerushalayim TV (including its assigns, licensees, parents, subsidiaries, and affiliates) (collectively, the 'Producer') and the undersigned participant (the 'Participant')."  SCA at p.1.  Defendants have submitted corporate documents, declarations, and deposition testimony demonstrating that they all fall within the term "Producer" as defined by the SCA.  This evidence, which has not been controverted, establishes that Cohen was the sole member of the limited liability corporations that own YTV, therefore making him a "parent[]" of YTV for purposes of the SCA.[4]  The uncontroverted evidence

---

[4] Cohen is the sole member of Please You Can Touch, LLC ("PYCT").  *See* Dkt. 114-21; Dkt. 114-22; Dkt. 114-23; Dkt. 114-7 (Deposition of Sacha Baron Cohen ("Cohen Deposition")) at 30; Dkt. 114-9 (Deposition of Jenifer Wallis ("Wallis Deposition")) at 22.  PYCT is the sole

also establishes that YTV's parent companies, La Quinta and PYCT, licensed the Program to Showtime, thereby similarly making Showtime and its parent company, CBS, "licensees" of YTV and thus "Producer[s]" under the SCA.  Dkt. 112 (Declaration of Brendan Countee) ¶¶ 3-7; Dkt. 112-1; Dkt. 113 (Declaration of Todd Schulman ("Schulman Declaration")) ¶ 5.

Plaintiffs contend that they "were only given extremely limited discovery as to the corporate ownership of YTV," while failing to cite to admissible evidence in their Counter-Rule 56.1 Statement.  Opposition at 19; *see, e.g.*, Pls. Counter-Rule 56.1 Stmt. ¶ 21 (citing "[in]adequate knowledge of the actual [sic] of the corporate entities used to defraud Judge Moore" and invoking Rule 56(d)).  Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may defer considering the motion or deny it" or "allow time to obtain affidavits or declarations to take discovery."  Fed R. Civ. P. 56(d).  Plaintiffs have not filed such an affidavit, and "[t]his failure alone is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate."  *Mattel, Inc. v. AnimeFun Store*, No. 18 Civ. 8824 (LAP), 2021 WL 765766, at *2 (S.D.N.Y. Feb. 26, 2021) (internal quotation marks and citations omitted).  But regardless, the parties were granted several months of discovery, including six weeks of discovery largely focused on this very issue, 12/3/20 Tr. at 29-30, 40, and Plaintiffs deposed multiple individuals with knowledge of the corporate relationship between YTV and Defendants*, see* Cohen Deposition; Schulman Deposition; Wallis Deposition, and received document discovery on this issue, *see* Dkt. 114 (Declaration of Elizabeth A. McNamara) ¶¶ 12-25, Exhs. 10-23.[5]  Plaintiffs had ample

---

member of La Quinta Entertainment, LLC ("La Quinta").  *See* Dkt. 114-19; Dkt. 114-18; Wallis Deposition at 22; Dkt. 114-8 (Deposition of Todd Schulman ("Schulman Deposition")) at 34.  La Quinta is the sole member of Greenpark Television, LLC ("Greenpark").  *See* Dkt. 114-15; Dkt. 114-16; Wallis Deposition at 22; Schulman Deposition at 33.  Greenpark is the sole member of YTV.  *See* Dkt. 114-11; Wallis Deposition at 21-22; Schulman Deposition at 33.

[5] Plaintiffs questioned Cohen at his deposition about his role in these corporate entities.

opportunity to develop and come forward with evidence to challenge Defendants' ability to enforce the SCA, and they have failed to do so.

The Court therefore finds that Defendants all fall within the scope of the "Producer" under the SCA.

## C. The Standard Consent Agreement Expressly Waives All Claims Brought by Judge Moore

The Court begins with the plain language of the SCA that Judge Moore signed to determine whether he has waived the causes of action he now brings. The Court concludes he has. Not only does the SCA set forth a clear waiver of any claims "related to the Program," but the contract even enumerates certain waived claims, including the very three pleaded in this case. Paragraph 4 of the SCA reads:

> [Judge Moore] specifically, but without limitation, waives, and agrees not to bring at any time in the future, any claims against the Producer, or against any of its assignees or licensees or anyone associated with the Program, which are related to the Program or its production, or this agreement, including, but not limited to, claims involving assertions of . . . (h) **infliction of emotional distress** (whether allegedly intentional or negligent), . . . (m) **defamation** (such as any allegedly false statements made in the Program), . . . (p) **fraud** (such as any alleged deception about the Program or this consent agreement) . . . .

SCA ¶ 4 (emphases added); *see* Compl. ¶¶ 26-32 (defamation), 33-38 (intentional infliction of emotional distress), 39-48 (fraud). In fact, the Complaint does not plead any cause of action in addition to these three claims. *See Salinger v. Salinger*, 4 N.Y.S.3d 81, 83 (App. Div. 2015) ("Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used." (quoting *Ayers v. Ayers*, 938 N.Y.S.2d 572, 574 (App.

---

Cohen Deposition at 30-31. Plaintiffs also deposed two non-parties with direct knowledge as to the agreements signed by YTV, as well as the relevant corporate documents. They deposed Todd Schulman, who was an Executive Producer and a Director for *Who is America?* and was responsible for executing agreements on behalf of YTV. *See* Schulman Declaration ¶¶ 1, 8; *see generally* Schulman Deposition. And they deposed Jenifer Wallis, an attorney who created YTV and had knowledge of the corporate relationships between YTV and the parent companies linking Cohen to YTV. *See* Wallis Deposition at 38, 51-56; Dkt. 114-10.

Div. 2012)).

Confronted with these unambiguous waivers of his only causes of action, Judge Moore turns to language he apparently struck through in another provision of Paragraph 4, which concerns an entirely different potential cause of action, "intrusion or invasion of privacy."  SCA ¶ 4(f). With this modification, the provision reads that Judge Moore waives any claims related to the Program

> involving assertions of . . . (f) intrusion or invasion of privacy (such as any
> allegedly sexual-oriented or offensive behavior or questioning) . . . .

*Id.*[6]  Judge Moore contends that this alteration somehow modifies the entire SCA to permit him to bring the causes of action alleged in the Complaint.   The Court disagrees.

The modification to Paragraph 4(f) of the SCA at most reflects an agreement of the parties to exempt from waiver an intrusion or invasion of privacy claim based on "any allegedly sexual oriented or offensive behavior or questioning."  But Judge Moore has not brought such a claim. And the modification does not pertain to the three causes of action—defamation, intentional infliction of emotion distress, and fraud—that Judge Moore in fact has pleaded.  Those claims, as discussed above, are expressly waived by the introductory language of Paragraph 4 and then specifically identified in subsections (h), (m), and (p).  Simply put, the parties' apparent agreement to modify the scope of the waiver as to one specific claim, *i.e.*, intrusion or invasion of privacy, has no effect on the agreement's waiver of claims relating to entirely different causes of action, *i.e.*, defamation, intentional infliction of emotional distress, and fraud.  *See Woodard v. Reliance Worldwide Corp.*, No. 18 Civ. 9058 (RA), 2019 WL 3288152, at *4 (S.D.N.Y. July 22, 2019) ("The modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement *while leaving*

---

[6] Judge Moore's initials, "RSM," are handwritten alongside the modification.  SCA ¶ 4(f); Pls. Counter-Rule 56.1 Stmt. ¶ 76.  While the parties do not provide any details as to when or how this portion of the contract was struck out, both parties assume that Judge Moore signed the contract with this amendment included.  Defs. Counter-Rule 56.1 Stmt. ¶ 1.

*the balance of it intact.*" (emphasis added) (quoting *Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 717-18 (App. Div. 1980)), *aff'd*, 819 F. App'x 48 (2d Cir. 2020).[7]

The Court also rejects Judge Moore's argument that the SCA expresses the intent of Defendants to agree "not to put forth '*any* allegedly sexual oriented or offensive behavior or questioning.'"  Opposition at 17.  "A court may not write into a contract conditions the parties did not insert, or, under the guise of construction, add or excise terms, and it may not construe the language in such a way as would distort the apparent meaning."  *Salinger*, 4 N.Y.S.3d at 83 (internal quotation marks and citations omitted).  There is no language in the SCA that obligated Defendants to refrain from any particular conduct or questioning during the course of the interview.  *See Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 277 ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." (internal quotation marks and citation omitted)).  To the contrary, the SCA provides that Judge Moore "is signing this agreement with no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program."  SCA ¶ 5.

### D. The Standard Consent Agreement's Waiver Language Is Not an Unenforceable General Release

Plaintiffs further challenge the waiver language in Paragraph 4 of the SCA by characterizing it as a general release and arguing that the release "does not extend to claims that a party does not know or suspect at the time of executing the release."  Opposition at 13.  This argument too fails.

---

[7] Plaintiffs argue that "[i]f the intent was truly to only limit the amendment to intrusion or invasion of privacy claims, then [the amendment] should have said something like, 'intrusion or invasion of privacy claims involving allegedly sexual oriented or offensive behavior or questioning.'"  Opposition at 7.  But it is irrelevant in what other ways the contract could have been amended.  Judge Moore only struck out the phrase beginning with "such as," which followed the mention of an "intrusion or invasion of privacy" claim.

As an initial matter, the SCA is far more specific than agreements that courts have identified as general releases.  *See, e.g.*, *Hui-Wen Chang v. N.Y.C. Dep't of Educ.*, 412 F. Supp. 3d 229, 244 (E.D.N.Y. 2019) (a plaintiff agreeing to "release and forever discharge . . . any and all claims . . . whatsoever, known or unknown, which RELEASOR had, now has or hereafter can, shall or may have"); *Rivera v. Wyckoff Heights Med. Ctr.*, 978 N.Y.S.2d 337, 341 (App. Div. 2014) (involving a release that "forever discharge[d]" "any and all actions, causes of action, suits, . . . claims, and demands whatsoever, in law, admiralty or equity" that the plaintiff "ever had, now has, can or may have, or claim to have, arising from or relating to" the relevant agreements and the provision of services to the plaintiff (second alteration in original)).  The release in the SCA applies to "any claims . . . which are related to the Program or its production, or this agreement," and goes on to enumerate a non-exhaustive list of waived claims.  SCA ¶ 4.

But even assuming *arguendo* that the SCA is a general release, New York courts routinely enforce such releases "where it is directly or circumstantially evident that the purpose is to achieve a truly general settlement."  *Mangini v. McClurg*, 24 N.Y.2d 556, 562 (1969).  The validity of a general release "depends on the controversy being settled and upon the purpose for which the release was actually given, and a general release may not be read to cover matters which the parties did not desire or intend to dispose of."  *Rivera*, 978 N.Y.S.2d at 341.  Courts typically look to "the terms of the release" and whether it "clearly and unambiguously encompass[es] the causes of action asserted in the . . . action."  *Kulkarni v. Arredondo & Co., LLC*, 56 N.Y.S.3d 351, 352 (App. Div. 2017); *see also Mateo v. Carinha*, 799 F. App'x 51 (2d Cir. 2020) ("The language of the notably broad General Release is clear on its face.  In such cases, court should generally interpret the contract without reference to extrinsic evidence . . . .").

The release language in the SCA "clearly and unambiguously encompass[es]" the claims brought by Judge Moore, and does so with specificity.  In very plain terms, Judge Moore waived

14

certain identified claims related to the Program, including the three claims that he has brought.  As mentioned above, courts routinely enforce similar, if not broader, releases.  *See Bihag v. A&E Television Networks, LLC*, 669 F. App'x 17, 18-19 (2d Cir. 2016); *Shapiro v. NFGTV, Inc.*, No. 16 Civ. 9152 (PGG), 2018 WL 2127806, at *6-9 (S.D.N.Y. Feb. 9, 2018); *RBS Holdings, Inc. v. Wells Fargo Cent., Inc.*, 485 F. Supp.2d 472, 478 (S.D.N.Y. 2007); *Klapper v. Graziano*, 41 Misc. 3d 401, 405-09 (N.Y. Sup. Ct. 2013), *aff'd*, 10 N.Y.S.3d 560 (App. Div. 2015).

**E.  The Standard Consent Agreement Precludes Judge Moore's Fraudulent Inducement Argument**

Judge Moore further asserts that the SCA is void because Defendants fraudulently induced him into signing the contract by misrepresenting the nature of the Program and the identity of the participating parties.  Compl. ¶¶ 11, 15-16; Opposition at 8-13.  Two provisions of the SCA foreclose this argument.

First, Judge Moore disclaimed reliance on the same representations that he now alleges fraudulently induced him to enter into the agreement.  Paragraph 5 of the SCA provides:

> the Participant acknowledges that in entering into [this agreement], the Participant is not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any other Participants, cast members, or other persons involved in the Program.  Participant is signing this agreement with no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program.

SCA ¶ 5.

To invalidate a contract, a plaintiff "must 'establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury.'"  *Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 276 (quoting *Glob. Mins. & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 214 (App. Div. 2006)).  Under New York law, when a "contract states that a contracting party disclaims the existence of or reliance upon *specified* representations,

15

that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 488 (S.D.N.Y. 2017) (quoting *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993)).  This requires that the agreement "contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim." *Mfrs. Hanover Tr. Co.*, 7 F.3d at 316.

Paragraph 5 is such an explicit disclaimer.  In signing the SCA, Judge Moore affirmed that he was "not relying upon any promises or statements made by anyone about the nature of the Program or the identity, behavior, or qualifications of any" other individuals who were participating in the Program.  SCA ¶ 5.  Judge Moore further affirmed that he had "no expectations or understandings concerning the conduct, offensive or otherwise, of anyone involved in this Program." *Id.*  This explicit language disclaims Judge Moore's "reliance upon *specified* representations," which forecloses him from now claiming "that he was defrauded into entering the contract in reliance on those representations." *PetEdge, Inc.*, 234 F. Supp. 3d at 488 (quoting *Mfrs. Hanover Tr. Co.*, 7 F.3d at 315).

The Honorable Loretta A. Preska reached this same conclusion when she considered substantially identical language in a release and dismissed claims brought by individuals featured in Cohen's 2006 film, *Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan*. *See Psenicska*, 2008 WL 4185752, at *4.  The relevant language before Judge Preska stated that "Plaintiff has not relied 'upon any promises or statements made by anyone about the *nature of the Film* or the *identity* of any other Participants or persons involved in the Film.'" *Id.* at *6 (citation omitted).  Like here, the plaintiffs in *Psenicska* argued that the waivers they signed should not be enforced because they were fraudulently induced by misrepresentations as to the nature of the production and identities of the defendants.  *Id.* at *5-6.  Judge Preska rejected this argument, finding that "a Plaintiff may not claim to have relied on a statement upon which he or

she has explicitly disclaimed reliance." *Id.* at *6; *see id.* (explaining that accepting the plaintiffs' arguments that the defendants had a duty to disclose the true nature of the film "would empower these Plaintiffs to avoid the clear wording of their own contracts in a manner [the court] must decline to condone under well-settled New York law").   Here, too, Judge Moore disclaimed reliance on the very "promises or statements" that he now relies on to argue fraudulent inducement.

Second, Plaintiffs' fraudulent inducement allegations are also foreclosed by the specific fraud waiver under Paragraph 4(p) of the SCA.   *See* SCA ¶ 4(p).   Not only does Paragraph 4(p) waive "any claims . . . related to the Program . . . involving . . . fraud," but it even specifies that this waiver includes "any alleged deception about the Program or this consent agreement."   *Id.* Pursuant to New York law, "[w]here a party releases a fraud claim, it 'may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release.'" *Usach v. Tikhman*, No. 11 Civ. 1472 (DLC), 2011 WL 6106542, at *6 (S.D.N.Y. Dec. 7, 2011) (quoting *Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 276).   The SCA's release specifically contemplates fraud arising from "deception about the Program," SCA ¶ 4(p), and Judge Moore has failed to identify a "separate fraud" not contemplated by this release.

For these reasons, the Court grants Defendants' motion for summary judgment as to Judge Moore and dismisses his defamation, fraud, and intentional infliction of emotional distress claims. The Court next considers whether Kayla Moore's claims must also be dismissed.

### IV.  Kayla Moore's Claims

Defendants argue that the waivers contained in the SCA should apply to the claims brought by Kayla Moore as well.   Even though Kayla Moore was not a signatory to the agreement, Defendants maintain that she is "closely related" to Judge Moore and it was foreseeable that she could be bound by the contract.   Motion at 22.   While a non-signatory may be bound to the contract in certain circumstances, *see Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009), it appears

that the "closely related" doctrine has been predominantly—if not exclusively—applied in the context of forum selection clauses.  *See, e.g.*, *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013); *Highland Crusader Offshore Partners, L.P. v. Targeted Delivery Techs. Holdings, Ltd.*, 124 N.Y.S.3d 346, 352-53 (App. Div. 2020).[8]  In fact, the Second Circuit has explicitly rejected this doctrine in the context of mandatory arbitration clauses.  *See Smoothline Ltd. v. N. Am. Foreign Trading Corp.*, 249 F.3d 147, 155 n.4 (2d Cir. 2001).  Mindful of the "general principle that only the parties to a contract are bound by its terms," *Highland Crusader Offshore Partners, L.P.*, 124 N.Y.S.3d at 352, and the Complaint's allegations of injuries suffered by Kayla Moore, *see* Compl. ¶¶ 38, 48, the Court declines to apply the "closely related" doctrine to bind Kayla Moore to the SCA's waiver provisions.

That of course does not end the Court's analysis of Defendants' motion to dismiss Kayla Moore's claims of intentional infliction of emotional distress and fraud.  The Court now turns to Defendants' alternative argument that the First Amendment bars her claims because Cohen's conduct during the interview "cannot reasonably be interpreted as stating actual facts about" Judge Moore.  Motion at 23 (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990)).  The Court agrees.

## A.  Applicable First Amendment Principles

The First Amendment safeguards certain forms of speech and expressive conduct.  *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 404-05 (1989); *Spence v. Washington*, 418 U.S. 405, 409-11 (1974).  As part of these protections, the Supreme Court has placed limits on state defamation claims, requiring public officials and public figures to show that the allegedly defamatory statements were made with "'actual malice'—that is, with knowledge that it was false or with

---

[8] Defendants also cite to *Buckley v. National Freight, Inc.*, 90 N.Y.2d 210, 217 (1997), but that case is inapposite because it was specific to New York's rule against double recovery under loss of consortium claims.

reckless disregard of whether it was false or not."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280

(1964); *see Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989) ("Today,

there is no question that public figure libel cases are controlled by the *New York Times*

standard . . . .").  In *Hustler Magazine, Inc. v. Falwell*, the Supreme Court further held that an

intentional infliction of emotional distress claim brought by a public figure and alleging

reputational damage falls within the ambit of the First Amendment.  485 U.S. 46, 56 (1988); *see*

*Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (similarly finding that the defendant's speech was

entitled "'special protection' under the First Amendment" in an intentional infliction of emotional

distress claim brought by a private figure concerning a matter of public concern).  Following the

reasoning of these decisions, the Second Circuit has explained that "regardless of the claim at

issue," the "heightened First Amendment protections apply to any tort alleging reputational harm

as long as the underlying speech relates to a matter of public concern."  *Dongguk Univ v. Yale*

*Univ.*, 734 F.3d 113, 129 (2d Cir. 2013).

The Supreme Court has emphasized that under the First Amendment, liability may not

attach for "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an

individual."  *Milkovich*, 497 U.S. at 20 (alteration in original) (quoting *Falwell*, 485 U.S. at 50).

This protection of speech is necessary to "provide[] assurance that public debate will not suffer for

lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much

to the discourse of our Nation."  *Id.*; *see Old Dominion Branch No. 496, Nat'l Assoc. of Letter*

*Carriers v. Austin*, 418 U.S. 264, 284 (1974) (holding inactionable words that "cannot be construed

as representations of fact"); *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) ("[T]he thrust of

the dispositive inquiry under both New York and constitutional law is whether a reasonable

[reader] could have concluded that [the publications were] conveying facts about the plaintiff."

(second and third alterations in original) (internal quotation marks and citation omitted)).[9]

This is especially so in the context of political satire when the target of the purportedly defamatory content is a public figure, given satire's "prominent role in public and political debate." *Falwell*, 485 U.S. at 54; *see also Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 493 (2d Cir. 1989) ("We have stated the general proposition that parody and satire *are* deserving of substantial freedom—both as entertainment and as a form of social and literary criticism." (internal quotation marks and citation omitted)); Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 5:5.2, at 5-121 (5th ed. 2017) ("Humor is an important medium of legitimate expression and central to the well-being of individuals, society, and their government. Despite its typical literal 'falsity,' any effort to control it runs severe risks to free expression as dangerous as those addressed to more 'serious' forms of communication.").

The context surrounding a statement thus is important in determining whether a reasonable reader could interpret it as stating facts. *See Milkovich*, 497 U.S. at 21 (considering the "general tenor" of the article in which the allegedly defamatory statement was included); *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) (finding a newspaper's use of the word "blackmail" about the conduct of a public figure in articles reporting on "heated" town meetings was "no more than rhetorical hyperbole" where the articles were "accurate and full" and no one would think that the public figure was in fact being charged with the crime of blackmail); *Flamm v. Am. Ass'n of Univ. Woman*, 201 F.3d 144, 151 (2d Cir. 2000) (concluding that "[a] reasonable reader would not expect . . . hyperbole" in a directory of attorneys featuring concrete facts as to those professionals, which made a reader more likely to treat the description of an attorney as an "ambulance chaser"

---

[9] While the *Milkovich* Court affirmed this doctrine and found that "loose, figurative, or hyperbolic" statements are protected, there is no "wholesale" constitutional "protection for so-called 'expressions of opinion' if those expressions imply assertions of objective fact." *Levin*, 119 F.3d at 196 (quoting *Milkovich*, 497 U.S. at 18).

as fact).

"The determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual presentation is a question of law for the court." *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985); *accord McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 181 (S.D.N.Y. 2020) ("[T]he question of whether the statements at issue are statements of fact is a legal one, informed by factual context of the statements in question."). Whether the speech at issue concerns a matter of public concern is similarly for a judge to decide. *See Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983).

## B. Kayla Moore's Claims Are Barred by the First Amendment

As an initial matter, the First Amendment applies to Kayla Moore's intentional infliction of emotional distress and fraud claims. As noted above, the Second Circuit has instructed that "heightened First Amendment protections apply to any tort alleging reputational harm as long as the underlying speech relates to a matter of public concern." *Dongguk Univ.*, 734 F.3d at 129. Both of Kayla Moore's claims stem from harm to Judge Moore's reputation, Compl. ¶¶ 38, 47-48, and her fraud claim additionally alleges damages as to her own reputation, *id.* ¶ 48 ("[P]laintiffs' entire family, including Mrs. Moore, have suffered loss of reputation . . . ."). Looking at the "content, form, and context as revealed by the whole record," *Dongguk Univ.*, 734 F.3d at 130 (citing *Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)), it is clear that the Program, including the segment featuring Judge Moore, was commentary on matters of public concern. "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'" *Snyder*, 562 U.S. at 453 (quoting *Connick*, 461 U.S. at 145), "or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public,'" *id.* (quoting *San Diego v. Roe*, 543 U.S. 77, 83-84 (2004)). Cohen's conduct during the interview with Judge Moore was related

to press reports of accusations against Judge Moore of sexual misconduct involving young females, with this media coverage occurring while Judge Moore was campaigning for the U.S. Senate.  Defs. Rule 56.1 Stmt. ¶¶ 3-4, 53-54.  The episode at issue began with footage of news agencies reporting these accusations against Judge Moore, followed by a clip of a public endorsement of Judge Moore's candidacy.  *Id.* ¶ 54; Episode 3 Video.  These matters are of public concern and are therefore protected by the First Amendment.

The Court next considers whether the segment could have been "reasonably . . . interpreted as stating actual facts about" Judge Moore.  *Milkovich*, 497 U.S. at 20 (quoting *Falwell*, 485 U.S. at 50); *see Flamm*, 201 F.3d at 150 (explaining that "statements of 'imaginative expression' or 'rhetorical hyperbole'" are not actionable).  In conducting this analysis, the Court considers whether the "general tenor" of the interview "negates the impression that [the] challenged statements imply defamatory facts."  *Flamm*, 201 F.3d at 150.  Also relevant is the political and satirical nature of the segment, as such content is afforded substantial First Amendment protections.  *See Falwell*, 485 U.S. at 54-55.  Plaintiffs do not challenge the characterization of the segment as satire, and the Supreme Court has previously defined satire as "work 'in which prevalent follies or vices are assailed with ridicule,' . . . or are 'attacked through irony, derision, or wit.'"  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 581 n.15 (1994) (citations omitted).  As the D.C. Circuit in *Farah v. Esquire Magazine* noted, "[s]atire's unifying element is the use of wit to expose something foolish or vicious to criticism," and may at times "seem cruel and mocking, attacking the core beliefs of its target."  736 F.3d 528, 536 (D.C. Cir. 2013) (internal quotation marks and citations omitted).  The interview, with Cohen using a wand that supposedly detects enzymes secreted by pedophiles, Defs. Rule 56.1 Stmt. ¶ 57; Episode 3 Video, was a comment on the accusations faced by Judge Moore and falls within this genre.

Several courts have precluded claims based on reputational injury stemming from satirical publications because they did not contain statements that could be reasonably interpreted as stating facts, including in situations where the statements at issue seemed far more likely to be viewed as conveying actual facts than Cohen's patently absurd conduct during his interview of Judge Moore. For instance, the D.C. Circuit in *Farah*  held that the First Amendment barred a suit brought by the writer and the publisher of a book that questioned whether former President Barack Obama was born in the United States against *Esquire* for publishing on its blog an article falsely claiming that the book had been pulled from bookstores.  736 F.3d at 536-40.  The plaintiffs argued that "reasonable readers would take the fictitious blog post literally" and pointed to numerous inquiries the plaintiffs received following the post and *Esquire*'s update clarifying that the story was satire. *Id.* at 536.  After considering the post in context, and observing that satire is often "grounded in truth" and that the story at issue "layer[ed] fiction upon fact," the D.C. Circuit concluded that no reasonable reader could understand the story to assert actual facts about the plaintiffs.  *Id.* at 537-39.

In *New Times, Inc. v. Isaacks*, the Supreme Court of Texas similarly found that a satirical article—loosely based on real events that transpired at a school—was protected under the First Amendment despite the article being published as a lead story under the heading "News" in a section ordinarily "devoted to hard-hitting investigative news."  146 S.W.3d 144, 159-61 (2004). As the court noted, "[w]hile a reader may initially approach the article as providing straight news, [the article] contains such a procession of improbable quotes and unlikely events that a reasonable reader could only conclude that the article was satirical."  *Id.* at 161.

The Tenth Circuit conducted a similar analysis in *Mink v. Knox*, 613 F.3d 995 (10th Cir. 2010).  At issue in *Mink* was a criminal investigation, including the execution of a residential search, of a student who authored an editorial column under the name "Junius Puke," which

displayed edited photographs of a university professor with the similar name of Junius Peake. *Id.* at 998-99.  The Tenth Circuit found that the "editorial column addressed subjects on which Mr. Peake would be unlikely to write, in language he would be unlikely to use, asserting views that were diametrically opposed to Mr. Peake's." *Id.* at 998.  The court then held that the comments at issue "constituted satire in its classic sense," and that "a reasonable person would not take the statements in the editorial column as statements of facts by or about Professor Peake." *Id.* at 1009-10.

In light of the context of Judge Moore's interview, the segment was clearly a joke and no reasonable viewer would have seen it otherwise.  The segment began with an absurd joke (*i.e.*, "Gen. Erran Morad" boasting about once killing a suicide bomber with an iPad 4, but luckily he had purchased AppleCare), followed soon by footage of numerous news reporters commenting on the accusations brought against Judge Moore.  *See* Defs. Rule 56.1 Stmt. ¶¶ 53; Episode 3 Video. At this point, it should have been abundantly clear to any reasonable viewer that Defendants were using humor to comment on those accusations, rather than making independent factual assertions or even remarking on the truth or accuracy of the allegations.  The actual interview of Judge Moore then became even more absurd.  No reasonable viewer would have interpreted Cohen, in his over-the-top "Erran Morad" character, waving a wand that supposedly detects enzymes emitted by pedophiles in the vicinity of Judge Moore as stating facts about Judge Moore.  Nor would a viewer have reasonably believed that this gadget—which "Erran Morad" contended also was able to detect hidden tunnels used by terrorists—doubled as a device that also could detect enzymes secreted by pedophiles.

The interview therefore was not "a statement of opinion that is based on undisclosed facts," which could "imply assertions of objective fact" to the viewer. *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) (internal quotation marks and citation omitted).  Additionally, as the

24

court in *Farah* noted, political satire necessarily comments on and involves news and facts that take place in the world.  736 F.3d at 537; *see also Falwell*, 485 U.S. at 54 ("The appeal of the political cartoon or caricature is often based on exploitation of unfortunate physical traits or politically embarrassing events—an exploitation often calculated to injure the feelings of the subject of the portrayal.").  It is this type of satire—which comments on social and political news— that the Supreme Court has found to be deserving of First Amendment protections due to its effect "on the course and outcome of contemporaneous debate."  *Falwell*, 485 U.S. at 55.

And taking a step back from the Judge Moore interview segment, no viewer could have reasonably believed that *Who Is America?* was providing accurate news to its audience, unlike for instance the attorney directory in *Flamm*.  *See Flamm*, 201 F.3d at 151-52; *see also Farah*, 736 F.3d at 537-38 (emphasizing that the satirical article's "primary intended audience . . . would have been familiar with [the defendant's] history of publishing satirical stories" and therefore readers "could not reasonably have taken the story literally").  As demonstrated by videos of episodes filed in support of Defendants' motion, throughout the *Who Is America?* series, Cohen portrayed ridiculous characters conducting absurd interviews of seemingly unsuspecting individuals.  For instance, during the same episode that featured Judge Moore, Cohen also taught three men how to kidnap illegal immigrants by having one of them dress up as a teenage girl and host a fake Quinceañera celebration; he attempted to facilitate an interview between the rapper "Bone Crusher" and a former South Carolina politician; and he engaged in a rap battle in Atlanta.  Defs. Rule 56.1 Stmt. ¶¶ 64-65; Episode 3 Video.  On Episode 1 of the series, Cohen—disguised then too as the supposed anti-terrorist expert "Erran Morad"—endorsed a program that would arm children as young as three years old with firearms to defend against school shootings, and sought the support of several politicians.  Defs. Rule 56.1 Stmt. ¶¶ 31-33.  On another episode, after a brief discussion of "interrogation techniques" with a former Vice President of the United States,

Cohen admitted to waterboarding his wife and then asked the former Vice President to sign his "waterboarding kit."  Defs. Rule 56.1 Stmt. ¶ 38; Episode 2 Video.  It is simply inconceivable that the Program's audience would have found a segment with Judge Moore activating a supposed pedophile-detecting wand to be grounded in any factual basis.

Given the satirical nature of that segment and the context in which it was presented, no reasonable viewer would have interpreted Cohen's conduct during the interview as asserting factual statements concerning Judge Moore.  Because both of Kayla Moore's claims are premised on reputational damage arising from that segment, her claims are barred by the First Amendment and must be dismissed.  *See Dongguk Univ.*, 734 F.3d at 129.

### V.  Conclusion

For the reasons set forth above, the Court grants summary judgment on all claims in favor of Defendants, and dismisses Plaintiffs' claims with prejudice.

The Clerk of Court is respectfully directed to terminate the motion pending on Docket Number 111 and close this case.

Dated: July 13, 2021
      New York, New York

                            JOHN P. CRONAN
                       United States District Judge